# EXHIBIT 11

## Part I



**National Commission on Correctional Health Care**

1145 W Diversey Pkwy  
Chicago, Illinois  
60614-1318

773-880-1460 phone  
773-880-2424 fax  
www.ncchc.org

May 16, 2017

William Plantier, Director of Corrections  
Bucks County Correctional Facility  
1730 S. Easton Road  
Doylestown, PA 18901

Dear Director Plantier:

Congratulations! The National Commission on Correctional Health Care (NCCHC), upon receipt of further documentation, determined that it will continue to accredit Bucks County Correctional Facility for its compliance with NCCHC's *Standards for Health Services in Jails*. Please find the accreditation report and Certificate of Accreditation enclosed. Your health services administrator will also receive a copy of the accreditation report.

NCCHC congratulates you on your achievement and wishes you continued success in the future. It is anticipated that the next scheduled on-site survey of the facility will occur sometime before June 1, 2019. If we can be of assistance to you, please feel free to call us at any time.

Sincerely,

*[signature]* CCHP-RN

Tracey Titus, RN, CCHP-RN  
Vice President, Accreditation

Enc.

cc: Joseph V. Penn, MD, CCHP, Chair  
    Joseph Lynch

CONFIDENTIAL

Bucks-Adami-000922  
JA0000065



# ACCREDITATION UPDATE REPORT OF

# THE HEALTH CARE SERVICES AT

# BUCKS COUNTY CORRECTIONAL FACILITY

Doylestown, PA

**May 30, 2017**

National Commission on Correctional Health Care
1145 W. Diversey Pkwy.
Chicago, IL 60614-1318
(773) 880-1460

Bucks County Correctional Facility, PA
May 11, 2017
UPDATE REPORT

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system. These standards have helped correctional facilities improve the health of their inmates and the communities to which they return, increase the efficiency of their health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes and legal judgments.

On March 31-April 1, 2016 NCCHC conducted its review for continuing accreditation of the Bucks County Correctional Facility under the NCCHC *2014 Standards for Health Services in Jails*. On June 30, 2016, NCCHC granted continuing accreditation with verification. Subsequently, the RHA submitted corrective action. Additional corrective action brought the facility into full compliance. This report focuses primarily on issues that required corrective action for compliance with the standards and is most effective when read in conjunction with NCCHC's June 30, 2016 and January 31, 2018 reports.

There are 40 essential standards; 39 are applicable to this facility and 39 (100%) were found to be in compliance. One hundred percent of the applicable essential standards must be met. *The Bucks County Correctional Facility has now met this condition.*

   Essential Standards Not in Compliance
   None

   Essential Standard Not Applicable
   J-G-03 Infirmary Care

There are 27 important standards; 26 are applicable to this facility and 26 (100%) were found to be in compliance. Eighty-five percent or more of the applicable important standards must be met. *The Bucks County Correctional Facility has met this condition.*

   Important Standards Not in Compliance
   None

   Important Standard Not Applicable
   J-C-08 Health Care Liaison

Decision: On May 11, 2017, NCCHC's Accreditation Committee granted accreditation to the Bucks County Correctional Facility.

CONFIDENTIAL                                                         Bucks-Adami-000924
                                                                      JA0000067

Bucks County Correctional Facility, PA
Update Report

2

**J-C-06 Inmate Workers (E).** Inmates perform janitorial and food service tasks. They have been trained to handle biohazards and bio-hazardous materials. The HSA completes this training on an individual basis. It is documented on a checklist, which the inmate signs, and it is then scanned into the medical record.

However, by facility policy, inmates may assist correctional officers to complete various types of watches (medical, mental health and suicide prevention). We observed this during the survey, but the documentation was inconsistent. We noted more conversation between inmate observers, than observing the inmates they were assigned to monitor. Further, the correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches. The observation logs had several blank spaces.

When we brought this practice to the attention of the facility director, a corrective action was developed. All correctional staff will have a training scheduled in the immediate future to review the facility's policy regarding inmate workers. On the second day of the survey, we noted that inmates who were participating with patient watches were doing so in conjunction with correctional officers and documentation was complete. The standard is not met.

