# EXHIBIT 11

## Part II

tests. Additional laboratory tests are provided by a contracted community service, as are radiology services. Each service includes a procedure manual, including testing device calibration protocols. The standard is met.

**J-D-05  Hospital and Specialty Care (E).** Hospitalization and specialty care is available to patients in need of these services. We verified through record review that off-site facilities or health professionals provide a summary of the treatment given and any follow-up instructions. If the patient returns to the facility without a discharge summary, the treating facility and/or physician is contacted. There did not appear to be any problem obtaining the requested documentation. The standard is met.

### E.  INMATE CARE AND TREATMENT

The standards in this section address the core of a health services program: that all inmates have access to health services, how they are to request emergency and non-emergency care, that health histories are obtained, that assessments and care can be demonstrated to be provided in a timely fashion, and that discharge planning is considered.  In short, health care for the inmates is to be consistent with current community standards of care.

**Standard Specific Findings**

**J-E-01 Information on Health Services (E).** Inmates receive verbal and written information (available in English and Spanish versions) on access to health care services, the co-pay fees, and the grievance procedures during the intake process. Inmates who speak other languages can use the assistance of bi-lingual staff, or a telephone-based language line; those with hearing impairment can use a TTY line. The standard is met.

**J-E-02  Receiving Screening (E).** New admissions arrive directly from the community or from the satellite facility. Reception personnel identify those individuals in need of medical care and refer them to a local acute care hospital. Their subsequent admission to the facility is predicated on a written medical clearance from the hospital.

Qualified health professionals complete the receiving screening as soon as possible, generally within four hours of inmates' arrival. It includes a disposition and addresses all the required areas of inquiry. All females are tested for pregnancy. If a pregnant woman reports current opiate use, she is immediately referred to the clinician for medical orders. Individuals entering the facility on prescribed medications have it verified; the clinician is notified and the medication is maintained as clinically indicated. The facility physician and mid-level clinician monitor all receiving screenings to determine the safety and effectiveness of the process. The standard is met.

**J-E-03  Transfer Screening (E).** Intra-system transfers do not occur at this facility, although inmates may transfer from the satellite to the main facility. The staff at all of them uses the same electronic health record program and has access to all of the patient's information. When a patient is returned to the main facility, the health record is reviewed within four hours. The standard is met.

**J-E-04  Initial Health Assessment (E).** The full-population health assessment model has been implemented; inmates receive an initial health assessment no later than 14 calendar days after their admission. A trained registered nurse, mid-level provided or physician completes the

hands-on portion of the health assessment, which consists of the required elements, including a review of the receiving screening results, and laboratory or diagnostic tests for communicable diseases when the patient is symptomatic; we reviewed a letter from the health department that indicated the area's prevalence rate for sexually transmitted diseases does not warrant routine testing. The medical director reviews all completed initial health assessments, including receiving screenings. When clinically indicated, specific problems are integrated into an initial problem list, and diagnostic and therapeutic plans are established for each problem, as clinically indicated. We verified that the nurses are trained during orientation, and review it annually. The standard is met.

**J-E-05  Mental Health Screening and Evaluation (E).** Trained, qualified health care professionals complete the mental health screening as part of the receiving screening. The licensed psychologist provides it during orientation, and reviews it annually. The screening tool includes all the required inquiry.

A positive score on the mental health-screening tool will trigger a mental health referral on the electronic medical record. The psychiatrist is on-call and available for after hours consultation as needed. The standard is met.

**J-E-06  Oral Care (E).** Trained health staff completes the oral screening during the intake medical screening; patient instruction in oral hygiene and preventive oral education is also given at this time. The dentist completes an oral examination on all patients within 12 months of their incarceration. Dental care is provided in a timely manner, based upon urgency of need. Urgent and painful conditions are prioritized and immediately referred for care. The established triage process is based on priorities established by the dentist. Dental care is not limited to extractions. The dentist is on-call for consultation when he is not on duty. The standard is met.

