# EXHIBIT 26

JA0000226

EXPERT REPORT
OF
MARY PERRIEN, Ph.D.
MENTAL HEALTH EXPERT

IN THE MATTER OF THE ESTATE OF CHARLES JOSEPH FREITAG

*vs*

BUCKS COUNTY ET AL.

SUBMITTED
January 29, 2022

Freitag001390

CONTENTS

ASSIGNMENT.................................................................................................................3

OVERVIEW .................................................................................................................3

QUALIFICATIONS ......................................................................................................6

COMPENSATION ........................................................................................................6

FACTS AND DATA CONSIDERED IN FORMING OPINIONS...............................6

SUMMARY OF OPINIONS .........................................................................................7

CONCLUSION..............................................................................................................28

APPENDIX A ...............................................................................................................31

APPENDIX B ...............................................................................................................38

APPENDIX C ...............................................................................................................40

Freitag001391

JA0000228

ASSIGNMENT

Jonathan Feinberg, Esq. requested that I evaluate the circumstances surrounding the death of Mr. Charles Joseph Freitag, Sr. to determine if appropriate correctional mental health standards of care were adhered to in the management and treatment of Mr. Freitag's serious mental health condition. Mr. Freitag was committed to the custody and care of the Bucks County Correctional Facility (BCCF) following conviction by jury on June 4, 2018. He was held there while awaiting sentencing. The day after Mr. Freitag received his sentence (six to 12 years of incarceration), he was found in his cell by another inmate who called staff to assist Mr. Freitag. Mr. Freitag was discovered unresponsive in his cell, and later determined to be deceased. The opinion rendered herein is based on the documents reviewed. If additional documents and/or other data become available to me, I reserve the opportunity to review the new information and modify or supplement my opinions if necessary.

OVERVIEW

      Mr. Freitag was a functioning and productive community member for more than 25 years as a parent, husband, sibling, and postal worker. This began to change in 2017. At that time after several years of significant loss and trauma, Mr. Freitag began to experience symptoms of mental illness including feelings of suicidality. He was diagnosed with Depression and prescribed psychotropic medication to relieve his symptoms. However, as Mr. Freitag improved, likely due to his prescribed medications, he decided that he was better and stopped taking his psychotropic medications. Mr. Freitag then experienced what documents suggest was further decompensation and an increase in suicidality. In his despondency on several occasions, Mr. Freitag consumed alcohol and attempted or had a strong desire to kill himself. During one of those incidents, he

called police for assistance and was taken to the hospital for assessment and treatment. Mr. Freitag was released later that day. His suicidality continued and he told his supervisor that he was struggling and needed help. With his supervisor's help, Mr. Freitag was taken to a hospital for evaluation and was admitted as an inpatient. Unfortunately, though discharged Mr. Freitag continued to experience thoughts of suicide. His charged offense of Aggravated Assault that resulted in commitment to BCCF was directly linked to Mr. Freitag's second suicide attempt. Mr. Freitag acknowledged to the Court in his criminal case that he had been suicidal the day that he had driven his truck into his ex-wife's house and that the act itself was a suicide attempt.

Mr. Freitag turned down a plea agreement in his criminal case because of his desire to continue his lifelong career and return to work. He believed that he could avoid a felony conviction and prison time and pursued a jury trial. Mr. Freitag's work was a vital and critical part of his life and at the time of trial, one of his most significant sources of support. After being found guilty, his bail was revoked and Mr. Freitag was committed to the custody of BCCF. During his time there, specific correctional staff, mental health staff, healthcare staff, and facility supervisors were aware of Mr. Freitag's pending sentencing and his high level of risk for self-harm. All staff would have been expected to be generally aware of Mr. Freitag's risk. They had been trained in suicide prevention and BCCF-specific policies related to suicide prevention.

The need for consistent and directive policies in detention generally and BCCF specifically was obvious throughout the review of Mr. Freitag's death and review of records. Corrections, both jails and prisons, function based primarily on policies. Frontline staff (e.g., custody officers, case manager, physicians, mental health clinicians) who have never worked in corrections require training based on clear policies to allow them to work in an effective, safe environment and to provide the same for the people in their custody. Any correctional or correctional healthcare

Freitag001393

supervisor or manager would be acutely aware of the need for policy to direct staff and provide a structure for the operations of their specific detention facility. There is an abundance of written materials (e.g., standards, journal articles, conferences, video-training) that underscore the need and benefit to establishing a comprehensive and clear "manual" of policies. The lack of these policies, particularly in high-risk areas such as suicide, can result in a system that is disorganized and unable to adequately respond to daily operational needs and urgent or emergent situations. To continue to operate a facility where county and contract staff, especially the supervisors and managers, were aware of their systemic problems and inability to provide constitutional treatment for someone like Mr. Freitag, would be highly questionable since the probability of doing harm would be needlessly elevated.

Concern for Mr. Freitag as his sentencing approached (late July) was so great that his brother contacted his criminal attorney out of concern for Mr. Freitag's safety and mental health. That lawyer contacted BCCF Deputy Warden Mitchell and requested assistance with Mr. Freitag's status as the lawyer had been informed that his client was not doing well and had a history of suicide.[1] Mr. Freitag was placed on a "level 3" status, a level of observation suitable for psychiatric observation in the case of unusual or bizarre behavior or observation during medication adjustments. Based on BCCF and PCM suicide prevention policy, Level 3 status was *not* [emphasis added] appropriate for a suicidal person such as Mr. Freitag. Policy clearly indicated that Level 3 did not meet criteria for suicide precaution. As multiple factors and lost opportunities collided leaving Mr. Freitag on the wrong level of observation with mental health and custodial staff who did not feel the urgency of suicide prevention in Mr. Freitag's case to see him upon return from his sentencing despite its significance in his mental status or to monitor him closely

---

[1] Transcript, Dr. A. Cassidy, 3/23/2021.

even at Level 3 observation, Mr. Freitag tragically took his own life while in the custody of and care of BCCF and its contractors.

QUALIFICATIONS

I am a licensed psychologist in the states of California and Idaho. I have worked in corrections for more than 25 years, providing services to offenders, parolees and probationers. I have provided direct care and also worked as an administrator within multiple agencies at the state and federal level. I have conducted program evaluation and treatment integrity assessment as a function of my private practice.

I have served as an expert monitor in the mental health class action case, *Coleman v Brown* (California) and in jail systems in Riverside and Sacramento, California. I have also worked as a consulting and potentially testifying expert in correctional mental health cases in Illinois, Rhode Island, Ohio, Florida and Alabama. In addition, I have conducted assessments of program adequacy of individual facilities and systems in Ohio, Florida, Louisiana, Idaho, Hawaii and Nevada.

A copy of my current curriculum vitae is attached as Appendix A.

COMPENSATION

My rate of compensation was $350 per hour for professional services rendered.

