# EXHIBIT 59

JA0000761

Thomas Weber, Esquire

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES JOSEPH FREITAG,       :    NO. 2:19-cv-05750-JMG
JR., as Administrator of      :
the ESTATE OF CHARLES         :
JOSEPH FREITAG, SR.,          :
              Plaintiff       :
                              :
       vs.                    :
                              :
BUCKS COUNTY; PRIMECARE       :    CIVIL ACTION - LAW
MEDICAL, INC.; STEPHAN        :
BRAUTIGAM, PMHNP;             :
JESSICA MAHONEY, PSY.D.;      :
AVIA JAMES, LPC;              :
CHRISTINA PENGE, LPC;         :
CORRECTIONAL OFFICER          :
MOODY; CORRECTIONAL           :
OFFICER MURPHY; and           :    JUDGE JOHN M. GALLAGHER
CORRECTIONAL OFFICER          :
YOUNG,                        :
              Defendants      :

_____

ZOOM DEPOSITION OF THOMAS WEBER, ESQUIRE

DATE AND TIME:  Wednesday, June 9, 2021
                at 2:30 p.m.

_____

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112  1-877-KLW-DEPO

WWW.KLWREPORTERS.COM

JA0000762

Thomas Weber, Esquire

Page 26

1                    MR. NINOSKY:  Object to the form, but you

2    can answer.

3                    THE WITNESS:  No.

4    BY MR. FEINBERG:

5           Q.    That's a segue into the substantive

6    issues that we want to address today on mental healthcare

7    staffing.

8                    And let's do this.  I think the best way

9    to get into this topic is for me to show you some of the

10   records here.  I know you did -- you did not review any

11   of the medical records or mental healthcare records

12   before today's deposition.  Is that correct?

13          A.    That's correct.

14          Q.    All right.  I'll put in front of you now

15   what has previously been marked as Exhibit P-23.  Do you

16   have it in front of you, sir?

17          A.    I do.

18          Q.    All right.  This is a 305-page document

19   containing the entire medical and mental health chart for

20   Mr. Freitag.  And what I'm going to do now is show you

21   Page 141.  And before I show you the specific document,

22   let me note that, just to save time, Mr. Freitag came

23   into the facility on June 4th after he was convicted by a

24   jury.  His sentencing was scheduled for August 24th.  Do

25   you understand those -- that time frame?

JA0000763

Thomas Weber, Esquire

Page 27

1          A.    Yes.

2          Q.    All right.  So I'm showing you here a

3    note from -- created by Jessica Mahoney on June 15th of

4    2018.  Do you see what I have highlighted, sir?

5          A.    Yeah.  I wouldn't call it a note but,

6    yes.

7          Q.    Yeah.  I have highlighted text.  This is

8    the -- I believe, the task section of the chart.  Is that

9    right?

10          A.    That's correct.

11          Q.    All right.  And what's -- what is noted

12    in this record that I have highlighted is that Dr.

13    Mahoney created an appointment for August 27th, 2018,

14    which reads:  MH FU after trial.  I understand that to be

15    mental health follow-up after trial.  Does that sound

16    right to you, sir?

17          A.    Yes.

18          Q.    Now, that's the scheduling.  Let me show

19    you the encounter that led to that scheduling.  And for

20    this I'm going to 268 -- no, I'm sorry, that's actually

21    the same thing.  Bear with me for one moment.

22                All right.  I'm now at Page 111, and we

23    have here a note from June 15th of 2018 -- I'm sorry.

24    My PDF application is giving me problems here.  Bear

25    with me for one moment.

JA0000764

Thomas Weber, Esquire

Page 28

1              Here's what I'm gonna do.  I'm gonna

2    close this document, sir, so bear with me for one

3    second.  These are the problems we face when I can't

4    share a paper with you.  Okay.  I should be able to

5    re-share this with you.

6              We have got Exhibit P-23 up.  Do you have

7    that on your screen, sir, the top of Page 112?

8         A.    Okay, yes.

9         Q.    Okay.  I'm showing you Dr. Mahoney's note

10   and highlighting here, at the bottom of Page 111, he,

11   referring to Mr. Freitag, discussed wanting mental health

12   to follow up after he goes to court in August.  Do you

13   see that, sir?

14        A.    Yes.

15        Q.    And then Dr. Mahoney notes:  Mental

16   health to follow up as per protocol.  Do you see that,

17   sir?

