# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CHARLES JOSEPH FREITAG, JR., as** | : |
| **ADMINISTRATOR of the ESTATE OF** | : |
| **CHARLES JOSEPH FREITAG, SR.,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | :     **No. 2:19-cv-05750-JMG** |
| | : |
| **BUCKS COUNTY et al.** | : |
| | : |
| **Defendants.** | : |
| | : |

## Plaintiff's Consolidated Opposition to Defendants' Motions for Summary Judgment

Jonathan H. Feinberg
Grace Harris
KAIRYS, RUDOVSKY, MESSING,
 FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Plaintiff*

# TABLE OF CONTENTS

I.   Introduction .................................................................................................... 1

II.  Facts ............................................................................................................... 4

    A.   The Defendants and Their Duty to Protect Prisoners from Harming
    Themselves ............................................................................................ 4

    B.   Charles Joseph Freitag Sr.'s Admission to BCCF and His Concerning Risk
    of Suicide and Self Harm ....................................................................... 4

    C.   Mr. Freitag's Placement on Suicide Precaution Status ........................... 5

    D.   Mr. Freitag's Request for Post-Sentencing Mental Health Follow-Up ................. 6

    E.   Mr. Freitag's Mental Health Deteriorates Through July 2018 .............................. 6

    F.   Mr. Freitag's Increasing Anxiety and Diminishing Insight and Judgment
    as Sentencing Approached ..................................................................... 7

    G.   PrimeCare's Deliberate Failure to Make Mental Health Care Available
    Following an Incarcerated Person's Return from Court ........................... 9

    H.   Mr. Freitag's Sentencing and Placement on an Insufficiently Protective
    Watch ................................................................................................... 9

    I.   Rules for Correctional Staff Implementing the Level 3 Watch Status ................ 10

    J.   Mr. Freitag's Death by Suicide on August 25, 2018 ............................. 11

    K.   Officer Young and Moody's Deliberate Failure to Follow the Level 3
    Watch Protocol ................................................................................... 12

    L.   Bucks County's Failure to Ensure Officers' Compliance with Watch
    Protocols ............................................................................................. 14

    M.   PrimeCare's Policy Changes Following Mr. Freitag's Death ............................ 16

III. Summary Judgment Standard ........................................................................ 16

IV.  Argument. ...................................................................................................... 17

    A.   Legal Standards................................................................................... 17

        1.   Eighth Amendment Standard ..................................................... 17

2.    *Monell* Liability Standard ........................................................................ 18

B.    The PrimeCare Defendants' Motion Should Be Denied........................................ 19

1.    Defendants Penge and Mahoney Violated Mr. Freitag's Eighth
Amendment Rights ...................................................................................... 19

a.    Mr. Freitag was Particularly Vulnerable to Self-Harm and
Suicide and Defendants Mahoney and Penge were Aware
of that Vulnerability................................................................ 19

b.    Defendants Penge and Mahoney were Deliberately
Indifferent to Mr. Freitag's Particular Vulnerability. .................. 21

2.    Defendant PrimeCare is Liable for Mr. Freitag's Death........................... 24

a.    PrimeCare's Deficient Policy of Failing to Provide Mental
Health Interventions Following Critical Events ........................... 24

b.    PrimeCare's Failure to Train and Supervise Mental Health
Staff .................................................................................... 27

C.    The Bucks County Defendants' Motion Should be Denied................................. 29

1.    Defendants Moody and Young Violated Mr. Freitag's Clearly
Established Constitutional Rights. ............................................................. 29

a.    Defendants Moody and Young Were Deliberately
Indifferent to Mr. Freitag's Known Risk of Self-Injury. .............. 29

i.    Mr. Freitag was Particularly Vulnerable to Self-
Injury and Suicide on August 25, 2018. .......................... 29

ii.    Young and Moody had Sufficient Knowledge of
Mr. Freitag's Particular Vulnerability to Self-Injury
and Suicide. ................................................................... 30

iii.    Young and Moody's Failure to Monitor Mr. Freitag
Constitutes Deliberate Indifference. ................................ 32

b.    Young and Moody are Not Entitled to Qualified Immunity......... 34

2.    Bucks County is Liable for Mr. Freitag's Death....................................... 36

a.    Bucks County is Responsible for its Deficient Policy of Failing to Provide Mental Health Care Following Critical Events...........................................................................................37

b.    Bucks County is Responsible for Failing to Ensure Proper Monitoring of Vulnerable Incarcerated People............................38

V.    Conclusion .....................................................................................................................40

## I.    Introduction

The defendants in this matter—mental health providers and correctional officers working at the Bucks County Correctional Facility ("BCCF")—were fully aware of their responsibility to protect mentally ill prisoners particularly vulnerable to the risk of self-harm. When Charles Joseph Freitag Sr. was admitted to BCCF in June 2018, there was little question of such risk. His incarceration was directly tied to a suicide attempt, his second in the space of two weeks: he used a blade to place several cuts in his arms and then drove his truck through the exterior wall of his ex-wife's home resulting in his arrest on aggravated assault charges.

During the nearly three months Mr. Freitag spent at BCCF awaiting his sentencing following his conviction on those charges, it was abundantly clear he was at risk for yet another attempt. Mr. Freitag told the defendant mental health providers that he was suffering from anxiety and stress over the outcome of his sentencing. He was desperately holding out hope he would be released on a non-custodial sentence that would allow him to return to his job with the U.S. Postal Service where he had worked for 25 years. The mental health providers were aware of this growing anxiety and made repeated observations that Mr. Freitag was lacking insight and judgment. Despite this recognition and knowledge that a result at sentencing outside Mr. Freitag's expectations was certain to enhance the risk he would harm himself, the defendants failed to ensure that adequate protective measures would be in place following his return from court—a failure that was aided and enhanced by the policy decision of their employer, PrimeCare Medical, not to make mental health staff available at BCCF in the late afternoon and evenings when prisoners returned to BCCF from their court proceedings.

On August 24, 2018, Mr. Freitag had his sentencing in the Bucks County Court of Common Pleas. The trial judge ordered his imprisonment for a period of six-to-twelve years. That sentence was wildly outside Mr. Freitag's expectations. Mr. Freitag was returned to BCCF

where he knew he would soon be transferred to the Pennsylvania Department of Corrections. With no mental health staff available, decisions on how to proceed were left to correctional staff without clinical training on suicide risks and without full knowledge of Mr. Freitag's history of suicide attempts, psychiatric hospitalizations, and mental health diagnoses.

The correctional staff ordered that Mr. Freitag be placed on the lowest available level of protective watch, one that required observation by a correctional officer every 30 minutes and by an inmate monitor (that is, another incarcerated person assigned to assist with protective watch practices under correctional officers' supervision) every 15 minutes. But, on the morning of August 25, 2018, that order was ignored. The inmate monitor working under officers' supervision and assigned to observe Mr. Freitag did so only *twice* over the course of five hours. The same officers responsible for ensuring that inmate monitor's performance failed to do their own observations. These dual failures—the officers' failure to perform their checks and the failure to ensure the inmate monitor's checks—were the natural result of a custom and practice known to Bucks County for years where officers did not perform protective watches.

Shortly before 11:00 am on August 25, a prisoner happened to walk by Mr. Freitag's cell and look in the window. The prisoner yelled to correctional officers that Mr. Freitag was kneeling beside his bed covered in blood. After an emergency alert was issued, correctional officers and medical staff arrived at the cell and found a gruesome scene: Mr. Freitag, surrounded by pools of blood, with large amounts of blood on the cell walls, and arteries and tendons strewn about the cell. As later became clear, Mr. Freitag had broken a hard plastic cup and used a pointed shard of plastic to dig quarter-sized holes in both of his arms. Mr. Freitag could not be revived and was pronounced dead. He was 57 years old.

From the moment of Mr. Freitag's death, it appeared that his suicide was entirely preventable. Plaintiff Charles Joseph Freitag Jr., the son of Charles Freitag Sr. and Administrator

of his Estate, brought this civil rights survival and wrongful death action to seek accountability for his father's death. After the Court denied two motions to dismiss, ECF 45 & 46, the parties conducted extensive discovery, which has demonstrated that Mr. Freitag's death was caused by the collective actions and inactions of two sets of defendants. First, the defendant mental health clinicians, Christina Penge and Jessica Mahoney, were deliberately indifferent to Mr. Freitag's risk of self-harm by failing to ensure necessary and available protective measures following his sentencing, and their employer, PrimeCare, caused that failure by knowingly providing insufficient mental health staffing. Second, the defendant correctional officers, James Young and Robert Moody, were, likewise, deliberately indifferent to the risk of self-harm by failing to implement a protective watch order, and their employer, Bucks County, caused that conduct by acquiescing for years to a custom and practice of officers not complying with watch directives while also failing to train and supervise officers regarding protective watches.[1]

The defendants have filed two separate motions for summary judgment seeking judgment in their favor as to all claims. As plaintiff demonstrates in this consolidated opposition to the motions, however, defendants' arguments misapply the relevant law and are based on factual characterizations that violate the bedrock Rule 56 standard requiring that all facts and inferences be drawn in plaintiff's favor. The facts, viewed in the proper context, are more than sufficient at this stage to support plaintiffs' claims that (1) the individual defendants, Mahoney, Penge, Young, and Moody, are liable under 42 U.S.C. § 1983 for their deliberate indifference to Mr. Freitag's particular vulnerability to self-harm in violation of the Eight Amendment; (2) the entity defendants, PrimeCare and Bucks County, are liable under § 1983 for their actions and inactions, with deliberate indifference, that led to the individual defendants' unconstitutional conduct; and

---

[1] Plaintiff's Amended Complaint also named Officer Tory Murphy as a defendant. Plaintiff agrees to dismissal of all claims against Murphy.

