# Exhibit 18 Supplement Young Deposition

SA000852

James Young

Pages: 14, 16, 19, 20, 21, 24, 25, 27, 31, 33, 34, 37, 38, 39, 40, 44, 45, 46, 47, 48, 49, 50, 51, 54, 55, 56, 57, 58, 59, 60, 66, 73, 74, 77, 79, 82, 83, 84, 85, 91, 92, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112

Dated: December 23, 2020

SA000853

James Young

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| CHARLES JOSEPH FREITAG, | : | CIVIL ACTION |
| JR., as ADMINISTRATOR of | : | |
| the ESTATE OF CHARLES | : | NO. 19-05750 |
| JOSEPH FREITAG, SR., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BUCKS COUNTY; PRIMECARE | : | |
| MEDICAL, INC.; STEPHAN | : | |
| BRAUTIGAM, PMHNP; | : | |
| JESSICA MAHONEY, PSY.D.; | : | |
| AVIA JAMES, LPC; | : | |
| CHRISTINA PENGE, LPC; | : | |
| JOHN DOES 1-10, | : | |
| Defendants. | : | |


-----

December 23, 2020

-----

Oral deposition of JAMES A. YOUNG,
taken on behalf of the Plaintiff, via
videoconference, on the above date, commencing
at 12:00 p.m., before Linda A. Ricciardi,
Certified Court Reporter.


KAPLAN LEAMAN & WOLFE
COURT REPORTERS
230 South Broad Street, Suite 1303
Philadelphia, Pennsylvania  19102
1-877-559-3376

SA000854

James Young

Page 14

1    A.      Negative.

2    Q.      By that I mean, just to be clear, any

3    Bucks County employees, supervisors, family

4    members, anybody at all?

5    A.      No.

6    Q.      You were working on the B module when

7    Mr. Freitag killed himself, right?

8    A.      Yes, sir.

9    Q.      Is there anything that you could have

10   done to prevent Mr. Freitag's death?

11   A.      I am sure there is a lot of things

12   everybody could have done to do that, but me

13   personally, negative.

14   Q.      Well, what other things could have been

15   done to prevent Mr. Freitag's death?

16   A.      Probably him not going to jail.

17   Q.      Are you suggesting that the fact that

18   Mr. Freitag ended up in jail is what lead to

19   his death?

20   A.      I know it lead to some mental questions

21   in his head.

22   Q.      Did you know anything about Mr. Freitag

23   before the morning of August 25th?

24   A.      Negative.  I knew he was a model A

James Young

1    his arrest.

2    Q.      So it sounds like you learned after the

3    fact that Mr. Freitag had some mental health

4    issues; is that right?

5    A.      I would say mental health and suicidal

6    tendencies.

7    Q.      You did not know that beforehand; is

8    that right?

9    A.      That is correct.

10   Q.      Let's get back to what others could

11   have done to prevent his death.  The first

12   thing you told me is that Mr. Freitag could

13   have tried to stay out of jail, right?

14   A.      Probably the easiest way for anyone not

15   to commit suicide in jail is to stay out of

16   jail.

17   Q.      Is there anybody else in the prison who

18   could have prevented his death?

19   A.      I don't think so.  Negative, no, I

20   don't think so.

21   Q.      Did you ever hear anyone say that they

22   could have done something to prevent his death?

23   A.      In his personal situation, if anybody

24   could have helped him that day?

SA000856

James Young

1   Q.      You don't believe any of the officers

2   who were involved in this case should be blamed

3   for anything; is that right?

4   A.      That's right.

5   Q.      I take it you believe that none of the

6   other mental health providers who work in the

7   prison should be blamed for anything; is that

8   right?

9   A.      I don't know where they stand, that is

10  not my department.  My department is Department

11  of Corrections.

12  Q.      The only person who is responsible for

13  Mr. Freitag's death is Mr. Freitag for getting

14  himself locked up; is that right?

15  A.      It all comes down to it.

16              MR. KOLANSKY:  Is the deposition

17  over?

18              MR. FEINBERG:  It is not.

19  BY MR. FEINBERG:

20  Q.      Mr. Young, would you agree that as an

21  officer in the Bucks County Correctional

22  Facility you have a responsibility to ensure

23  the protection of prisoners who are under your

24  supervision?

SA000857

James Young

Page 20

1    A.      Absolutely.

2    Q.      How do you do that?

3    A.      Visual, my ears, word of mouth, walk

4    around my block, knowing my inmates.

5    Q.      Did you do that on August 25, 2018?

6    A.      I did it that day, and I do it every

7    day, sir.

8    Q.      There is not a single thing that you

9    could have done differently that day; is that

10   correct?

11   A.      When you are watching 92 people between

12   two of you and two floors, and you got, you

13   know, let's say at that time we brought yard

14   in, at that time medication was on its way,

15   there is a lot of things going on at once.

16   Q.      So your answer is yes?

17   A.      Can you repeat the question?

18   Q.      Sure.  There is not a single thing you

19   could have done differently, correct?

20   A.      No.

21   Q.      The way I asked you the question, I

22   think we are talking about the same thing,

23   let's make sure the record is clear.

24   A.      All right.

SA000858

James Young

Page 21

1   Q.      Am I correct, yes or no, that there is

2   not a single thing you could have done

3   differently?

4   A.      As my job duties for that day?

5   Q.      Correct.

6   A.      It is an open ended question.  I could

7   have called out that day and wouldn't have

8   experienced any of this.

9   Q.      Really, sir, I am trying to ask which

10   should be a simple yes or no question, and

11   maybe I am not doing a good job.  Let me try

12   again.  Are you saying to me that on that day,

13   August 25, 2018, there was nothing different

14   you could have done?

15   A.      No.

16   Q.      No, there is nothing different you

17   could have done?

18   A.      Nothing I could have done.

19   Q.      All right, thank you.  You are a

20   correctional officer; is that correct?

21   A.      That's correct.

22   Q.      How long have you had that job?

23   A.      Ten years.

24   Q.      2010?

SA000859

James Young

Page 24

1    Q.      Yeah.  Let's confirm, you have been in

2    corrections as your field of employment for ten

3    years; is that correct?

4    A.      Yes, sir.

5    Q.      Have you ever sought a promotion at any

6    time during your work at Bucks County?

