# Exhibit 19 Supplement Nottingham Deposition

SA000908

James H. Nottingham (Deposition 1)

Pages: 16, 17, 21, 22, 38, 39, 40, 41, 43, 44, 45, 46, 48, 49, 50, 51, 53, 54, 61, 62, 65, 66, 67, 68, 69, 72, 73, 97, 98, 99, 100, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 127, 128

Dated: May 5, 2021

SA000909

James Nottingham

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CHARLES JOSEPH FREITAG,      :   NO. 2:19-cv-05750-JMG
JR., as Administrator of     :
the ESTATE OF CHARLES        :
JOSEPH FREITAG, SR.,         :
            Plaintiff        :
                             :
       vs.                   :
                             :
BUCKS COUNTY; PRIMECARE      :   CIVIL ACTION - LAW
MEDICAL, INC.; STEPHAN       :
BRAUTIGAM, PMHNP;            :
JESSICA MAHONEY, PSY.D.;     :
AVIA JAMES, LPC;             :
CHRISTINA PENGE, LPC;        :
CORRECTIONAL OFFICER         :
MOODY; CORRECTIONAL          :
OFFICER MURPHY; and          :   JUDGE JOHN M. GALLAGHER
CORRECTIONAL OFFICER         :
YOUNG,                       :
            Defendants       :


_____


          ZOOM DEPOSITION OF JAMES H. NOTTINGHAM


          DATE AND TIME:   Wednesday, May 5, 2021
                           at 9:35 a.m.


_____


               KAPLAN LEAMAN & WOLFE
        COURT REPORTING & LITIGATION SUPPORT
         230 SOUTH BROAD STREET, SUITE 1303
          PHILADELPHIA, PENNSYLVANIA 19102
          (215) 922-7112  1-877-KLW-DEPO
               www.klwreporters.com

James Nottingham

Page 16

1  ever terminated from a job?

2          A.    Never asked, never terminated.

3          Q.    Were any of your positions between 1982

4  and 2008, any of your employment positions that is, in

5  the law enforcement field?

6          A.    No, sir.

7          Q.    What brought you into Corrections?

8          A.    Actually, I have a sister that's a

9  police officer, and she -- she kinda inspired me about

10  getting into the law enforcement field.

11          Q.    Where is she a police officer?

12          A.    Philadelphia.

13          Q.    Can you walk me through the various ranks

14  and procedures -- or ranks and responsibilities that

15  you've had at Bucks County since 2008?

16          A.    2008 I started as an officer.  I was an

17  officer for approximately six years.  I became a

18  sergeant.  I was a sergeant for approximately four

19  years, and then I became a training lieutenant.  I was

20  promoted to training lieutenant.  From training

21  lieutenant, I just made captain in the last year.

22          Q.    So you would have been the training

23  lieutenant from 2018 to 2020 or 2021?

24          A.    So I was transitioning actually in

25  August of 2018.  I was just getting promoted to become

James Nottingham

1    the training lieutenant.  I assumed the position in

2    October, but I was going through the process in August.

3             Q.    And then when did you receive the

4    promotion to captain?

5             A.    August of 2- -- 2020, August.

6             Q.    So, obviously, you're here to testify

7    about training and supervision that took place in 2018.

8    It sounds like you're in a different position now, that

9    your -- your current responsibilities don't cover the

10   same responsibilities you had back then.  Is that

11   correct?

12            A.    As a training lieutenant, absolutely

13   correct, yes.

14            Q.    So then let's do this.  I want to ask you

15   about your responsibilities in both positions.  Let --

16   let's start with the training lieutenant.  Can you just

17   give me a description of what your day-to-day

18   responsibilities were?

19            A.    So as a training lieutenant, my

20   responsibilities were in-service training for staff and

21   academy training for new hires, to revitalize any kind

22   of training, keep the standards up to par and, when

23   needed at the jail, to come over and -- and act as a

24   lieutenant.

25            Q.    When you say act as a lieutenant, what

James Nottingham

1   Kratz -- then Captain Kratz?

2           A.      Absolutely not.  He was our direct

3   immediate supervisor in training.

4           Q.      Who reported to you?

5           A.      We -- just my partner and I.  We didn't

6   have anybody under us.

7           Q.      Okay, got it.  And really what I'm asking

8   there is whether there was any direct reports, anyone

9   specifically charged with -- with working under you and

10  conducting a training.  It sounds like the answer is no.

11  Is that correct?

12          A.      Not -- not -- not really.  So there was

13  some -- there was some expert -- we have adjunct

14  instructors come in.  It might be a sergeant in a

15  particular field, his expertise of training.  He would

16  come in and would be directly under us.

17          Q.      And so you reported as the Training

18  Lieutenant to Captain Kratz, is that -- as -- as we've

19  described.  Did you have any day-to-day interactions with

20  the highest ranking official at that time, who would have

21  been the director; right?

22          A.      Mr. Pirolli.

23          Q.      Yeah, got it.  Yes.  Did you have any

24  day-to-day interaction with Director Pirolli?

25          A.      Occasionally.

SA000913

James Nottingham

Page 22

1          Q.    Really, my question is aimed at this,

2     sir.  I take it -- we've established before that -- that

3     you speak for Bucks County on matters of training back in

4     2018, and I assume that Director Pirolli would have

5     delegated to you or did delegate to you the

6     responsibility to supervise training and supervision at

7     that time.  Is that correct?

8          A.    Through Captain Kratz, yes.

9          Q.    And if there was ever any question about

10    training or supervision that was directed to Director

11    Pirolli, then you could assume or expect that Director

12    Pirolli would have directed that question to you.  Is

13    that correct?

14         A.    Yes.

15         Q.    In your position as the Director of

16    Training, did you have any interaction with PrimeCare,

17    the medical or mental health provider?

18         A.    Can you explain?  What do you mean

19    direct?

20         Q.    Yeah.  I guess -- well, my question is

21    this -- that's a fair point -- did you ever coordinate

22    trainings with anyone from the medical or mental health

23    staff?

24         A.    We did one time, yes.

25         Q.    What was the nature of that training?

James Nottingham

Page 38

1    testimony on that topic.  Is that correct?