<u>Corrective action is required for Compliance Indicators #4.</u> Inmates should not be used as substitutes for regular program staff. Acceptable documentation includes a plan by the RHA on how this standard will be corrected, including any policy and procedure changes and staff training. In order to receive accreditation, verification that this standard has been met is required.

In October 2016, the RHA indicated that the forms were revised to distinguish between those used by officers and those used by inmate monitors, that the county SOP was revised in September 2016 to specify the types of watches employed at the facility and the roles of correctional officers and inmate workers, and that the captain issued a memo to shift command (to be read at each shift's roll call for several days) on the expectations of watch procedures. The memo (which included emphasis on acute watches to occur at random intervals not to exceed 15 minutes) was included, as were examples of officers' acute watch observation sheets (documenting staggered 15 minutes watches), written instructions to inmate monitors emphasizing continual watch and five-minute documentation (with new forms initiated at the change of each shift), and the necessity of reporting any unusual behavior to the module officer. The procedures include a means to ensure alternating officer and inmate monitor watches to ensure the inmate on watch is viewed every seven or eight minutes. Training acknowledgement sheets for each module (signed by the inmate monitors) were forwarded as well.

However, the monitoring described in the corrective action is not in compliance with the requirements of Standard J-G-05, Suicide Prevention Program (see corrective action under J-G-05). The standard is not met.

See March 2017 corrective action for J-G-05 Suicide Prevention Program. **The standard is now met.**

**J-G-05 Suicide Prevention Program (E).** The suicide prevention program addresses each of the 11 key components as described by the standard. The responsible health authority has approved the training curriculum for staff. Treatment plans address suicidal ideation and

CONFIDENTIAL

Bucks-Adami-000925
JA0000068

recurrence. Patient follow-up occurs as clinically indicated. Acutely suicidal inmates are placed on constant observation in the mental health unit. Non-acutely suicidal inmates are monitored on an unpredictable (staggered) schedule not exceeding 15 minutes. Patients can self refer, or be referred by staff, for possible suicidal ideation. A mental health professional evaluates the situation almost immediately.

However, by facility policy, inmates may assist correctional officers to complete various types of watches including watching other inmates on suicide precautions. We observed this during the survey, but the documentation was inconsistent. We noted more conversation between inmate observers, than observing the inmates they were assigned to monitor. Further, the correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches. The observation logs had several blank spaces.

When we brought this practice to the attention of the facility director, a corrective action was developed. All correctional staff will have a training scheduled in the immediate future to review the facility's policy regarding inmate workers. On the second day of the survey, we noted that inmates who were participating with patient watches were doing so in conjunction with correctional officers and documentation was complete. The standard is not met.

> <u>Corrective action is required for Compliance Indicator #3.</u> The use of other inmates in any way (e.g., companions, suicide-prevention aides) is not a substitute for staff supervision. Inmate companions can be used as a supplement to, but never as a substitute for, staff monitoring. The RHA should submit a plan addressing how this standard will be corrected, including policy and procedure changes and evidence of training for staff. In addition the following should also be submitted: (a) evidence of watches for both acutely and nonacutely suicidal inmates completed by health or correctional staff; and (b) a memorandum to staff indicating that suicide watches are to be completed by *staff*, with inmates only used as supplementary companions. In order to receive accreditation, verification that this standard has been met is required.

See corrective action for J-C-06 Inmates Workers. However, inmates are still used in place of officers for the watch: regular watch inmate workers is defined as occurring at staggered 15-minute intervals, with staff monitoring at 30 minute intervals. Additionally, while the acutely suicidal are monitored constantly, they are monitored by inmates, with staff monitoring every 15 minutes. The use of inmate workers may only supplement the monitoring of suicidal inmates (whether acutely or non-acutely suicidal) by trained staff. Corrective action is required.
The standard is not met.