**J-E-07  Nonemergency Health Care Requests and Services (E).** All inmates, regardless of housing assignment have access to regularly scheduled times for sick call. Inmates can obtain request slips from the nurse during administration, or from the security officer. They place the slips (which can be sealed) in the locked boxes outside the inmate dining room. Inmates can also use the kiosk in each of the housing units to request sick call.

A night-shift nurse retrieves and triages the requests (whether in writing or from the kiosk). If triage requires a face-to-face assessment, the inmate is seen at sick call within 24 to 48 hours. When a provider visit is necessary, clinical need dictates timing. Nursing sick call is conducted seven days a week in the medical treatment area. The standard is met.

**J-E-08  Emergency Services (E).** The local EMS system is summoned when an inmate needs to be transferred to the local hospital (approximately three miles away). We verified that adequate supplies of emergency equipment, drugs and supplies were on hand; three operating AED units are maintained within the facility. The standard is met.

**J-E-09  Segregated Inmates (I).** Conditions of segregation at this facility (NCCHC's category b) require health rounds at least three times each week. In practice, nursing staff conducts wellness rounds twice a day and document it in the electronic medical record and in the housing officer's log. Upon notification that an inmate will be segregated, a nurse reviews the inmate's medical record to determine if there are any contraindications. In such a case, security staff would be notified so an alternative housing situation, or disciplinary measure, can be arranged. If the

Bucks County Correctional Facility, PA
June 30, 2016

inmate going into segregation has been in an altercation, he/she is brought to medical services to be examined beforehand.

Health staff informs custody officials of the latest scientific information concerning the health effects of segregation during the quarterly administrative team meetings, either verbally or with literature, if it is available. The standard is met.

**J-E-10   Patient Escort (I).** Patients are escorted to both on- and off-site appointments in a timely manner. Transporting officers are alerted to special patient accommodations, such as medication needs, infection control measures, and mobility limitations. To ensure medical patient confidentiality is maintained throughout the transport, all health information is placed in sealed envelopes. The standard is met.

**J-E-11   Nursing Assessment Protocols (I).** The nursing staff utilizes nursing protocols, which do not include any prescription medication. The physician and HSA review and approve them annually, most recently on January 8, 2016. The health staff meeting minutes included verification that the nurses are trained on new or revised protocols. We also verified that they undergo annual reviews of the clinical protocols and competency assessments. The standard is met.

**J-E-12   Continuity and Coordination of Care During Incarceration (E).** We confirmed that continuity of care is appropriate. The clinical orders were evidenced-based and implemented in a timely manner. The deviations were clinically justified, documented and shared with the patient. The clinician reviews diagnostic tests in a timely manner and modifies treatment plans as clinically indicated. Patients receive treatment and diagnostic tests as ordered by clinicians, who discuss the need for these diagnostic tests with them. All diagnostic test results are shared with the patients as well (face-to-face for abnormal results). When a patient returns from the emergency room, urgent care or hospitalization, protocols are followed in accordance with the standard, and a medical provider evaluates the patient either the same day, or at the next provider sick call. If a provider is not available when patient returns, the on-call provider is consulted. The medical director reviews recommendations from specialty consultations in a timely manner. The medical director determines the frequency of periodic health assessments on the basis of protocols promulgated by nationally recognized professional health organizations.

The medical director also reviews medical records to assure that clinically appropriate care is ordered and implemented. The standard is met.

**J-E-13   Discharge Planning (E).** When an inmate's discharge date is known, the health staff meets with him or her to review any specific medical follow-up appointments. The patient is provided with verbal discharge information, and written special instructions, regarding medications and/or other medical treatments. Discharging patients will receive a three-day supply of medication. The standard is met.

## F. HEALTH PROMOTION AND DISEASE PREVENTION

The standards in this section address health and lifestyle education and practices, as well as patient-specific instruction during clinical encounters.