FACTS AND DATA CONSIDERED IN FORMING MY OPINIONS

1. Amended Complaint, Estate Charles Joseph Freitag Sr., filed 1/31/2020 (No. 2:19-cv-05750-TJS);

2. Multiple BCCF and PrimeCare Medical policies (see Appendix B):
   a. Suicide Prevention, ABBCC 427-432;
   b. Watch and Observation Policy, AGBCC 421-422;
   c. Watch and Observation Procedures, AGBCC 449-455;
   d. Treatment Services, AGBCC 437-439;
   e. Inmate Monitoring Form, ABBCC 185-186;
   f. PrimeCare Suicide Prevention Policy, PCM 349-360
   g.
3. PrimeCare healthcare chart (including medical and mental health) for Mr. Freitag, PCM 1-305;
4. PrimeCare Mortality Review, PCM 1666-1673;
5. PrimeCare job descriptions, PCM 1277-1284;
6. PrimeCare letter to J. Mahoney regarding licensing, PCM 1168;
7. Buck's County detectives' incident report, 8/25/18;
8. Deposition transcripts, see Appendix C, including:
   a. Deposition of James Young, 12/23/2020;
   b. Deposition of Robert Moody, 12/23/2020;
   c. Deposition of Tory Murphy, 03/25/2021;
   d. Deposition of Christina Penge, 01/27/2021;
   e. Deposition of Jessica Mahoney, 01/29/2021;
   f. Deposition of Abbey Cassidy, 03/23/2021.
9. Bucks County Correctional Facility video footage from 8/25/2018 including video 8-25 1013 AGBCC 466;
10. Jail Classification and Discipline, National Institute of Corrections and National Sheriffs' Association, Arlington, VA, 1988;
11. American Correctional Association (2003). Standards for Adult Correctional Institutions, fourth edition (and associated updates). American Correctional Association (ACA): Alexandria, VA.;
12. NCCHC (2018). Standards for health services in jails. NCCHC: Chicago, IL.;
13. NCCHC (2015). Standards for mental health services in correctional facilities. NCCHC: Chicago, IL.;
14. American Psychiatric Association (2016). Psychiatric services in jails and prisons, third edition. American Psychiatric Association (APA): Washington, DC.;
15. Trestman, R., Appelbaum, K., & Metzner, J. (2015). Oxford textbook of correctional psychiatry, pp.57-61. Oxford University Press: NY, NY.

SUMMARY OF OPINIONS

Mr. Freitag's death was preventable. Based on the documents reviewed, it appeared that a culmination of multiple failures on the part of Defendants created a perfect storm leaving Mr.

Freitag001396

Freitag without access to treatment or external safety mechanisms during a critical period when he ultimately killed himself in B Module on August 25, 2018, just one day after sentencing.

1. **Defendants failed to protect Mr. Freitag while he was in their custody by establishing policies, patterns and practices that supported suicide prevention and safe management of people with mental illness.**

Defendants failed to develop and implement policies and practices that were consistent with standards of care and sound correctional practices and if implemented, may have prevented Mr. Freitag's death. While BCCF and PCM both had policies regarding suicide prevention, the polices were more aspirational in structure. For example, PCM and BCCF policies stated the following:

> "Reporting. Procedures for documenting the identification and monitoring of potential or attempted suicides are detailed, as are procedures for reporting a completed suicide."

This policy statement is derived from national standards[2],[3] that provide direction to agencies and correctional staff on how to develop adequate policies. These standards are not something you can cut and paste due to the fact that they are directives to administrators that must be articulated in policy sufficiently as to provide direction to staff at each unique facility. These standards are to ensure that agency leaders (BCCF and PCM) provide policies that are "***detailed***" and ***comprehensive*** so that any staff member can pick up the suicide prevention policy and learn their individual obligations in the prevention of suicide as well as clues to look for and how to respond to someone in crisis. Instead, the BCCF and PCM policies provide little detailed information regarding the suicide prevention program.

---

[2] NCCHC (2015).
[3] NCCHC (2018).

Freitag001397

JA0000234

Training for these policies was reportedly provided by people like Dr. Cassidy, a certified trainer. She reported in her deposition that she had received what sounded like "training for trainers" type instruction to become "certified" to provide suicide prevention training. Much of BCCF and PCM training appeared to occur at "self-pace" and online. This reduces the probability that the staff actually complete the training rather than rushing through slides. In addition, comprehension and competency has been shown to be lower for non-guided or self-study training. In person training that utilizes scenario-based training results in higher comprehension of trainees, better evaluation opportunities for trainers of their trainees, and greater recollection and competence for trainees.

Typically, suicide prevention training occurs annually given its importance in safely housing detainees. The BCCF and PCM suicide prevention policies did not indicate the frequency of training required. However, Dr. Cassidy stated on multiple occasions in her deposition that it had been primarily a "one time" training. This does not meet the correctional standard for training that occurs "regularly." This is usually interpreted as once when employment begins and then ongoing training every year or bi-annually.

Dr. Cassidy spent a great deal of care in her deposition describing her supervision of licensed and unlicensed staff and expectations regarding mental health staff in suicide prevention. Dr. Cassidy highlighted that existing policies failed to indicate when suicide risk assessments were required or advised. While the PCM policy noted that a risk assessment would be completed whenever a patient screens positive for suicidality or mental illness and if placed on a suicide watch by someone else, it did not discuss the necessity of ongoing assessment or other situations when a risk assessment was indicated. For example, the policy listed several high-risk indicators,

including when a person is first sentenced. However, no direction occurs regarding assessment in those situations or appropriate treatment options that may be undertaken.

Existing policies failed to highlight to staff that placing someone on a watch was NOT a treatment intervention. Placing someone on suicide precautions is an extreme response to a crisis situation and is an environmental constraint to reduce acute risk. However, isolation and medication management are not sufficient. Though the policies did direct staff to write comprehensive individualized treatment plans for anyone on watch longer than 24 hours, the clinical supervision and culture at BCCF was that there was not time for extensive treatment planning nor for actual therapy.[4] Despite Dr. Cassidy's chart reviews, her expectations of staff were to simply write a brief "plan" in their "SOAP" or "SOAPE" note.

While Dr. Cassidy spent a great amount of time detailing how her supervision of Ms. Mahoney as an unlicensed provider would occur, there was a lack of documentation to support ongoing individual clinical supervision as required by licensing regulations. There was no documentation of those meetings, the clinical focus or content, or any other details. No policy was provided by defendants to address clinical supervision for licensed and unlicensed providers. For example, had Dr. Cassidy been properly trained in policy and suicide prevention, she may have been more vigilant in her supervision. For example, PCM had to provide Ms. Mahoney with a letter directing her to become licensed or lose her position. Ms. Mahoney did, in fact, lose her psychologist position due to ongoing lack of licensure, and had to accept a lower position as a mental health clinician. Typically, clinical supervisors monitor trainees' efforts to progress toward

---

[4] Mental health staff depositions indicated that they could only spend 10-15 minutes with a patient, often had to see four to give people per hour, and did not have staffing to provide actual therapy beyond practicum students and interns providing questionably supervised treatment in lieu of licensed staff.

Freitag001399

licensure but do not supervise indefinitely. It did not appear that Ms. Mahoney had become a licensed professional counselor, instead remaining as a "psychologist trainee" since 2014.

Despite Dr. Cassidy's emphasis on staff consulting her before releasing or downgrading detainees on suicide precautions, there was no policy and a lack of documentation to reflect that her expectation was implemented and occurred. None of the suicide prevention-related policies addressed this required consultation and method of documentation. Though Dr. Cassidy thought this process was important, she did not produce a memo to her staff indicating that it was required or recommended. This was a significant deficit in policy development and implementation highlighted by Mr. Freitag's case, where his watch status was downgraded without consultation. It was unclear if mental health staff actually had the benefit of regularly available clinical supervision and to what degree it was required for licensed providers.