18        A.    Yes.

19        Q.    Now, my understanding from Dr. Mahoney's

20   testimony and also Dr. Cassidy's testimony, is that if

21   Mr. Freitag was gonna be going to court on August 24th,

22   which was a Friday.  The next available appointment for

23   him to be seen by mental health staff would have been on

24   Monday, August 27th.

25              First of all, do you understand the

JA0000765

Thomas Weber, Esquire

Page 29

1    timelines that I've outlined?

2         A.    Yes.

3         Q.    Second, is that consistent with your

4    understanding of what the practice was at Bucks County in

5    that time frame?

6              MR. NINOSKY:  Object to the form.

7              THE WITNESS:  Yes.

8    BY MR. FEINBERG:

9         Q.    My understanding from Dr. Cassidy, in

10   particular, in her testimony is that mental health staff

11   would leave the facility by 4:00 p.m.  Is that your

12   understanding as well?

13        A.    That was when their -- yeah, their

14   workday would end.  Yes.

15        Q.    All right.  So their workday was -- I

16   forget the start time -- but 6:30 or 7:00 a.m.  Does that

17   sound right?

18        A.    I think it's 6:00 to 4:00, was 6:00 to

19   4:00.

20        Q.    So after 4:00 p.m. Monday through Friday

21   there would be no mental health staff in the facility;

22   correct?

23        A.    Correct.

24        Q.    And Friday 4:00 p.m. until Monday 6:00

25   a.m. there are no mental health staff in the facility.

JA0000766

Thomas Weber, Esquire

Page 33

1          Q.    Okay.  Fair to say several years before

2    2018.  Is that right?

3          A.    Correct.  We were -- there was a period

4    of time where we were just providing the medical side of

5    the house.

6          Q.    And the mental healthcare was provided by

7    another entity.  Is that correct?

8          A.    That is correct.

9          Q.    And was it March of 2018 when PrimeCare

10   was asked to handle the mental healthcare?

11         A.    We were asked prior to March of '18 and

12   that's when we assumed to provide the care.

13         Q.    Yeah, understood.  I assume there were

14   negotiations over the contract and so on and then that

15   was executed or finalized with the start date in March of

16   2018; correct?

17         A.    Correct.

18         Q.    So you mentioned that PrimeCare made

19   recommendations about numbers of staff.  Can you give me

20   some of the specifics on that.  What were the

21   recommendations that were made?

22         A.    I think we added one full-time mental

23   health clinician.

24         Q.    Would that have been someone as a -- at

25   the LPC level?

JA0000767

Thomas Weber, Esquire

Page 34

```
 1          A.    Yes.
 2          Q.    Did PrimeCare make any recommendations
 3    about the hours at which mental health staff would be
 4    available?
 5          A.    Not at that time, no.
 6          Q.    Were those -- were the hours for
 7    availability of mental healthcare staff the subject of
 8    any negotiations?
 9          A.    No.
10          Q.    Well, for example, did the County put out
11    an RFP for mental healthcare?
12          A.    No.
13          Q.    This was part of ongoing -- an ongoing
14    business relationship.  Is that how it worked?
15          A.    Yeah.  The -- the Director of the
16    Department of Health there, you know, had seen our
17    operations on the medical side.  He perceived some
18    utility from combining the services for coordinated
19    care, approached us and asked if we would be willing to
20    do so.  And after some period of time, you know, we
21    agreed and then were able to come to terms and start the
22    care.
23          Q.    Who is the director from the County?
24          A.    Dr. Damsker, David.
25          Q.    D-A-M-S-K-E-R?
```

JA0000768

Thomas Weber, Esquire

Page 35

```
 1              A.    I believe so.

 2              Q.    Let me ask it this way.  Do you recall

 3    personally -- strike that.

 4                    In the course of these negotiations I

 5    assume PrimeCare became aware of what hours mental

 6    healthcare staff would be expected to work.  Is that

 7    correct?

 8                    MR. SCOTT:  Objection.

 9                    THE WITNESS:  Yes.

10    BY MR. FEINBERG:

11              Q.    The hours being 6:00 to 4:00, Monday

12    through Friday; correct?

13              A.    Yes.

14              Q.    At any time did you personally raise any

15    concerns that that may not provide enough coverage for

16    mental healthcare needs of prisoners?

17                    MR. NINOSKY:  Object to form.

18                    THE WITNESS:  No.  It's --

19    BY MR. FEINBERG:

20              Q.    Did anyone within PrimeCare --

21              A.    -- rather exhaustive coverage.

22              Q.    Yeah.  I spoke over you, Mr. Weber, so if

23    you could just repeat your answer.

24              A.    No.  I mean it's rather exhaustive

25    full-time coverage.
```