(3) defendants Mahoney, Penge, and PrimeCare are liable to plaintiff for negligence under Pennsylvania law.[2] Accordingly, the motions should be denied, and plaintiff should be permitted to present these claims to a jury.

## II.    Facts

Plaintiff has submitted with this memorandum a Statement of Facts in Support of Consolidated Opposition to Defendants' Motions for Summary Judgment. The statement is cited throughout this brief with references to "PS," followed by the relevant paragraph number.[3]  A summary of the facts relevant to the motions is as follows:

### A.    The Defendants and Their Duty to Protect Prisoners from Harming Themselves

The individual defendants in this matter, mental health clinicians Christina Penge and Jessica Mahoney and correctional officers James Young and Robert Moody, knew that suicide and self-harm are ever-present risks in a prison population and that those risks may arise at any time. PS 1-2, 4. The defendants likewise knew that as employees at BCCF they had a responsibility to protect the safety of incarcerated people and to address risks that an incarcerated person might engage in self-harm. PS 3, 5-7. In particular, the defendants knew these responsibilities were of central importance when an incarcerated person experienced critical events in criminal proceedings, including a denial of bail, a jury verdict, or sentencing. PS 8.

### B.    Charles Joseph Freitag Sr.'s Admission to BCCF and His Concerning Risk of Suicide and Self Harm

Until 2017, Charles Joseph Freitag Sr. had a productive, arrest-free life and 25-year

---

[2] Plaintiff's Amended Complaint included a claim against Bucks County under the Americans with Disabilities Act, 42 U.S.C. § 12132. Plaintiff agrees to dismissal of that claim.

[3] As required by the Court's policies and procedures, plaintiff has also filed responses to the defendants' respective statements of undisputed material facts.

career with the U.S. Postal Service. Following the deaths of several close family members and contentious divorce proceedings, his mental health deteriorated, and he attempted suicide twice. PS 10. He was hospitalized and released, but, after he stopped taking medications, he attempted suicide a third time, this time by placing several cuts in his arms and driving his truck through the exterior wall of his ex-wife's home in Fallsington, Pennsylvania. PS 11. He was arrested on aggravated assault and related charges. *Id.* On June 4, 2018, he was convicted by a jury and his bail was revoked, leading to his admission to BCCF. PS 9. From the moment of his admission, PrimeCare staff were aware of his substantial suicide risk given his multiple previous attempts, his inpatient psychiatric hospitalizations, and scars on his right forearm. PS 12-13.

## C. Mr. Freitag's Placement on Suicide Precaution Status

When Mr. Freitag was admitted to BCCF, Bucks County and PrimeCare had in place a suicide prevention policy that included four different watch levels aimed at preventing people from harming themselves, identified, in decreasing order of protectiveness, as: Constant Watch, Level 1, Level 2, and Level 3. PS 14. After his first medical encounter with a PrimeCare nurse on June 4, Mr. Freitag was placed on Level 2 status, meaning that he was locked in a "stripped cell" (that is, a cell with all property removed) under the constant observation of an inmate monitor, with an officer checking him no less than every 15 minutes. PS 14, 16. The Level 2 status was the default level of protection used by mental health clinicians in the event of any questions about a person's stability, and the less protective Level 3 status was typically only used as a step-down procedure after removal from a more intensive watch. PS 15.

On June 5, the day after his admission to BCCF, Mr. Freitag had a mental health evaluation with defendant Mahoney. She learned that Mr. Freitag had three prior suicide attempts, with the most recent seeming "pretty severe," and she reported that Mr. Freitag continued to have thoughts of self-harm when he got depressed. PS 17-19. Mr. Freitag, who

knew he would go back to court for sentencing, told Mahoney that he was anxious whenever he thought about the case and the chance he would lose his job. PS 20. Given these factors, Mahoney determined Mr. Freitag had a moderate risk of engaging in suicidal conduct. PS 22.

### D. Mr. Freitag's Request for Post-Sentencing Mental Health Follow-Up

On June 15, in another encounter with Mahoney, Mr. Freitag repeated his concern about going back to court for sentencing and requested that mental health staff follow up with him after court. Given Mr. Freitag's background and his anxiety specifically tied to sentencing, mental health staff knew they needed to address those concerns. PS 24-25. Mahoney knew Mr. Freitag's sentencing was scheduled for Friday, August 24, 2018, but she arranged for a follow-up appointment to occur three days later, on Monday, August 27. PS 26. She scheduled the appointment with this delay because of PrimeCare's staffing policies, under which no mental health clinicians would be available either when Mr. Freitag returned from court or at any time during the weekend following the sentencing. PS 27.

### E. Mr. Freitag's Mental Health Deteriorates Through July 2018

In late July 2018, Mr. Freitag called his brother from BCCF and told him that he was "so depressed" and that he "didn't want to get out of bed anymore." These statements concerned Mr. Freitag's brother who then contacted Mr. Freitag's lawyer and asked him to seek assistance. PS 28. Mr. Freitag's counsel did so on July 31, 2018, sending an email to BCCF Deputy Warden Clifton Mitchell stating that Mr. Freitag was "not doing well incarcerated and has a history of suicide attempts." PS 29.

After receiving that email, Mitchell spoke with Dr. Abbey Cassidy, PrimeCare's mental health supervisor for BCCF, and asked that someone evaluate Mr. Freitag and take into consideration his age, the seriousness of his charges, and the fact that his sentencing hearing was approaching. PS 30-31. In the mental health encounter that followed, a clinician reported that

Mr. Freitag was "tearful and highly emotional" and stated that he was an "emotional wreck," "thinking about everything he's done to himself and [his] family," "in disbelief" that he was in jail and was "beating himself up." PS 32. Following the encounter, Mr. Freitag was placed on a Level 3 watch, a status that, in addition to requiring regular observations, also required three mental health encounters per week, something that Mr. Freitag felt he needed. PS 33-34.

Dr. Cassidy reported back to Deputy Warden Mitchell that mental health staff would keep Mr. Freitag on Level 3 watch. PS 35. Cassidy believed that Mr. Freitag should stay on Level 3 watch at least through his sentencing. The next day, August 1, she emailed the entire mental health staff, including defendants Penge and Mahoney, stating that Mr. Freitag would "need to stay on a Level 3 for at least a few weeks" and noting that "Level 3 appears appropriate for now, but we need to keep a close eye on him as his sentencing date (8/24/18) approaches since he strikes several of the increased risk factors for suicide." PS 36-37. In view of this message. Dr. Cassidy expected that any clinician would speak with her before removing Mr. Freitag from Level 3 status. PS 39.

### F. Mr. Freitag's Increasing Anxiety and Diminishing Insight and Judgment as Sentencing Approached

Mr. Freitag had multiple mental health encounters between August 1 and his August 24 court date, during most of which he continued to express serious anxiety about his sentencing. On August 8, he saw Mahoney and told her his anxiety was increasing as his court date approached and that he was worried about how sentencing would impact his life. PS 41. On August 10, he saw Penge and expressed specific concern about how his sentencing would impact his job. PS 42. Prior to the August 10 encounter, Penge had seen Mr. Freitag before, and, on each occasion, noted that he had "limited insight and judgment." She made that finding again on

August 10 based on her determination that Mr. Freitag could not accept that factors outside his control would determine whether he would be able to retain his job. PS 43-44.

Penge repeated this finding regarding limited insight and judgment after another encounter with Mr. Freitag on August 14. PS 45. Following a visit with a psychiatric nurse practitioner in which Mr. Freitag was noted to have appeared anxious, Mr. Freitag saw Penge again on August 17. PS 46-47. Despite noting, again, that Mr. Freitag showed limited insight and judgment and despite his expressing anxiety about his sentencing, Penge elected to remove Mr. Freitag from the Level 3 watch status. PS 47-48. She did so notwithstanding her knowledge of, among other things, Mr. Freitag's repeated expressions of anxiety about the sentencing proceeding that was just one week away. PS 49. Further, she did so without consulting anyone, including Dr. Cassidy, an action that was not consistent with Dr. Cassidy's expectations for the clinicians working under her supervision—and one that was of particular concern to Dr. Cassidy given the finding that Mr. Freitag was reported to have lacked insight and judgment. PS 50-53.

Following the August 17 termination of the Level 3 watch protocol, on August 22, Mr. Freitag had a "step-down" appointment with defendant Mahoney. Mr. Freitag told Mahoney that he was confident he would be released from prison. PS 54. On August 23, in his final mental health encounter before his sentencing, Mr. Freitag, while noting his nervousness, repeated to Penge what he had told Mahoney: that he believed he would be getting out of prison after his sentencing. PS 55, 57. Penge, as she had done before, concluded Mr. Freitag lacked insight and judgment because he appeared not to comprehend that he could be coming back to prison and he "wasn't really listening" to the suggestion that his expectations might not be met. PS 56-58. While Penge claimed it never crossed her mind that Mr. Freitag could be devastated by a sentence requiring more time in custody, Dr. Cassidy believed that Penge's findings on August 23 required mental health intervention for Mr. Freitag when he returned from court. PS 59-60.