7    A.      Negative.

8    Q.      Have you ever left a job at Bucks

9    County for anything other than vacation or

10   personal leave?

11   A.      Negative.

12   Q.      Have you ever had any part-time jobs

13   while you were working at Bucks County?

14   A.      My wife did DoorDash twice.

15   Q.      You said DoorDash?

16   A.      Yeah, she did DoorDash, I sat in the

17   car, that is about as part time as I can get.

18   Q.      Were you ever sued before this case?

19   A.      Negative.

20   Q.      Have you ever sued anyone else?

21   A.      Negative.

22   Q.      Have you ever been disciplined on the

23   job in Bucks County?

24   A.      Negative.

SA000860

James Young

Page 25

1    Q.        What I mean by discipline, I think you

2    know what I mean, just to be sure, have you

3    ever been disciplined for any violation of

4    prison rules, any misconduct, anything like

5    that?

6    A.        Negative.

7    Q.        Have you ever observed any other

8    officer at Bucks County violate any rule?

9    A.        Violate any rule, what rule, prison

10   rules?

11   Q.        Yeah.

12   A.        I do not recall that.

13   Q.        Have you ever reported any other

14   officer for violating a prison rule, engaging

15   in misconduct, anything like that?

16   A.        Negative, absolutely not.

17   Q.        What are you suppose to do if an

18   officer engages in misconduct?

19   A.        I don't know, what are you suppose to

20   do?

21   Q.        That is what I am asking you.  If you

22   see an officer beat up a prisoner for no good

23   reason -- first of all, has that ever happened?

24   A.        Negative.

James Young

Page 27

1   A.      I have it, but I don't use it.

2   Q.      Any others, Twitter, anything like

3   that?

4   A.      No, I don't know how to do Twitter.

5   Q.      Let's talk more specifically about your

6   duties at Bucks County.  Officer Moody told me

7   in his deposition that back in 2018 you were

8   typically assigned to the B housing module; is

9   that right?

10  A.      That is correct.

11  Q.      Are you still in that -- oh, no, you

12  are not in that position anymore, right?

13  A.      That's correct.

14  Q.      What do you do now?

15  A.      I am a five day SA.  I have recently

16  been given the opportunity to do video court

17  with four other co-workers.

18  Q.      For how long were you in that B module

19  responsibility?

20  A.      Almost nine years.

21  Q.      What shift did you typically work on?

22  A.      6 to 2.

23  Q.      Did you ever have overtime shifts?

24  A.      Yes.

SA000862

James Young

1    they call them, would be on another unit.

2    Q.      One of the numbers that you mentioned

3    were people on watch.  At any given time how

4    many people tended to be on watch on B module

5    back in August of 2018?

6    A.      I would say it could be anywhere from

7    zero, typically kept it under 10, so zero to

8    nine.

9    Q.      That is something that you would pay

10   attention to, from the moment you got in at the

11   start of the shift, right?

12   A.      Sure.

13   Q.      You were explaining to me how the shift

14   would start.  Tell me what does the rest of the

15   shift look like?

16   A.      Eventually we would open them, we would

17   run them to chow, come back from chow, close

18   the dayroom down until they got done with their

19   cleaning and stuff like that, and then just

20   normal duties, 9 o'clock one tier would come

21   out for yard till 11, 11 o'clock everybody

22   would come out, 12:30 was count, 1 o'clock the

23   other tier would come out from 1 to 3.

24   Q.      How many officers were typically

SA000863

James Young

1    before on the B module?

2    A.      Probably on Bravo, probably on other

3    blocks also.

4    Q.      Did you get along with Officer Moody?

5    A.      Yes.

6    Q.      Never had any problems with working

7    with him?

8    A.      Negative.

9    Q.      You feel like you had a good working

10   relationship?

11   A.      Yes, sir.

12   Q.      When you and another officer were

13   assigned together to B module would you have a

14   natural division of responsibility, one officer

15   does this, the other officer does something

16   else?

17   A.      Yes, sir.

18   Q.      How did that work, can you give me an

19   example?

20   A.      The most senior officer normally would

21   be downstairs, the junior officer would be

22   upstairs.  So each day you draw teams somebody

23   gets the, they call it the top tier keys, the

24   second set where the main set is always down on

SA000864

James Young

Page 34

1    the block.

2    Q.      To be downstairs versus be upstairs,

3    explain what that means to me, please?

4    A.      Just I wouldn't say different

5    responsibilities but maybe different areas of

6    responsibilities.

7    Q.      So if you are the downstairs officer

8    then you have a list of things you are going to

9    do on your shift, if you are the upstairs

10   officer you are going to have a different set

11   of things; is that right?

12   A.      I expect the guy that is downstairs to

13   open the door and answer the telephone, respond

14   to things like that, where the individual

15   upstairs he wouldn't have to, we would hope he

16   wouldn't have to go downstairs if he has to

17   open the door, if somebody is at the door, so

18   responsibilities like that.

19   Q.      I have seen some video from the housing

20   unit, and it looks like there is a desk or a

21   podium?

22   A.      Yes, sir.

23   Q.      Right by the door; is that correct?

24   A.      Yes, sir.

SA000865

James Young

Page 37

1    BY MR. FEINBERG:

2    Q.       Have you seen documents that look like

3    this, I am highlighting the text here, Bucks

4    County Department of Corrections standard

5    operating procedures and guidelines?

6    A.       Yes.

7    Q.       If you needed to look at a Bucks County

8    policy you would be able to locate them; is

9    that right?

10   A.       Yes.

11   Q.       This one is suicide prevention program.

12   Have you seen this policy before?

13   A.       Yes, sir.

14   Q.       There is text here that is highlighted,

15   which I will read to you.  I just want to ask

16   you whether these are principals that you are

17   familiar.  This is from the policy.  Inmates

18   may become suicidal at any time during their

19   incarceration.  I will stop there.  Do you

20   agree, are you familiar with that principal?

21   A.       Inmates may become suicidal at any time

22   during their incarceration, yes.

23   Q.       That is something you are aware of,

24   right?

SA000866

James Young

Page 38

1    A.       I am sure everybody in the world is

2    aware of that.