2             A.    I am.

3             Q.    First, just some introductory questions

4    on that issue, sir.  Would you agree that from Bucks

5    County's perspective, the most important responsibility

6    of correctional staff is to ensure the health and safety

7    of people incarcerated in the facility?

8             A.    Absolutely, and I would add cleanliness,

9    also.

10            Q.    That's part of health and safety; right?

11            A.    Correct.

12            Q.    Would you agree, sir, that also Bucks

13   County is aware that risks of suicide or self-harm is

14   always a concern when you're dealing with an incarcerated

15   population?

16            A.    I would agree.

17            Q.    By definition, people who are in the

18   criminal justice system may be there for mental health

19   reasons, drug abuse issues and so on.  Agreed?

20            A.    Agree.

21            Q.    And I take it Bucks County is aware that

22   those issues that are present in the criminal justice

23   system are closely associated with risks of suicide or

24   self-harm?

25            A.    I agree.

James Nottingham

Page 39

1          Q.    Would you agree on behalf of Bucks County

2    that correctional staff have a responsibility to prevent

3    people from harming themselves?

4          A.    I agree.

5          Q.    Now, my understanding is that mental

6    health staff in the facility are the ultimate

7    decision-makers on what level of precautions are

8    necessary.  Is that your understanding, as well?

9          A.    That is -- that is correct.

10         Q.    Now, my understanding is also that mental

11   health staff are, obviously, usually stationed within the

12   medical or mental health unit.  Is that correct?

13              MR. KOLANSKY:  Within the medical or

14   mental health what?  I didn't hear you.

15              MR. FEINBERG:  Unit in the facility.

16              MR. KOLANSKY:  Okay.

17              THE WITNESS:  They're in the facility,

18   yes.

19   BY MR. FEINBERG:

20         Q.    Well, they're -- the correctional staff

21   are the ones who are on the -- in the housing modules at

22   all times.  Is that correct?

23         A.    At all times we have staff on the

24   modules.  That's correct.

25         Q.    And it's those officers who work on the

SA000916

James Nottingham

Page 40

1   modules -- it's their responsibility to carry out the

2   precautions that are directed by mental health staff.  Is

3   that correct?

4               A.    And I would add our supervisors, also,

5   to visit the modules, tour them, yes.

6               Q.    Thank you.  And I take it the prison

7   administration puts procedures in place to make sure that

8   all happens.  Is that correct?

9               A.    That is correct.

10              Q.    And I take it you expect that

11  correctional officers will understand those principles.

12  Is that correct?

13              A.    That is correct.

14              Q.    And you would expect that correctional

15  officers would follow all directions on how to conduct

16  their watches.  Is that correct?

17              A.    That is correct.

18              Q.    And any requirements to correctional

19  officers are not suggestions or guidelines that they

20  should aim to do, they're -- they're mandatory; correct?

21              A.    They're directives, yes.

22              Q.    And I take it that Bucks County knows

23  that there's a need to ensure that this is done.  Is that

24  correct?

25              A.    That is correct.  I agree.

SA000917

James Nottingham

Page 41

1          Q.    If watches are not followed and complied

2   with, there's a risk of someone harming him or herself.

3   Is that correct?

4          A.    That is correct.

5          Q.    And I take it that was obvious to -- to

6   you and everyone else in Bucks County.  Is that correct?

7          A.    That's correct.

8                MR. KOLANSKY:  Well, object to the form,

9   but you can answer.

10  BY MR. FEINBERG:

11         Q.    Sure.  But, yeah, speaking on behalf --

12  and speaking on behalf of Bucks County, sir, it was

13  obvious to Bucks County that there was a need to comply

14  with these procedures.  Is that correct?

15         A.    That's why we do training, yes, that's

16  correct.

17         Q.    Okay, thank you.  Sir, my understanding

18  is that there are different levels of watch that applied

19  in 2018.  Is that correct, sir?

20         A.    There are different levels of watch,

21  yes.

22         Q.    Could you describe for me -- I mean, I've

23  seen the policies, but to make sure we're -- we're on the

24  same page, could you describe for me your recollection of

25  the different levels of watches and what those meant for

James Nottingham

Page 42

1    officers' responsibilities back in 2018?

2                    MR. KOLANSKY:  And are you asking him to

3    differentiate -- excuse me -- are you asking him to

4    differentiate between the jail levels versus the medical

5    levels or just the jail levels to any extent?

6                    MR. FEINBERG:  I'm not even sure I

7    understand that distinction, so --

8                    MR. KOLANSKY:  Well, okay, I'm just

9    asking to be precise then.

10   BY MR. FEINBERG:

11          Q.    Yeah, Captain, do you understand my

12   question?

13          A.    Well, I was going to ask you a question.

14   I was going to ask you, do you want me to go through

15   each one, name each level?

16          Q.    Sure.  Yeah, tell me -- let's start with

17   that.  Tell me what each level is or just identify each

18   level, and then I'll come back and ask you some

19   follow-ups.

20          A.    So I'll identify each level.  So we have

21   a constant watch.  We have a contraband watch.  We have

22   a Level 1 watch.  We have a Level 2 watch.  We have a

23   Level 3 watch.  And we also have a hospital watch, which

24   will be at a hospital.

25          Q.    Each of those different watches has --

SA000919

James Nottingham

Page 43

1   places different obligations on officers.  Is that

2   correct?

3               A.     That is correct and supervisors.

4               Q.     Thank you.  And I'll -- I'll try to use

5   that reference in each of my questions.  And can I --

6   well, am I understanding correctly that the main

7   difference between each of these levels, as far as

8   correctional officers and supervisors are concerned, is

9   the frequency at which watches take place?

10              A.     Yes and no.

11              Q.     Tell me -- tell me why no.

12              A.     So no, because some of these watches

13  there's an officer actually being the monitor, not an

14  inmate.

15              Q.     Okay, understood.  So the distinction is

16  between officers versus inmates.  Is that correct?

17              A.      Correct.

18              Q.     Bottom line, though, from Bucks County's

19  perspective, whenever obligations are placed on officers

20  under each of these different watch levels, it's a

21  mandatory directive.  Is that correct?

22              A.     Yes.

23              Q.     Let's focus specifically on Level 3

24  watch, which was the watch that -- that applied to Mr.