In March 2017, the RHA submitted a revised policy and procedure (effective March 2017) that stipulates an officer will be assigned to monitor inmates on constant watch status (documenting activity every 10 minutes); there is no mention of inmate monitors. For inmates on "level 1" and "level 2" watch, an inmate monitor will be posted outside the cell and maintain constant observation (and record it every five minutes), while an officer is responsible to observe the inmate at random intervals not to exceed 15 minutes (and to document the inmate's activities). The RHA also submitted the "Watch and Observation Officer Post Order" of March 22, 2017, which directed training to occur during roll call through March 25, 2017 and the letter from the law enforcement training director to the warden confirming this has been added to the annual in-service schedule. **The standard is now met.**

CONFIDENTIAL                                                Bucks-Adami-000926
                                                                 JA0000069


National Commission on
Correctional Health Care

1145 W Diversey Pkwy    773-880-1460 phone
Chicago, Illinois       773-880-2424 fax
60614-1318              www.ncchc.org

July 11, 2016

William Plantier, Director of Corrections
Bucks County Correctional Facility
1730 S. Easton Road
Doylestown, PA 18901

Dear Director Plantier:

The Accreditation Committee of the National Commission on Correctional Health Care (NCCHC) met on June 30, 2016 to review the findings from a recent survey and to consider the accreditation status of Bucks County Correctional Facility. The Committee voted to continue the accreditation of your facility with the following qualification: that compliance be demonstrated with all of the essential standards and at least 85% of the applicable important standards. Compliance should be documented in a report and submitted to NCCHC by October 31, 2016. Enclosed is the accreditation report for your facility, listing cited standards and recommendations for achieving compliance.

The Committee acknowledged the facility's significant level of compliance with a number of NCCHC standards. However, in order to maintain your accreditation, it is important that you address the cited standards in a timely manner.

Following receipt of documentation and verification of compliance, a Certificate of Accreditation will be sent to you indicating your facility's accreditation status. Please let us know if we can be of any assistance.

Sincerely,

*Tracey Titus, CCHP-RN*

Tracey Titus, RN, CCHP-RN
Vice President, Accreditation

Enclosure

cc: Thomas L. Joseph, MPS, CAE, President & CEO
    Joseph Lynch

CONFIDENTIAL

Bucks-Adami-000927
JA0000070



ACCREDITATION REPORT OF

THE HEALTH CARE SERVICES AT

BUCKS COUNTY CORRECTIONAL FACILITY

Doylestown, PA

**June 30, 2016**

National Commission on Correctional Health Care
1145 W. Diversey Pkwy.
Chicago, IL 60614-1318
(773) 880-1460

CONFIDENTIAL

Bucks-Adami-000928
JA0000071

Bucks County Correctional Facility, PA
June 30, 2016

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system. These standards have helped correctional facilities improve the health of their inmates and the communities to which they return, increase the efficiency of their health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes and legal judgments.

On March 31 and April 1, 2016 NCCHC conducted its review for continued accreditation of this facility. We commend the facility staff for their professional conduct, assistance, and candor during the course of our review. The NCCHC's team of experienced certified correctional health professionals utilized NCCHC's 2014 *Standards for Health Services in Jails* as the basis of its health services analysis. This report focuses primarily on issues in need of correction or enhancement. It is most effective when read in conjunction with the *Standards* manual. The information in this report is privileged and confidential and is intended for the sole use of persons addressed.

There are 40 essential standards; 39 are applicable to this facility and 37 (95%) were found to be in compliance. One hundred percent of the applicable essential standards must be met. Our findings include:

    Essential Standards Not in Compliance
    J-C-06 Inmate Workers
    J-G-05 Suicide Prevention Program

    Essential Standard Not Applicable
    J-G-03 Infirmary Care

There are 27 important standards; 26 are applicable to this facility and 26 (100%) were found to be in compliance. Eighty-five percent or more of the applicable important standards must be met. Our findings include:

    Important Standards Not in Compliance
    None

    Important Standard Not Applicable
    J-C-08 Health Care Liaison

Decision: On June 30, 2016, NCCHC's Accreditation Committee awarded the facility Continuing Accreditation with Verification (CAV), *contingent* upon receiving requested compliance verification by October 31, 2016.