**Standard Specific Findings**

**J-F-01   Healthy Lifestyle Promotion (I).** A variety of health-related brochures and pamphlets are available to all inmates. Individual health education and instruction in self-care is documented in the health record during clinical encounters. The standard is met.

**J-F-02   Medical Diets (I).** At the time of the survey, 28 medical diets were being prepared for patients with specific medical dietary needs. The food service vendor supervises workers who prepare medical diets. Inmates who refuse prescribed diets receive follow up nutritional counseling the ordering clinician. A registered dietitian reviews the medical diet menus at least every six months, most recently on March 24, 2016. The standard is met.

**J-F-03   Use of Tobacco (I).** Use of tobacco products is prohibited in all areas of the facility. Inmates are given verbal and written information on the health hazards of tobacco; the risks of tobacco use are discussed with smokers during the intake screening and initial health assessment. Receiving screening includes providing inmates with written information on smoking cessation. The standard is met.

## G.   SPECIAL NEEDS AND SERVICES

The standards in this section address the needs of inmates with chronic conditions or other health conditions that require a multidisciplinary approach to treatment.   These special needs include mental health issues.

**Standard Specific Findings**

**J-G-01   Chronic Disease Services (E).** Care as reflected in the health record appears in compliance with current community standards. The physician has established and annually approves the clinical protocols, which were consistent with national clinical practice guidelines.

Health record documentation confirmed that clinicians follow the chronic disease protocols.   The treatment plans include the required elements for the assessment and treatment of appropriate patient care. Chronic illnesses are listed on the master problem list. A list of chronic care patients is maintained through a program within the electronic medical records. The standard is met.

**J-G-02   Patients With Special Health Needs (E).** When required by the health condition(s) of the patient, treatment plans define the individual's care. Treatment plans include the frequency of follow-up, type and frequency of diagnostic testing and therapeutic regimens and instructions about diet, exercise, and adaptation to the correctional environment and medication. A list of special needs patients is maintained through a program in the electronic medical record. The standard is met.

**J-G-03   Infirmary Care (E).** The facility does not have and infirmary. The special housing unit is used for those individuals who need close medical observation, and who are not good candidates for general population housing. The standard is not applicable.

**J-G-04   Basic Mental Health Services (E).** Patients with mental health needs have access to the services of a full-time psychologist, a part-time mental health counselor, and part-time psychiatrists (including one via telemedicine). Access to the mental health staff is readily available, either by staff referral or by patient request. Both individual and group therapy sessions are offered. When clinically appropriate, a patient's commitment or transfer to an inpatient

psychiatric setting is timely and accomplished according to established procedures. Outpatients receiving basic mental health services are seen at least every 90 days (or as clinically indicated). Mental health, medical and substance abuse services are coordinated to facilitate integrated patient management and to ensure medical and mental health needs are met.

The mental health unit consists of eight single cell beds. The mental health staff is actively involved in case management. Group therapy sessions include topics such as goal setting, hygiene, personal reflection, anger management, and Alcoholics and Narcotics Anonymous.

Mental health services include assessment, treatment, referral off-site (if in-patient care indicated), crisis intervention, individual and group counseling, and psychotropic medication management.

When crisis intervention is necessary (usually after hours), the county crisis team is called to the facility to assess the inmate and make treatment plan recommendations. The standard is met.

**J-G-05  Suicide Prevention Program (E).** The suicide prevention program addresses each of the 11 key components as described by the standard. The responsible health authority has approved the training curriculum for staff. Treatment plans address suicidal ideation and recurrence. Patient follow-up occurs as clinically indicated. Acutely suicidal inmates are placed on constant observation in the mental health unit. Non-acutely suicidal inmates are monitored on an unpredictable (staggered) schedule not exceeding 15 minutes. Patients can self refer, or be referred by staff, for possible suicidal ideation. A mental health professional evaluates the situation almost immediately.