Existing policies were not always consistent. For example, in this case there were multiple policies staff would need to integrate for suicide prevention. There were the two suicide prevention policies mentioned (BCCF and PCM). Then there was a Watch and Observation standard operating procedures (SOP) (AGBCC 421-422) revised January 2018, and Watch and Observation procedures (AGBCC 449-455) revised December 2017. The prior referred to the watch officer and the latter to the watch overall. While these two policies should be consistent with the suicide prevention policies, they were not. The Watch and Observation policies did not use the same terminology for acute watch. It was listed as though synonymous with Level 1 and Level 2 which may have been partially responsible for Mr. Moody's seemingly confused deposition when he appeared to describe acute watch as having a Level 1 or 2 despite policy describing them separately. Despite the multiple levels of observation at BCCF, standards of care indicate that there are only two levels of suicide watch: acute and nonacute. These are not properly reflected in the

Freitag001400

BCCF/PCM policies. Once getting to the actual watch SOP, different terms were used for watches that could cause confusion, and only one indicated that Level 3 was not a suicide precaution (e.g., Level 3 is never for suicidal people). It was not surprising to see that Mr. Moody and Mr. Young both had some difficulty recalling the types of watches and responsibilities for custody staff at each level.

Defendants failed to develop and implement policies that were detailed and comprehensive, not vague and limited, to address some of the basic correctional and correctional healthcare standards that assist in safety and security while protecting those in its custody. When they did produce policies, at times those were aspirational (e.g., should do) rather than directive and helpful for staff. Staff appeared confused at times during their depositions and still could not consistently accurately describe policies or expectations for suicide prevention assessment, management, and treatment.

### 2. Defendants failed to protect Mr. Freitag while he was in their custody by properly training and supervising staff.

Based on documentation provided, much of the training that occurs at BCCF and PCM appears to be self-paced computer or on-your-own training involving reading policies and viewing PowerPoint presentations. It appeared that at some point in-person training was provided to all new custody staff though the certified trainer, Dr. Cassidy, reported that training only occurred once for the employee. It was not clear if regular ongoing training was provided. While Dr. Cassidy mentioned in her deposition that she had put together her own updates, she could not describe the structure and content of those presentations and no documentation was made available. It is highly

unlikely that those presentations, when and if they occurred, would qualify for ongoing adequate training.

This was particularly notable in the depositions of custody staff who could not provide basic elements of the policies, including their role and responsibilities, or even of the different levels of observation for suicide precautions and what type of observation was explicitly prohibited for people considered suicidal. Mr. Young reported that he rarely referred a detainee (in 10 years of service) to mental health, which is not consistent with jails that meet the standards of care. Custody staff are a frequent source of referrals. The obligation to review the suicide prevention inmate monitor's documentation was unknown to Mr. Young who reported not reviewing inmates' documentation. Once confronted with the policy and job performance expectation for Mr. Young, he became defensive in responding and contradicted himself by saying he must have viewed some of them though he had no actual recollection of such (Young deposition).

3. **Defendants failed to protect Mr. Freitag while he was in their custody by adhering to known correctional standards of care and BCCF/PCM policies.**

While inadequate training may have contributed to some staff lapses, it was not the cause for all staff failures. Staff reported that they were aware of certain responsibilities, but failed to adhere to them. Mr. Young reported that he made no effort to get to know his detainee population even indicating that if an inmate was unfamiliar to him, it was because that was a "Model A inmate" who acted in accordance with Mr. Young's expectations of inmates. The deposition clarified that Mr. Young defined "model A" inmates as those that he doesn't know or recall who do "what they're supposed to." Unfortunately, that is not consistent with good correctional

Freitag001402

practices and actions that promote safety and security. Mr. Young's deposition suggested that he may be potentially contemptuous of inmates[5] which may have negatively impacted his ability to keep Mr. Freitag safe. Mr. Young's deposition also revealed that he lacked reasonable correctional rationales for when he failed to perform certain duties.

Dr. Cassidy reported in her deposition that she had received no supervisor or other training from PCM or BCCF once she was promoted to Director of Mental Health. This was true despite her very limited correctional experience and lack of experience supervising and directing an entire mental health department. Because it was incumbent on PCM and BCCF to ensure that Dr. Cassidy was properly trained and to supervise her, any failures on the part of Dr. Cassidy to correctly and adequately manage mental health services was a direct failure of PCM, and by extension BCCF. PCM had the direct responsibility to provide Dr. Cassidy with the training, supervision and support to fulfill her role as director adequately. BCCF was responsible for holding the contractor to proper discharge of the contract and to provide competent, appropriately educated and trained staff. Defendants were responsible to monitor Dr. Cassidy to be sure that she was properly implementing and utilizing existing policies and properly supervising her staff. There was no evidence that any meaningful form of monitoring (e.g., observation of Dr. Cassidy, review of her written documents) was provided to Dr. Cassidy, increasing the probability that she would face challenges as a director.

Dr. Cassidy, when discussing operation failures (e.g., lack of suicide risk assessments consistent with policy), appeared focused on what staff should do or were expected to do without proof that those actions were occurring. She never discussed any subsequent training or individual

---

[5] Mr. Young stated that Mr. Freitag would still be alive if he hadn't come to jail, that the only thing that could have prevented Mr. Freitag's death was for him to have not come to jail, and that the only thing Mr. Young could have done differently was to call in sick that day so that he could have avoided involvement. Mr. Young also responded negatively to supervising or monitoring the suicide prevention companion detainees or looking at their records. There was no reasonable rationale for this behavior.

Freitag001403

JA0000240

supervision sessions or other actions that occurred as a result of her reported chart reviews. She implied that those chart reviews were undertaken for documentation completion and quality reviews, yet did not report the outcomes. Despite being the Director of Mental Health, it was unclear if she personally reviewed the suicide watch forms discussed by Ms. Penge in her deposition. These observation monitoring forms would be sent to mental health for review but staff just skimmed and signed the forms (Penge deposition). There was no concurrent record review. Dr. Cassidy would be expected to monitor and audit important areas of focus, like suicide prevention based on standards of care, but that did not occur. She was not able to provide much information regarding the mortality review of Mr. Freitag or the discussions and recommendations of a national suicide expert, Mr. Lindsay Hayes, who was brought to BCCF and spoke about Mr. Freitag's case.

The correctional officers (Young and Moody) working the day of Mr. Freitag's death communicated their perception that 30-minute rounds were conducted "in a perfect world"[6] or that they would "try" to complete the required rounds.[7] These phrases were repeated frequently when going through a typical day or asked questions about duties and tasks. It became clear that Mr. Young and Mr. Moody, both working in Mr. Freitag's unit the day of his death, believed that two officers could not complete all required tasks in the unit. Mr. Young was able to articulate the daily schedule for B Module and it appeared very predictable. Predictable schedules are quite common in corrections. Because of that, all types of monitoring observations expected, including those related to suicide precaution watches, are to occur at *irregular* intervals so that detainees cannot predict when an officer will appear. This is believed to reduce the opportunity for dangerous or

---

[6] Mr. Young, deposition.
[7] Mr. Moody, deposition.

problematic behaviors. B Module was a general population unit and was reported to have less disturbances including fewer watches than other units. Mr. Young reported that when he was working officers usually began their rounds at the top and bottom of the hour. The predictable nature of the schedule would provide detainees with an increased likelihood that they could time certain behaviors and activities to minimize the chance of detection by custody staff.

For example, Mr. Young mentioned that morning yard returns to the unit at 1045 hours. He noted that it would be one thing that could challenge the occurrence of timely irregular checks not to exceed 30 minutes, the status that applied to Mr. Freitag on the day of his death. However, when reviewing video footage from that day, it appeared that both officers were behind the desk/officers' station in the corner of the unit. It was unclear why one officer could not have been making rounds at that time. Neither was able to provide a direct link between unit events and their inability to make timely rounds that day (8/25/18). Neither appeared to realize the requirement for irregular intervals, reporting that rounds occurred at the top and bottom of the hour.[8] They each seemed to view the 30-minute intervals as aspirational to be done if one could do so without stopping anything else.