JA0000769

Thomas Weber, Esquire

1          Q.    Did anyone raise any concerns about the

2     availability -- anyone within PrimeCare raise any

3     concerns about the hours at which mental healthcare would

4     be available?

5          A.    No.

6          Q.    Did anyone from the County make any

7     suggestions that mental healthcare staff -- it would be

8     helpful to have mental healthcare staff available for

9     longer time periods during the day or during the weekend?

10         A.    I don't believe so, no.

11         Q.    Did anyone, PrimeCare or Bucks County,

12    ever raise any concerns that having mental healthcare

13    staff leave at 4:00 p.m. would prevent mental healthcare

14    staff from being available when people returned from

15    court?

16              MR. NINOSKY:  Object to the form.

17              THE WITNESS:  No.

18    BY MR. FEINBERG:

19         Q.    Was there -- so, in sum, it sounds like

20    there was no consideration at that time, any time before

21    August of 2018, of having mental healthcare staff in the

22    building after 4:00 p.m.  Is that correct?

23         A.    That's correct.

24         Q.    In the -- I guess nearly -- well, 80 as

25    of next week, facilities where PrimeCare has a contract

Thomas Weber, Esquire

Page 37

 1   --

 2                   MR. NINOSKY:  Jon, you have to start it

 3   again.  You froze on us again.

 4                   MR. FEINBERG:  I've gotta do something

 5   about this internet connection.  Okay.  Is that better?

 6   Lori, can you hear me all right?

 7                   COURT REPORTER:  Yeah, I can hear you.

 8   You just broke a little bit.

 9                   MR. FEINBERG:  I'm in the middle of the

10   fifth largest city in the country.  You'd figure I'd be

11   able to get decent internet service.

12   BY MR. FEINBERG:

13            Q.    Okay.  Mr. Weber, at any of the other

14   facilities where PrimeCare has contracts are there any

15   arrangements made to allow -- that would ensure the

16   availability of mental healthcare staff when people

17   return from various court dates?

18                   MR. NINOSKY:  And you're talking about

19   availability in person in the facility at the time,

20   correct, Jon, not --

21                   MR. FEINBERG:  Correct.

22                   MR. NINOSKY:  -- not the on-call setup

23   which is available at all these facilities?

24                   MR. FEINBERG:  Correct.

25                   MR. NINOSKY:  Okay.  You can answer Tom.

JA0000771

Thomas Weber, Esquire

Page 38

```
 1                    THE WITNESS:  There are other facilities
 2    that have different hours of operation including
 3    facilities that don't have coverage every day of the
 4    week.  Some facilities have coverage that goes beyond
 5    4:00 and 5:00 o'clock.  It was not established to ensure
 6    availability of mental health for people who returned
 7    from court.
 8    BY MR. FEINBERG:
 9         Q.    Okay.  So it sounds like that's if -- I
10    want to make sure I'm understanding correctly.  At other
11    facilities if they have people who are available at a
12    later time period it's an artifact of the way scheduling
13    works there and not specifically tied to return from
14    court.  Is that correct?
15         A.    Correct.
16         Q.    All right.  Now, my understanding is that
17    at sometime between August of 2018 and the present there
18    was a change in staffing in -- for mental healthcare at
19    Bucks County.  Is that correct?
20                    MR. NINOSKY:  Object to form, but you can
21    answer.
22                    THE WITNESS:  That is correct.
23    BY MR. FEINBERG:
24         Q.    All right.  What was that change?
25         A.    Hours were -- in the day were increased
```

JA0000772

Thomas Weber, Esquire

Page 40

1  we're talking about would have been in place as of

2  December of 2019.  Your best recollection is that it was

3  early that year, early 2019?

4          A.    First -- first three or four months we

5  probably -- I mean, we would have conducted a review

6  approaching the anniversary of the start of the service

7  to see, you know, what modifications can be made or

8  should be made.  So that's my best recollection as to

9  when something like this would be implemented.