**G.**     **PrimeCare's Deliberate Failure to Make Mental Health Care Available Following an Incarcerated Person's Return from Court**

When people incarcerated at BCCF were transported to court proceedings in the Bucks County Court of Common Pleas, it was commonly known that they would not be returned to BCCF until after 4:00 pm. PS 64. Despite the knowledge that suicidal behavior is often tied to critical events in a person's criminal case, PrimeCare's staffing policy at BCCF did not allow for mental health staff availability after 4:00 pm on weekdays and weekends. PS 61-63. This practice, which had been in place since PrimeCare took over the contract for mental health care at BCCF in March 2018, meant that mental health staff were not available for clinical evaluations after court proceedings, and there was no procedure in place to ensure mental health providers could see a person on the mental health caseload after court. PS 65-69. With no mental health staff available for such evaluations, the established practice was to have members of the Bucks County correctional staff—who did not have sufficient mental health training to fully assess suicide risk—make decisions about suicide risk after a return from court. PS 70-73.

**H.**     **Mr. Freitag's Sentencing and Placement on an Insufficiently Protective Watch**

Mr. Freitag's sentencing was held on August 24. He received a sentence of six-to-twelve years imprisonment, well beyond his expectations. PS 74. His friends and family members in attendance knew he would be distraught and believed he might attempt to harm himself. PS 75.

When Mr. Freitag returned to BCCF, an email reporting his sentence was sent to administrative correctional staff, including Deputy Warden Mitchell, who had learned of Mr. Freitag's prior suicide attempts on July 31. PS 29, 76. That email was sent at 3:52 pm, right as mental health staff were leaving BCCF. PS 77. Mitchell forwarded the email to, among others, Correctional Case Manager Supervisor Carl Metellus, and stated "Unlock, my sure he's on a watch."  PS 78. Metellus interpreted this to require that he should "make sure" Mr. Freitag was

on Level 3 watch because the statement "unlock" meant Mr. Freitag should be placed in an unlocked cell, and the only watch status that allowed for an unlocked cell was Level 3. PS 79. Metellus, following the directive of a superior officer, therefore informed the officers in Mr. Freitag's housing area to initiate a Level 3 watch. PS 79-80, 82. Mitchell did not fully understand the watch procedures and believed it was up to Metellus to decide the specific watch level, and that Metellus was, therefore, the person who ordered the Level 3 watch; in any event, Mitchell was "handcuffed" in his decision-making because he did not have access to Mr. Freitag's mental health history or any understanding of how the sentencing impacted him. PS 81, 83-84.

Mitchell had been left with the responsibility to initiate the watch decision because no mental health practitioners were available in the facility under PrimeCare's staffing practices. PS 85, 89. Accordingly, no mental health staff were aware of the decision to place Mr. Freitag on Level 3; given Mr. Freitag's history, however, and because of the result in his sentencing, mental health staff would have wanted an opportunity to assess him. PS 86-90. Had Dr. Cassidy been asked about how to handle Mr. Freitag's risk of harm following his sentencing, she would have either directed an evaluation with a clinician or requested placement on a Level 2 watch—in a stripped cell under the constant observation of an inmate monitor. PS 91.

I. **Rules for Correctional Staff Implementing the Level 3 Watch Status**

An order to officers to implement a Level 3 watch for a person on their housing unit is an indication to officers that ensuring the person's safety from harm requires six observations every hour—an officer's observation every 30 minutes and an inmate monitor's observation every 15 minutes. PS 92. Orders to officers to implement a watch with this frequency of checks are mandatory and not mere suggestions of guidelines, and an officer's failure to follow them could lead to someone engaging in self-harm. PS 93-96. The purpose of the watch is to ensure that the person subject to the watch is alive. PS 97. The Level 3 watch imposes two responsibilities on

officers: that the officers conduct their own checks and that they ensure the inmate monitors under their supervision conduct their checks and accurately report them. PS 95, 97-98.

Defendant Officers Young and Moody were familiar with these rules. PS 102. Young had worked in the B Module at BCCF for nine years, had frequently seen people placed on various watch statuses in that housing area, and knew that he was required to pay attention to people on watch from the moment he started his shift. PS 99-103. In particular, Young and Moody were aware of the importance of inmate monitors, recognizing that if an inmate monitor failed to perform required observations, then that failure would be the same as if the officers failed to do their own watches. PS 104-05. This meant that at least one officer in the housing area was required to ensure the inmate monitor prepared an accurate report documenting observations of a person on watch. PS 106.

**J.      Mr. Freitag's Death by Suicide on August 25, 2018**

Young knew that Mr. Freitag had resided in B Module for weeks; he had been on a Level 3 watch for much of his time there, and, when he returned from court on August 24, Young escorted him back to the unit. PS 107-08. The next morning, Young and Moody were assigned to work the 6 am to 2 pm shift in B Module. At 9:12 am, Mr. Freitag left his cell to obtain medication, and returned to his cell at 9:16 am. PS 110. At 10:21 am, Officer Tory Murphy, who entered the B Module for a short time while Officer Moody took a break, observed Mr. Freitag in his cell. PS 109, 111. An inmate monitor checked Mr. Freitag's cell at 10:32 am. PS 112.

At 10:55 am, an incarcerated person happened to walk by Mr. Freitag's cell. PS 115. No officer had checked Mr. Freitag's cell since 10:21, a period of 34 minutes, and no inmate monitor had checked Mr. Freitag's cell since 10:32, a period of 23 minutes. PS 113-14. The person who walked by the cell looked in and yelled to Young and Moody that Mr. Freitag was covered in blood. PS 115. Moody went to the cell, saw large pools of blood, and yelled to Young

to call a medical emergency. PS 116. Young did so, and multiple BCCF personnel reported to the B Module. *Id.* Mr. Freitag was found to have multiple wounds on his arms. Resuscitation efforts were not successful, and Mr. Freitag was pronounced dead at 11:19 am. PS 117.

Investigators found pools of blood all over the cell, and they located what appeared to be human tendons and arteries strewn about the cell. PS 119. They discovered a jagged piece of plastic near one of the pools of blood and determined that it came from a shattered plastic coffee cup of the type that BCCF made available for use by incarcerated people. They determined that Mr. Freitag used the piece of plastic to gouge holes in his left and right arms. The Bucks County Coroner's Office later concluded that Mr. Freitag's death was a suicide caused by these self-inflicted wounds. PS 112. Additionally, forensic pathology expert testimony confirmed that, given the implement used and the depth and number of wounds, it took at least 15 minutes from the time he started harming himself for Mr. Freitag to reach a point where he could not be saved. PS 121.

**K.      Officer Young and Moody's Deliberate Failure to Follow the Level 3 Watch Protocol**

When Young and Moody arrived for their shift in B Module at 6 am on August 25, they knew Mr. Freitag had been placed on a Level 3 watch. PS 122. Despite that knowledge, they failed to fulfill their dual responsibilities to carry out the watch. First, with respect to officer watches, once Officer Murphy observed Mr. Freitag at 10:21 am (an observation that Young failed to record in the computerized log), neither Young nor Moody conducted any watch until they were alerted to a medical emergency 34 minutes later. PS 123-25. They failed to do so notwithstanding the fact that Young was idly standing behind a podium (with no sightline into Mr. Freitag's cell) for 30 out of the 34 minutes in that period. PS 123.

Second, with respect to their duty to supervise the inmate monitor, neither Young nor Moody had any knowledge as to whether the assigned monitor observed Mr. Freitag at any time. The assigned monitor, Hugh Caldwell, had completed an "inmate monitor form" reporting that he saw Mr. Freitag 20 times, every 15 minutes between 6:15 am and 10:45 am. PS 126-27. Video footage, however, shows that Caldwell observed Mr. Freitag in his cell only twice, once at 8:47 am and again at 10:32 am. PS 128. Neither Young nor Moody had ever looked at the form and thus did not know, for example, that Caldwell had reported that Mr. Freitag was sleeping in his cell at 9:15 am when video footage from 9:15 am showed Mr. Freitag out of his cell and standing in line for medications. PS 131-32. Even during their depositions in December 2020, 28 months after Mr. Freitag's death, neither Young nor Moody had any idea whether Caldwell looked in Mr. Freitag's cell a single time on the morning of August 25, 2018. PS 133.

In their testimony, Young and Moody insisted they had acted appropriately. They believed it was permissible not to observe Mr. Freitag themselves and thought it would have been acceptable to wait until 11:00 am—39 minutes after the last observation. PS 135-36. And, with respect to their supervision of inmate monitors, Young, after noting that he made a practice of not reviewing inmate monitor forms to ensure compliance with watch directives, explained that he *expected* monitors not to do their jobs, stating: "So they are paid $3 a day to stand in front of somebody's door and mark down whether they are sleeping, eating, pooping. Imagine what $3 a day gets you." PS 137-39. The fact that Caldwell did not observe Mr. Freitag as he was required was, in Young's words, "$3 a day not well spent." PS 140. Ultimately, Young and Moody claimed there was nothing they could have done differently to address the risk of harm to Mr. Freitag, with Young explaining that the only thing that could have prevented the death would have been Mr. Freitag "not going to jail." PS 141.