3    Q.       Suicidal behavior is more likely at

4    critical periods of time, including commitment,

5    the first several days thereafter, court

6    hearings, sentencing.  Have you heard that

7    before, that it is specific times during court

8    proceedings that may be an enhanced risk of

9    suicidal behavior?

10   A.       It makes sense.

11   Q.       So it sounds like you are talking to me

12   about your common sense.  Have you heard from

13   your supervisors, mental health providers that

14   that is a commonly understood principal?

15   A.       I would say so, yes.

16   Q.       To your knowledge is there any policy

17   or rule about providing a mental health

18   evaluation for a prisoner when they come back

19   from sentencing at court?

20   A.       That I do not know of.

21   Q.       Have you ever heard anything about a

22   requirement that a prisoner who receives a

23   state sentence to be placed on level 2

24   precautions?

SA000867

James Young

Page 39

1    A.       I have heard that now.

2    Q.       When do you remember hearing that for

3    the first time?

4    A.       Probably in a roll call one morning.

5    Q.       Do you remember when that was?

6    A.       Negative, I do not.

7    Q.       I heard what you said, but let me just

8    pose this additional question.  Do you know or

9    have you ever heard that that rule, level 2

10   precautions for someone receiving a state

11   sentence, was connected in any way to Mr.

12   Freitag's case?

13   A.       I do not recall if it was connected to

14   Mr. Freitag's case.

15   Q.       Sir, this may be obvious, would you

16   agree that, we may have covered this already,

17   one of your most important jobs as a

18   corrections officer is to protect prisoners

19   under your custody?

20   A.       Yes, I would agree with that.

21   Q.       It sounds like that is something you

22   take pretty seriously; is that right?

23   A.       Yes.

24   Q.       There are rules in place which tell you

James Young

Page 40

1  what you need to do to protect a prisoner in

2  your custody; is that right?

3  A.      Yes.

4  Q.      One example if you find a prisoner with

5  a weapon in his hands or an item that can be

6  used as a weapon you got to take it away from

7  him, right?

8  A.      I would imagine you would have to take

9  it away, whether it would be you or you get a

10  team of four with a supervisor to take that

11  weapon away.

12  Q.      The bottom line is this, if you find

13  out that a prisoner has a weapon you are not

14  just going to let it go and not do anything

15  about it, right?

16  A.      That's correct.

17  Q.      You have to act to protect the safety

18  of that person, other prisoners, yourself and

19  your fellow staff; is that right?

20  A.      Absolutely.

21  Q.      That is the bottom line rule about how

22  to operate as a correction officer; is that

23  right?

24  A.      If you don't want to get hurt before

SA000869


James Young

Page 44

1    see level 3?

2    A.      Yes.

3    Q.      Do me a favor, just read to yourself

4    from that whole description of level 3, when

5    you are finished I will ask you some questions.

6    A.      Okay.

7    Q.      Does this -- first of all, is this news

8    to you or were you aware of what is required

9    here for level 3?

10   A.      No, I just don't know what the numbers

11   are.

12   Q.      So have you ever heard level 3 referred

13   to as regular watch?

14   A.      Yeah, it is the regular watch.

15   Q.      So your understanding then is that

16   under regular watch next to B, I am going to

17   highlight this, the inmate monitor is required

18   to observe the person's activities every 15

19   minutes, right?

20   A.      Sure.

21   Q.      They log them on the monitor forms; is

22   that right?

23   A.      That is what they are suppose to do.

24   Q.      Let me stop there.  You say they are

James Young

1   suppose to, have you ever heard of inmate

2   monitors not doing their jobs?

3   A.      So they are paid $3 a day to stand in

4   front of somebody's door and mark down whether

5   they are sleeping, eating, pooping.  Imagine

6   what $3 a day gets you.

7   Q.      Well, if you and I were having a beer

8   and having a conversation I would understand

9   what you are saying, but we are not, we are on

10  the record in a formal deposition proceeding,

11  so I am going to ask you to answer the

12  question.

13          Have you ever seen situations where an

14  inmate monitor has not done his job?

15  A.      Yes.

16  Q.      If that happens and you are aware of it

17  what do you do?

18  A.      I would take over the paperwork for him

19  because he is using the bathroom let's say on

20  one occasion.

21  Q.      Well, let me make sure I understand.

22  If an inmate monitor is not doing what he is

23  suppose to do then, you will take over the

24  paperwork and do those 15 minute watches, is

James Young

1    that what you are saying?

2    A.      Sometimes they have to go to D and A,

3    mental health, the dispensary, we would either

4    sign it to another inmate or take the watch for

5    a couple minutes while he is gone.

6    Q.      Thank you, that confirms what I think I

7    understand you to be saying.  If an inmate

8    monitor is not able to do his job or is not

9    doing his job then it is your responsibility to

10   take over; is that right?

11   A.      That is negative.  You are not taking

12   over anything, you usually assign it to another

13   inmate.

14   Q.      Let me ask it a different way.  Would

15   you agree with me that it is your job that at

16   least someone is fulfilling the responsibility

17   of monitoring a person on regular watch every

18   15 minutes?

19   A.      In a perfect world, yes.

20   Q.      That is what the policy requires,

21   right?

22   A.      In a perfect world that policy works.

23   Q.      It is your understanding that that is

24   what is expected of you as an officer; is that

James Young

1    right?

2    A.       I assume.

3    Q.       In addition to the inmate monitor, you

4    have a responsibility here next to the letter C

5    to look in the cell every 30 minutes; is that

6    right?

7    A.       Yes.

8    Q.       Or a period not to exceed 30 minutes;

9    is that correct?

10   A.       Yet again, in a perfect world, 30

11   minutes.

12   Q.       Would you agree, sir -- let me ask

13   this.  Would you agree, sir, under these rules

14   every hour, let's say right now it is 12:45

15   p.m., if you were on the block and someone was

16   on regular watch under this policy between 12

17   p.m. and 1 p.m. if a prisoner is on regular

18   watch you would expect him to be seen as part

19   of that watch six times; is that correct?

20   A.       How many times?

21   Q.       Six times.

22   A.       Six?

23   Q.       Two by the officer, right?

24   A.       Yes.

SA000873

James Young

Page 48

1    Q.       Four by the inmate monitor, correct?

2    A.       Correct, in a perfect world correct.

3    Q.       In a perfect world as you said that is

4    what would happen under the terms of the

5    policy; is that right?