25  Freitag in August of 2018.  In fact, before I do that,

James Nottingham

Page 44

1    let me -- no, I'm sorry, withdraw that.  I'll show you

2    what's been previously marked as Exhibit P-6, which is

3    the Standard Operating Procedure regarding Watch and

4    Observation Officer.

5              (Exhibit shown.)

6              Do you have that in front of you, sir?

7         A.    I see it, yes.

8         Q.    I'm going to move forward to the second

9    page, at the bottom of the page there's some highlighted

10   text referring to Level 3.  Let me ask you, just to make

11   things easier, can you take a moment to read the text to

12   yourself on Level 3?  Let me know when you're finished,

13   and I'll ask you some follow-ups.

14        A.    (Witness reviewed document.)

15             Okay, I'm done.

16        Q.    Obviously -- well, this is self-evident

17   from the policy, sir, but can we agree that there are two

18   different types of obligations that are put on officer --

19   well, that are imposed as a result of Level 3 watch.

20   One, an obligation on an officer, and two, an obligation

21   on an Inmate Monitor.  Is that correct?

22        A.    That is correct.

23        Q.    The obligation on the officer is to do at

24   least one check on the person's cell every 30 minutes.

25   Is that correct?

James Nottingham

Page 45

1          A.     I would say observe the inmate.  The

2    inmate may not particularly be in the cell.

3          Q.     Okay.  In other words -- and -- and

4    that's a good clarification.  So the officer has an

5    obligations to -- an obligation to lay eyes on that

6    particular person at least once every 30 minutes.  Is

7    that correct?

8          A.     I would say yes.

9          Q.     The Inmate Monitor has an obligation to

10   place eyes on that person once every 15 minutes.  Is that

11   correct?

12         A.     Yes.

13         Q.     So from the prison's perspective, the

14   county's perspective, when someone is on Level 3 watch,

15   there's an expectation that -- that there will be on six

16   occasions for every hour someone laying their eyes on

17   that person.  Is that correct?

18         A.     According to the math, yes.

19         Q.     And I take it that -- I mean, that's --

20   that's not a complicated math equation; right?  This is

21   -- that's -- that's the county's purpose in implementing

22   this policy.  Is that correct?

23         A.     According to the math, yes, that's the

24   -- that's the policy.

25         Q.     And I take it -- I assume you -- you were

James Nottingham

Page 46

1    not involved in -- in development of this policy.  Is

2    that correct?

3            A.    That is correct.

4            Q.    Okay, but -- and we'll get into this in a

5    moment -- your responsibilities as the Training

6    Lieutenant include making sure that officers are aware of

7    what the policy requires.  Is that correct?

8            A.    And -- and enforcing it.

9            Q.    Yeah, okay.  And when someone is placed

10   on this level of watch, the expectation of the county is

11   that officers will make sure that all of these watches

12   take place.  Is that correct?

13           A.    Yes.

14           Q.    Let's move on to the next topic which is

15   listed in the Notice of Deposition.  It's Topic No. 2,

16   which states that I'll be seeking testimony on Bucks

17   County's policies, practices and procedures in and around

18   August of 2018 regarding the responsibility of

19   correctional officers and supervisors at the Bucks County

20   Correctional Facility to supervise Inmate Monitors and

21   ensure their compliance with obligations to conduct cell

22   checks for persons placed on a Level 3 watch status.

23                 You're prepared to testify on that topic,

24   sir.  Is that correct?

25           A.    That is correct.

SA000923

James Nottingham

Page 48

1    supervising Inmate Monitors.  Is that correct?

2              A.    Yeah, that's correct, and supervisors.

3              Q.    Okay.  Thank you for continuing to remind

4    me.  So officers and supervisors have an obligation to

5    ensure that Inmate Monitors do the job that is assigned

6    to them.  Is that correct?

7              A.    That is correct.

8              Q.    Now, the main responsibility of an Inmate

9    Monitor is, as we discussed before, to lay eyes on the

10   person who is the subject of the watch.  Is that correct?

11             A.    And I would also add, and note activity.

12   They're supposed to note the activity, what they're

13   doing when they're laying these eyes on them.

14                   (Court Reporter interrupted.)

15                   MR. FEINBERG:  Note activity.

16                   THE WITNESS:  Note activity.

17   BY MR. FEINBERG:

18             Q.    So the officer -- that obligation may --

19   I'm sorry, let me say that again.  The officer's

20   obligation is to make sure that the Inmate Monitor is

21   doing exactly what you just described.  Is that correct?

22             A.    Correct.

23             Q.    If the Inmate Monitor is not doing the

24   job that is assigned to that Inmate Monitor, then that's

25   the officer's responsibility.  Is that correct?

SA000924

James Nottingham

Page 49

```
1          A.     To handle that situation, absolutely.

2          Q.     Okay.  So I'll take the document down

3    now.  To review, an officer's responsibility for a person

4    on Level 3 watch, the officer's got two-fold

5    responsibility.  Is that -- officer and supervisors have

6    a two-fold responsibility.  Is that correct?

7          A.     Explain two-fold.

8          Q.     Sure.  Well, first, on the one hand, the

9    officers have a responsibility to conduct their own

10   checks at least once every 30 minutes; correct?

11         A.     Correct.

12         Q.     And they have a responsibility, on the

13   other hand, to make sure that the Inmate Monitors are

14   conducting their checks and noting activity every 15

15   minutes.  Is that correct?

16         A.     Yes, I agree.

17         Q.     All right.  And, once again, that's a

18   directive, a mandatory directive to the officers and

19   supervisors; correct?

20         A.     Correct.

21         Q.     Any failure to do that job is a -- is a

22   violation of Bucks County's policy; correct?

23         A.     Correct.

24         Q.     And a violation of Bucks County's

25   expectations of its officers.  Is that correct?
```

SA000925

James Nottingham

Page 50

1        A.    I agree, correct.

2        Q.    Sir, in your experience, whether as a

3   Training Lieutenant or in your supervisory experience

4   before then, were you -- did you ever become aware of any

5   problems with Inmate Monitors not fulfilling their

6   responsibilities?

7        A.    Yes.

8        Q.    Describe that to me.  What -- what type

9   of notice did you receive?