CONFIDENTIAL

Bucks-Adami-000929
JA0000072

Bucks County Correctional Facility, PA
June 30, 2016

I. **Facility Profile**

| | |
|---|---|
| Type of Facility: | Jail |
| Total Admissions for 2014: | 6,736 |
| Design-rated capacity: | 764 |
| Average daily population: | 1,101 |
| Average daily intake: | 22 |
| Satellites: | 2 |
| Satellite average daily population: | 249 (combined) |

Description of Facility

This county correctional facility houses pre-trial and sentenced inmates of both genders. The main building, which was constructed in 1985, consists of 10 housing areas (A through H). Two smaller locks down units are known as RHU (restricted housing unit) and MHU (medical/mental health housing unit). County caseworkers have offices on the top floor of each housing unit. A corridor off the main corridor houses the kitchen, staff and inmate dinning rooms, laundry, maintenance, classrooms, and intake area. The satellite facilities were constructed in 1991 and 1963 (men's and women's community corrections).

The housing units in the main are configured as the spokes of a wheel, with central control in the hub. Units A through E are direct supervision, with each unit having two tiers and double bunked cells. Each of the units holds up to 90 inmates. Some of the cells are triple bunked and each housing unit has a large day space with tables, televisions and showers, etc. The women's unit (F) has four cells in a separate area for lock down/segregation. The main women's housing unit is direct supervision and is also double tiered. The men's housing unit, known as G, houses those inmates with medical issues and it is a short distance away from the medical area. Health services (the Dispensary) are adjacent to central control. The restricted housing unit (RHU), is double-tiered, and is used for disciplinary segregation; inmates in segregation are secluded 23 hours per day. The mental health-housing unit (MHU) is single tiered and includes eight single cells. Inmates may be locked in or have freedom of movement outside their cells, depending on their behavior.

The satellite facility is located on the same grounds, but located outside the perimeter fencing, the community corrections building houses the men's and work release center; the women's is located in another building. These inmates are classified as minimums security and are involved in several programs. A nurse is assigned to the men's building and is available on the day and evening shift (16 hours daily) every day. Both nurses and providers see inmates in this area at sick call. A variety of treatment programs are offered, including substance abuse therapy and educational.

Within the main facility, 134 correctional officers (COs) are scheduled on duty during three, eight-hour work shifts: 57 officers assigned on the days shift, 46 on the evening shift, and 31 on the night shift. At the satellite, 17 COs are scheduled to work in a 24-hour period: six on the day and evening shifts (each), and five on the night shift.

Inmate Population Characteristics
On the day of the survey, there were 776 inmates at the main facility (663 males and 113 females), and 264 inmates at the satellite facilities (219 males and 45 females).

Bucks County Correctional Facility, PA
June 30, 2016

Facility's Health Services
A private national health services contractor has provided health services since 2013.

Staffing
Health staff is on site in the main facility 24 hours a day. A nurse has been assigned to the satellite facilities 16 hours every day, and provides services to inmates at both buildings.

## II. Survey Method

We toured the main facility and the satellites; the intake area; program areas; mental health unit; medical special housing unit; clinic areas; inmate housing areas; and segregation units. We reviewed randomly selected health records; policies and procedures; provider licenses; administrative, health staff, and continuous quality improvement (CQI) meeting minutes; statistical and environmental inspection reports; and health services personnel and officer training records. We also interviewed the warden, responsible physician, health services administrator (HSA), other health, dental, and mental health staff, 13 officers (escort, intake, housing, satellites, segregation), and 20 inmates who were selected at random.

## III. Survey Findings and Comments

### A. GOVERNANCE AND ADMINISTRATION

The standards in this section address the foundation of a functioning correctional health services system and the interactions between custody and health services authorities. Any model of organization is considered valid, provided the outcome is an integrated system of health care in which medical orders are carried out and documented appropriately and the results are monitored as indicated. Policies and procedures are to include site-specific operating guidelines.

**Standard Specific Findings**

**J-A-01 Access to Care (E).** Inmates have access to health care. Patients see a qualified clinician and receive care for their serious medical, mental health, and dental needs. They are assessed $3.00 for self-initiated services (and $5.00 for dental visits); chronic care, follow-up visits and medications are exempt from the policy. The standard is met.