However, by facility policy, inmates may assist correctional officers to complete various types of watches including watching other inmates on suicide precautions. We observed this during the survey, but the documentation was inconsistent. We noted more conversation between inmate observers, than observing the inmates they were assigned to monitor. Further, the correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches. The observation logs had several blank spaces.

When we brought this practice to the attention of the facility director, a corrective action was developed. All correctional staff will have a training scheduled in the immediate future to review the facility's policy regarding inmate workers. On the second day of the survey, we noted that inmates who were participating with patient watches were doing so in conjunction with correctional officers and documentation was complete. **The standard is not met.**

> Corrective action is required for Compliance Indicator #3. The use of other inmates in any way (e.g., companions, suicide-prevention aides) is not a substitute for staff supervision. Inmate companions can be used as a supplement to, but never as a substitute for, staff monitoring. The RHA should submit a plan addressing how this standard will be corrected, including policy and procedure changes and evidence of training for staff. In addition the following should also be submitted: (a) evidence of watches for both acutely and nonacutely suicidal inmates completed by health or correctional staff; and (b) a memorandum to staff indicating that suicide watches are to be completed by *staff*, with inmates only used as supplementary companions. In order to receive accreditation, verification that this standard has been met is required.

**J-G-06   Patients with Alcohol And Other Drug Problems (AOD) (E).** Disorders associated with AOD, such as HIV and liver disease, are recognized and treated. Correctional staff has been trained to recognize inmates' AOD problems. Medical, mental health and substance abuse staff communicates and coordinate with each other regarding patients' AOD care. Self-help substance abuse programs, individual counseling and/or group therapy are offered on site. Alcoholics & Narcotics Anonymous meetings are offered on a regular schedule at the facility and are open to all inmates.

Inmates with drug and alcohol problems are housed in a specially designated housing unit. The standard is met.

**J-G-07   Intoxication and Withdrawal (E).** The responsible physician has approved current protocols consistent with nationally accepted treatment guidelines for intoxication and withdrawal. The protocols were last approved on January 28, 2016. Individuals are housed in a safe location that allows for effective monitoring by health professionals, using recognized standard assessments at appropriate intervals. All patients undergoing detoxification treatment are housed in the same housing until they have completed the detoxification protocol and are cleared by the clinician. A nurse assesses each patient going through detoxification at least twice a day. A physician supervises detoxification.

If a pregnant inmate is admitted with opioid dependence, the clinician is notified and orders are obtained for treatment. The facility's policy addresses the management of inmates on opiates and/or methadone. Pregnant females are referred to the local methadone clinic for continued methadone treatment, or they are evaluated to start on methadone therapy (rather than continued opiates). The policy outlines is a plan for treatment of methadone withdrawal.

The physician is contacted for orders when Individuals experiencing severe intoxication or withdrawal to transfer immediately to a licensed, acute care facility. The standard is met.

**J-G-08   Contraception (I).** Continued contraception is the practice whenever medically indicated. Emergency contraception is available when the situation warrants it. Written pamphlets and printouts are available to the patient, as are handouts listing community resources. The standard is met.

**J-G-09   Counseling And Care Of The Pregnant Inmate (E).** Comprehensive counseling services are available to pregnant inmates. Upon intake, the pregnant female is counseled regarding her pregnancy; she also is given reference material regarding community resources for prenatal care. Prenatal care and specialized obstetrical services (when indicated), and postpartum care are available to all pregnant inmates.

Extensive prenatal care and education is provided by the nurse practitioner from the local hospital (where the patient is sent for delivery). The patient will be sent to the hospital for advanced diagnostic studies when required. The obstetrical nurse practitioner provides all monthly prenatal care at the facility. The patient is seen at the hospital's prenatal clinic during the third trimester.

Policy prohibits use of restraints used during active labor and delivery. The standard is met.