Supervisors were required to conduct checks and maintain accountability across areas. For custody staff, their direct supervisors were to monitor their work. When those supervisors toured the units, part of their job would be to review the log book for maintenance of daily operations, talk to staff and detainees, and review documentation to be sure it is all being completed properly. Yet BCCF custody staff and inmate monitors were allowed to use pre-printed forms in equal blocks of time, such as every 15 minutes. Any kind of monitoring form should never be preprinted. It is an expectation and standard to document actual time at the start of the round and actual time at the

---

[8] Mr. Young, deposition.

conclusion. Not adhering to this standard could be viewed as a falsification of a document, particularly if times are not accurate. Staff and supervisors should have been aware of this basic documentation standard, though existing suicide prevention policy did not actively address it. The pre-printed forms suggest to staff those observations can be made at regular, predictable intervals, which negates any potential benefit from placing someone on enhanced observations and contradicts national standards. Mr. Young and Mr. Moody both reported that they had never received any progressive discipline or other notice that they were not maintaining their employment obligations and were violating policy. This shows that custody supervisors failed to consistently address observation failures such as those that occurred on the day of Mr. Freitag's suicide.

The suicide risk assessment (SRA) conducted by Ms. Mahoney on 6/5/18 was not accurately or properly completed. This form did note that she did not seek consultation from Dr. Cassidy or anyone else. There was also no documentation on the form that Dr. Cassidy had signed off on Ms. Mahoney's assessment. Ms. Mahoney failed to identify multiple risk factors present for Mr. Freitag at that time. Just to list a few she failed to identify: feelings of hopelessness and guilt, diagnosis of depression, bad news, and prior attempts. This information would have been readily available in the chart and likely from Mr. Freitag as he had been open with the registered nurse who conducted his suicide prevention screen. It was unclear that Ms. Mahoney was responsibly fulfilling her clinician duties or that Dr. Cassidy was adequately monitoring Ms. Mahoney. Based on subsequent documentation, it also appeared that these SRA errors were either not addressed with Ms. Mahoney or she failed to heed any advice.

In addition, while Dr. Cassidy reported during deposition that a SRA should be completed when a patient is placed on suicide watch/precautions and when decreasing the level of observation

as well as at the time of discharge, she did not appear to hold her clinicians to that standard. Existing policy reiterated the need for an SRA if someone else had placed the detainee on watch and when reducing/discharging levels. Despite the requirements that would have resulted in multiple SRAs over time, Mr. Freitag did not have another SRA after the two conducted in early June: one taken on intake and another on June 6th removing him from Level 2 watch and placing him on Level 3, despite policy clearly indicating that this level is not appropriate for a suicidal person. There was a mental status form completed at the time Deputy Warden Mitchell had been notified and then alerted mental health. The mental status exam was completed by Ms. James but no SRA was completed despite the Deputy Warden placing Mr. Freitag on a level of observation due to concerns from Mr. Freitag's family about his functioning and suicidality. Despite failing to conduct the SRA, Ms. James determined that Mr. Freitag was at low risk for suicide despite documenting behaviors and statements inconsistent with someone who was "low risk." According to Dr. Cassidy and BCCF and PCM policy, an SRA was required at that time and Ms. James' failure to complete a formal assessment violated expectations, policy, and standards of care.

While psychiatric nurse practitioner, Mr. Brautigam had maintained Mr. Freitag on Lexapro, on August 15, there was an order placed for Buspar, which was added to Mr. Freitag's psychotropic medication. Mr. Brautigam was responding to Mr. Freitag's symptoms and attempting to manage them with medications. While mental health saw Mr. Freitag on an ongoing basis, medical documentation did not support that those contacts were anything more than brief check-ins, as defendants acknowledged in their depositions. Mr. Freitag expressed his desire for treatment, but was told by Ms. James that therapy is not available though Mr. Freitag was agreeable to the twice per month contacts with student interns and possibly group treatment. Mr. Freitag

instead received medication management and brief "check in" contacts with mental health. No evidence of therapy was found in the medical record.

Mr. Freitag was seen regularly once he was placed on Level 3 observation status on July 31. During those contacts he reported negative ruminations regarding his situation, high anxiety focused on his sentencing, shame and guilt for what he had done to his family and his life, and demonstrated limited insight and judgment to his mental status and ongoing situation. Mr. Freitag was described repeatedly as having "loose associations" or rambling, racing thoughts. His condition did not improve and he still did not receive any therapeutic intervention beyond some support as a result of the contacts and possibly motivational interviewing, neither of which is considered an adequate treatment for clinical depression and suicidality.

Standards of care require that a person identified with a serious mental health illness, as Mr. Freitag had been, should receive necessary and indicated treatment.[9] Standards of care also require that if the existing facility/staff are unable to provide that care, the patient must be moved to a setting where he can receive adequate treatment. BCCF and PCM staff failed to meet these standards in their failure to adequately treat Mr. Freitag.

Medical records documentation by all mental health staff paint the picture of a patient who was decompensating during his time in their custody. Ms. Penge and Ms. Mahoney, the primary mental health providers once Mr. Freitag was placed on Level 3 until the time of his suicide, documented Mr. Freitag's reports of increasing anxiety and depression and his overwhelming concerns regarding sentencing. Records documented that Mr. Freitag had difficulty controlling his emotions and could not manage his anxiety and depression. While he had experienced some improvement due to medications early in his arrival, that quickly ceased. He reported ongoing and

---

[9] NCCHC 2015, 2018.

increasing symptoms during his mental health contacts, but continued to be viewed as "low risk" of suicide by Ms. Penge and Ms. Mahoney. They documented this conclusion on progress notes despite Mr. Freitag having been placed and maintained on a Level 3 watch due to suicidality concerns. Both Ms. Penge and Ms. Mahoney's failed to complete a structured assessment of ongoing risk during those contacts. In fact, Ms. Penge removed Mr. Freitag from Level 3 watch without consultation, in contradiction of her supervisor's (Dr. Cassidy) direction, and without completing the required suicide risk assessment. Mr. Freitag had multiple significant high risk suicide factors that staff, particularly Ms. Penge and Ms. Mahoney, did not address in progress notes suggesting that they did not address them with Mr. Freitag. Even Mr. Freitag's upcoming sentencing, a potential trigger for suicide did not result in staff taking appropriate action and responding appropriately.

While the chart documented Mr. Freitag's decline, it did not substantiate ongoing efforts to reduce risk and treat Mr. Freitag. Mr. Freitag's decompensating mental state was readily apparent to lay individuals who had contact with him. His cellmate reported to investigators[10] that Mr. Freitag felt guilt and shame over his offense and was highly anxious about sentencing. Mr. Freitag's brother recognized his brother's deterioration and notified BCCF of that via Mr. Freitag's attorney. It would have been clear to any adequately educated and trained clinician that Mr. Freitag's mental status was in decline and that his current elevated risk of suicide would increase greatly at the time of sentencing. To know that Mr. Freitag was not stable, had a serious mental illness, and numerous suicide risk factors and was facing an intense upcoming stressor but to not take action to reduce that risk was reckless. Ms. Penge and Ms. Mahoney should have placed Mr. Freitag at an appropriate level of suicide precaution, provided ongoing treatment out-of-cell

---

[10] Bucks County Detectives incident report.

targeted at suicide risk factors including depression, anxiety, hopelessness, guilt and shame. Instead, Ms. Penge and Ms. Mahoney were recklessly indifferent to Mr. Freitag's elevated suicide risk, not developing an adequate individualized treatment plan and updating it regularly as sentencing approached.