10         Q.    Who made the decision to change the

11 hours?

12         A.    It would have been a collaborative

13 effort amongst myself, Todd, with insight given to us by

14 Dr. Cassidy and, perhaps, Dr. Scordellis to the extent,

15 you know, she had direct interaction and supervision

16 down there.

17         Q.    Why was the change made?

18         A.    With the -- with the addition of an

19 additional person we found that -- you know, any time in

20 a correctional facility there are windows in which you

21 can get patients.  You know, you have to compete with

22 the medical provider call, the dental provider call.

23               We had more individuals and it was

24 perceived that, you know, you could run into a situation

25 where -- you know, in the trades they'd call it staffing

JA0000773

Thomas Weber, Esquire

Page 41

1   where you're not getting the most efficiency out of the

2   staff that you have there, so spread it out a little

3   further, provide, you know, a little bit more coverage

4   area in which people can operate.

5          Q.   Okay.  So with an additional person -- I

6   understood you to have said and maybe -- let me just

7   confirm.

8               When you said before that PrimeCare

9   recommended to the County adding an additional

10  clinician, did that occur at the time the service

11  initiated in March of 2018?

12         A.   Yeah.  It's not that we recommended an

13  additional person, but when we were asked to give a

14  proposal our proposal included that, you know, here is

15  the package of what we're gonna provide and that

16  included an additional individual.

17         Q.   So in 2019 was there another person added

18  or was it, looking backwards over the course of the

19  year --

20         A.   It was --

21         Q.   -- an additional person?

22         A.   Yeah.  It's looking backwards over that

23  year.  Did -- did we get the most utility out of an

24  extra body there or, you know, is it possible to have

25  someone free up and provide a little extended coverage.

JA0000774

Thomas Weber, Esquire

Page 42

1          Q.    Was there any relationship between this
2    decision and a specific desire to have mental healthcare
3    staff available for when prisoners returned from court?
4          A.    No.
5          Q.    Did that ever come up in any
6    conversation?
7          A.    No.
8          Q.    Do you know whether --
9          A.    Not that I -- not that I am aware of or
10   participated in.
11         Q.    Okay.  And do you know whether, under
12   current practices -- and, by the way, I assume the
13   practice that you've described as being adopted in early
14   2019 is still in place as of today.  Is that correct?
15         A.    In terms of -- you're talking about the
16   hours of coverage provided?
17         Q.    Yes.
18         A.    Yes.
19         Q.    Are you aware at this point or any time,
20   really, since early 2019 and the present whether that
21   change in hours has resulted in a change in practices for
22   seeing people on return from court?
23         A.    I do not know that.
24         Q.    Was there -- and this may be -- I fully
25   expect the answer will be no given your previous

JA0000775

Thomas Weber, Esquire

Page 50

1    BY MR. FEINBERG:

2           Q.    Yeah.  All right.  I've got to remember

3    what the question was.  Is there -- I think it's this.

4    Is it correct then, sir, that there is no contractual

5    provision or any other rule that you're aware of which

6    would have prevented PrimeCare from making the staffing

7    change before it actually happened?

8                 MR. NINOSKY:  Object to the form.

9                 THE WITNESS:  Given the caveat that we

10   would let them know beforehand -- and I guess they could

11   object and say, you know, that's during meal time,

12   everyone is gonna be on lockdown so there's no use doing

13   it -- but there's no impediment or policy that doesn't

14   allow us to propose and sell that change.

15   BY MR. FEINBERG:

16          Q.    And it sounds like -- you talked about

17   that meal time -- that's speculating about a concern that

18   the County would raise.  Is that correct?

19          A.    We -- we encounter that at times, count,

20   meal time.  There are certain times throughout the day

21   that you know you're not going to get patients so you do

22   more administrative work during those windows so....

23          Q.    When the change was made in early 2019,

24   whenever it was, there was no objection from the County.

25   Is that correct?

JA0000776

Thomas Weber, Esquire

Page 51

1          A.     That's correct.

2          Q.     Are you aware of any audits or studies

3    that have been done since this change was made, which

4    would document how many people are seen in that time

5    period between 4:00 and 5:00 p.m. by mental healthcare

6    staff?

7          A.     No, I am not aware of any studies.  I am

8    just thinking about our EMR and whether -- I assume the

9    data can be pulled, but I'm unaware of any studies.