**L.** **Bucks County's Failure to Ensure Officers' Compliance with Watch Protocols**

The conduct of Officers Young and Moody with respect to implementing the Level 3 watch protocols is consistent with an established pattern at BCCF, known and accepted at Bucks County's highest ranks. In 2016, inspectors from the National Commission on Correctional Health Care (NCCHC) conducted a site visit at BCCF and, in their observation of suicide prevention practices, noted (and reported to Bucks County in June 2016) that "correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches." PS 142-43. In response to that advisory, Bucks County informed NCCHC it would implement training measures, including officer training; however, according to Captain James Nottingham, Bucks County's corporate designee regarding training, the County has no documentation of that training. PS 144-47.

Documentation of NCCHC's findings was disclosed at the end of the discovery period in this litigation.[4]  Nottingham, who, as noted, was the designee named to testify concerning the NCCHC issues, had testified in another deposition earlier in the case regarding officer training; because he had served as the training lieutenant starting in late 2018, he offered testimony on how officers were trained regarding implementation of watch procedures and claimed he had never heard any reports of problems in the way officers conducted their watches or supervised inmate monitors. PS 148-49. Once he reviewed the NCCHC materials, however, he acknowledged he had never received any information about the NCCHC findings and that, had he seen those materials, he would have testified differently in his first deposition. PS 150.

---

[4] The Court granted plaintiff an extension of discovery deadlines to allow for a designee deposition regarding these documents. ECF 76.

The issues identified by NCCHC were, according to a different Bucks County designee, Deputy Superintendent Kelly Reed, who testified concerning the County's practices for mental health treatment at BCCF, well known for years. Reed explained that throughout her career she had heard hundreds of complaints from officers that they were expected to complete too many watches and could not fulfill all of the responsibilities Bucks County policies required of them. PS 151. Additionally, according to Reed, no one in a supervisory position was checking to ensure that officers did their jobs regarding watches and, based on Reed's experience, there was no basis to conclude that officers actually carried out the ordered watches. PS 152. As Reed testified: "I don't believe there was any follow through from the Administration to confirm that everybody is following rules and regulations of the facility." PS 153. To Reed's knowledge, no changes were made to the absence of such supervisory involvement until sometime in 2019 when she took her deputy superintendent position. PS 155. Officer Young's experience bore out this assessment as he did not recall any supervisor telling him that inmate monitors were not doing their jobs. PS 154. Additionally, Hugh Caldwell, the inmate monitor who failed to check Mr. Freitag on August 25, 2018, confirmed that in his experience none of the officers ever took steps to ensure he was performing his assigned checks which led to situations where he would miss checking on the people he was assigned to watch. PS 157.

The lack of follow through regarding watch procedures was further observed in Bucks County's approach to the investigation of Mr. Freitag's death. The county official assigned to supervise that investigation, Frank Bochenek, acknowledged that he focused only on whether someone else had killed Mr. Freitag, and, once he concluded that this was not the case, he conducted no investigation into whether officers fulfilled their duties. PS 158-65. Bochenek did not investigate this issue until October 2019, 14 months after Mr. Freitag's death, when a suicide prevention expert was present at BCCF and asked for details on Mr. Freitag's death. PS 166. It

was only at that point that Bochenek prepared a memorandum noting that "there was no inmate monitor observed checking on [Mr. Freitag]." PS 167-68. Even then, however, there was no investigative follow up as neither Moody nor Young were interviewed about their job performance. PS 169. Instead, it was not until the litigation of this case, when supervisors including Deputy Warden Mitchell and Captain Nottingham were deposed, that any administrative staff were asked to consider the officers' performance. After they were presented with Young and Moody's testimony insisting they had acted appropriately, Mitchell and Nottingham acknowledged that Young and Moody required discipline and training. PS 170-76. However, as of Nottingham's second deposition, 11 months after his first in which he described the need for discipline, no such discipline had been imposed. PS 177.

### M. PrimeCare's Policy Changes Following Mr. Freitag's Death

After Mr. Freitag's death, PrimeCare made two changes to practices that were significant factors in Mr. Freitag's death. First, as part of its mortality review process, it instituted a rule that any person at BCCF who received a state sentence would be placed on Level 2 status, a status that results in assignment to a stripped cell under the constant observation of an inmate monitor. PS 178-79. Second, PrimeCare expanded the hours for its mental health clinicians to ensure availability when people return from court. PS 180-82. Had these practices been in place in August 2018, according to Dr. Cassidy, Mr. Freitag would have likely been seen by a mental health clinician following his sentencing, an encounter that would have led to a full risk assessment or placement on a status with constant observation and a stripped cell. PS 183-85.

## III. Summary Judgment Standard

Summary judgment should only be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgement as a matter of law." *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 322 (1986). There is a genuine issue of material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A factual dispute bars summary judgment when it "might affect the outcome of the suit under governing law." *Id.* In deciding a summary judgment motion, the Court must "view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland Cty.,* 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted).

## IV. Argument

### A. Legal Standards

#### 1. Eighth Amendment Standard

Defendants violated Mr. Freitag's Eighth Amendment rights when they failed to take appropriate measures to respond to his clear, known risk of self-harm and suicide. The Eighth Amendment prohibits prison staff and contractors from acting with deliberate indifference to incarcerated peoples' serious healthcare needs and any substantial risks of serious harm. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Farmer v. Brennan,* 511 U.S. 825, 828 (1994). When an incarcerated person ends their life while in custody, the Third Circuit has held that prison officials and subcontractors have violated the Constitution if "(1) the detainee had a particular vulnerability to suicide, (2) the custodial officer or officers knew of should have known of that vulnerability, and (3) those officers acted with reckless indifference to the detainee's particular vulnerability." *Colburn v. Upper Darby Tp.,* 946 F.2d 1017, 1023 (3d Cir. 1991).

In *Colburn* and many subsequent cases, the Third Circuit has used the language of "self-inflicted injury," "self-inflicted harm," and "self-harm" interchangeably with suicide. *Id. at* 1025; *see also Woloszyn v. Cty. of Lawrence,* 396 U.S. 314, 320 (3d Cir. 2005) ("'the risk of *self-inflicted injury* must not only be great, but also sufficiently apparent'" (quoting *Colburn,*

emphasis added)); *Joines v. Twp. of Ridley,* 229 Fed Appx. 161, 163 (2007) ("Joines's behavior in no way demonstrated that he was inclined towards *self-inflicted harm*" (emphasis added)); *Palakovic v. Wetzel,* 854 F.3d 209, 230 (3d Cir. 2017) ("our statements...requiring a plaintiff to demonstrate a 'strong likelihood' of *self-harm* were never intended to demand a heightened showing at the pleading stage" (emphasis added)). *See also Wilson v. Taylor,* 597 F. Supp. 2d 451, 460 (D. Del. 2009) ("a genuine issue of material facts exists as to whether or not defendants acted with deliberate indifference to Wilson's *risk of hurting himself*" (emphasis added)).

The law is, therefore, clear that particular vulnerability to suicide and particular vulnerability to self-harm or self-injurious behavior are equivalent concepts. *See Shirey v. Landonne,* No. 18-4960, 2019 WL 1470863, at *8 (E.D. Pa. April 3, 2019) (finding deliberate indifference to plaintiff's suicidal tendencies appropriately pled with regard to an attempted suicide not resulting in death). When an incarcerated person is specifically vulnerable to self-inflicted harm or suicide, and security or medical staff of a facility know or should know of that vulnerability but are recklessly indifferent to its risks, they have violated the Eighth Amendment.

### 2. *Monell* Liability Standard

Plaintiff's claims against Bucks County and PrimeCare are brought under *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978)*,* which holds that a municipal entity is liable under 42 U.S.C. § 1983 when the entity's policy, practice, or custom is a moving force of a constitutional violation. 436 U.S. at 694. In the absence of a formal policy, an entity's custom can establish municipal liability. A custom "can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).

A failure to train, supervise, discipline, or control municipal entity employees can also constitute a basis for liability when the "failure…reflects deliberate indifference to the

constitutional rights of [the municipality's] inhabitants." *City of Canton v. Harris*, 489 U.S. 378

(1989).Claims based on a failure to train theory do not require a showing of previous instances to

put the defendant on notice. Rather, "the need for training 'can be said to be 'so obvious,' that

failure to do so can be characterized as 'deliberate indifference' to constitutional rights' even

without a pattern of constitutional violations." *Thomas v. Cumberland Cty.,* 749 F.3d at 223.

> **B.** **The PrimeCare Defendants' Motion Should Be Denied.**

The evidence adduced in discovery shows that a reasonable jury may find that defendants

Christina Penge, Jessica Mahoney and PrimeCare are liable for Mr. Freitag's death due to the

individual and systemic deliberate indifference that led him to take his own life. Their motion for

summary judgment should be denied.

> **1.** **Defendants Penge and Mahoney Violated Mr. Freitag's Eighth Amendment Rights.**

Defendants Penge and Mahoney were both aware of Mr. Freitag's particular vulnerability

to suicide and self-injury and were deliberately indifferent to the risk he would harm himself.

> **a.** **Mr. Freitag was Particularly Vulnerable to Self-Harm and Suicide and Defendants Mahoney and Penge were Aware of that Vulnerability.**

Plaintiffs alleging deliberate indifference to a particular vulnerability to suicide do not

have to show that an individual's suicidality "was temporally imminent or somehow clinically

inevitable. A particular individual's vulnerability to suicide must be assessed based on totality of

the facts presented." *Palakovic* 854 F.3d at 230. The totality of the facts in this case presents a

stark and clear picture of particular vulnerability and awareness of that vulnerability on the part

of defendants Mahoney and Penge.