6    A.       Absolutely.

7    Q.       The implication of your phrase that you

8    used now a number of times, in a perfect world,

9    says to me this is not a perfect world, am I

10   understanding it correctly?

11   A.       This is not a perfect world in any

12   means in the building sir.

13   Q.       In reality how many times do those

14   watches take place?

15   A.       Whose watch, the inmate watch or my

16   watch?

17   Q.       Start with the inmate watch.  How often

18   do those take place?

19   A.       Inmate, normally everybody is out in

20   the dayroom so you can pretty much just look

21   around the room and see everybody, much like

22   us, I see everybody, I know everybody.

23   Q.       How often do the officer watches take

24   place, do they take place every 30 minutes like

James  Young

Page  49

1    they are suppose to under the policy?

2    A.      They are suppose to.

3    Q.      This is well tread territory, we know

4    what is suppose to happen.  I am asking about

5    in the real world at the Bucks County

6    Correction Facility, how often do they happen?

7    A.      I don't recall.

8    Q.      Let me ask you this, has any

9    supervising officer ever said to you, Officer

10   Young, look, we got a problem, you guys are not

11   doing the watches as frequently as you are

12   suppose to?

13   A.      I don't recall that either.

14   Q.      Has any supervising officer ever said

15   to you, hey Officer Young, the inmate monitors

16   on your block they are not doing their job,

17   they are not seeing people as often as they are

18   suppose to?

19   A.      I don't recall.

20   Q.      Has any supervising officer ever said

21   to you these inmate monitors are fabricating

22   their forms, they are writing falsehoods down

23   about whether they are seeing people, they are

24   not actually looking in cells?

SA000875

James Young

Page 50

1   A.     I do not recall.

2   Q.     Have you ever seen that happen before?

3   A.     I do not recall.

4   Q.     Have you ever looked at an inmate

5  monitor form and seen a list of notations of

6  observations and knowing that it was false?

7   A.     I do not recall looking at those forms.

8   Q.     Do you ever look at those forms?

9   A.     Occasionally.

10  Q.     You are not suppose to look at them

11  every day?

12  A.     You can.  Normally the supervisors are

13  suppose to check on those forms.

14  Q.     Let's actually look at one more policy.

15  I will show you the policy, understanding that

16  it is not a perfect world, sir.  Actually we

17  will come back.

18        How many times has a prisoner attempted

19  to commit suicide on a block that you were

20  working?

21  A.     That was the only time.

22  Q.     Mr. Freitag is the only time?

23  A.     First time I've seen someone kill

24  themselves.

SA000876

James Young

Page 51

1   Q.      Now, let's distinguish between a

2   completed suicide and an attempt to commit

3   suicide.  Have you ever seen anyone try to hang

4   themselves, try to cut themselves where they

5   ended up not dying?

6   A.      Not dying?

7   Q.      Correct.

8   A.      Yes.

9   Q.      How many times has that happened?

10  A.      In this jail it could happen all the

11  time.  People are screaming for help.

12  Q.      I am sorry, I was flipping papers, I

13  didn't hear the last portion of what you said.

14  A.      What was the question?

15  Q.      Can you repeat -- well, forget that.

16  Linda, would you mind reading back the last

17  answer?

18               (Whereupon the court reporter read

19  back from the record.)

20  BY MR. FEINBERG:

21  Q.      What do you mean by that?

22  A.      It is the holiday season, no one wants

23  to be in jail so a lot of them do superficial

24  things for attention.

James Young

Page 54

1   make decisions to what level of watch is

2   appropriate, right?

3   A.      Sure.

4   Q.      When a mental health provider or case

5   manager says this person is on regular watch,

6   your job is to implement that watch to the best

7   of your ability; is that right?

8   A.      Yes.

9   Q.      Now, back to Exhibit 7.  Do you see it

10  in front of you, sir?

11  A.      Yes.

12  Q.      Going down to page 5.  Before I get

13  there, this section of the policy, if you want

14  to read more, tell me, inmate monitor forms.

15  Do you see here next to the letter E is the

16  module officer's responsibility to assure that

17  inmate monitors are using IMF's correctly.  Do

18  you see that, sir?

19  A.      Yes.

20  Q.      Are you aware under this policy that it

21  is your responsibility to do so?

22  A.      Yes.

23  Q.      Officer, do you agree?

24  A.      Sure, yes.

SA000878

James Young

Page 55

1    Q.       You mentioned before that sometimes you

2    look at the forms and sometimes it is the

3    supervisor's job, did I hear you right before?

4    A.       Their job is to come through the unit

5    and make sure the inmate is doing his job

6    diligently.

7    Q.       That is not your job?

8    A.       It is one of my jobs, but I am not

9    going to go -- I can't recall, no.

10   Q.       You can't recall, sir?

11   A.       No, I can't recall.

12   Q.       Sir, I am asking you about what you

13   have done over the course of your nine years as

14   a module officer, is it your job or not to make

15   sure the inmate completes the inmate monitor

16   form correctly?

17   A.       Like I said, I was the junior officer

18   down there, so probably five days out of the

19   week I was upstairs.  When that officer went

20   off the unit I would make sure that they were

21   taken care of, but it was usually senior

22   officer who was downstairs duties to do that.

23            Even though it says module officer,

24   there is two different duties for module

James Young

1    officer downstairs and module officer upstairs.

2    There is never anybody on watch upstairs.

3    Q.      Officer Moody told me he has been at

4    the facility since '08.

5    A.      Yeah, I think he has been there for 12

6    years.

7    Q.      So he is slightly more senior than you;

8    is that right?

9    A.      Yes.

10   Q.      So when you and Moody were working

11   together on the B module, who was the

12   quote-unquote senior officer?

13   A.      I would say Officer Moody.

14   Q.      Well, was there any distinction drawn

15   because of the fact that that was your block

16   where you worked every day and he was specially

17   assigned?

18   A.      He was visiting that day I would say.

19   Q.      So who was responsible for handling the

20   inmate monitor forms that day?

21   A.      I don't recall.

22   Q.      Did anybody take that responsibility?

23   A.      I am sure somebody took that

24   responsibility.