10        A.    So as an officer and a supervisor --

11   I'll explain as an officer first.  Is that okay?

12        Q.    Please.

13        A.    So I was a Module Officer.  My

14   responsibility, like we agree, was to check these

15   monitor forms to note the activity.  I will correct the

16   inmates if they weren't doing it to my standards, if

17   they were a little behind on the time or if they were

18   not writing any information in there, if they were using

19   the ditto marks, I would correct them.

20            Me, personally, as the Module Officer, I

21   would give them a warning first and then a second time

22   they would be fired, I would replace them.  That was as

23   an officer.

24            As a supervisor, I had the same kind of

25   interactions, the same thing on my tours.  If I seen

James Nottingham

Page 51

1  anything wrong with a monitor, I would correct that.

2          Q.    When you were a Module Officer, I take it

3  Inmate Monitors would be responsible for handing in their

4  monitoring forms to you.  Is that correct?

5          A.    At the end of the shift, yes.

6          Q.    And it sounds like, from what you've

7  described, where if you look for ditto marks or whether

8  the forms were being appropriately completed, that you

9  would review every single form that got handed to you.

10 Is that correct?

11         A.    Not only at the end, but during the

12 shift, also, yes.

13         Q.    So at that point -- strike that.  Then --

14 so your practice was -- was to engage in, it sounds like,

15 fairly careful supervision of the Inmate Monitors.  Is

16 that right?

17         A.    I would say that's correct, yes.

18         Q.    And that's something that's required by

19 Bucks County directives, as we've just reviewed.  Is that

20 correct?

21         A.    Correct.

22         Q.    The problems that you've identified, did

23 they come up frequently?

24         A.    Not frequently, not frequently, but from

25 time to time you -- we would have to -- I would have had

James Nottingham

Page 53

1    understand.  Anybody in this field understands why we

2    use the Inmate Monitors, why we use inmates.

3                    (Court Reporter interrupted.)

4                    Inmates as Inmate Monitors.

5              Q.    Articulate that for me then, sir.  Why is

6    it that -- well, tell me, when you -- when you respond to

7    your family or civilians who ask that -- that question,

8    how do you say it?

9              A.    So I tell them, you know, we have a lot

10   of sick people in the world, you know, addicted to drugs

11   and for whatever reason they come in, they've given up

12   hope, you realize there's a lot -- a lot of the

13   population of the jail right now and back then like

14   that.

15                    We don't have enough staff members.  We

16   would have -- have to have an officer at every -- every

17   inmate on watch.  It's impossible.  So nobody in this

18   field -- anyone not in this field doesn't understand

19   that.  People in this field, correctional officers,

20   correctional supervisors, administration, they

21   understand.

22             Q.    What you're describing sounds like a

23   resources issue.  Is that correct, sir?

24             A.    It can be.

25             Q.    It's -- I think the way you've described

James Nottingham

Page 54

1    is it would be impossible to protect the safety of every

2    prisoner if you were relying on officers to do it

3    exclusively.  Is that correct?

4            A.    It -- it's impossible.

5            Q.    Okay.  So given that, given that you're

6    -- that there's a necessity to ask inmates to assist with

7    the supervision and protection of other inmates, I take

8    it that, as you've described, you expect that officers

9    will handle their supervision responsibilities carefully.

10   Is that correct?

11           A.    That's the critical part.  Yes, I agree.

12           Q.    Let's go to Item 3 in the Notice of

13   Deposition, which is Bucks County's policies, practices

14   and procedures in and around August of 2018 regarding the

15   training and supervision of correctional officers on the

16   responsibilities that we've addressed so far.  I take it

17   you're prepared to testify on that, sir.  Is that

18   correct?

19           A.    That's correct, yes.

20           Q.    Can -- just -- before we get into it,

21   let's talk generally about training.  Can you estimate

22   for me, how many different Standard Operating Procedures

23   are there?

24           A.    Well, I have -- I have no idea on the

25   number.  I couldn't even guess.

James Nottingham

Page 61

1   BY MR. FEINBERG:

2          Q.    Yeah, let me -- and let me -- let me

3   revise the question.  What did you do or, to your

4   knowledge, did anybody else do?

5          A.    As I previously stated, it was my duty

6   -- and I took it seriously -- to make sure the officers

7   were aware of the policy and procedure.  I made sure

8   that if they had any questions, that I answered the

9   questions very well, specifically to my knowledge and my

10  experience.  I shared my experiences as a supervisor and

11  a Module Officer.

12         Q.    Did you or anyone else, to your

13  knowledge, conduct spot checks on officers to make sure

14  they were doing their jobs on this particular issue?

15         A.    Any supervisor that's conducting a tour

16  or an unannounced round, that's happening daily, that's

17  happening every day of the week, every hour, so yes.

18         Q.    And that's built into the expectations

19  for supervising officers.  Is that correct?

20         A.    That is correct, exactly.

21         Q.    So Mr. Freitag was housed on the B

22  module.  Which level of supervisor would be required to

23  do periodic checks in that module?

24         A.    So you could have a lieutenant rank or a

25  sergeant rank.

SA000930

James Nottingham

Page 62

 1             Q.    And any one of them could -- well, is

 2    there a specific requirement that a sergeant has to tour

 3    that module every three, four hours or something like

 4    that?

 5             A.    It's expected that each supervisor tour

 6    as many blocks as they can.

 7             Q.    Okay.

 8             A.    So yes, to answer your question, yes.

 9             Q.    Got it.  When the officers go to each

10    housing module -- I'm sorry -- the supervisors, when they

11    go to a housing module, is there an expectation that they

12    will check on the officer's computerized log records?

13             A.    Absolutely.

14             Q.    And I put in front of you as you were

15    answering that question, sir, a document previously

16    marked as Exhibit P-5.

17                   (Exhibit shown.)

18                   Do you see that?

19             A.    I see P-5.

20             Q.    And I take it that you've seen documents

21    that look like this before?

22             A.    These look like log entries.

23             Q.    So these are the log entries that

24    officers make when they're working on a housing module.

25    Is that correct?

SA000931

James Nottingham

1    time preceding 2018.  Did you see yourself or did you

2    become aware of any problems with the way in which

3    officers were conducting their watches as required by

4    county procedures?