**J-A-02 Responsible Health Authority (E).** The responsible health authority (RHA) is a private health care company, whose on-site representative is the full-time HSA. Overall clinical judgments rest with a designated responsible physician who is on site three eight hour days, three days per week.

Mental health services are not a component of the medical contract, and are provided by a corporate mental health vendor. The standard is met.

**J-A-03 Medical Autonomy (E).** Qualified health care professionals make decisions regarding inmates' serious medical, dental, and mental health needs in the inmates' best interests. We noted good cooperation between custody and medical and mental health staff. Administrative decisions are coordinated, if necessary, with clinical needs so that patient care is not jeopardized. The health staff is subject to the same security regulations as other facility employees. All medical staff is required to attend a security class as a component of their orientation. The standard is met.

Bucks County Correctional Facility, PA
June 30, 2016

**J-A-04 Administrative Meetings and Reports (E).** The facility administrative team, HSA, mental health staff, and representatives from the medical contractor meet quarterly to discuss administrative matters, continuous quality improvement studies, infection control reports, sentinel reports, and any additional medical concerns. Health staff meets monthly to discuss health services operations, continuous quality improvement studies, and infection control reports. In-service trainings are also conducted during these meetings. Regular attendees include the HSA, the medical director, and nursing staff. Other medical providers attend as the agenda dictates. The facility administrator is given monthly statistical reports of health services utilization, which are used to monitor trends in the delivery of health care at the facility.

The monthly 'severe persistent mental health' committee consists of the housing unit counselors, director of mental health services, HSA, and representative from the county public health office to discuss specific patient needs. Additional members from community resources who may provide assistance for patients being released from incarceration are invited as well. The standard is met.

**J-A-05 Policies and Procedures (E).** The health services policy manual, which the RHA and responsible physician last reviewed on January 28, 2016, is site-specific. Other policies, such as those for custody, kitchen, or corporate, do not conflict with health care policies, which are accessible to the health staff in the main medical area. The policies and procedures are reviewed annually at the January health staff meeting, with special focus on revised or new policies and procedures. All medical staff members annually sign to indicate their review. The standard is met.

**J-A-06 Continuous Quality Improvement Program (E).** The continuous quality improvement program (CQI) identifies health care aspects to be monitored, implements and monitors corrective action when necessary, and studies the effectiveness of the corrective action plan. The quality improvement committee includes the participation of the warden, assistant director of corrections, the responsible physician, HSA, director of nursing and the assistant director of nursing, public health department representatives, and additional representatives from the medical vendor. The committee meets monthly to identify problems, establishes thresholds, design-monitoring activities, analyzes the results of any audit/study from previous month, and re-monitors performance after implementing improvement strategies. The recommendations and discussions of the CQI meeting, as well as CQI studies themselves and medical chart audits, are also discussed monthly during the health staff meetings.

Three significant site-specific in-depth studies have been completed since the last survey. One study looked at inmates receiving detoxification therapy. There was a question among the clinicians whether inmates receiving detoxification treatment 'while in lock-down' were consistently having vital signs taken twice a day. Indicators were developed and all inmates receiving therapy had their charts monitored for three months. No issues were identified, and all inmates receiving detoxification treatment regardless of their housing assignment had their treatment plans consistently followed.

Emergency room referrals was the subject of another study. The study was completed over several months and by the end of the study, the compliance rate was 100% for all indicators studied. It remained at this compliance level when restudied several months later.

The final study looked at procedures of referring patients to specialty visits. Once all the indicators were developed and the initial chart audit was completed, medical records were studied the next

four months, with compliance for all the indicators at 90% or better. Follow-up audits showed consistent compliance. There have not been any mental health studies since 2013.

The CQI team has studied the incidence of MRSA infections over a three-year period. It looked at whether the individual came into the facility with a skin lesion, or whether the lesion developed post incarceration. The study also reviewed the housing units where the inmate was housed when the skin lesion was identified (post-incarceration). The manner in which this study was conducted and reviewed it appeared to be more of data collection rather that an outcome or process study. Trends were studied and when necessary corrective actions were implemented. We verified the program is reviewed annually for its effectiveness, most recently on January 12, 2016.