**J-G-10   Aids to Impairment (I).** Health policies indicated that aids are provided when clinically indicated. When specific aids that may pose a security risk are required, alternatives are used

Bucks County Correctional Facility, PA
June 30, 2016

when possible, or special housing arrangements are coordinated with the security staff. At the time of the survey, we observed patients using canes and wheelchairs for ambulation. The standard is met.

**J-G-11 Care for the Terminally Ill (I).** Although it would be rare for a terminally ill patient to be held at this facility, procedures are in place to make the appropriate accommodations. Off-site hospice consultation is arranged if a release is not arranged by the courts. Palliative therapies will be provided for all terminally ill patients who continue to be incarcerated at the facility. The standard is met.

## H. HEALTH RECORDS

The standards in this section address the importance of accurate health record documentation, health record organization and accessibility, and need to ensure that medical and mental health information is communicated when those records are separate documents.

**Standard Specific Findings**

**J-H-01 Health Record Format and Contents (E).** Inmates' medical and mental health records are integrated in an electronic format; the record consists of a problem list, as well as all other critical elements. The standard is met.

**J-H-02 Confidentiality of Health Records (E).** The HSA controls access to the electronic health record. Health and security had documented training on maintaining patient confidentiality. Health records are placed into envelopes and sealed in order provide secure and private transport whenever a patient is transferred outside of the facility. The standard is met.

**J-H-03 Management of Health Records (I).** Health records are available for all clinical encounters. A health care summary is generated and sent with a patient whenever he or she is transferred to a facility outside of the jail system.

Electronic health records are maintained on-site for seven years, as mandated by local legal authorities. They can also be readily reactivated upon an individual's return to custody. The standard is met.

**J-H-04 Access to Custody Information (I).** Qualified health care professionals have access to information in the inmate's custody record when such information may be relevant to the inmate's health and course of treatment. The standard is met.

## I. MEDICAL-LEGAL ISSUES

The standards in this section address the most complex issues facing correctional health care providers. While the rights of inmate-patients in a correctional setting are generally the same as those of a patient in the free world, the correctional setting often adds additional considerations when patient care is decided. The rights of the patient, and the duty to protect that patient and others, may conflict; however, ethical guidelines, professional practice standards, and NCCHC's standards are the determining factors regarding these interventions and issues.

**Standard Specific Findings**

**J-I-01  Restraint and Seclusion (E).** Clinical restraint and seclusion are not applied at this facility. When custody-ordered restraints are applied, health staff is notified so they can review the health record, which is documented; they participate only in monitoring the inmate's health status. The physician is notified immediately should the inmate develop a medical or mental health condition. A member of the health staff checks the restraint as soon as they are applied, and then every 15 minutes for the initial two hours to ensure adequate circulation. After this, a nurse checks the restraints every two hours and provides range of motion on restrained joints, offers the patient fluids, and access to bathrooms.

If health staff notes improper restraint use that is jeopardizing the health of the inmate, they communicate this to the appropriate custody staff. The standard is met.

**J-I-02  Emergency Psychotropic Medication (E).** Forced psychotropic medications may be used on a one-time basis, if necessary (when the individual poses a significant risk of harm to self or others). Individuals who are noncompliant with the prescribed medications will receive a mental health examination. Before prescribing forced psychotropic medications, a provider must evaluate patient. If such intervention is appropriate, a court order to administer the medications will be obtained. Patients with on-going serious mental health needs would be transported to an appropriate off-site health facility for assessment and treatment. The standard is met.

**J-I-03  Forensic Information (I).** The health staff does not collect forensic information. If there is a court order, they obtain the patient's consent first. If the patient refuses, he or she is referred to a local hospital for the collection of the forensic laboratory samples. The standard is met.

**J-I-04  End-of-life Decision Making (I).** Patients approaching the end of life are permitted to execute advance directives, after being counseled as to the meaning and consequences of such actions. A physician not directly involved in the patient's treatment would first complete an independent review. The standard is met.