Additionally, no one from mental health could be bothered to meet with Mr. Freitag post-sentencing to conduct a necessary risk assessment, not even one of his primary mental health providers, Ms. Penge or Ms. Mahoney who had repeatedly documented how significant that day would be for Mr. Freitag and his mental status. At no point did Ms. Penge, Ms. Mahoney or any other mental health staff complete an actual treatment plan. Treatment plans are a required element of mental health services. In any setting, the failure to provide a patient experiencing a serious mental illness and elevated risk of suicide with an individualized adequate treatment plan would be profoundly alarming. The lack of an actual treatment plan was a significant departure from treatment standards of care in the community (e.g., licensure laws and professional standards) and in correctional settings.

The medical record also substantiates that Mr. Freitag was removed from even the Level 3 observation status prior to his sentencing. On August 17, 2018, Ms. Penge removed Mr. Freitag from any observation. She did this in the face of known risk factors despite not completing a suicide risk assessment and not consulting with her supervisor. This was contrary to that supervisor's email to mental health staff to keep Mr. Freitag on at least Level 3 for "weeks." (PCM 1674)

Ms. Mahoney saw Mr. Freitag on August 22 and despite completing no structured suicide risk assessment, found him to be at "low risk." Ms. Penge saw Mr. Freitag on August 23, and also concluded that he was "low risk" for suicide despite his report that he was very "nervous" about

court the following day and Ms. Penge's failure to complete a structured risk assessment. At that appointment, Ms. Penge took no action to have Mr. Freitag seen when he returned from court the following day. It is critical to recall that neither observation status nor a "check in" (i.e., brief contact with mental health staff where no actual treatment is provided) were considered interventions. As of August 23, Mr. Freitag was entering a period of the highest level of suicide risk since he had been in the custody of BCCF. Ms. Penge was fully aware or should have been fully aware of Mr. Freitag's risk level. She could have created a task or appointment that resulted in Mr. Freitag being seen following sentencing. Ms. Penge was also able to choose to be the clinician to see Mr. Freitag upon his return since she had so much contact with him and was knowledgeable about his case. Ms. Penge had acknowledged in her deposition that Mr. Freitag wasn't "listening" to her during their brief contacts regarding maintaining an open mind about what could happen in sentencing. Ms. Penge stated that Mr. Freitag was fairly sure that he would receive probation and he was focused on possible restrictions. She implied that Mr. Freitag was not preparing for any other outcome. Any clinician would recognize that this increased his risk of suicide if sentencing resulted in anything but probation. A correctional clinician would particularly be expected to recognize how this would increase risk level and take action, by asking that the detainee be placed on the most restrictive suicide precautions upon return pending suicide risk evaluation or meet with him post-sentencing to complete that SRA. Ms. Penge failed to adhere to the suicide prevention policies and standards of care, instead showing indifference to Mr. Freitag's high risk for suicide and failing to take any action to reduced his risk and potentially prevent suicide. By allowing a culture of indifference to detainees' needs where end-of-shift was prioritized over the needs of the people they were responsible for and by not implementing a policy or actual mechanism for ensuring newly sentenced offenders were seen before being returned to

their cells, PCM and BCCF demonstrated that their systemic failures would create systemic dysfunction that they knew likely to end in preventable harm to people like Mr. Freitag.

Correctional suicide prevention requires many actions and plans for action. One critical feature of the standard of care is that risk assessment is an ongoing process. It is readily acknowledged that risk level can vary, a risk assessment becomes less valid the older (further back in time) it gets, and that known high risk periods require closer and more frequent monitoring and assessment. For example, some systems use a screen that includes "bad news" items. This is to reflect that when detainees arrive at or return to a facility, significant negative events categorized as "bad news" may have occurred. These include medical diagnoses, family news, and losing custodial rights. Trips to court are considered significant because of the increased opportunity to receive bad news. The point of sentencing is considered so significant a risk factor that many systems have newly sentenced offenders speak to mental health immediately upon return regardless of the offender's presentation. This allows for that necessary risk assessment prior to re-housing the newly sentenced offender. This allows for identification of potentially suicidal offenders so that staff can take immediate action to implement safeguards and keep the offender safe.

While defendants in general and Dr. Cassidy in particular all acknowledge that sentencing is a significant event and known suicide risk factor, no such system of requiring mental health staff speak to returning detainees was established at BCCF. Instead, no one seemed to take responsibility for operations that could be easily modified to reduce risk of a suicide at the facility. There was no policy even informing staff that this was possible and how to initiate such contact. Mental health did not develop tasks to provide for this important and necessary assessment. While PCM supervisory staff and BCCF managers were aware of evidence-based risk factors, they did

not take simple actions to create a system that truly worked to prevent suicide. While Dr. Cassidy allows that mental health *could* meet with newly sentenced offenders upon their return, it would have to occur before the clinical staff left the facility. There was no recognition that clinical staff work in an unpredictable profession regardless of setting. At times there are crises at the end of a shift and it is the mental health clinician's ethical obligation to ensure that the patient receives appropriate care. This may require the clinician to remain past quitting hours to provide that care. However, the culture at BCCF fostered by Dr. Cassidy was one where quitting time was absolute and patients could be seen the next working day. For Mr. Freitag, this was too late. In his case, quitting time meant that Mr. Freitag would not be seen for days. No mental health visits or contact were scheduled to occur on: August 24 (sentencing), August 25, and August 26, with a mental health appointment not scheduled until August 27.

PCM and BCCF have changed this and did so in the month following Mr. Freitag's death as a direct result of his suicide. PCM and BCCF implemented a process where returning newly sentenced offenders would automatically be placed on Level 2 suicide precautions watch. In addition, PCM modified clinician hours to require that two mental health staff be present until 1600 hours and that a clinician must be on site until 1700 hours. These were positive and necessary improvements to operations. However, the need for these changes was obvious well before Mr. Freitag's suicide. Evidence regarding the increased suicide risk at sentencing has been widely available for years prior to Mr. Freitag's suicide.

**4. Defendants failed to adequately assess and identify the degree of Mr. Freitag's suicidality.**

As referenced above, Mr. Freitag only received two SRAs that were of the format described in policy and those were not properly completed. One failed to properly document Mr. Freitag's acute and chronic risk factors while the other (PCM 187-189) failed to properly consider his risk factors rather than just current behavior and provide an adequate clinical rationale for reducing Mr. Freitag's level to 3 when he was a suicidal patient.

As increasing information was gathered through ongoing contacts between clinicians and Mr. Freitag, there was no change in how Mr. Freitag was treated by mental health. Despite an elevated risk of suicide, Mr. Freitag, though possibly seen more frequently than peers was not provided any actual therapy, instead having to make due with 10-15 minute patient check-ins where documentation indicated that his anxious presentation and associated thoughts were concerning but no clinical interventions were utilized and he was not provided therapy.

As the situation grew so concerning that Mr. Freitag's family contacted his attorney for help with Mr. Freitag's care, defendants became aware that his functioning was considered abnormal by family. Dr. Cassidy provided mental health staff with information regarding Mr. Freitag following Deputy Warden Mitchell's inquiry. Mr. Freitag was placed on a level of observation (3) reserved for patients who are not at risk of harm but exhibit unusual or bizarre behaviors.[11] All mental health staff, including the Director Dr. Cassidy, were aware or should have been aware of each status of suicide precaution levels of observation and that Level 3 observations were not considered appropriate for suicidal people and specifically did not meet criteria for suicide precautions. Despite Mr. Freitag's placement on watch due to concerns about suicide risk, no clinician noted the problem with the observation level or took action to change it. Because every

[11] Medical Record and Suicide Prevention and related policies.

Freitag001414

JA0000251

person is obligated to keep detainees safe, any licensed clinician could have changed Mr. Freitag to a Level 2 suicide precaution.