10         Q.     And really what I'm getting at is this,

11   Mr. Weber, is that, you know, once the change was made

12   has anyone gone back and looked to decide -- to see, was

13   this an effective use of resources now that we've made

14   this change?  Do you know of anything like that?

15         A.     Not any actual statistical review.

16         Q.     Have you heard any, at least anecdotally,

17   any discussion from the mental health staff or anyone

18   else at PrimeCare corporate on this topic?

19         A.     It was viewed as, you know, a positive

20   change at the time it occurred, and I have not heard

21   anything that says that change, that view of how it

22   would work, has changed to the negative.

23         Q.     You used the passive voice to describe

24   how it was viewed -- and that's not a critique -- so my

25   question is who -- who informed you that it was viewed

JA0000777

Thomas Weber, Esquire

Page 52

1    positively?

2         A.    I remember at or around the discussions

3    of having it that, yes, this is a good idea.  Everyone

4    seemed to be onboard and no one has raised an objection

5    after it was implemented.

6         Q.    With that, Mr. Weber, I don't have any

7    further questions for you.  I defer to County Counsel.

8    BY MR. SCOTT:

9         Q.    Mr. Weber, it's Jeffrey Scott.  You had

10   used a term exhaustive full-time coverage.  Do you

11   remember that testimony?

12        A.    Yes.

13        Q.    What does that mean in the mental health

14   field?

15        A.    Well, in the correctional healthcare

16   facility we are happy that an individual is gonna see a

17   mental health clinician much more quickly in one of our

18   facilities than they will in the community.

19              And at Bucks County we have a full

20   complement of mental health clinicians there over -- I

21   mean, when you talk billets it's well over, you know, 40

22   hours -- they have 40 hour -- more than 40 hours a week

23   coverage as well as multiple individuals there to

24   address the needs and concerns of our patient base.

25              That is a exhaustive or extensive --

JA0000778

Thomas Weber, Esquire

Page 53

1    maybe exhaustive is the wrong term -- but it's an

2    extensive coverage base in correctional healthcare.

3                    MR. SCOTT:  All right.  That's all the

4    questions I had.

5    BY MR. NINOSKY:

6            Q.    And, Mr. Weber, math has never been my

7    strong point, as you know, but even in June of 2018 the

8    amount of hours or billets of mental healthcare would

9    have exceeded 40 hours a week; correct?

10           A.    Yeah.  The billets certainly do and the

11   6:00 to 4:00 coverage does.  And moving to 5:00 based

12   upon, you know, court transports -- I mean, most courts

13   don't end until 4:00 or 4:30 so, unfortunately, the move

14   to 5:00 doesn't guarantee that we would have had the

15   opportunity to see Mr. Freitag when he came back from

16   court.

17                   So, you know, I've been involved in

18   trials that have ended at 8:00 o'clock at night and

19   someone could be convicted and come back at that point.

20                   You know, there is, unfortunately, not a

21   way to guarantee, unless you're gonna have coverage

22   24/7, that when someone returns or is in -- brought into

23   the facility with high profile charges that they can be

24   seen immediately or that same day.

25                   MR. NINOSKY:  Nothing further.

JA0000779

Thomas Weber, Esquire

Page 54

1          MR. SCOTT:  I'm sorry, I have one more

2  follow-up.

3  BY MR. SCOTT:

4          Q.    There was a mention of on-call.  What is

5  the on-call availability of the mental health

6  professional, should it -- should it be needed?

7          A.    24/7.

8          Q.    And --

9          A.    Mental health clinicians as well as

10  those with prescriptive authority.  If someone needs a

11  prescription, that can be obtained at any hour as well.

12          MR. SCOTT:  Thank you.  That was my last

13  question.  Thank you.

14          MR. NINOSKY:  Jon, anything further or

15  are you done?

16          MR. FEINBERG:  Give me one moment.

17  BY MR. FEINBERG:

18          Q.    Yeah, let me -- Mr. Weber, a follow-up to

19  Mr. Ninosky's question of just a moment ago about return

20  from court.

21          I'm gonna put Dr. Cassidy's deposition

22  testimony back in front of you.  I'm at Pages 103 to

23  104.

24          And I'll represent to you that, leading

25  up to the bottom of 103 where there's some highlighted

JA0000780