Mr. Freitag's particular vulnerability to self-inflicted harm was evident from the time of

his arrival at BCCF. By mid-June, Penge and Mahoney knew Mr. Freitag had multiple prior

suicide attempts and that his most recent attempt resulted in his arrest, conviction, and incarceration. PS 24. They knew Mr. Freitag had diagnosed mental health disorders, PS 90, that he had multiple inpatient psychiatric hospitalizations in 2017, PS 13, and that he thought of harming himself whenever he became depressed. PS 19. In late July 2018, Mr. Freitag's attorney, at the urging of his family, contacted the facility with concerns about his mental state, specifically mentioning his history of suicide attempts. PS 28-29. After a mental health encounter following that advisory, Dr. Cassidy sent an email to the entire mental health staff, including defendants Penge and Mahoney pointing out significant risk factors, including Mr. Freitag's history of self-inflicted injury and suicide attempts, and the heightened risk posed by his upcoming sentencing. PS 37-38.

Mr. Freitag's particular vulnerability became more obvious as his court date approached. For weeks, he reported growing anxiety over his sentencing while at the same time convincing himself he would be released with a probationary sentence. PS 57-58. That certainty was combined with, as Penge found, persistent limited insight and judgment which prevented Mr. Freitag from even considering the prospect that he could return to prison after his sentencing—let alone receive a sentence that would result in his incarceration for at least another six years. Penge and Mahoney fully understood the familiar concept that critical events in a criminal case increase the risk of suicidality. Thus, when Mr. Freitag had his last encounter with Mahoney on August 22 and with Penge on August 23, he was in a deeply precarious position.[5]

The PrimeCare defendants' suggestion that because Mr. Freitag did not explicitly state that he was suicidal he was not particularly vulnerable, ECF 77-1 at 16, is undermined by the

---

[5] Even if Mahoney and Penge did not learn specific information in their encounters with Mr. Freitag, a jury can draw the inference that they reviewed all entries in Mr. Freitag's medical chart and were aware of all information contained in the chart. *See Palakovic,* 854 F.3d at 231 (noting reasonable inferences as to knowledge of particular vulnerability).

testimony of PrimeCare's own mental health supervisor, Dr. Cassidy.[6] As she explained, it is a well-known fact to mental health clinicians that people who are suicidal often do not share that information and that a proper inquiry into one's vulnerability to suicide must go far beyond the individual's stated level of suicidal ideation. PS 73.

> **b.** **Defendants Penge and Mahoney were Deliberately Indifferent to Mr. Freitag's Particular Vulnerability.**

The PrimeCare defendants argue that because mental health staff saw Mr. Freitag on several occasions, they were not deliberately indifferent to his mental health care needs and risk of self-injury. ECF 77-1 at 16. However, healthcare providers in jails and prisons are constitutionally obligated to provide not just care, but "adequate" care. *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987) (citing *Estelle*, 429 U.S. at 105). This is also true with regard to mental health care, including in cases when an incarcerated person is able to end their life in custody. *Stuart v. Pierce,* No. 17-934, 2022 WL 605821, at *6 (D. Del. Feb. 24, 2022) ("the care Stuart allegedly received—minimal and sporadic contact with nurses and psychiatric workers—can be insufficient to treat a seriously mentally ill prisoner and indicate reckless disregard when the treatment is clearly ineffective"); *see also Clark v. Coupe,* No. 1:17-cv-00066, 2019 WL 1349484, at *3 (D. Del. March 26, 2019) ("the fact that DOC Defendants allowed Plaintiff occasional visits with mental health providers does not *per se* immunize them from liability").

Even in situations where prison personnel have provided substantial medical care, they may be deemed deliberately indifferent where they "opt for 'an easier and less efficacious treatment' of the inmate's condition." *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 347

---

[6] The PrimeCare defendants fail to even mention Dr. Cassidy's testimony in their brief and statement of facts, an omission that is especially glaring with respect to plaintiff's *Monell* claims against PrimeCare. *See infra* § IV.B.2.

(quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Following this principle, "[p]rison officials may not entirely insulate themselves from liability under § 1983 simply by providing some measure of treatment." *Jones v. Muskegon Cty.*, 625 F.3d 935, 944-45 (6th Cir. 2010); see also *Snow v. McDaniel*, 681 F.3d 978, 986 (9th Cir. 2012) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000)) (noting that "'[a] prisoner need not prove that he was completely denied medical care' in order to prevail"); *Berry v. Peterman,* 604 F.3d 435, 441 (7th Cir. 2010) (citing *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)) ("[A] prisoner also is not required to show that he was literally ignored"). These principles hold true in the mental health field; providers have been deemed deliberately indifferent for removing someone from suicide watch when it was not clinically indicated even if they engaged in extensive treatment encounters. *Carlos v. York Cty.*, No. 15-1994, 2019 WL 6699710, at *20 (M.D. Pa. Dec. 9, 2019); *Estate of Kempf v. Wash. Cty.,* No. 15-1125, 2018 WL 4354547, at *25 (W.D. Pa. Sept. 12, 2018).

As Penge and Mahoney were aware, it is commonly understood in the prison environment that suicidal and self-harming behavior is more likely at critical time periods in a person's criminal case, such as after a denial of bail, a jury verdict, or a sentencing. PS 8. Mr. Freitag clearly communicated that he was, on the one hand, worried about his sentencing, while, on the other hand, communicating his expectation that he would be released and return to his job. PS 57-58. Given the clinical determination made by Penge—and known by Mahoney—that Mr. Freitag lacked insight and judgment, this combination of factors made Mr. Freitag's sentencing an obvious inflection point for Mr. Freitag's risk of self-harm. Indeed, as Dr. Cassidy expressly acknowledged, all clinicians on the BCCF mental health staff would be expected to know that Mr. Freitag's risk factors were connected to his sentencing. PS 38.

In the face of this knowledge, defendant Mahoney failed to ensure that Mr. Freitag would be seen directly following his sentencing. On June 15, two months before his sentencing, Mr.

Freitag asked Mahoney to schedule a mental health follow-up appointment after his sentencing "because he figured he would need somebody to talk to afterwards." PS 23. Mahoney did not schedule an appointment or any other type of intervention after Mr. Freitag's sentencing. Nor, in the face of mounting evidence that Mr. Freitag would be at risk as sentencing approached, did she take any steps to create an alert for the correctional staff as to how to address Mr. Freitag's mental health.[7] Instead, she scheduled an appointment for August 27, 2018, a woefully inadequate step given Mahoney's knowledge of Mr. Freitag's risk factors. PS 26. As plaintiff's forensic psychology expert, Dr. Mary Perrien, explained, this failure is evidence of insufficient treatment planning, a step critical to the adequate provision of mental health care. PS 187.

Penge, like Mahoney, did not take steps to ensure a necessary follow-up after Mr. Freitag's sentencing. Additionally, Penge's decisions prior to sentencing greatly enhanced Mr. Freitag's risk. When she saw him on August 17, just a week before sentencing, she removed him from Level 3 watch despite the fact he had been anxiously awaiting sentencing for weeks, despite the fact he had limited insight and judgment, and despite the fact her supervisor, Dr. Cassidy, intended Mr. Freitag to remain on that watch through sentencing and that any decision to remove him from this level should be cleared with her first. PS 48-53. This decision was highly consequential after sentencing. When Mr. Freitag returned to BCCF after sentencing and correctional staff saw he was not on any level of watch, and without any communication from Penge (or Mahoney), correctional staff were left with the impression that the Level 3 watch was appropriate—a decision Dr. Cassidy confirmed was insufficiently protective.

If Mr. Freitag had been seen after court, mental health staff would have had the opportunity to conduct a more thorough assessment taking into account all of the circumstances

_____

[7] This became a commonly accepted practice for Dr. Cassidy following Mr. Freitag's death. PS 186.

of the sentencing. PS 184. Additionally, if Mr. Freitag had been placed on more intensive status, such as Constant Watch, Level 1, or Level 2, it would have been more difficult for him to end his life, both due to increased supervision and lack of access to the means he used to effectuate his suicide. PS 185. Penge and Mahoney had the information necessary to understand Mr. Freitag required immediate mental health care and appropriate precautionary measures after his devastating, life-altering sentencing. Because they did nothing to adequately intervene, a reasonable jury could conclude they were deliberately indifferent.

### 2. Defendant PrimeCare is Liable for Mr. Freitag's Death.

PrimeCare, a private medical care provider, is a municipal entity for purposes of a *Monell* claim as it has been contracted to fulfill a municipal function. *Eckstorm v. Cmty. Educ. Ctrs., Inc.*, No. 19-782, 2019 WL 3804146, at *5 (E.D. Pa. Aug. 12, 2019). As such, PrimeCare is liable for any constitutionally inadequate policies, customs, and failures to train, supervise, and discipline its employees. The summary judgment record shows that PrimeCare was a moving force in causing the constitutional violations leading to Mr. Freitag's death in two different respects: by maintaining a deficient policy regarding mental health staff availability and by failing to train and supervise its providers in appropriately assessing and treating patients.

### a. PrimeCare's Deficient Policy of Failing to Provide Mental Health Interventions Following Critical Events

PrimeCare knowingly adopted a policy and practice allowing correctional staff— insufficiently trained in the identification of risks of self-harm—to be the sole decisionmakers regarding how to protect people returning to BCCF at critical moments in their criminal proceedings. It did so with the understanding that these critical moments enhance the risk of self-harm, and it did so knowing that easy fixes—extending staff time by approximately one hour each day and by ensuring proactive communication to correctional staff—were readily available.