SA000880

James Young

Page 57

1    Q.      We will come back to that.  You would

2    agree then that someone is, in fact,

3    responsible to make sure the inmate monitor

4    forms get filled out completely; is that right?

5    A.      It is usually filled out by the 10 to 6

6    cop, the 10 to 6 inmate monitor and then he

7    hands it to the 6 to 2 monitor.

8    Q.      I hear what you are saying, sir, but

9    that was an answer that I think was not

10   terribly responsive to my question so let me

11   try a different question.

12           Would you agree that an inmate monitor

13   filling out a form correctly that means that

14   the inmate monitor should actually be looking

15   in the cell when they are filling out the form,

16   right?

17   A.      Correct.

18   Q.      So, for instance, if an inmate monitor

19   was just sitting in his own cell, sitting on

20   the bed, it would be completely improper for

21   that inmate monitor to say I looked at Mr.

22   Freitag's cell and he is doing fine and put

23   that on the log, right?

24   A.      Correct.

SA000881

James Young

Page 58

1    Q.       In other words, the inmate monitor

2    forms are suppose to be truthful and accurate;

3    is that right?

4    A.       Correct.

5    Q.       Would you agree that whether it is your

6    job or some other officer's job, one of the

7    officers on the module is responsible for

8    making sure that the inmate monitor is

9    completing both a full and accurate inmate

10   monitor form?

11   A.       Yes.

12   Q.       That is basic responsibility that you

13   have been aware of for your entire nine years;

14   is that right?

15   A.       Yes.

16   Q.       That responsibility is critical to your

17   job to implement the watch procedures that are

18   dictated by mental health or case manager,

19   correct?

20   A.       Correct.

21   Q.       I want to start talking about Mr.

22   Freitag now, and what you remember about him.

23   Before I do that, though, we have been going a

24   while, do you need a break at all?

SA000882

James Young

Page 59

1  A.      Negative.

2            MR. FEINBERG:  Any other counsel?

3            MR. KOLANSKY:  No, I am good.

4  BY MR. FEINBERG:

5  Q.      You said that Mr. Freitag was a model A

6  inmate; is that correct?

7  A.      Correct.

8  Q.      That is because you had some

9  preexisting contact with him?

10 A.      Negative, I didn't know who he was.

11 Q.      I am sorry?

12 A.      I said I didn't even know who he was on

13 the block, that is how quiet he was.

14 Q.      Did I speak over you?

15 A.      Negative.  Go ahead.

16 Q.      How did you make the determination that

17 he was a model A inmate?

18 A.      Because I did not know who he was.

19 Q.      So someone who you don't know is a

20 model A inmate; is that right?

21 A.      He never caused a problem, he never

22 asked any questions, he never asked for

23 anything.

24 Q.      You knew nothing about his case; is

James Young

Page 60

1  that right?

2  A.       That's correct.

3  Q.       My understanding is that he was on the

4  B module for probably a couple of months before

5  his death.  During that time do you remember

6  him being on regular watch at other times?

7  A.       I believe he was on regular watch at

8  other times.

9  Q.       If he was on a more intensive watch,

10  level 2 or level 1, would that have taken place

11  on the B module?

12  A.       Negative, he would have went to either

13  E or G.

14  Q.       I think you told me before that B

15  module cannot house people on that level of

16  precautions; is that correct?

17  A.       Correct.

18  Q.       Did you ever hear any discussion about

19  Mr. Freitag's mental health issues prior to

20  August 25th?

21  A.       Negative.

22  Q.       Did you ever hear Mr. Freitag talking

23  about the fact that he was nervous about his

24  sentencing?

SA000884

James Young

Page 66

1    starting at 6 a.m. that appears to be HC.  Do

2    you see that?

3    A.       Yes, sir.

4    Q.       I have looked at other documents, which

5    I will spare you the time looking at, which

6    identified a prisoner by the name of Hugh

7    Caldwell, Hugh, H-U-G-H.  Does that name ring a

8    bell to you?

9    A.       I think I remember.

10   Q.       Was Hugh Caldwell someone who tended to

11   work as an inmate monitor back in this time

12   frame?

13   A.       I believe he was.

14   Q.       So piecing that together can we assume

15   that Caldwell was assigned as the inmate

16   monitor to look at Mr. Freitag's cell every 15

17   minutes the morning of August 25, 2018?

18   A.       Yes, sir.

19   Q.       If that is the case can we assume then

20   someone on the B module knew that Mr. Freitag

21   was on a level 3 watch?

22   A.       Yes.

23   Q.       Let's talk about your recollection of

24   August 25th in finding Mr. Freitag or when Mr.

SA000885

James Young

Page 73

1    watch, who saw him last?

2    A.      No, I don't think any type of

3    conversation was like that.  Just still shock.

4    Q.      At any point did someone put together

5    the fact that Mr. Freitag had been on watch at

6    that time?

7    A.      I am sure that it was brought up, I

8    don't know when.

9    Q.      Do you remember who brought it up?

10   A.      No.

11   Q.      Did you bring it up?

12   A.      I don't recall if I brought it up.

13   Everything was just so crazy, and then like we

14   were there and then we were gone.

15   Q.      At any point do you remember anyone

16   coming and asking you, hey Officer Young how

17   did this happen, he was suppose to be on watch?

18   A.      I don't think anybody asked us that.

19   Maybe not until we got to the detectives.  I

20   don't even think they asked it.

21   Q.      I showed you before Mr. Onisick's

22   report summarizing his interview with you from

23   that afternoon, right?

24   A.      Yes.

James Young

Page 74

1    Q.      I will represent to you that that

2    interview report did not reference any

3    discussion of this watch status.  I will also

4    represent to you that Mr. Onisick testified

5    yesterday that the memo would have summarized

6    everything that you discussed.  So with that

7    background does that sound right, no one ever

8    asked you whether this was a watch?

9    A.      At far as I recall.  I don't recall if

10   anyone asked that.

11   Q.      Do you remember specifically discussing

12   with anyone at any time whether there was a

13   watch?