5             A.    As an officer?  No.

6             Q.    Well, let's talk about in -- as a -- as a

7    -- for example, let me -- I'll phrase it so you

8    understand the way I want to ask this question.  Sir, I'm

9    going to give you a hypothetical.

10                  At some point when you were the Training

11   Lieutenant in 2018, did anyone ever say to you, hey, you

12   know, Lieutenant -- then Lieutenant Nottingham, we've got

13   a problem, officers on the B modules, they're just --

14   they're not doing the checks as frequently as they're

15   supposed to under the watch procedures.  Did anything

16   like that ever come up?

17            A.    Never.

18            Q.    Did you yourself ever see evidence of any

19   problems with the way officers were conducting their

20   checks?

21            A.    No.

22            Q.    Did you ever overhear of any

23   conversations between officers and supervisors about

24   failure to conduct checks as required?

25            A.    No.  Just complaints, general

SA000932

James Nottingham

Page 66

1   complaints, that there was a lot of them.

2                    (Court Reporter interrupted.)

3                    Complaints of how many watches there

4   were, never negligence.

5                    MR. KOLANSKY:  Guys, can I interrupt for

6   one second?  Finish the answer.  I gotta interrupt for

7   this phone call right now here.

8                    MR. FEINBERG:  Okay.  Let's go off the

9   record.

10                    (Discussion was held off the record.)

11                    (Break was taken.)

12   BY MR. FEINBERG:

13           Q.    Captain Nottingham, are you ready to go

14   back on the record?

15           A.    I am.

16           Q.    So we had -- we had a break for, oh,

17   gosh, about 30, 40 minutes now.  During the course of

18   that break, did you realize that any of your previous

19   testimony was incorrect or incomplete?

20                    MR. KOLANSKY:  It was -- sorry.

21                    THE WITNESS:  No, sir.

22   BY MR. FEINBERG:

23           Q.    Great.  We ended with a question and

24   answer about whether you have seen or heard about any

25   problems with officers conducting their checks on the

James Nottingham

Page 67

1   housing modules, and it sounds like what you're saying is

2   that the only thing that you've heard about are officers

3   complaining that there's just too many checks for them to

4   do.  Sir, we lost your video there.

5            MR. KOLANSKY:  There you go.

6   BY MR. FEINBERG:

7            Q.   Did you hear my question?

8            A.   I did.  Let me -- let me be clear,

9   though.  You asked me the question as a Training

10  Lieutenant.

11           Q.   Sure.

12           A.   Absolutely, yes.  That's exactly my

13  statement, yep.

14           Q.   Is -- is there some other complaint that

15  you've heard in some other capacity?

16           A.   As a supervisor, I heard complaints,

17  yes.

18           Q.   Okay.  Basically officers saying there's

19  -- there's too much -- we have too much of an obligation

20  to conduct these checks.  Is that right?

21           A.   Exactly, and -- and the number of how

22  many there were.

23           Q.   Have you ever observed, because of the

24  number of checks that are required, that officers failure

25  -- fail to comply with their responsibilities to conduct

James Nottingham

Page 68

1  those checks?

2          A.    As a sergeant, yes.  As a Training

3  Lieutenant, no.

4          Q.    Remind me when you were a sergeant.

5          A.    2015 to 2018.

6          Q.    Got it.  What kind of failures did you

7  see in that role?

8          A.    There was a couple cases where I had a

9  officer, one particular time, had an inmate watching too

10  many inmates on Level 3.  We have a policy on eight, no

11  more than eight.  There was about approximately ten, if

12  my memory serves me correctly.  I --

13         Q.    How many others have you -- I'm sorry, go

14  ahead, I interrupted you.

15         A.    And I -- I recommended discipline for

16  that officer.

17         Q.    Were there any other instances that you

18  saw while working as a sergeant?

19         A.    Not to my recollection that I can

20  remember.

21         Q.    Let me ask you the same series of

22  questions about Inmate Monitors.  Although it sounds like

23  we may have already covered that, but I want to be more

24  specific.  In your position as a training lieutenant, did

25  you overhear or learn about any problems in the way

SA000935

James Nottingham

Page 69

1    officers were conducting themselves in their supervision

2    of Inmate Monitors?

3              A.    No, sir.

4              Q.    As a Sergeant, you've already described

5    one issue where a -- where an officer had too many Inmate

6    Monitors working under him.  Is that correct?

7              A.    It was too many inmates on Level 3 under

8    one monitor --

9              Q.    I see.

10             A.    -- to be more precise.

11             Q.    Okay.  In terms of a responsibility to

12   supervise Inmate Monitors, you told me that both officers

13   and supervisors have a responsibility to do so.  Is that

14   correct?

15             A.    Yes, sir.

16             Q.    And I think you told me that -- you gave

17   me an example that when you were a correctional officer

18   working on a housing module, you took very seriously your

19   job to look at every single Inmate Monitor form both

20   during your shift and at the conclusion of the shift;

21   correct?

22             A.    Yes, sir.

23             Q.    And you would expect the same of other

24   correctional officers.  Is that right?

25             A.    Absolutely.

SA000936

James Nottingham

Page 72

1  Young testified that he doesn't recall looking at Inmate

2  Monitor forms, only looked at them occasionally, and it

3  says that the supervisors are the ones who are supposed

4  to check the forms.  Do you see that testimony?

5              A.   I do see it, yes.  I read it.

6              Q.   That's inconsistent with your

7  understanding of -- or what you've described as the

8  directives to officers.  Is that correct?

9              A.   As the Training Lieutenant, that is

10 incorrect.

11              (Court Reporter interrupted.)

12              Q.   As the training lieutenant, often --

13              (Court Reporter interrupted.)

14              A.   That is incorrect.  I -- I agree with

15 the attorney's statement.

16              Q.   Meaning that Officer Young has it wrong.

17 Is that correct?

18              A.   I agree, yes.

19              MR. FEINBERG:  Lori, off the record for

20 one second.

21              (Discussion was held off the record.)

22 BY MR. FEINBERG:

23              Q.   And in connection with this issue about

24 the officer's responsibility to look at Inmate Monitor

25 forms, sir -- well, I'm sorry, let me withdraw that

SA000937

James Nottingham

Page 73

1    question and ask you a different one.