In addition to the site studies, the RHA participates in corporate-identified monthly medical record audits. By agency/corporate policy, if the threshold of one indicator on a specific audit falls below 90%, the audit is to be completed monthly until the threshold is met. This may or may not included development of interventions to improve the compliance rate. On numerous occasions since 2013 (when the vendor began providing services at this facility), this policy has not been followed. On at least one occasion, an indicator on a monthly chart audit was at 20% compliance, and there were several other occasions when the threshold fell below the 90% acceptance rate. On these specific occasions, the audit was not repeated unit the next quarter. This falls outside of the medical services policy. We recommend that the RHA review this issue and make corrections as necessary. The standard is met.

**J-A-07  Emergency Response Plan (E).** The RHA and facility administrator have approved the health aspects of the emergency response plan, which includes the required elements; the last review occurred on January 12, 2016.

Multiple casualty disaster drills have been held annually so that over the course of three years, staff on each shift has had an opportunity to participate. The scenarios have included a storage room explosion, a chemical spill in the laundry room and subsequent fire, and a natural gas leak in the kitchen. Local public fire and emergency medical services were not involved in any of the drills. The critique summaries were discussed at the CQI, administrative, and staff meetings.

Man-down events were all actual events; we confirmed that health staff on each shift has been able to participate annually. We also confirmed that the man-down events were critiqued and the results were shared with all health staff. The standard is met.

**J-A-08  Communication on Patients' Health Needs (E).** Communication between designated correctional and health services staff with regard to inmates' special health needs occurs both electronically and verbally. The standard is met.

**J-A-09  Privacy of Care (I).** Clinical encounters and discussion of patient information is conducted in auditory and/or visual privacy. There is one large medical treatment room with four examination beds, each with privacy curtains. The beds are sufficiently separated that when the curtains are drawn, visual and auditory privacy are protected. The examination room is equipped with an examination table. Security personnel present only if the patient poses a probable risk to the safety of the health care professional or others. The standard is met.

**J-A-10  Procedure in the Event of an Inmate Death (I).** There have been three deaths in this facility since the last accreditation survey. Two of the deaths were related to drug overdoses (the

drugs were hidden inside the newly arrived inmates' bodies), and the third was determined to be a homicide (committed by another inmate). Mortality reviews were conducted for each death within 30 days and consisted of administrative and clinical reviews. The results were shared with treating staff. The standard is met.

**J-A-11  Grievance Mechanism for Health Complaints (I).** The health-related grievance program is integrated with the facility's formal grievance program. On average, four health-related grievances are filed per month. The responsible health authority drafts a response to the initial health grievance, and submits it to the director (warden), who composes the formal response. When an appeal is submitted, the director of corrections responds. All responses are completed within seven days (each, the grievance and appeals). The HSA maintains a log of each health grievance filed. The standard is met.

### B.  MANAGING A SAFE AND HEALTHY ENVIRONMENT

> The standards in this section address the importance of preventative monitoring of the physical plant. Health staff has a crucial role in identifying issues that could have a negative impact on the health and safety of facility staff and the inmate population if left unaddressed.

**Standard Specific Findings**

**J-B-01  Infection Prevention and Control Program (E).** The responsible physician has approved the written exposure control plan, most recently on January 28, 2016. Infection control matters are discussed addressed during administrative team and health staff meetings. Patients with communicable disease can be treated on-site in one of the four negative pressure rooms; those with possible contagious skin infections are housed in single cells. If an inmate refuses tuberculosis screening, he or she would be housed in a single cell until a chest x-ray is performed. Effective ectoparasite control procedures are used to treat infected inmates. The HSA and a representative from the facility maintenance department inspect the health services areas monthly for any environmental concerns. The standard is met.

**J-B-02  Patient Safety (I).** Health staff completes a sentinel event report in the event of an adverse occurrence or near-miss situation. These are reviewed at the quarterly administrative team meeting and at the health staff team meetings. Staff is able to report adverse and near-miss events that affect patient safety in a non-punitive environment. The standard is met.