**J-I-05  Informed Consent and Right to Refuse (I).** All informed consents and refusals of care documented and consist of the required elements, including the signatures of the patient and a health staff witness. All incoming inmates sign consent for treatment at the time of the receiving screening. Additional consents are obtained prior to any invasive procedure (i.e., dental treatments) and for taking mental health medications.

Patients are counseled as to possible adverse consequences to their health that may occur as a result of a refusal. Any the refusal is witnessed by at least one health staff member and another individual. The standard is met.

**J-I-06  Medical and Other Research (I).** No health-related research is instituted at this facility. Should inmates who are participants in a community-based health-related research protocol be admitted, procedures provide for their continued participation after the community researchers are consulted to determine if withdrawal from the protocol can be completed without harming the inmate's health. The standard is met.

# REPORT OF INSPECTION
## JANUARY 22, 2018
## BUCKS COUNTY PRISON OVERSIGHT BOARD

On January 22, 2018, the Bucks County Prison Oversight Board conducted an inspection of the Bucks County Correctional Facility. Present for the inspection were Commissioner Diane M. Ellis-Marseglia, Chief Probation Officer Sean Ryan, Controller Neale Dougherty, Deputy Controller Kim Doran, Chief Investigator Kevin McCreary, and Solicitor Michael Klimpl.

## FINDINGS AND DETERMINATIONS

### MENTAL HEALTH UNIT (MALE)

1. This unit contains eight cells, all single occupants.
2. At the time of the inspection, there was one corrections officer on duty.
3. The lights were off in most of the cells.
4. The corrections officer who controls the lights told the inspectors that the lights are turned off in the cells if requested by the inmate.
5. An inmate, from outside the cells, was monitoring the well-being of another inmate in the cell.
6. A corrections officer also observes the inmates.
7. One inmate was observed to be up and about in his cell.
8. When an inmate attempts to harm him/herself, the inmate is put in the restricted unit and a professional staff member monitors the inmate for a 24 hour period.
9. The inmate is then seen by a psychiatrist/psychologist who determines what level of care/custody is needed.
10. There is a telephone on the wall outside the cells.
11. Inmates can make supervised telephone calls if approved by the proper authorities.
12. There are two secure shower stalls in the unit.
13. There is an interview room within the unit.
14. The unit smelled of feces.
15. The inspectors were told that the facility is constantly power spraying the area and sanitizing it since some residents defecate on the floor.

### RESTRICTED HOUSING UNIT (MALE)

16. There are 20 cells on two tiers in this unit, 10 on each tier.
17. The cells on the first tier are single units; the second tier is doubled up.
18. There are two secure shower units in this unit.
19. The unit also has a library cart containing numerous books.
20. One cell was observed to have an inmate monitor.

CONFIDENTIAL

21. One cell was observed to have paper covering the glass opening. (This is done when an inmate in using the toilet. The corrections officers monitoring the cell do not allow the glass opening to remain obstructed).

## YARD

22. There is an outside yard area for the MHU and RHU Unit containing five secure pens.
23. If the inmates are cellmates, they may go to the pen together, otherwise the inmates are placed in the pen by themselves.
24. The inmates are allowed one hour of yard time per day
25. The inmates are handcuffed while going to and from the yard.
26. There is an opening to allow the handcuffs to be removed once they are inside.

## "G" BLOCK (MALE)

27. This block has 46 cells on two tiers.
28. The cells on the first tier are single; the second tier is doubled.
29. There is a day room consisting of four tables with attached seating.
30. There are two large screen TVs with seating in front of them.
31. There are six telephones on the wall separate from the TV area.
32. There are two commissary kiosks.

## DISPENSARY

33. There were three inmates being attended by the medical staff.
34. There were no other inmates waiting to be treated.
35. The Dentist was in and there was an inmate undergoing a dental procedure.