It is important to recall that suicide prevention in detention facilities is everyone's responsibility. This is the premise that underscores the need to provide adequate training to all staff who have contact with detainees. Custody staff are particularly critical in monitoring detainee behavior and refer those who may be of concern for mental health including suicidality matters. In multiple facilities that this expert has assessed or monitored, I can walk into any housing unit and ask for a "regular" or custody staff who are usually posted to that unit. I can interview those officers for detainees who may be of concern. In my experience, a regular unit officer will have information about most of the detainees, even those who have not been in the unit long. This is not uncommon to find in units with 200 patients though it would likely be easier in units the size of B module. Despite the universal view that good security awareness means knowing what is going on in your unit, that was not found in Mr. Freitag's case.

The transcripts of staff provide rich context for Mr. Freitag's suicide. In B Module, Mr. Freitag's unit, the regular officer (Young) working the 6-2 shift stated during deposition that a good "Model A inmate" was someone he didn't know. Despite officers Young and Moody both stressing the importance of correctional awareness (e.g., surveil, frequent observation, familiarity with unit offenders) on safety, security, and suicide prevention, Mr. Young revealed that BCCF detainees who do not engage with him or come to his attention in any way are good "Model A inmate(s)." Clearly any one-time or ongoing training failed to promote the security value of knowing the people in your unit to Mr. Young in a way that he believed or adhered to personally. No custodial supervisor appeared to identify this risky frame of thought or made efforts to correct it and re-train Mr. Young so that he interacted with the people in his regular duty station.

Consequently, Mr. Young was uncertain that he had ever interacted with Mr. Freitag, a man who had been on a Level 3 observation status in his unit for about 3 weeks.[12]

5. **Defendants failed to adequately treat Mr. Freitag's decompensating serious psychiatric diagnosis (Major Depression) and related functional impairments.**

While much discussion has been given to Mr. Freitag's multiple and serious suicide risk factors, there was no reason to assume that his completed suicide was inevitable. Despite repeated attempts, research shows that therapeutic interventions are successful and that by interrupting a suicide attempt trajectory through the use of environmental and other protective mechanisms to then provide direct mental health treatment targeted to the patient's risk can prevent suicide and has done so.

While BCCF has policy on treatment services, this is a broad policy that provides little specificity on mental health treatment except to say that there was a referral process for access to mental health treatment. The policy also noted that treatment was as clinically indicated. However, in their depositions, Dr. Cassidy, Ms. Mahoney, and Ms. Penge stated that there was no opportunity to provide individual treatment to patients, regardless of need or desire. Mr. Freitag demonstrated both need and a desire to continue mental health treatment. Most of the clinicians and correctional staff interviewed did not seem to believe that they were empowered to either document the need for resources and staff or to take some sort of action on their concerns. While officers explained in their depositions that their roles were primarily to do as instructed, they did not seem aware of any action they could take to work with their supervisors to improve conditions. The same was

---

[12] J. Young, deposition, 12/23/2020.

true for mental health clinical staff. Dr. Cassidy's deposition suggested that she was a more passive director who took instruction from her health services administrator or regional administrator. In her deposition, Dr. Cassidy did not appear to provide input into decisions, request operational change or review of a practice, or function as a true director of mental health.

As all mental health staff readily acknowledged, they did not have the resources or the time to provide actual psychological treatment. While each mental health profession has their own ethical standards and professional standards associated with licensure, no clinical staff complied with standards of care in corrections. When something that an employer or facility staff ask of mental health providers conflicts with their ethical and professional standards, it is assumed that those requesting the questionable behavior are unfamiliar with mental health ethics and standards. It is then incumbent on the clinician to inform the party (e.g., custodial chain of command) of the conflict and work to resolve it. Licensed clinicians are not excused from providing sub-standard care or no treatment at all when faced with patients with psychiatric diagnoses of serious mental illness and/or suicidality. Each individual clinician who failed to adhere to policy, who failed to establish adequate treatment plans and then implement that indicated treatment, who repeatedly failed to notice their chain of command of the inability to provide adequate care to their patients and the emergent need for resolution, failed to adhere to standards of care as well as ethical and professional standards.

CONCLUSION

Defendants failed to protect Mr. Freitag. Because of a combination of inadequate or nonexistent policies, inadequate training of staff, failure to identify and properly assess Mr. Freitag's risk of suicide, failure to intervene to moderate risk, failure to supervise, and failure to

implement and maintain standards of care, Mr. Freitag was left in his cell without the required

proper observation for someone in his situation. Had Mr. Moody and Mr. Young and their

supervisors properly discharged their duties, they may have prevented the suicide of Mr. Freitag

through prevention of the act altogether or responding fast enough to prevent death. Contrary to

Mr. Young's statement during his deposition that the only way to prevent Mr. Freitag's suicide

was for Mr. Freitag to "…not come to jail…," there were many opportunities that custody and

mental health staff failed to recognize or utilize that would have likely prevented the suicide of

Mr. Freitag. Because of a failure to supervise and observe Mr. Freitag, it was unknown how long

he had been in his cell injured, reducing the probability of a successful rescue and resuscitation.

Despite Mr. Freitag telling mental health staff at each contact of his increasing symptoms and

anxiety, no treatment beyond medication management was provided to him. Mental health staff

did not even properly implement the suicide precautions described in policy when notified by

Mr. Freitag's brother of significant concerns regarding Mr. Freitag's well-being and suicidality.

Custody staff failed on the day of Mr. Freitag's death to properly implement suicide prevention

observations.

    BCCF supervisors and managers (county and contract) should have been aware that their

policies and practices were inadequate in several key areas. The inability to provide staff specific

and detailed policies that were sufficiently directive that all employees would be able to take

appropriate action to minimize the probability of self-harm and prevent suicide was apparent

throughout staff deposition testimony and multiple records. Because of the failures to produce

policies consistent with correctional and community standards, staff were in great need of

frequent assertive supervision. That also did not appear to occur for mental health or custody

Freitag001418

staff. As Mr. Freitag's mental status began to spiral negatively, the staff around him did not respond appropriately, even when prompted by Mr. Freitag's own brother and lawyer.

Because of the repeated failures and lost opportunities for defendants to take action to reduce the risk to Mr. Freitag and potentially prevent his death, Mr. Freitag was pronounced dead by suicide on August 25, 2018, the day after being sentenced.

*Mary Perrien, Ph.D.*  1/31/2022
Mary Perrien, Ph.D.    Date

Freitag001419

**APPENDIX A**

Curriculum Vitae/Resume

Freitag001420

**Mary Perrien, Ph.D.**
3313 W. Cherry Lane, Suite 333
Meridian, ID 83642
(208) 965-0875
mperrien@safesocietysolutions.com

| | | |
|---|---|---|
| **EDUCATION** | **University of Hawaii, Manoa** | |
| | Doctor of Philosophy, Clinical Psychology | 1998 |
| | Master of Arts, Clinical Psychology | 1994 |
| | **San Jose State University** | |
| | Bachelor of Arts, Psychology | 1991 |
| **LICENSURE STATUS** | PSY18582 (California) | |
| | PSY 202317 (Idaho) | |
| **TRAINING** | Internship in Clinical Psychology | 1997-1998 |
| | Atascadero State Hospital | |
| | Atascadero, California | |
| **PROFESSIONAL** | | |
| **EXPERIENCE** | Expert Consultant | 3/2019-7/2021 |
| | Correct Care Solutions, LLC | |
| | Expert Consultant | 2017-11/2020 |
| | Alabama Department of Corrections | |
| | Expert Consultant | 2013-2015 |
| | Idaho Department of Correction | |
| | Expert Consultant | 2012-2014 |
| | Ohio Department of Rehabilitation and Correction | |
| | Expert Consultant | 2012-2013 |
| | National Institute of Corrections | |
| | Expert Consultant | 2011-2012 |
| | Illinois Department of Corrections | |
| | **Safe Society Solutions, LLC** | 2010 to present |
| | Sole Proprietor, forensic evaluator and expert | |
| | Witness (for defendants and plaintiffs) practice | |
| | Expert Consultant | 2010-present |
| | Department of Homeland Security, Civil Rights | |
| | and Civil Liberties (function as a subcontractor) | |