Under established Third Circuit law, a *Monell* claim need not prove a facially unconstitutional policy. Instead, "[a reasonable jury] could also infer that the failure to establish a more responsive policy caused a specific constitutional violation." *Natale v. Camden City,* 318 F.3d 575, 585 (3d Cir. 2003). Here, similar to the defendants in *Natale,* PrimeCare failed to establish a policy addressing immediate needs of incarcerated people with serious vulnerabilities following critical events. Just as the plaintiff in *Natale* was forced to wait up to 72 hours to receive necessary medication, *id.* at 585, PrimeCare's policy resulted in circumstances where Mr. Freitag could not be seen for three days for immediately necessary mental health care. As plaintiff's expert, Dr. Perrien explained, this system resulted in an obvious risk of harm. PS 188.

Prison medical providers cannot wantonly delay treatment and care without running afoul of the Eighth Amendment. It is regularly understood that delaying an incarcerated person's necessary medical care for non-medical reasons supports a finding of deliberate indifference. *Rouse v. Planiter,* 182 F.3d 192, 197 (3d Cir. 1999). When there is a delay, "there is no presumption that the defendant acted properly...all that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 537 (3d Cir. 2018). Indeed, "systemic deficiencies in staffing which effectively deny inmates access to qualified medical personnel for diagnosis and treatment of serious health problems have been held to violate constitutional requirements." *Inmates of Allegheny Cty. Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979). This is precisely what PrimeCare's policy formalized: a systematic delay in immediately necessary medical care in the form of post-court mental health evaluations due to non-medical, staffing considerations.

PrimeCare mischaracterizes plaintiff's position as demanding "24/7 onsite mental health care," and argues that the policy in place was sufficient because correctional staff were available

after individuals returned from court and were able to call mental health staff if they believed it necessary. ECF 77-1 at 20. This defense ignores the common-sense constitutional principle that a municipal entity may not delegate decisions requiring specialized medical knowledge to unqualified correctional staff. *Inmates of Allegheny Cty. Jail*, 612 F.2d at 763 ("when inmates with serious mental ills are effectively prevented from being diagnosed and treated by qualified professionals, the system of care does not meet the constitutional requirements set forth by *Estelle v. Gamble*"); *Beckwith v. Blair County,* No. 3:18-cv-0040, 2022 WL 267428, at *10 (W.D. Pa. Jan. 28, 2022) (upholding *Monell* claim where correctional staff were permitted to make decisions about suicide watch status without consulting mental health clinicians).

PrimeCare's defense also makes little sense on the facts. The staffing practices required correctional staff to make decisions about mental health interventions when they did not know how to make such decisions. As Deputy Warden Mitchell confirmed, if mental health professionals had been on site when Mr. Freitag returned from court, he would have contacted them to discuss which precautions were appropriate to order, but, without their presence, and without knowledge of Mr. Freitag's full history, he was "handcuffed" in his decision-making. *Cf. Beckwith*, 2022 WL 267428, at *10 (finding that a reasonable jury could conclude that "County Defendants had a deficient policy which permitted corrections officers to remove a detainee from suicide watch without a mental health evaluation, and did not provide for clear communication between corrections officers and medical staff).

PrimeCare's reliance on *Alexander v. Monroe Cty,* No. 3:13-cv-01758, 2016 WL 6953477 (M.D. Pa. Sept. 7, 2016), is misplaced. In *Alexander*, the court addressed a policy that did not provide for sharing of legal records or court scheduling information, which the plaintiff contended deprived medical and mental health providers of information that could have been useful in their risk assessments. *Id.* at *14. In the instant case, however, PrimeCare's policy is

infirm not because of the failure to provide information to treating medical staff, but, rather, the failure to make necessary staff available at all. In direct contrast to the facts of *Alexander*, here, PrimeCare staff knew that Mr. Freitag was returning from sentencing and knew that sentencing had substantial potential to increase his risk of self-harm, but, as a result of its policy, there was no meaningful treatment available. While *Alexander* focuses on deficiencies in Monroe County's policy regarding information available to treating providers, PrimeCare employees had all the information they needed to adequately treat Mr. Freitag, but due to their employer's policy, they were not available to act on that information when Mr. Freitag was most vulnerable.

In these circumstances, a reasonable jury could find that PrimeCare's policy to dismiss mental health staff before individuals returned from court was the moving force behind the deliberate indifference shown to Mr. Freitag.

### b.    PrimeCare's Failure to Train and Supervise Mental Health Staff

In the prison medical context, the risk of providing inadequate care to incarcerated people who have no other means of obtaining treatment is so obvious that failing to appropriately train or supervise front-line staff creates a triable issue without evidence of a pattern of constitutional violations. *Ponzini v. Monroe Cty,* No. 3:11-cv-00413, 2015 WL 5123635, at *14 (M.D. Pa. Aug. 31, 2015) ("[G]iven such a system [where incarcerated people must rely on prison authorities for medical care], it is vital that front-line staff have training adequate to meet the demands placed upon them. Failure to do so makes it 'highly predictable' that constitutional violations would occur as a result"). PrimeCare's failure to train and supervise its mental health staff regarding watch level precautions created this highly predictable risk and led to the inadequate treatment Mr. Freitag received.

Dr. Cassidy, Penge and Mahoney's supervisor, indicated that, given his clear risk factors, Mr. Freitag should have remained on Level 3 watch at least through his sentencing and that any clinical decision to the contrary should be confirmed with her first. PS 36, 39. Despite receiving Cassidy's guidance on this point, Penge removed Mr. Freitag from Level 3 watch 16 days later without speaking to anyone, let alone her supervisor, Dr. Cassidy. PS 50. Significantly, Penge made this decision a week before Mr. Freitag's sentencing, which left plenty of time for Dr. Cassidy to remedy it. A jury could reasonably determine that the failure to do so constitutes a failure on the part of PrimeCare, through its BCCF supervisor, Dr. Cassidy, to supervise mental health clinicians. Additionally, for similar reasons to those discussed above regarding the impact on correctional staff of removing the Level 3 status, a reasonable jury could conclude that this failure resulted in correctional staff perceiving that Mr. Freitag was at less of a risk than was actually true, which led to his placement on an inadequate Level 3 watch after sentencing.

Accordingly, plaintiff should be permitted to present to a jury his claim regarding PrimeCare's failure to train and supervise its clinicians.

### 3. The Court Should Exercise Supplemental Jurisdiction to Hear Plaintiff's State Law Claims.

In addition to his federal constitutional claims, plaintiff also asserts supplemental state-law negligence claims against PrimeCare and the individual medical defendants. The PrimeCare defendants do not contest that the summary judgment record supports negligence claims, but, instead, argue that the Court should dismiss those claims so that they can be heard in state court. If the Court were to grant summary judgment on plaintiff's constitutional claims—which, given the record and legal principles discussed above and below, it should not—plaintiff submits that, given the Court's extensive expenditure of resources to develop an understanding of the facts and

issues in this case, the Court should use its discretion under 28 U.S.C. § 1367(c) to exercise jurisdiction over the state law claims.

**C.  The Bucks County Defendants' Motion Should be Denied.**

The Bucks County defendants' motion should also be denied as plaintiff has offered sufficient evidence to support constitutional claims against defendants Young and Moody and a *Monell* claim against Bucks County.

**1.  Defendants Moody and Young Violated Mr. Freitag's Clearly Established Constitutional Rights.**

**a.  Defendants Moody and Young Were Deliberately Indifferent to Mr. Freitag's Known Risk of Self-Injury.**

**i.  Mr. Freitag was Particularly Vulnerable to Self-Injury and Suicide on August 25, 2018.**

As discussed above with regard to plaintiff's claims against defendants Penge and Mahoney, in the time before Mr. Freitag's sentencing, a range of factors, including his mental health and inpatient hospitalization history, his prior suicide attempts, and his repeatedly expressed anxiety about how imprisonment could result in him losing his job, provided substantial evidence of Mr. Freitag's particular vulnerability to suicide. *See supra* § IV.B.1.a. Those factors were present in *advance* of sentencing, before the relevant time for assessing Young and Moody's liability regarding their actions on August 25.

On that date, of course, Mr. Freitag's vulnerability was even more enhanced. His worst fears about the impact of sentencing had come to fruition. Knowing he would spend at least the next six years in prison meant the end of his 25-year career, which had been a source of great pride prior to and even during his incarceration. With a history of three prior suicide attempts and the added factor of a devastating result in a critical moment of his criminal case, Mr.

Freitag's condition unquestionably met the status of particularly vulnerable to self-harm as of the morning of August 25.

      ii.      **Young and Moody had Sufficient Knowledge of Mr. Freitag's Particular Vulnerability to Self-Injury and Suicide.**

When evaluating whether prison staff knew of an individual's risk of self-harm under *Colburn*, "it is not necessary that the custodian have a subjective appreciation of the detainee's 'particular vulnerability.'" *Colburn*, 946 F.2d at 1025. In rejecting a subjective standard, the Third Circuit explained "that 'reckless or deliberate indifference to that risk' only demands 'something more culpable on the part of the officials than negligent failure to recognize the high risk of suicide'" *Palakovic*, 854 F.3d at 231 (citing *Woloszyn* 396 F.3d at 320). "[S]ubjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known the risk." *Woloszyn,* 396 F.3d at 321 (quoting *Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001)).