14   A.      I don't recall.

15   Q.      Let me show you the Onisick memo one

16   more time.  Do you have in front of you Exhibit

17   P-11?

18   A.      Yes.

19   Q.      You see the Onisick report?

20   A.      Yes.

21   Q.      I am going to scroll down.  In the

22   middle of this page, we are on page 2 now,

23   there is discussion of a timeline, and I will

24   represent to you that this timeline was

James Young

1   Bravo on 3 cell on Saturday.

2   Q.      So you are surprised that Mr. Freitag

3   killed himself, right?

4   A.      Ten years on that block I've never seen

5   anything like that.

6   Q.      Are you surprised that Mr. Freitag

7   killed himself or are you surprised that he

8   killed himself in that manner?

9   A.      I would say in that manner.

10  Q.      Is that surprising to you because it is

11  of the gruesome nature?

12  A.      I don't know if I was surprised at that

13  or more so that I see a lot of people that do

14  it, and don't go all the way through it, where

15  Mr. Freitag went all the way in, you know, he

16  committed it, he was committed to what he

17  wanted to do.

18  Q.      When you say do it, what do you mean?

19  A.      Well, I feel like Mr. Freitag was

20  committed to what he wanted to do, the end

21  result, where I see other inmates that will do

22  superficial cuts.

23  Q.      We got on this topic because I asked

24  you whether you were surprised about the fact

SA000888

James Young

1   Q.      Correct.  So I am asking you, I never

2   set foot inside the B module at Bucks County

3   Correctional Facility, I am asking you, you

4   spent nine years on that module.  Are you doing

5   your job --

6   A.      Yes.

7   Q.      Are you and your fellow officers doing

8   your job --

9   A.      Absolutely.

10  Q.      Let me finish the question.  You are

11  interrupting me, and again I am not accusing

12  you of being intentional in the way you are

13  interrupting me, I want to make sure the

14  transcript is clear.  Are you and your fellow

15  officers doing your job if there is 34 minutes

16  that passes between one check at 10:21 and

17  10:55?

18  A.      Yes.

19  Q.      Let's clarify, at 10:55 that is not an

20  officer check, right?

21  A.      No, that says Inmate Monachelli.

22  Q.      Would you agree that just as a basic

23  principal an inmate looking in the cell does

24  not satisfy the responsibility of an officer to

James Young

Page 82

1   A.      I think so.

2   Q.      I am going to play the video, I will

3   ask you to watch the person on the right, see

4   what he does?

5   A.      All right.

6   Q.      Let's watch just another minute and

7   then we will summarize.  Okay, I am stopping at

8   42:02.  Let me explain what you saw and tell me

9   if you agree.  Would you agree that Mr.

10  Monachelli appears to have just been walking,

11  glancing in the window, and then I think you

12  saw it happen, you kind of explained, he saw

13  something which was clearly disturbing, yelled

14  over to the officers and then Officer Moody

15  approached the cell.  Is that accurate, sir?

16  A.      Yes.

17  Q.      We got on this topic because I was

18  asking you whether Mr. Monachelli glancing into

19  the cell was sufficient to accomplish the

20  responsibility of the officer check onto the

21  level 3 procedure, do you remember how we were

22  discussing that topic?

23  A.      Yes.

24  Q.      Does Mr. Monachelli glancing in the

SA000890

James Young

Page 83

1   cell like that is that good enough for an

2   officer check?

3   A.      No.

4   Q.      He is a fellow prisoner just walking by

5   the cell, right, that is not an officer check,

6   correct?

7   A.      Yes.

8   Q.      At that time you and Officer Moody were

9   standing behind the podium; is that right?

10  A.      Yes.

11  Q.      Do you have any recollection as to why

12  you and Officer Moody had not completed a check

13  within the 30 minutes following the last check

14  at 10:22 a.m.?

15  A.      I don't recall.

16  Q.      Would you agree that the fact that you

17  did not complete a check within 30 minutes was

18  inconsistent with your responsibilities under

19  the level 3 watch?

20          MR. KOLANSKY:   Objection.

21  BY MR. FEINBERG:

22  Q.      You can answer, sir.

23  A.      I don't recall.

24  Q.      I am not asking about your

SA000891

James Young

Page 84

1   recollection, I am just asking you, do you know

2   what you are suppose to do under level 3 watch,

3   right, in a perfect world?

4   A.      Yes.

5   Q.      You or one of the other officers are

6   suppose to look in the cell in 30 minutes or

7   less, every 30 minutes or less, correct?

8   A.      Yes.

9   Q.      So if you look in the cell at 10:22,

10  one of the other officers looks in the cell at

11  10:22, then you or another officer has to look

12  in that cell no later than 10:51; is that

13  correct?

14  A.      Mathematically speaking yes.  We

15  normally do tours on the double zeros and the

16  30s.

17  Q.      That is your understanding of what you

18  are suppose to do under the policy; is that

19  right?

20  A.      Half hour.

21  Q.      Has anyone ever -- well, all right.

22  Sitting here today do you know when you were

23  going to do your next tour?

24  A.      11 o'clock.

James Young

Page 85

1    Q.      You know that for a fact?

2    A.      That is usually how we try to keep it.

3    Q.      So your explanation for why you and

4    Officer Moody were sitting at the podium

5    despite the fact that there had been at that

6    point 35 minutes since the last check, you

7    didn't think you were responsible to do another

8    check until 11 a.m., correct?

9    A.      Negative.

10   Q.      What did I get wrong?

11   A.      I don't know when the last tour was

12   done.  Who went to chow during that time?

13   Someone was breaking us, correct, there is a

14   red headed person I see on the block.

15   Q.      Let me do this, sir.  Do you have any

16   reason to doubt the timeline that is outlined

17   in Mr. Onisick's report?

18   A.      I don't think so.

19   Q.      Have you watched the video yourself?

20   A.      Yes, yeah, that is what we've just

21   seen.

22   Q.      You knew you were going to be

23   questioned about this today, right?

24   A.      Yes.

James Young

Page 91

1    A.      Yes.

2    Q.      So when should the next tour be logged

3    if one was logged at 10:09?

4    A.      10:39.

5    Q.      Do you see one there?

6    A.      I do not.

7    Q.      Do you have any explanation for why it

8    is not?

9    A.      Because at 10:45 the yard comes in.

10   Q.      So what are you suppose to do in that

11   situation?

12   A.      Bring the yard in, then do a tour.

13   Q.      Is it your understanding that your

14   supervisors would be fine with that, conducting

15   a tour more than 30 minutes because of the yard

16   situation?