2                    If you learned, as the Training

3    Lieutenant, that Officer Young was under the mistaken

4    impression that it was the supervisor's responsibility to

5    look at these, what would you have done?

6            A.    Well, let me put it to you this way.  If

7    that would have came up in training and that question

8    was directed to me from that officer or I asked that

9    officer the question you asked him, I would definitely

10   have to correct him about that.  That -- that is

11   incorrect.  Not only is -- not only a supervisor, but he

12   is also to check those forms.

13           Q.    Prior to 2018, do you recall any

14   conversations with -- whether it was Officer Young or any

15   other officer -- where other -- where officers

16   communicated to you that they were under that mistaken

17   impression that it was the supervisor's responsibility to

18   look at Inmate Monitor forms?

19           A.    I never had it phrased to me that way,

20   but like I said, as a sergeant, I did correct that one

21   officer, and he should have been paying attention to the

22   forms and how many he had -- the other inmate -- how

23   many -- how many inmates that Inmate Monitor was

24   watching.  So other than that one occasion that I

25   remember, no officer had ever presented -- presented

SA000938

James Nottingham

Page 97

1    something different in reference to Dr. Cassidy.  I'll

2    just represent to you that this meeting took place in

3    October of 2019, so a full 14 months after Mr. Freitag's

4    suicide in August, 2018.  Do you understand that, sir?

5                A.    Okay.

6                Q.    And Lindsay Hayes, for reference, is a

7    suicide prevention expert and, to my understanding, was

8    brought in by either PrimeCare and Bucks County or both,

9    to look at practices and procedures.  Do you understand

10   that, sir?

11               A.    Yes.

12               Q.    Now, what Mr. Hayes, from the context of

13   this memorandum, did is he asked whether anyone had

14   looked into the watch issue and checked with the Module

15   Officers to see if the watch was put into place.  Do you

16   see that?

17               A.    I do see it.

18               Q.    And then the next paragraph down says

19   investigators did not look into the issue.  The focus was

20   on the suicide incident, gathering evidence, et cetera.

21   Did you read along with me and see that text?

22               A.    I did.

23               Q.    Can we agree that based on that

24   description, at least from Mr. Bochenek's perspective, no

25   one between August of 2018 and October of 2019 looked

James Nottingham

Page 98

1   into the question about what happened on the block in

2   terms of compliance with the watch procedures.  Are we

3   agreed?

4          A.    According to what I read, that's what it

5   says.

6          Q.    Okay.

7          A.    Not to be disrespectful to you, but

8   isn't that a question for Mr. Bochenek?

9          Q.    Well, as you heard, I'll be asking him

10   that question shortly.

11          A.    I agree.  I agree.

12          Q.    My -- my question for you then, sir, is

13   do you know, in your position, why no one -- or strike

14   that.  Let me ask this since you mentioned Mr. Bochenek.

15   Whose responsibility is it to look into that issue?

16          A.    A supervisor can come down there at any

17   point, like I said earlier, during a tour and check

18   those watch sheets, go into OMS, which is the log

19   entries, look up any inmate and check any alert that's

20   in there on an inmate.  So any supervisor, any officer

21   can do that.

22          Q.    I appreciate that, sir, but my -- my --

23   and maybe I didn't articulate the question well.  The

24   question I have for you is that in your position as the

25   training officer, is there any explanation for why you

SA000940

James Nottingham

Page 99

1    were not called upon, if you know, as -- to look into how

2    the officers did their job in connection with this

3    suicide incident?

4                    MR. KOLANSKY:  Objection to form.  How

5    can he know why somebody else did not call upon him to do

6    that investigation, especially given that that's not part

7    of his obligation --

8                    MR. FEINBERG:  Well --

9                    MR. KOLANSKY:  -- if -- if that's not

10   part of the obligation.

11   BY MR. FEINBERG:

12           Q.    Sir, you can answer the question.

13           A.    Yeah, I had no knowledge.  No one asked

14   me, so I had no idea.  I don't know.

15           Q.    Sure.  Is that something -- so in

16   response to the video that I showed you, I think you told

17   me -- and the transcript will speak for itself -- that

18   you'd like to see another angle or you'd like to know

19   more.  Did I understand your -- your response correctly?

20           A.    Absolutely, to rule out other

21   possibilities.

22           Q.    In other words, you hypoth- -- and it was

23   -- and this is not a critique, but you hypothesized that

24   Officer Young could have been on the phone at that time.

25   Is that right?

James Nottingham

1          A.    I did, yes.

2          Q.    And I think you and I both agreed that no

3     one really knows because we only see that little spec on

4     the video.  Is that correct?

5          A.    Yes.

6          Q.    And my question for you then is, are you

7     aware of anyone within the Bucks County Correctional

8     Facility whose responsibility it is to ask those

9     questions of Officer Young after an event like a suicide,

10    to find out specifically what happened?

11         A.    Yeah, that department's called SIU,

12    Special Investigations Unit.

13         Q.    Is that Mr. Bochenek's department?

14         A.    That was formerly Mr. Bochenek's

15    department.  He retired.

16         Q.    Oh, got it.  So at that point, it would

17    have been Mr. Bochenek's responsibility.  Is that

18    correct?

19         A.    At that -- at that time, yes.

20         Q.    Okay.  Thank you.  So at any point -- and

21    let me just back out.  Let's not -- let's not talk about

22    this incident.  Just in general.  When there -- let me

23    use the phrase critical incident.  Do you ever use a

24    phrase like that to describe things that happen in the

25    prison?

James Nottingham

Page 114

1    some time to read, sir.  It's a few pages.  Let's see

2    here.  Let's do this, sir, I'll highlight as we -- as we

3    go.  Could you start by reading the bottom of what's

4    Page 105 of Mr. Young's deposition, and let me know when

5    you finish.

6             A.    (Witness reviewed document.)

7                   I'm finished.

8             Q.    All right.  Now I'm moving to Page 106.

9    I won't highlight.  I'll just ask you to read the entire

10   page.

11            A.    (Witness reviewed document.)

12                  Okay, I'm finished.

13            Q.    All right.  Did you -- you read Page 106.

14   Is that correct?

15            A.    106 and 107.

16            Q.    All right, thank you.  Now, let's go on

17   to 108, and you can read just this text right here

18   (indicating).