**J-B-03  Staff Safety (I).** Health staff appears to work under safe and sanitary conditions. A security officer accompanies medical staff whenever they are in the housing areas. A security officer is also assigned to the medical unit whenever there is a patient in the unit. The standard is met.

**J-B-04  Federal Sexual Abuse Regulations (E).** The facility director described the facility as compliant with the 2003 Federal Prison Rape Elimination Act (PREA). Written policies and procedures address the detection, prevention and reduction of sexual abuse. The director of corrections is responsible for PREA compliance. Staff receives PREA training via an on-line training module prepared by a national correctional agency. The standard is met.

**J-B-05  Response to Sexual Abuse (I).** Health staff is trained in how to detect, assess, and respond to signs of sexual abuse and sexual harassment, including how to preserve physical evidence of sexual abuse. The vendor's regional manager completes the training. The training,

which includes a post-test, is part of orientation, and is reviewed annually thereafter. Victims of sexual assault are referred to a community hospital for treatment and evidence collection. In each case, the victim is evaluated by a qualified mental health professional and a report is made to correctional authorities to effect a housing separation of the victim from the assailant. The standard is met.

### C. PERSONNEL AND TRAINING

> The standards in this section address the need for a staffing plan adequate to meet the needs of the inmate population, and appropriately trained and credentialed health staff. Correctional officers are to have a minimum amount of health-related training in order to step in during an emergency, if health staff is not immediately available.

**Standard Specific Findings**

**J-C-01  Credentials (E).** Health care personnel who provide services to inmates had credentials and were providing services consistent with the jurisdiction's licensure, certification, and registration requirements. The vendor's corporate office staff complete credential verification, which includes inquiry regarding sanctions or disciplinary actions of state boards, employers, and the National Practitioner Data Bank. The standard is met.

**J-C-02  Clinical Performance Enhancement (I).** A clinical performance enhancement process evaluates the appropriateness of services delivered by all direct patient care clinicians, registered nurses (RN) and licensed practical nurses (LPN). A professional of at least equal training in the same general discipline completes the reviews annually. We reviewed a written log of the individuals under review, the date of their most recent review, and the date the findings were shared with the staff member. We confirmed that the reviews consisted of the required elements. The standard is met.

**J-C-03  Professional Development (E).** We confirmed that qualified health care professionals had the required number of continuing education credits; all were current in cardiopulmonary resuscitation (CPR) training. In this state, all licensed professionals, except for LPNs, are required to have continuing education hours for license renewal. The health vendor provides at least 12 hours of continuing educational units annually. We reviewed a log in the HSA's office that listed each employee's training units for the year. Each staff member, whether full-time or part-time, receives the same number of required in-service training. The standard is met.

**J-C-04  Health Training for Correctional Officers (E).** Correctional staff had the required training in health-related topics, and approximately 95% were current in their health-related training. We reviewed a log off correctional staff training, and the training outline (including course content and length), and verified it included the required topics. The standard is met.

**J-C-05  Medication Administration Training (E).** Licensed nursing staff administers all prescribed medications. They are trained in matters of security, accountability, common side effects, and documentation during orientation, and review it annually thereafter. The vendor's medical director and the facility administrator approved the training content in March 2016. Correctional officers have a supply of over-the-counter medications in their desk at their post assignments. When an inmate request an over-the counter analgesic (Tylenol), the officer may give it to the inmate. The standard is met.

**J-C-06 Inmate Workers (E).** Inmates perform janitorial and food service tasks. They have been trained to handle biohazards and bio-hazardous materials. The HSA completes this training on an individual basis. It is documented on a checklist, which the inmate signs, and it is then scanned into the medical record.

However, by facility policy, inmates may assist correctional officers to complete various types of watches (medical, mental health and suicide prevention). We observed this during the survey, but the documentation was inconsistent. We noted more conversation between inmate observers, than observing the inmates they were assigned to monitor. Further, the correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches. The observation logs had several blank spaces.