## "F" BLOCK (FEMALE)

36. This block has 45 cells on two levels, each doubled.
37. Most of the inmates were locked down because medication was being dispensed.
38. One inmate was lying on the cell floor.
39. A towel was on the floor because of odors emanating from the cell.
40. We were told that the inmate does need a shower but because the inmate is on lockdown on acute watch, permission is needed from a supervisor before they can let her take a shower.

CONFIDENTIAL

## MISCELLANEOUS

41. Overall, the prison appeared clean, orderly and well run.

Approved this __14__ day of __March__, 2018.

BUCKS COUNTY PRISON OVERSIGHT BOARD

BY: _____
~~SEAN R. RYAN, CHAIRMAN~~
DIANE M. ELLIS-MARSEGLIA

CONFIDENTIAL



ACCREDITATION UPDATE REPORT ON

THE HEALTH CARE SERVICES AT

BUCKS COUNTY CORRECTIONAL FACILITY

Doylestown, PA

January 31, 2017

National Commission on Correctional Health Care
1145 W. Diversey Pkwy.
Chicago, IL 60614-1318
(773) 880-1460

CONFIDENTIAL

Bucks-Adami-000963
JA0000106

Bucks County Correctional Facility, PA
January 31, 2017
**UPDATE REPORT**

The National Commission on Correctional Health Care is dedicated to improving the quality of correctional health services and helping correctional facilities provide effective and efficient care. NCCHC grew out of a program begun at the American Medical Association in the 1970s. The standards are NCCHC's recommended requirements for the proper management of a correctional health services delivery system. These standards have helped correctional facilities improve the health of their inmates and the communities to which they return, increase the efficiency of their health services delivery, strengthen their organizational effectiveness, and reduce their risk of adverse patient outcomes and legal judgments.

On March 31-April 1, 2016 NCCHC conducted its review for continuing accreditation of the Bucks County Correctional Facility under the NCCHC *2014 Standards for Health Services in Jails.* On June 30, 2016, NCCHC granted continuing accreditation with verification. Subsequently, the RHA submitted corrective action. This report focuses primarily on issues that required corrective action for compliance with the standards and is most effective when read in conjunction with NCCHC's June 30, 2016 report.

There are 40 essential standards; 39 are applicable to this facility and 37 (95%) were found to be in compliance. One hundred percent of the applicable essential standards must be met. ***The Bucks County Correctional Facility has not met this condition.***

    Essential Standards Not in Compliance
    J-C-06 Inmate Workers
    J-G-05 Suicide Prevention Program

    Essential Standard Not Applicable
    J-G-03 Infirmary Care

There are 27 important standards; 26 are applicable to this facility and 26 (100%) were found to be in compliance. Eighty-five percent or more of the applicable important standards must be met. **The Bucks County Correctional Facility has met this condition.**

    Important Standards Not in Compliance
    None

    Important Standard Not Applicable
    J-C-08 Health Care Liaison

Decision: On January 31, 2017, NCCHC's Accreditation Committee voted to continue the facility's Continuing Accreditation with Verification (CAV) status, *contingent* upon receiving requested compliance verification by March 31, 2017.

CONFIDENTIAL                    Bucks-Adami-000964
JA0000107

**J-C-06 Inmate Workers (E).** Inmates perform janitorial and food service tasks. They have been trained to handle biohazards and bio-hazardous materials. The HSA completes this training on an individual basis. It is documented on a checklist, which the inmate signs, and it is then scanned into the medical record.

However, by facility policy, inmates may assist correctional officers to complete various types of watches (medical, mental health and suicide prevention). We observed this during the survey, but the documentation was inconsistent. We noted more conversation between inmate observers, than observing the inmates they were assigned to monitor. Further, the correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches. The observation logs had several blank spaces.