Freitag001421

JA0000258

| | | |
|---|---|---|
| **PROFESSIONAL EXPERIENCE Continued** | **Expert Consultant** United States District Court, Eastern District of California (*Coleman et al. v. Brown et al.*) Case No. 90-0520 LKK-JFM | 2007 to present |
| | **Chief, Division of Education and Treatment** Idaho State Department of Correction | 2006-2010 |
| | **Chief Psychologist/Director of Mental Health** Idaho State Department of Correction | 2005-2006 |
| | **Chief Psychologist/Director of Mental Health Services – Correctional Facility** California State Prison at Corcoran | 2003-2005 |
| | **Senior Psychologist, Supervisor – Correctional Facility** California State Prison at Corcoran | 2001-2003 |
| | **Psychologist - Clinical, Correctional Facility** California State Prison at Corcoran | 2000-2001 |
| | **Staff Psychologist** Federal Correctional Institution, Butner | 1998-2000 |
| | **Therapist/Researcher** Honolulu Police Department | 1996-1997 |
| | **Therapist/Group Facilitator** Child & Family Services, Hawaii | 1994-1997 |
| | **Therapist/Group Facilitator** Department of Public Safety, Hawaii | 1994-1997 |
| **TEACHING EXPERIENCE** | **Guest Lecturer, various Psychology and Criminology courses Boise State University** | 2006-2014 |
| | **Instructor, Correctional Peace Officers Standards & Training Academy (Idaho)** | 2006-2014 |
| | **Lecturer Department of Psychology, University of Hawaii** | multiple 1994-1997 |

Freitag001422

**PUBLICATIONS &
TECHNICAL
REPORTS**

Perrien, M. and O'Keefe, M. (2015). Disciplinary Infractions and Restricted Housing. In *Oxford Textbook of Correctional Psychiatry.* New York NY: Oxford University Press.

Perrien, M. (2010). Mental Health Guidelines and Documentation for Psychotherapists. In *Manual of Forms and Guidelines for Correctional Mental Health.* Washington DC: American Psychiatric Publications.

Perrien, M. (2009). Sex offenders: Analysis of best practice and current practice in Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Perrien, M. (2008). Sex offenders: The current practices in the State of Idaho for case disposition, assessment, treatment and supervision. A Report provided to the Idaho Criminal Justice Commission.

Kunitake, M., Perrien, M., Yokoi, E., Perrone, P., Green, T., Sakamoto-Cheung, S., & Richmond, J. (1997). Felony sexual assault arrests in Hawaii. <u>Crime Trend Series: State of Hawaii Department of the Attorney General</u>, 5(2), 1-9.

**PRESENTATIONS**

Perrien, M., Barboza, S., and Masotta, M. (April 2021). Presenter at NCCHC Spring
2021 virtual conference.

Perrien, M. (September 2009). Presenter at the annual Idaho District Judges Retreat Training, Twin Falls, Idaho.

Perrien, M. (January-March 2009). Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2009). Presenter at the annual Idaho District Judges Seminar. Boise, ID.

Perrien, M. (December 2008). Educating correctional officers to respond to medical emergencies. A paper presented at the conference Operational Excellence in Correctional Healthcare, Las Vegas, NV.

Perrien, M. (September 2008). Panel Presenter at the annual Idaho District Judges Retreat Training. Sun Valley, Idaho.

Perrien, M. (January-March 2008). Provided expert testimony in multiple Senate and House Legislative hearings.

Perrien, M. (January 2008). Presenter at the annual Idaho District Judges Seminar. Boise, ID.

Perrien, M. (September 2007). Panel Presenter at the annual Idaho District Judges Retreat Training. Sun Valley, Idaho.

Perrien, M. (January-March 2007). Provided expert testimony in multiple Senate and House Legislative hearings.

**PRESENTATIONS
Continued**

Perrien, M. (November 2006).  Suicide Risk Management in Corrections.  Paper presented at the Idaho Suicide Prevention Action Network Conference, Boise, Idaho.

Perrien, M. (November 2006).  Mental Health Care in Corrections and Community Corrections.  Presentation to District 7 Judges, Idaho Falls, Idaho.

Perrien, M. (October 2006).  Correctional Mental Health Care in Idaho.  Presentation to the Mental Health and Substance Abuse Treatment Delivery Systems Interim Legislative Committee.

Perrien, M. and Muller, C. (June 2006).  Cultural Competence and Multi-cultural Psychology.  Paper presented at the Idaho Mental Health Coalition Conference, Boise, Idaho.

Perrien, M. (April 2006).  Sex Offender Treatment in Correctional Setting.  Paper presented at the annual National Commission on Correctional Health Care Updates Conference, Las Vegas, Nevada.

Perrien, M. (November 2005).  Sex Offender Risk Assessment.  A training for clinical staff employed by the Idaho Department of Correction and Corrections Corporation of America.

Perrien, M. (October 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Boise, Idaho.

Perrien, M. (September 2005).  Sex Offender Management.  Informational presentation at Community Meeting sponsored by Idaho Department of Correction, Pocatello, Idaho.

Perrien, M. (April 2003).  Cultural Competence and Multi-cultural Mental Health Services.  A training workshop presented to mental health staff at CSP-Corcoran.

Perrien, M. (2002, multiple).  Forensic Evaluations and Courtroom Expert Testimony. A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2001, multiple).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for mental health staff at CSP-Corcoran.

Perrien, M. (2000, February).  The Assessment, Treatment, Management and Community Supervision of the Sex Offender.  A training workshop provided to U.S.Probation Officers, Long Island, NY.

Perrien, M. (1999, July).  Psychopathy and the Hare Psychopathy Checklist, Revised.  A training workshop for predoctoral interns presented at the Federal Correctional Institution at Butner.

Perrien, M. (1999, April).  Psychopathy and the Hare Psychopathy Checklist Revised.  A training workshop for doctoral and masters level staff in the Sex Offender Treatment Program at the Federal Correctional Institution at Butner.

JA0000261

**PRESENTATIONS**
**Continued**          Perrien, M. & Kunitake, M. (1997, February).  Demographic characteristics of
                         felony sex assault arrestees in Hawaii.  Paper presented to the Hawaii
                         State Legislature at an Informational Symposium on Community
                         Notification of Sex Offenders in Honolulu, Hawaii.

                      Perrien, M. & Kunitake, M. (1997, February).  Registration and community
                         notification of sex offenders in Hawaii.  Paper presented at the annual
                         meeting of the Western Society of Criminology conference in Honolulu,
                         Hawaii.

                      Perrien, M. & Marsella, A.J. (1996, April).  Reported frequencies and perceived
                         severity ratings of traumatic and near-traumatic events among college
                         students.  Paper presented at the meeting of the Western Psychological
                         Association, Santa Clara, California.