Young and Moody insist that they had no idea Mr. Freitag was at risk of harm on the morning of August 25. But those denials must be weighed against the ample circumstantial evidence that was available to them to make Mr. Freitag's individual risk sufficiently apparent. Crucially, both Officers Young and Moody knew Mr. Freitag was on Level 3 status. PS 122. As Buck's County's supervisory officials, Deputy Warden Mitchell and Captain Nottingham, testified, the Level 3 watch status is put in place for the specific purpose of preventing *harm* to the person who is the subject of the watch. PS 94, 170, 174. That in itself should have alerted the correctional defendants that Mr. Freitag was particularly vulnerable to self-inflicted injury.

The Bucks County defendants' contention that Level 3 watch was not a "suicide watch" is a classic example of exalting form over substance, not supported by the law or the facts. As noted above, *supra* § IV.A.1, the Third Circuit has recognized that the Eighth Amendment

analysis contemplates situations where a person could harm themselves and is not confined to cases involving completed suicides. And, on the facts, even if the law requires some notice of "suicide," as opposed to "harm," the Level 3 watch status is defined within Bucks County's *suicide prevention* policy under the subheading "Levels of Suicide Watch." JA 35, 37. In short, because Young and Moody knew they were tasked with monitoring Mr. Freitag in compliance with watch procedures intended to protect against self-harm, procedures which were defined within the suicide prevention policy, there is more than sufficient circumstantial evidence to support a finding that they knew Mr. Freitag was particularly vulnerable to that harm.

Their awareness of the watch was not the only factor providing Young and Moody with knowledge of Mr. Freitag's vulnerability. Young knew Mr. Freitag had previously been placed on Level 3 watch multiple times while he was housed on B Module. PS 107. Mr. Freitag was sent to medical to meet with mental health providers numerous times during the period of time he was housed on Young's unit. ECF 77-1 at 5. Mr. Freitag had multiple visible scars on his right forearm from his recent suicide attempts. PS 13. Young knew Mr. Freitag had just returned from court on August 24, 2018, PS 108, and Young and Moody both knew the risk of suicidal and self-harming behavior is higher after critical court events, including sentencing. PS 8.

The self-serving assertions by defendant Young that he had no idea about Mr. Freitag's risk are seriously lacking in credibility. Young was Mr. Freitag's block officer for approximately two months. PS 107. Despite his responsibility to supervise Mr. Freitag throughout that period, Young described not even knowing who he was. PS 107. Young claimed that Mr. Freitag's death could have been prevented by "him not going to jail." PS 141. He flippantly dismissed the fact that inmate monitor watch procedures were not followed with regards to Mr. Freitag. PS 140 ("That was $3 a day not well spent"). Young was also dismissive of the vulnerability of incarcerated people with severe mental health issues, stating that people are screaming for help

"all the time" and engage in "superficial [cutting] for attention." PS 6. Young's descriptions of

Mr. Freitag and his death reflect the very "absence of any concern for the welfare of his charges"

that the Third Circuit cautioned against. *Colburn*, 946 F.2d at 1025. Accordingly, because a

reasonable fact finder may determine that their willful and blatant derision directed toward the

vulnerable incarcerated people for whom they were responsible supports a finding of reckless

disregard of Mr. Freitag's welfare, there is sufficient evidence at this stage to demonstrate Young

and Moody's knowledge of Mr. Freitag's particular vulnerability.

### iii. Young and Moody's Failure to Monitor Mr. Freitag Constitutes Deliberate Indifference.

Young and Moody were deliberately indifferent to Mr. Freitag's particular vulnerability

to self-harm and suicide when they failed to perform and enforce Level 3 observation watch

procedures in direct violation of BCCF's suicide prevention policy. Numerous courts have found

that when correctional officers do not complete prescribed checks of an incarcerated person who

is on a heightened level of watch or observation probative of deliberate indifference. *Keohane v.

Lancaster Cty.,* No. 07-3175, 2010 WL 3221861, at *10 (E.D. Pa. Aug. 12, 2010) (finding that a

correctional officer failing to properly observe individual on watch status "could establish his

reckless indifference"); *Rogers v. Santa Rosa Cty. Sheriff's Office,* 856 Fed Appx. 241, 255 (11th

Cir. 2021) ("a jury could find that, had the deputies monitored Escano-Reyes, they could have

prevented him from committing suicide and that their failure to perform the task assigned to

them constituted deliberate indifference"); *Estate of Conroy v. Cumberland Cty.,* No. 17-1783,

2020 WL 7417983 *7 (D.N.J. Dec. 18, 2020) ("a jury could find that they acted with deliberate

indifference by disregarding their duties and failing to conduct their suicide watch checks");

*Sabbie v. Southwestern Cor. LLC,* 5:17-cv-113, 2019 U.S. Dist. LEXIS 214463 *127 (E.D. Tex.

March 6, 2019) ("a jury could infer deliberate indifference on the part of Defendant Nash, who

also indicated she did twenty-four visual checks when she did not do any"); *Shepard v. Hansford Cty,* 110 F. Supp. 3d 696, 711 (N.D. Tex. 2015) ("she acted with deliberate indifference by intentionally prioritizing her other duties over her suicide watch duties and by failing to take steps to protect Lacy from harm").

More broadly, it is well-established what when an official "knows of a prisoner's need for medical treatment but intentionally refuses to provide it" they are deliberately indifferent. *Innis v. Wilson*, 334 Fed Appx. 454, 456 (3d Cir. 2009). Accordingly, correctional staff are deliberately indifferent when they fail to implement orders from medical staff. *Bolling v. Carter,* 819 F.3d 1035, 1036-37 (7th Cir. 2016). The Bucks County defendants' rebuttal to these points, that a violation of policy alone does not give rise to an Eighth Amendment violation, ECF 88 at 12, ignores the well-established principle that such violations are *probative* of deliberate indifference. *Shirey,* 2019 WL 1470863, at *8 (citing *Giandonato v. Montgomery Cty.*, No. 97-cv-0419, 1998 WL 314694, at *5 (E.D. Pa. May 22, 1998)) ("The alleged failure to follow prison protocol in the face of actual knowledge of Plaintiff's suicidal tendencies suffices to state a plausible claim of deliberate indifference."). *See also Arenas v. Calhoun*, 922 F.3d 616, 624 (5th Cir. 2019) ([A] knowing failure to execute policies necessary to an inmate's safety may be evidence of an officer's deliberate indifference."); *Phillips v. Roane Cty.*, 534 F.3d 531, 541, 543-44 (6th Cir. 2008) ("[W]e find persuasive the correctional officers' disregard of prison protocols, which describe the actions that officers should take when an inmate makes certain medical complaints or exhibits certain medical symptoms.").

On August 25, 2018, Young and Moody knew Mr. Freitag was on Level 3 watch. PS 122. They knew that when an individual is on Level 3 precautions, they must be seen six times per hour, with the officers performing checks every 30 minutes and the inmate monitors performing checks every 15 minutes. PS 102. They knew their responsibility was to ensure that the subject

of the watch was present and alive, or as Officer Murphy described, that they could see "living, breathing flesh." PS 97.

Despite Young and Moody's knowledge of these vital watch procedures and their responsibilities to implement them, they utterly ignored their obligations, leaving Mr. Freitag predictably and dangerously vulnerable to self-injury and his ultimate death. At the outset, they failed to conduct the checks for which they were responsible and believed it would have been acceptable for them to wait close to 40 minutes to conduct the next check on Mr. Freitag's cell. And, with regard to their supervision of the assigned inmate monitor, their inattention to their obligations was so extreme that, Hugh Caldwell, observed Mr. Freitag only *twice* during a five-hour period—a fact that they did not learn until their depositions more than two years after Mr. Freitag's death. This failure to follow protocols is all the more striking—and all the more deliberate—in view of the fact that video surveillance footage shows Young idly standing behind a podium on B Module from 10:21 to 10:55, except for a brief four-minute period when he was in the yard. PS 123. In that time, there is even more evidence of Young's dilatory conduct as he failed to fulfill his responsibly of recording information in a computerized log when Officer Murphy checked Mr. Freitag's cell. PS 124.

In short, Mr. Freitag, already prone to self-harm and suicidality, was in a highly vulnerable state following his sentencing. Young and Moody knew of that vulnerability and knew that they were charged with the responsibility of protecting Mr. Freitag. Their failure to follow through with that responsibility demonstrates their deliberate indifference and establishes plaintiff's constitutional claim against them.

### b.   Young and Moody are Not Entitled to Qualified Immunity.

Young and Moody contend that even if plaintiff has established proof of constitutional violations they are entitled to qualified immunity. Qualified immunity is not a defense to an

action under 42 U.S.C. § 1983 where defendants' conduct violated "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). It is defendants' burden to establish that they are entitled to qualified immunity. *Beers-Capitol,* 256 F.3d at 142 n.15 (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989)). Young and Moody cannot meet that burden here.

The Third Circuit has explained that "it need not be the case that the exact conduct has previously been held unlawful so long as the 'contours of the right' are sufficiently clear." *E.D. v. Sharkey,* 928, F.3d 299, 308 (3d Cir. 2019). When prior cases, even if not involving the same conduct, give "fair warning" that defendants' actions were unconstitutional, there is no qualified immunity. *See Hope v. Pelzer,* 536 U.S. 730, 741 (2002) ("Officials can still be on notice that their conduct violates established law even in novel circumstances"). Defendants' assertion that no case exists with the exact facts surrounding Mr. Freitag's death does not entitle them to qualified immunity.