17   A.      I don't know what they would be okay

18   with.

19   Q.      Has anyone ever raised that with you,

20   that hey, look Officer Young if you are going

21   to be bringing people in from the yard make

22   sure you conduct your tours in such a way that

23   you are doing it within every 30 minutes?

24   A.      Not every day somebody rips their veins

James Young

Page 92

1    out of their arms either.

2    Q.      That is not in response to my question,

3    sir.

4    A.      I understand, but that was the

5    circumstance for that day.  Nine years on that

6    unit I've never experienced that, so.

7    Q.      Is there a reason why you are not

8    answering my question?

9    A.      Can you repeat the question?

10              MR. FEINBERG:  Linda, would you

11   mind reading back my last question?

12              (Whereupon the court reporter read

13   back from the record.)

14   BY MR. FEINBERG:

15   Q.      Can you answer the question, sir?

16   A.      I have to do tours every 30 minutes to

17   bring the yard in.

18   Q.      Has anyone ever told you, Officer

19   Young, that you should schedule your morning so

20   that you make sure you are conducting your

21   tours every 30 minutes regardless of what

22   happens with the yard?

23   A.      Negative.

24   Q.      Since we were on that video before, do

James Young

Page 101

1   A.      I do not know if they located anything.

2   I know the detectives had that in a Ziploc bag.

3   Q.      Had you ever seen anyone break a cup

4   like that in the past?

5   A.      No.

6   Q.      I want to talk again about the inmate

7   monitors, specifically Mr. Caldwell.  The form

8   that Mr. Caldwell filled out, I will start at

9   the top of the second page.  First of all, do

10  you see Exhibit 9 in front of you?

11  A.      Yes.

12  Q.      Do you see there is a bunch of

13  references here or abbreviations it looks like

14  everyone, says LF from 8 a.m. to 10:45 a.m.

15  A.      Yes.

16  Q.      Do you know off the top of your head

17  what LF means on these forms?

18  A.      L I think is in the cell, I forget what

19  F is.

20  Q.      I will show you, L at the top says in

21  cell as you said, and F means sleeping; is that

22  right?

23  A.      Yes.

24  Q.      So would you agree that according to

SA000896

James Young

1    Mr. Caldwell, I will highlight his name here,

2    the inmate monitor, between 8 a.m. and 10:45

3    a.m., Mr. Freitag was in his cell and sleeping

4    between 8 a.m. and 10:45 a.m.  Would you agree?

5    A.      Yes.

6    Q.      Do you know whether that is true?

7    A.      No, I don't recall any of that.

8    Q.      Do you remember ever looking at this

9    form?

10   A.      This form?

11   Q.      Yes.

12   A.      Two years ago.

13   Q.      Do you remember saying at any point at

14   that time this form is wrong, it is false?

15   A.      Negative.

16   Q.      I am going to show you some additional

17   video.  So do you see video in front of you,

18   start time at 8:13?

19   A.      Yes.

20   Q.      I am fast forwarding ahead to about 59

21   minutes.  At 58:39 do you see someone coming

22   out of the cell 3 there?

23   A.      Yes.

24   Q.      If we do simple math, 8:13 a.m. 58

SA000897

James Young

1    minutes forward that takes us to about 9:11,

2    9:12 a.m., do you agree?

3    A.      Yes.

4    Q.      So I am going to play that on high

5    speed here, that is Mr. Freitag walking out at

6    58:46.  Do you recognize him, sir?

7    A.      Negative.

8    Q.      You don't recognize him at all?

9    A.      Negative.

10   Q.      Any reason to dispute that is him?

11   A.      Negative.

12   Q.      I am playing this on fast motion, and

13   you see as the video ends one hour in from

14   8:13, so 9:13 a.m. Mr. Freitag is in line for

15   his medication, would you agree?

16   A.      Correct.

17   Q.      Close that up.  Next video starts at

18   9:13 a.m.  Do you have that in front of you

19   now?

20   A.      Yes.

21   Q.      Would you agree even though we might

22   have a different file or just looking at the

23   same image, you agree?

24   A.      Yes.

SA000898

James Young

Page 104

1    Q.       Mr. Freitag is still in line at

2    medical; is that right?

3    A.       Appears, yes.

4    Q.       The officer who is walking towards Mr.

5    Freitag although not looking at him is Officer

6    Moody, correct?

7    A.       Appears, yes.

8    Q.       There is another officer in the front

9    of the line, it may be difficult for you to

10   see, a black male.  Do you know who that is?

11   A.       Negative.

12   Q.       I am going to continue playing, and we

13   will watch Mr. Freitag, he is in line getting

14   medications; is that correct?

15   A.       Appears, yes.

16   Q.       Just shy of two minutes in, so 9:15

17   a.m., give or take, Mr. Freitag is at the front

18   getting his medication, would you agree?

19   A.       Yes.

20   Q.       Now at 2:18, so at 16, 9:17 a.m. Mr.

21   Freitag is walking back into his cell.  Do you

22   see that?

23   A.       Yes.

24   Q.       Can we agree that based on the video

James Young

1   that you have seen that Mr. Freitag between

2   let's say 9:12 and 9:16 was in line waiting for

3   medicine?

4   A.      Yes.

5   Q.      If that is the case, can you agree that

6   the inmate monitor form which says at 9:15 --

7   by the way, can you see that in front of you

8   now?

9   A.      Yes.

10  Q.      I've highlighted 9:15.  According to

11  the inmate monitor form Mr. Freitag is in his

12  cell sleeping, that is what it says, correct?

13  A.      Yes.

14  Q.      That is not true, correct?

15  A.      Correct.

16  Q.      Would you agree that a false statement

17  under the inmate monitor form is a problem?

18  A.      Yes.

19  Q.      Have you ever noticed that before in

20  connection with Mr. Freitag's case?

21  A.      Negative.

22  Q.      Would you agree that it is your

23  responsibility as the module officer to ensure

24  that the inmate monitor is actually making

James Young

1    observations and they are recording them on the

2    form?

3    A.      Yes.

4    Q.      Do you have any explanation for why you

5    did not do that until today, December 23, 2020,

6    two plus years later, that there was a serious

7    inaccuracy on this form?