19            A.    (Witness reviewed document.)

20                  I'm finished.

21            Q.    Obviously, sir, from this testimony, Mr.

22   Young had no idea whether the Inmate Monitor, Hugh

23   Caldwell, working under his supervision, did the job that

24   he was supposed to do.  Is that correct?

25            A.    I agree.

SA000943

James Nottingham

Page 115

1          Q.    Did you see here -- pardon me, on

2   Page 107, Mr. Young believed that he did his job

3   completely appropriately.

4          A.    (Witness reviewed document.)

5          Q.    Did you see his testimony on that point,

6   sir?

7          A.    I do agree -- I did read it, yes.

8          Q.    Do you agree with that testimony?

9          A.    I disagree with his opinion of his job

10  duty, but....

11         Q.    Why do you say that?

12         A.    Well, he -- that's what his answer says.

13         Q.    No, no, no.  Why -- why do you disagree

14  with his opinion?

15         A.    Because I think it is his

16  responsibility.

17         Q.    It's his responsibility to make sure the

18  Inmate Monitor is looking in his cell.  Is that correct?

19         A.    Yes.

20               (Court Reporter interrupted.)

21               MR. FEINBERG:  It's his responsibility to

22  make sure the Inmate Monitor is looking in his cell, and

23  the captain's response was yes.

24  BY MR. FEINBERG:

25         Q.    And, Captain, do you -- so you would

James Nottingham

Page 116

1   agree that Captain -- pardon me -- that Officer Young did

2   not comply with his responsibilities under Bucks County's

3   Standard Operating Procedures.  Is that correct?

4            A.    I agree.

5            Q.    Obviously, we've -- we've reviewed from

6   Mr. Bochenek's report that this was not -- that Officer

7   Young's compliance with his responsibilities was not

8   evaluated at any time between August of 2018 and October

9   of 2019 when that meeting took place with Lindsay Hayes.

10  Do you recall looking at that document?

11           A.    I did see the document.

12           Q.    Do you have any --

13                 (Court Reporter interrupted.)

14           A.    I did see the document that Mr. Freitag

15  showed me -- I'm sorry, the attorney.  I'm sorry.

16           Q.    Sure.  Do you have any understanding as

17  to why there was no evaluation or discussion of Officer

18  Young's performance in that regard in that time period?

19           A.    I can't answer that question.  I have no

20  --

21           Q.    Once again --

22           A.    -- knowledge of it.

23                 (Court Reporter interrupted.)

24           Q.    Captain, once again, would that be Mr.

25  Bochenek's responsibility, to your understanding?

SA000945

James Nottingham

Page 117

1              MR. KOLANSKY:  Objection, outside the

2    scope within the questions to be answered.

3    BY MR. FEINBERG:

4         Q.    You can answer, sir.

5         A.    To the best of my knowledge, that would

6    fall under Mr. Bochenek's responsibility, yes.

7         Q.    Thank you.  As the -- if this issue came

8    up in training, sir, and you learned that Mr. Young

9    had -- based on his deposition testimony -- had no idea

10   what an Inmate Monitor on his module was doing, what

11   would you do?

12        A.    If I had the same conversation that you

13   were having with him right there, with those same

14   responses, I would have to definitely tell the officer

15   that he was wrong and that he -- it is his

16   responsibility, and he should be checking those monitor

17   forms and making sure that the inmates are doing their

18   job properly, as well as himself.  So that would have

19   been addressed --

20        Q.    If you found out --

21              (Court Reporter interrupted.)

22        A.    That would have been addressed, to

23   answer your question, Counselor.

24        Q.    How would it have been addressed?  I'm

25   sorry, let me withdraw that question.  If -- if you

SA000946

James Nottingham

Page 118

1   learned about this in the immediate wake of Mr. Freitag's

2   death in August of 2018, how would it have been

3   addressed?

4            A.   So we're -- we're in the -- we're in the

5   hypothetical again; right?

6            Q.   Yeah, sure.

7            A.   So if I was a -- and I was a supervisor,

8   if I had him come into the module, tour his module at

9   the time, and I was checking those forms, which I would

10  have done, I would have definitely called him on the

11  carpet about it, the officer.

12           Q.   Would you have disciplined him?

13           A.   I would have.  I would have recommended.

14  I would have recommended discipline.

15           Q.   Okay.  And in fact --

16           A.   Let me finish.  It would have been part

17  of my --

18           Q.   Please.

19           A.   -- it would have been part of my report.

20           Q.   What report are you referring to?

21           A.   I had to do a Daily Report every day as

22  a supervisor.

23           Q.   And in your position as the Training

24  Lieutenant, it sounds like, from your testimony, you

25  would not have the authority to impose discipline on an

SA000947

James Nottingham

Page 119

1   officer.  Is that correct?

2           A.     That is incorrect.

3           Q.     Well, yeah, then -- then let me ask.  Who

4   would have the authority to impose discipline?

5           A.     I would have.  Any supervisor can

6   recommend it.

7           Q.     Who makes the ultimate decision once a

8   recommendation of discipline is made?

9           A.     So the admin lieutenant, the captain,

10  Deputy Warden, they would make the final decision.

11          Q.     Okay.  So let's say on August 25th of

12  2018 you went to the B module where Officer Young was

13  stationed, and you could tell that he had no idea what

14  was going on with the Inmate Monitor.  Your

15  recommendation would have been to discipline him.  Is

16  that correct?

17          A.     I would have spoke to the officer and

18  said, here's what's expected, here's what you should be

19  doing, and I would recommend --

20          Q.     Okay.

21          A.     -- discipline.

22          Q.     If found out on August 26th of 2018 --

23  that's a Sunday -- Monday, August 27th, two days after

24  Mr. Freitag's death, that Officer Young had been on the

25  module all that morning, Saturday morning, the 25th, and

James Nottingham

Page 120

1   he had no idea what the Inmate Monitor was doing, you

2   would have recommended discipline at that point.  Is that

3   correct?

4           A.    That's correct.

5           Q.    In terms of post-incident investigation,

6   though, for disciplinary purposes, what you're describing

7   to me is that's not your role to do.  Is that correct?