When we brought this practice to the attention of the facility director, a corrective action was developed. All correctional staff will have a training scheduled in the immediate future to review the facility's policy regarding inmate workers. On the second day of the survey, we noted that inmates who were participating with patient watches were doing so in conjunction with correctional officers and documentation was complete. **The standard is not met.**

> Corrective action is required for Compliance Indicators #4. Inmates should not be used as substitutes for regular program staff. Acceptable documentation includes a plan by the RHA on how this standard will be corrected, including any policy and procedure changes and staff training. In order to receive accreditation, verification that this standard has been met is required.

**J-C-07 Staffing (I).** Full-time equivalent health staff includes:

| | |
|---|---|
| HSA | 1.00 |
| Physician | 0.60 |
| Physician Assistant | 1.00 |
| Nurse Practitioner | 0.20 |
| Director of Nurses | 1.00 |
| Assistant Director of Nurses | 1.00 |
| Registered Nurse | 10.00 |
| Licensed Practical Nurse | 6.07 |
| Dentist | 0.60 |
| Dental Hygienist | 0.60 |
| Administrative Assistant | 1.00 |

At the time of the survey, there were four per diem registered nurses, and three LPNs. Vacancies consisted of a part-time registered nurse, and two LPNs. A different vendor was providing mental health care at the time of the survey. The standard is met.

**J-C-08 Health Care Liaison (I).** Health staff is on duty 24 hours a day. The standard is not applicable.

**J-C-09 Orientation for Health Staff (I).** We confirmed that health staff has received the appropriate orientation. Each new staff member is required to have security training with the HSA on the first day of orientation, in addition to a scheduled security training session with the facility security/training officer. The HSA maintains documentation of the orientation in the personnel

files. New staff orientation is accomplished over a two-week period; following this, new employees undergo a 90-day probation period that includes working with an assigned mentor. The responsible physician and HSA review and approve the orientation plan at least every two years, most recently on January 5, 2016. The standard is met.

## D. HEALTH CARE SERVICES AND SUPPORT

> The standards in this section address the manner in which health services are delivered—the adequacy of space, the availability and adequacy of materials, and, when necessary, documented agreements with community providers for health services.

**Standard Specific Findings**

**J-D-01 Pharmaceutical Operations (E).** A national contract vendor provides pharmaceutical services that are sufficient to meet the needs of the patients. The locked medication carts are stored in the medication room. Also stored in the medication room are additional stock and controlled medications (controlled medications are further secure in a double-locked box). A consulting pharmacist inspects quarterly; we reviewed the reports for 2015 and 2016 (to date); we also confirmed the quarterly schedule has been maintained since the last survey. The HSA maintains the records of the daily shift counts of controlled substances. We verified an adequate monitoring, tracking and inventory process was in place for all medications (refrigerated and emergency medications). In this state, it is permitted to use stock medication for all prescribed medications, with minimal accountability. The only patient-specific medications are non-formulary medications.

We verified that all medications were stored under proper conditions and an adequate supply of antidotes and other emergency medications was readily available to staff. When an individual arrives with a prescribed medication, it is verified, the physician notified, and it is continued as clinically indicated (or an appropriate substitute is made). A local pharmacy is used for back up services as needed. The standard is met.

**J-D-02 Medication Services (E).** Medication services are clinically appropriate and provided in a timely, safe and sufficient manner. Licensed nursing staff administers all medications. The electronic medical record includes a means of notifying a prescribing clinician when a prescription is about to expire. When the clinician prescribes a non-formulary medication, corporate representatives return the approval within 24 hours.

Keep-on-person medications are permitted at this facility. The standard is met.

**J-D-03 Clinic Space, Equipment, and Supplies (I).** The main and satellite clinic areas include examination rooms, office space, a nursing station, a dental operatory, a pharmaceutical room, a health records storage area, and a room for medical specimen collection. Dental sharps are inventoried at least once a week, while medical sharps are inventoried at the change of shift. We reviewed the count logs and confirmed the accuracy with spot checks of several controlled medications and medical and dental sharps. We also verified that adequate stock levels of medical supplies, and emergency equipment (including automated external defibrillators, or AED) were on hand. The standard is met.

**J-D-04 Diagnostic Services (I).** On-site diagnostic services include stool blood-testing material, finger-stick blood glucose tests, peak flow meters, multiple-test dipstick urinalysis, and pregnancy