When we brought this practice to the attention of the facility director, a corrective action was developed. All correctional staff will have a training scheduled in the immediate future to review the facility's policy regarding inmate workers. On the second day of the survey, we noted that inmates who were participating with patient watches were doing so in conjunction with correctional officers and documentation was complete. The standard is not met.

> Corrective action is required for Compliance Indicators #4. Inmates should not be used as substitutes for regular program staff. Acceptable documentation includes a plan by the RHA on how this standard will be corrected, including any policy and procedure changes and staff training. In order to receive accreditation, verification that this standard has been met is required.

In October 2016, the RHA indicated that the forms were revised to distinguish between those used by officers and those used by inmate monitors, that the county SOP was revised in September 2016 to specify the types of watches employed at the facility and the roles of correctional officers and inmate workers, and that the captain issued a memo to shift command (to be read at each shift's roll call for several days) on the expectations of watch procedures. The memo (which included emphasis on acute watches to occur at random intervals not to exceed 15 minutes) was included, as were examples of officers' acute watch observation sheets (documenting staggered 15 minutes watches), written instructions to inmate monitors emphasizing continual watch and five-minute documentation (with new forms initiated at the change of each shift), and the necessity of reporting any unusual behavior to the module officer. The procedures include a means to ensure alternating officer and inmate monitor watches to ensure the inmate on watch is viewed every seven or eight minutes. Training acknowledgement sheets for each module (signed by the inmate monitors) were forwarded as well.

However, the monitoring described in the corrective action is not in compliance with the requirements of Standard J-G-05, Suicide Prevention Program (see corrective action under J-G-05). **The standard is not met.**

**J-G-05 Suicide Prevention Program (E).** The suicide prevention program addresses each of the 11 key components as described by the standard. The responsible health authority has approved the training curriculum for staff. Treatment plans address suicidal ideation and recurrence. Patient follow-up occurs as clinically indicated. Acutely suicidal inmates are placed on constant observation in the mental health unit. Non-acutely suicidal inmates are monitored on an unpredictable (staggered) schedule not exceeding 15 minutes. Patients can self refer, or be

referred by staff, for possible suicidal ideation. A mental health professional evaluates the situation almost immediately.

However, by facility policy, inmates may assist correctional officers to complete various types of watches including watching other inmates on suicide precautions. We observed this during the survey, but the documentation was inconsistent. We noted more conversation between inmate observers, than observing the inmates they were assigned to monitor. Further, the correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches. The observation logs had several blank spaces.

When we brought this practice to the attention of the facility director, a corrective action was developed. All correctional staff will have a training scheduled in the immediate future to review the facility's policy regarding inmate workers. On the second day of the survey, we noted that inmates who were participating with patient watches were doing so in conjunction with correctional officers and documentation was complete. The standard is not met.

> <u>Corrective action is required for Compliance Indicator #3.</u> The use of other inmates in any way (e.g., companions, suicide-prevention aides) is not a substitute for staff supervision. Inmate companions can be used as a supplement to, but never as a substitute for, staff monitoring. The RHA should submit a plan addressing how this standard will be corrected, including policy and procedure changes and evidence of training for staff. In addition the following should also be submitted: (a) evidence of watches for both acutely and nonacutely suicidal inmates completed by health or correctional staff; and (b) a memorandum to staff indicating that suicide watches are to be completed by *staff*, with inmates only used as supplementary companions. In order to receive accreditation, verification that this standard has been met is required.

See corrective action for J-C-06 Inmates Workers. However, inmates are still used in place of officers for the watch: regular watch inmate workers is defined as occurring at staggered 15-minute intervals, with staff monitoring at 30 minute intervals. Additionally, while the acutely suicidal are monitored constantly, they are monitored by inmates, with staff monitoring every 15 minutes. The use of inmate workers may only supplement the monitoring of suicidal inmates (whether acutely or non-acutely suicidal) by trained staff. Corrective action is required. **The standard is not met.**

CONFIDENTIAL