**ASSOCIATIONS/MEMBERSHIP**
          American Psychological Association, member
          American Psychology-Law Society, member
          Association for Behavioral and Cognitive Therapies, member
          Association for the Treatment of Sexual Abusers, clinical member
          National Commission on Correctional Health Care, member
          World Professional Association for Transgender Health, member

**COMMUNITY APPOINTMENTS**
Idaho State Planning Council on Mental Health, appointed by the Governor, 2009 and 2010.

**EXPERT WITNESS & CONSULTING**
*Various, Pennsylvania Institutional Law Project.* (January 2021 to present) Assessment of adequacy of
services in county jails and Pennsylvania Department of Corrections. (Retained by plaintiff).

*Craig Boston v Bucks County, PA et al.* (February 2021 to present). Adequacy of care provided to plaintiff
in while in custody of county jail. (Retained by plaintiff, report provided).

*Jacinta Nall as guardian for estate of Tessa Joy Nall v King County et al. (2020 – 2021)* Assessment of
adequacy of services provided in while in jail custody. United States District Court, Western District of
Washington (retained by plaintiff). Parties settled case.

*Abdiwali Musse v King County et al.* (2020 to November 2021) Assessment of adequacy of care and risk
assessment in the assault in custody of jail detainee. U.S. District Court, District of Columbia, (Retained
by plaintiff, report and deposition completed).

*Lorenzo Mays, et al v County of Sacramento.* (2020 to present) Monitoring Expert. Assessment of
implementation of consent decree for mental health services in county jail. U.S. District Court, Eastern
District of California (Appointed via agreement by both parties).

*Toby Meagher, et al v King County, et al.* (2019 to present) Assessment of adequacy of care in the
assault in custody of jail detainee. Pending hearing. U.S. District Court, Western District of Washington
(Retained by plaintiff, report and deposition with testimony expected).

*Edward Braggs, et al v Jefferson Dunn (ADOC), et al.* (2018-October 2020) Multiple court-ordered
assessment reports including suicide prevention and functional segregation. U.S. District Court, Middle
District of Alabama, Northern Division (Retained by defendants).

Freitag001425

**EXPERT WITNESS & CONSULTING Continued**

*The estate of Marc Moreno v Benton County Sheriff et al. (December 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case in mediation. Benton County, Washington. (Retained by plaintiff, report).

*The estate of Mathew Ajibade et al v Wilcher et al. (June 2017)* Assessment of adequacy of care in the death in custody of jail detainee. Case set for trial; deposition taken. U.S. District Court, Southern District of Georgia. (Retained by plaintiff, report and deposition testimony).

*Potter v State of Idaho Department of Health and Welfare.* (May 2017) Provided expert testimony regarding the reliability and validity of recovered memories as well as the adequacy of investigations into allegations of sexual abuse. Idaho state hearing, appeal of finding. (Retained by defendant, report and testimony).

*The estate of Gordon Powell v Barnes et al.* (May 2017) Assessment of mental health staff and the adequacy of care in the murder of an inmate. U.S. District Court, Western District of Washington. (Retained by plaintiff, report).

*Edward Braggs v Jeffrey Dunn (Alabama Department of Correction) (2017)* Expert consultation to defendants post-litigation regarding adequacy and needs of current mental health service delivery system; provide expert assistance in mediation process; provide expert testimony and assistance in failed mediation trial matters, conducted staffing and suicide prevention assessment. (Retained by defendant, report and trial testimony)

*Disability Rights Florida, Inc. v Julie Jones, Secretary Florida Department of Corrections, et al.* (2016-2017) Consulting expert to plaintiffs to conduct assessments of the inpatient units at all facilities except for Dade Correctional Institution and develop recommendations on issues of mental health treatment, staffing, training and quality improvement. U.S. District Court, middle District of Florida. (Retained by plaintiff, report)

*Walker v Wall, Director, Rhode Island Department of Corrections et al*. (February 2016) Evaluated adequacy of care in post-PREA incident. Provided deposition testimony. U.S. District Court, District of Rhode Island. (Retained by defendant, report and deposition testimony).

Freitag001426

## APPENDIX B

Freitag Deposition Exhibits

| Ex. No. | Document | Bates |
|---------|----------|-------|
| 1 | Post-sentence level 3 email thread | AGBCC 126 - 127 |
| 2 | Suicide Prevention Program Policy | AGBCC 427 - 432 |
| 3 | Social Worker Case Notes | AGBCC 351 - 352 |
| 4 | Offender Management - Alerts | AGBCC 444 |
| 5 | B Module Activity Log (8-24, 8-25) | AGBCC 99 - 101 |
| 6 | Watch and Observation Policy | AGBCC 421 - 422 |
| 7 | Watch and Observation Procedures | AGBCC 449 - 455 |
| 8 | Treatment Services | AGBCC 437 - 439 |
| 9 | Inmate monitor form (8-24 10 pm - 8-25) | AGBCC 185 - 186 |
| 10 | Bochenek 10-24-19 incident report | AGBCC 418 |
| 11 | Onisick investigation report | AGBCC 4 - 8 |
| 12 | DiSandro report re prisoner interviews | AGBCC 193 |
| 13 | Bochenek Investigation report | AGBCC 196 |
| 14 | Officer Young Incident Report | AGBCC 114 |
| 15 | Officer Moody Incident Report | AGBCC 115 |
| 16 | PrimeCare Mortality Review | PCM 1666 - 1673 |
| 17 | Christina Penge, MS, LPC resume | PCM 1271 – 1272 |
| 18 | Jesssica Mahoney resume | PCM 1273 – 1274 |
| 19 | PrimeCare Annual Report, 2018 | PCM 865 – 870 |
| 20 | PrimeCare job descriptions | PCM 1277 – 1284 |
| 21 | PrimeCare letter to J. Mahoney re: licensing | PCM 1168 |
| 22 | PrimeCare Suicide Prevention Policy | PCM 349 – 360 |

Freitag001427

| 23 | PrimeCare medical/mental health chart for Charles Freitag | PCM 1 – 305 |
| 24 | A. Cassidy email to mental health staff re: Charles Freitag, 8/1/2018 | PMC 1674 |
| 25 | Photograph of prison-issued cup | N/A |
| 26 | P. Lang email to C. Mitchell re: Charles Freitag, 8/1/2018 | Freitag 1191 |
| 27 | Statement of Hugh Caldwell re: inmate monitors | Freitag 1388 – 1389 |
| 28 | Notice of Deposition – Bucks County designee | N/A |
| 29 | Bucks County Detectives incident report | N/A |
| 30 | PrimeCare email to staff re: mental health hours | PCM 1675 |
| 31 | Stephan Brautigam resume | PCM 1277-1279 |
| 32 | Avia James resume | PCM 1275 – 1275 |

Freitag001428

**APPENDIX C**

TRANSCRIPT DOCUMENTS

| RANDOM NUMBER | NAME | DOCUMENT |
|---|---|---|
| 1 | Christina Penge | Mini |
| 2 | Charles Freitag, Jr. | Mini |
| 3 | Carl Metellus | Mini |
| 4 | Avia James | Mini |
| 5 | Abbey Cassidy, Psy.D. | Mini |
| 6 | Tory Murphy | Mini |
| 7 | Thomas Weber, Esq. | Mini |
| 8 | Thomas Hyers | Mini |
| 9 | Stephan Brautigam | Mini |
| 10 | Robert Moody | Mini |
| 11 | Robert Miller | Mini |
| 12 | Robert Freitag | Mini |
| 13 | Lillian Budd | Mini |
| 14 | Kelly Reed | Mini |
| 15 | Jessica Mahoney | Mini |
| 16 | James Young | Mini |
| 17 | James Nottingham | Mini |
| 18 | Frank Bochenek | Mini |
| 19 | Emily Scordellis | Mini |
| 20 | Daniel Onisick | Mini |
| 21 | Clifton Mitchell | Mini |

Freitag001429

JA0000266