An incarcerated person's constitutional right to be free from deliberate indifference to a serious medical need while in custody has been clearly established since 1976. *Estelle,* 429 U.S. 97, 104. In 1991, the Third Circuit specifically extended the *Estelle* analysis to the context of prison suicides, clearly establishing that correctional officers violate the constitution when they are recklessly indifferent to a known particular vulnerability to suicide. *Colburn,* 946 F.2d at 1023. Although more specificity should not be required to demonstrate that defendants were aware of their obligation to ensure adequate protection by fulfilling prescribed watches, decisions from this Court have denied qualified immunity in the same basic factual scenario. *Keohane*, 2010 WL 3221861, at *10; *see supra* § IV.C.1.a.iii. Young and Moody had ample notice their conduct in ignoring Mr. Freitag's prescribed observation status violated his constitutional rights under existing caselaw.

Additionally, when a plaintiff has produced sufficient evidence of deliberate indifference, defendants face a high burden to establish a qualified immunity defense. As the Third Circuit has explained, "because deliberate indifference under *Farmer* requires actual knowledge or awareness on the part of the defendant, a defendant cannot have qualified immunity if she was deliberately indifferent." *Beers-Capitol,* 256 F.3d at 142 n.15; *see also Carter v. City of Philadelphia,* 181 F.3d 339, 356 (3d Cir. 1999); *Nealman v. Laughlin*, No. 15-cv-1579, 2016 WL 4539203, at *7 (M.D. Pa. Aug. 31, 2016) (rejecting qualified immunity defense for correctional officer defendants on ground that "[t]here is no debate…that the suicide of a pretrial detainee may support a Fourteenth Amendment claim against custodial officers who are aware of and act with reckless indifference to a detainee's 'particularized vulnerability' to suicide"). As discussed above, Young and Moody violated Mr. Freitag's constitutional rights when they were deliberately indifferent to his particular vulnerability to self-harm and suicide by failing to monitor him according to established watch protocols put in place to ensure his safety. Their request for qualified immunity should be denied on this basis alone.

### 2. Bucks County is Liable for Mr. Freitag's Death.

There is abundant evidence in the summary judgment record that Bucks County's policies and customs, as well as its deficient training, supervision and discipline created the conditions leading to Mr. Freitag's death. Two sets of facts establish these claims: Bucks County's acceptance of PrimeCare's practice placing mental health decisions in the hands of insufficiently trained correctional staff and Bucks County's failure to train, supervise, and discipline correctional staff regarding their implementation and execution of necessary watch

procedures. Taken on their own or collectively, these facts demonstrate Bucks County's liability, and plaintiff should be permitted to present these claims to a jury.[8]

### a. Bucks County is Responsible for its Deficient Policy of Failing to Provide Mental Health Care Following Critical Events.

Notwithstanding Bucks County's contract with PrimeCare, a "[c]ounty cannot immunize itself from liability for constitutional harm by delegating the provision of medical care to an independent entity." *Whitehurst v. Lackawanna Cty.* No. 3:17-903, 2020 WL 6083409 *4 (M.D. Pa. Oct. 15, 2020). Bucks County therefore maintains responsibility for ensuring adequate mental healthcare is available to the people who it incarcerates in its jail. PrimeCare's policy of dismissing the only onsite mental health clinicians before individuals return from court and deferring treatment decisions to an unqualified correctional staff member during what is understood to be a critical time with regards to mental health and risk of self-injury, amounts to Bucks County's policy as well. Bucks County was well aware of this constitutionally deficient policy; indeed this policy was in place even before PrimeCare took over from a prior contractor.[9]

---

[8] Defendants' argument that the failure to identify a policymaker who acted with deliberate indifference is fatal to a claim of municipal liability is without merit. This Court has found that caselaw does "not require the Court to dismiss [a] plaintiff's *Monell* claim on summary judgment for failure to identify the specific final policymaker on the record." *Thomas v. City of Phila.,* No. 17-4196, 2019 WL 4039575, at *24 (E.D. Pa. Aug. 23, 2019), relying on *Bielevicz*, 915 F.2d at 850 ("This does not mean, however, that the responsible decisionmaker must be specifically identified by the plaintiff's evidence").

[9] Although it is not necessary for the viability of this claim that plaintiff identify and prove a constitutional violation by a Bucks County employee caused by Bucks County's policy decision, there is sufficient evidence in the record to show that such a violation occurred. Specifically, Deputy Warden Mitchell's actions in directing Mr. Freitag's placement on a Level 3 watch on August 25, without any inquiry into his risk factors and despite his knowledge from July 31 that Mr. Freitag had a prior history of suicide attempts, demonstrates his deliberate indifference to Mr. Freitag's particular vulnerability to suicide. There is further support for this claim in Mitchell's admitted lack of attention to the level of protection provided to Mr. Freitag, which was so scant that Mitchell could not accurately identify who was responsible for deciding what watch to implement. PS 81-82. The fact that Mitchell is not named as a defendant does not undermine the claim in this respect. *Estate of Conroy,* 2020 WL 7417983 at *6.

### b.  Bucks County is Responsible for Failing to Ensure Proper Monitoring of Vulnerable Incarcerated People.

Bucks County is also liable under *Monell* for its longstanding practice of performing inadequate watch procedures. This conduct is actionable under both a custom and practice framework as well as a failure to train, supervise, and discipline theory. At the time of Mr. Freitag's death, it was Bucks County's custom to ignore protective watch requirements and fail to supervise inmate monitors in their crucial role of observing psychologically vulnerable individuals. Additionally, evidence shows that there was a systemic failure to train, supervise, and discipline correctional officers regarding appropriate watch procedures.

More than two years before Mr. Freitag's death, Bucks County was made aware that its officers were failing to supervise inmate monitors who were tasked with checking on their fellow incarcerated people who had been prescribed observation status. PS 142-43. In March and April 2016, inspectors from the National Commission on Correctional Health Care (NCCHC) visited BCCF and raised concerns regarding inmate monitors preparing inconsistent documentation of their watches and officers failing to participate in the watches or supervise the inmate monitors. Despite assertions by Captain Nottingham, the witness designated under Fed. R. Civ. P. 30(b)(6) to offer testimony on Bucks County's response to these findings, that the County took corrective action, there is little credibility to that claim given that the same witness, when designated to testify about officer training, did not even know about the NCCHC findings. In short, if Bucks County's "training lieutenant" had no idea that a national accreditation agency had found Bucks County's training of officers regarding watch obligations insufficient, there is little support for the County's claim that it acted to address an identified deficiency.

Further, the credibility of Bucks County's response is conclusively undermined by the testimony of another Bucks County deposition designee, Deputy Superintendent of Programs

Reed, who explained with blunt candor (and whose testimony defendants do not cite) that officers' failures to comply with watch protocols were well known and that officers have complained *hundreds* of times about watch procedures and expectations. PS 151. Despite widespread knowledge of these issues, no one in the administration monitored whether officers were adequately performing watches and there was no reason to believe that they were. PS 152. Her understanding was that "there was [not] any follow through from the Administration to confirm that everybody is following rules and regulations of the facility." PS 153. Young's testimony confirmed as much, as he does not remember a single supervisor ever telling him that the inmate monitors were not doing their job or that the forms were incorrect. This is more than sufficient to demonstrate that failure to perform and enforce watches was BCCF's custom, as custom "may be established by evidence of knowledge and acquiescence." *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (1996).

In addition to acquiescing to this custom of skipping watches and failing to supervise inmate monitors, Bucks County did not train, supervise, or discipline its staff to correct the practice. As stated, Young confirmed he had never received any supervisory guidance on how to implement Level 3 watches and, in particular, how to supervise inmate monitors. PS 154. Young, in fact, had a thoroughly incorrect understanding of his responsibilities with regard to ensuring that inmate monitors performed their watches correctly. PS 172-175. Given that Young was responsible for overseeing watches on a regular basis, PS 100, his ignorance of protocols and lack of training are glaring. The result of that absent training and supervision is immediately apparent based on Young's claim that he did everything he was supposed to do on August 25. It is also particularly evident in the aftermath of Mr. Freitag's death. Even after Mr. Freitag's gruesome suicide, no one discussed with Young and Moody whether they had properly conducted their watches that morning. It was not until *this litigation* that two supervisors, Deputy

Warden Mitchell and Captain Nottingham, were presented with evidence of Young and Moody's actions; once they were, they confirmed that Young and Moody violated their responsibilities to protect Mr. Freitag, and, as a result, placed him at a risk of harm. As in *Thomas*, Bucks County failed to provide training for an essential, predictable function that its officers "have no reason to have an independent education, knowledge base, or ethical duty that would prepare them to handle." 749 F.3d at 225.

If Young and Moody had been trained to perform adequate checks and supervise inmate monitors, Mr. Freitag would never have gone as long as he did without observation under Level 3 watch. Someone would have checked him every 15 minutes as the protocol requires. This would have made it far less likely that Mr. Freitag could have ended his life in the manner that he did, given that it took him at least 15 minutes to injure himself beyond the possibility of recovery. PS 121. On these facts, a reasonable jury could find that proper training and supervision more likely than not would have saved Mr. Freitag's life.

## V.    Conclusion

For the foregoing reasons, the defendants' motions for summary judgment should be denied.

Respectfully submitted,

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg

/s/ Grace Harris
Grace Harris

KAIRYS, RUDOVSKY, MESSING,
  FEINBERG & LIN LLP
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Plaintiff*

40