8    A.      Yes.

9    Q.      What is your explanation?

10   A.      I don't know.

11   Q.      My question was do you have any

12   explanation and your answer is no, you don't;

13   is that correct?

14   A.      My explanation is, I guess who is it

15   you just, Caldwell?

16   Q.      Right.

17   A.      That was $3 a day not well spent.

18   Q.      Well, how much do you make a day?

19   A.      $3.

20   Q.      Is that right?

21   A.      I don't know, my wife takes it all.

22   Q.      Is that money they paid you that day

23   well spent?

24   A.      I don't know.

SA000901

James Young

Page 107

1    Q.      Were you doing your job?

2    A.      Yes.

3    Q.      Your testimony, sir, is that the job

4    you did on August 25, 2018 was perfectly

5    satisfactory even though Mr. Caldwell was

6    writing falsehoods on an inmate monitor form;

7    is that correct?

8    A.      Yes.

9    Q.      Do you have any idea whether Mr.

10   Caldwell looked at Mr. Freitag's cell at 9:30

11   a.m.?

12   A.      Negative.

13   Q.      Do you have any idea whether Mr.

14   Caldwell looked at Mr. Freitag's cell at 9:45

15   a.m.?

16   A.      I do not recall, and that is negative.

17   Q.      Do you have any idea whether Mr.

18   Caldwell looked in Mr. Freitag's cell at 10:00

19   a.m.?

20   A.      No.

21   Q.      Do you have any idea whether Mr.

22   Caldwell looked at Mr. Freitag's cell at 10:15

23   a.m.?

24   A.      No.

SA000902

James Young

Page 108

1    Q.      Do you have any idea whether Mr.

2    Caldwell looked at Mr. Freitag's cell at 10:30

3    a.m.?

4    A.      No.

5    Q.      Do you have any idea whether Mr.

6    Caldwell looked in Mr. Freitag's cell at 10:45

7    a.m.?

8    A.      No.

9    Q.      I am going to show you one more time

10   Mr. Bochenek's report, I may not have shown

11   this to you before, this is Exhibit 10.

12              (Whereupon incident report was

13   premarked for identification as P-10.)

14   BY MR. FEINBERG:

15   Q.      Do you have that in front of you, sir?

16   A.      Yes.

17   Q.      Do you see this is a report dated

18   10/24/19.  Mr. Bochenek wrote on that day, I am

19   highlighting two sentences for you in the

20   second paragraph from the bottom and I am going

21   to read them into the record.  In a follow-up

22   investigation, this is time period October

23   2019, 14 months after Mr. Freitag's incident,

24   it was learned there was no level 3 watch sheet

SA000903

James Young

1  prepared.  In reviewing the video there was no

2  inmate monitor observed checking on the inmate.

3  Do you understand what I have just read?

4  A.      Yes.

5  Q.      Do you have any reason to dispute the

6  fact that Mr. Bochenek concluded that there was

7  no inmate monitor looking at Mr. Freitag's cell

8  in that critical time period on the morning of

9  August 24th?

10 A.      No.

11 Q.      Do you have any explanation once again

12 for why there was no inmate monitor looking at

13 Mr. Freitag's cell that morning?

14 A.      No.

15 Q.      One other question about this

16 memorandum, without reading the whole thing,

17 sir, this memorandum concerned a follow-up

18 investigation about the situation concerning

19 Mr. Freitag, and there was some question about

20 whether the watch had been communicated to the

21 module officers.  Do you understand that, sir?

22 A.      Yes.

23 Q.      We already established the fact that

24 there was an inmate monitor form prepared

James Young

Page 110

1   suggests that the module was, in fact,

2   notified, would you agree?

3   A.      No, didn't he have -- what was that you

4   were showing me before, the monitor form, what

5   monitor form was he showing that was not there?

6   Q.      Sir, I think you misunderstood my

7   question.  Do you remember how we described

8   that if an inmate monitor form had been

9   prepared by someone noting level 3, that means

10  the module officers knew level 3 monitor,

11  right?

12  A.      Which is a regular watch, correct?

13  Q.      You tell me?

14  A.      Yes.

15  Q.      Do you agree, sir?

16  A.      Yes.

17  Q.      There is a statement here that the

18  assigned module officers were not available for

19  an interview.  I take it that refers to you and

20  Officer Moody, but I don't know because I

21  haven't asked Mr. Bochenek.  My question for

22  you is, do you remember in October of 2019

23  anyone reaching out to you and asking you

24  questions about what happened back in August of

SA000905

James Young

Page 111

1    2018 concerning this inmate?

2    A.      I do not recall that.

3    Q.      Let's go off the record for just a

4    minute.

5            (Whereupon a discussion was held

6    off the record.)

7    BY MR. FEINBERG:

8    Q.      Mr. Young, are you ready to go back on

9    the record?

10   A.      Yes.

11   Q.      We took a short break, our first break

12   after quite a while.  Did you realize during

13   the break that any of your previous testimony

14   was incorrect or incomplete?

15   A.      Negative.

16   Q.      Just a final set of questions for you

17   very briefly.  At the beginning of the

18   deposition I asked you whether anyone could

19   have done something differently to prevent Mr.

20   Freitag's death, do you remember that question?

21   A.      Yes.

22   Q.      Your answer was the only person that

23   could do something different was Mr. Freitag,

24   he could have not gotten locked up, correct?

SA000906

James Young

Page 112

1    A.       Right.

2    Q.       Anything about today's questions, the

3    documents we reviewed, the video we've looked

4    at, did that change your conclusion at all?

5    A.       Negative.

6    Q.       In your judgment there is nothing that

7    you could have done differently to prevent Mr.

8    Freitag's death; is that right?

9    A.       Correct.

10   Q.       There is nothing that any of your

11   colleagues, any of your follow officers could

12   have done to prevent Mr. Freitag's death; is

13   that right?

14   A.       Correct.

15   Q.       I have nothing further for you.

16           MR. NINOSKY:  No questions.

17           COURT REPORTER:  Does everyone want

18   a copy of the transcripts?

19           MR. KOLANSKY:  I will take a

20   transcript.

21           MR. NINOSKY:  Me too.

22                 -----

23           (Witness excused.)

24        (Deposition concluded at 1:58 p.m.)

SA000907