8           A.    That's correct.

9           Q.    To your understanding, any post-incident

10  investigation for disciplinary purposes falls on the

11  shoulders of the Investigative Unit.  Is that correct?

12          A.    Yes, sir.

13          Q.    Obviously, sir, what I've shown you today

14  in terms of the gap in the officers looking in Mr.

15  Freitag's cell and the inconsistencies between the Inmate

16  Monitor form and what actually happened, this is the

17  first you're seeing of all that.  Is that correct?

18          A.    That's correct.

19          Q.    Can I assume -- strike that.  You agree

20  with me that we've seen violations of policies in

21  multiple respects by the officers on the housing module.

22  Is that correct?

23          A.    I would say by the inmate and by the

24  officer from what I've seen.

25          Q.    And am I correct then in understanding

James Nottingham

Page 121

1    that today is the first time you're hearing of any of

2    that?  Is that correct?

3            A.    That's correct.

4            Q.    Does that concern you, sir, as the former

5    training lieutenant, that this is the first time you're

6    hearing about it?

7            A.    No, I'm not concerned about it.  I'm not

8    concerned.

9            Q.    Do you think there's any need to go back

10   and talk to Officer Young now?

11           A.    Me personally, I think, yeah, I think I

12   will.

13           Q.    How about Officer Moody?  He was also on

14   the module.

15           A.    I would.

16           Q.    What are you gonna say to them?

17           A.    I would like to ask them a few

18   questions.  I don't know what I would say.  I would have

19   to ask them questions.  I don't know what I would say,

20   though.  I can't answer that right now.

21           Q.    What's the first question you'll ask

22   them?

23                 MR. KOLANSKY:  Objection.

24                 THE WITNESS:  If they remember -- if they

25   remember the events of that day.

SA000950

James Nottingham

Page 122

1   BY MR. FEINBERG:

2          Q.    What's the next question you'll ask them?

3                MR. KOLANSKY:  Objection.  You can

4   answer.

5   BY MR. FEINBERG:

6          Q.    You can answer, sir.

7          A.    I would have to wait and see what their

8   response was for the next question.

9          Q.    Okay.  It sounds like rather than doing

10  this in a script fashion, you'd want to know what was

11  going on on the housing module.  Is that correct?

12         A.    More or less, if you put it that way,

13  yeah.

14         Q.    We've agreed that all of the measures

15  that are in place for monitoring checks by -- or let me

16  try that again.  All of the measures that are in place

17  for cell checks by -- by officers and Inmate Monitors are

18  intended to protect people who might be at risk of

19  harming themselves.  Is that correct?

20         A.    I wouldn't call it a cell check.  I

21  would say observation, but to your point, they are.

22         Q.    And when -- if officers are not living up

23  to their responsibilities, that's putting people at risk.

24  Is that correct?

25         A.    And supervisors.  Yes.

SA000951

James Nottingham

Page 123

```
 1              Q.    And it's obvious to the county that that

 2    risk is there.  Is that correct?

 3              A.    There's always a risk of that.  We're

 4    dealing with human beings.

 5              Q.    Well, it's obvious that when officers

 6    fail to do their jobs in supervising Inmate Monitors and

 7    doing their own observation, that's an obvious risk.  Is

 8    that correct?

 9              A.    I would agree.

10              MR. FEINBERG:  Sir, I appreciate you

11    hanging in for a longer than expected deposition.  I

12    don't have any further questions for you, but I defer to

13    other counsel.

14    BY MR. KOLANSKY:

15              Q.    Thanks.  I do have a couple.  Captain,

16    before you would go back and ask those officers -- well,

17    first of all, in going back and asking to -- or speaking

18    with those officers, I assume that you're going back and

19    speaking with them as captain of the guard or whatever

20    your exact title is.  Is that correct?

21              A.    Yes, sir.

22              Q.    And in speaking with them, I assume

23    you're going back not to discipline them at this point,

24    but to possibly engage in further training for them as

25    your -- in your role as their captain.  Is that correct?
```

SA000952

James Nottingham

Page 127

1    described in this instance?

2              A.    I am in a -- I'm in a position now,

3    whereas before I wasn't.

4              Q.    And do you ensure that those -- those

5    checks occur?

6              A.    Absolutely.

7              MR. KOLANSKY:  I have nothing further at

8    this time.  John?

9              MR. NINOSKY:  No questions.

10             MR. KOLANSKY:  Thank you.  Jon?

11   BY MR. FEINBERG:

12             Q.    I have, yeah, one follow-up for you, sir.

13   Would you agree that based on the testimony that Officer

14   Young gave, that up through August of 2018, in fact,

15   December of 2020 when this deposition occurred, Officer

16   Young was under the impression that he had no obligation

17   to ensure that Inmate Monitors were conducting their

18   checks?

19             A.    And I told you I don't agree with that.

20             Q.    Right, and that's -- but that appears to

21   be his -- his understanding.  Is that correct?

22             A.    That's his perception.

23             Q.    And does that perception suggest to you

24   that Officer Young needed some more training or

25   supervision?

SA000953

James Nottingham

Page 128

1                    MR. KOLANSKY:  Objection to form.

2                    THE WITNESS:  Yes, definitely.

3    BY MR. FEINBERG:

4          Q.    Yes, he definitely needed more training

5    because his perception was wrong.  Is that correct?

6                    MR. KOLANSKY:  Well, objection to the

7    form and to the question because it doesn't mean that he

8    needed more training.  It means that he didn't understand

9    what he was supposed to do, I would assume.

10   BY MR. FEINBERG:

11         Q.    You can answer the question, sir.

12         A.    I would have definitely addressed the

13   situation if I was there or in this building.  I would

14   address it to make sure that Officer Young and Officer

15   Moody or any officer was aware that their responsibility

16   is to supervise the Inmate Monitors and to peruse and

17   check those Inmate Monitor forms.

18                   MR. FEINBERG:  I don't have anything

19   further.  Thank you, sir.

20   BY MR. KOLANSKY:

21         Q.    I do have one more then.  Captain, is

22   there any reason to believe from the training modules

23   that you presented over the years, that those two

24   officers were not trained in that procedure properly?

25         A.    None whatsoever.

SA000954