# Exhibit 20 Supplement Mitchell Deposition

SA000955

Clifton Mitchell

Pages: 36, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 52, 55, 57, 58, 63, 64, 65, 66, 67, 68, 74, 76, 77, 78, 80, 83, 84, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 103, 104, 108, 110, 111

Dated: March 25, 2021

SA000956

Clifton Mitchell

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____ :
                                               :
Charles Joseph Freitag, Jr., as   :
Administrator of the Estate of    :
Charles Joseph Freitag, Sr.,      :
                                               :
                Plaintiff,              :
                                               :
                V.                        :
                                               :
Bucks County; Primecare Medical,  :
Inc.; et al,                      :
                                               :
                Defendants.            :
_____ :


Thursday, March 25, 2021


VIDEOTAPED ZOOM DEPOSITION OF:


CLIFTON MITCHELL,


Called for oral examination by counsel for the

plaintiff, pursuant to notice, before Ramona L.

Devlin, of Kaplan, Leaman & Wolfe, a Notary

Public, in and for the Commonwealth of

Pennsylvania, beginning at 9:33 a.m., when were

present on behalf of the respective parties.

Clifton Mitchell

Page 36

1   you have to address questions of discipline for

2   officers, if you can estimate?

3        A      It varies.  It varies from the

4   standpoint of whether it would be the attendance

5   issues and/or some other issues.  You know, it is

6   just a normal course of business.

7        Q      Okay.  I identified as an issue in my

8   hypothetical there the question of officers

9   checking cells as part of mental health or

10   suicide watches.  I want to talk to you more

11   specifically about those in just a moment.

12             First, though, would you agree, sir,

13   that the most important responsibility of

14   correctional staff is to ensure the health and

15   safety of people incarcerated in the facility?

16        A      The edict is care, custody and

17   control.

18        Q      Right.  So care is the first thing

19   you said; right?

20        A      Yeah.

21        Q      Meaning that -- protect and care

22   would seem to mean health and safety of the

23   person in your control; is that right?

24        A      Yes.

25        Q      All right.  Sir, would you agree,

SA000958

Clifton Mitchell

Page 40

1   are any number of factors that could come up

2   which might increase the risk of suicide in a

3   prison, would you agree, sir?

4        A     Yes, but also in the community.

5        Q     All right.  So when you are working

6   in a correctional facility with your vast three

7   and a half decade experience, it sounds like you

8   understood that correctional staff working under

9   you, and yourself included, had a responsibility

10  to do whatever you could to prevent people from

11  harming themselves; is that correct, sir?

12       A     Yes.

13       Q     Now, I understand that mental health

14  staff are the ones who ultimately make the

15  decision about what mental health measures are

16  appropriate.  Would you agree with that, sir?

17       A     Correct.

18       Q     But in terms of what goes on on the

19  housing areas, it is the officers who are

20  patrolling those areas; is that correct?

21       A     Yes, that is their duty.

22       Q     And the officer's job is in the event

23  of a risk of suicide for a prisoner is to carry

24  out whatever precautions have been directed by

25  supervisors or mental health staff; is that

Clifton Mitchell

Page 41

1   correct, sir?

2       A     Yes.

3       Q     And do I understand correctly that

4   the prison administration, including with

5   reference to the exhibit that we looked at a

6   short time ago, puts procedures in place that are

7   intended to make sure that officers do what is

8   necessary to prevent people from harming

9   themselves?

10      A     Yes.

11      Q     And you would expect correctional

12  officers to understand their obligations under

13  those policies; is that correct, sir?

14      A     Yes.

15      Q     And you would expect correctional

16  officers to follow all directives given to them

17  about how to carry out their responsibilities; is

18  that correct, sir?

19      A     Yes.

20      Q     And you would expect correctional

21  officers to do that without question; is that

22  correct, sir?

23      A     Well, again, the -- one of the things

24  in a paramilitary organization, you follow

25  procedure, but that doesn't mean you can't

SA000960

Clifton Mitchell

Page 42

1   question it afterwards.

2       Q      Fair enough.  But as an example, if

3   you told officers on a certain housing area, hey,

4   this guy is on regular watch, which means he has

5   got to be checked every 30 minutes, you wouldn't

6   expect officers to say no, I'm not doing that,

7   would you?

8       A      Correct.

9       Q      You would expect officers to do it,

10  and if they had a problem with it, they would

11  tell you about it afterwards; correct?

12      A      Correct.

13      Q      All right.  I just mentioned the

14  phrase regular watch.  Do you have a recollection

15  of the different levels of watches that were in

16  place or that were available in the correctional

17  facility back in 2018?

18      A      Historically, there has been a

19  regular watch, I think they call it an acute

20  watch, and then there was a suicide watch, I

21  think, as I recall.

22      Q      Okay.  So my question, just to be

23  clear, was not intended as a quiz to see what you

24  remember, really, I just want to establish that

25  there are different levels and it sounds like,

SA000961

Clifton Mitchell

Page 44

1              THE WITNESS:  I'm trying to remember.
2    BY MR. FEINBERG:
3        Q    Okay.  Well, would you agree, sir,
4    that it is not a question of the officer getting
5    around to the check whenever the officer can, the
6    officer has got to do the 30-minute check; right?
7        A    Yep.
8        Q    Okay.  In fact, actually, that is a
9    good point.  I want to bring up just a couple of
10   exhibits which address the responsibilities of
11   officers under these different protocols.  I'm
12   going to show you now Exhibit P-6.  Do you have
13   P-6 in front of you, sir?
14       A    Yes.
15       Q    Scrolling down to Page 2, and let's
16   do this, sir:  First, are you able to read the
17   text on your phone?
18       A    I'm enlarging it.
19       Q    Yeah.  Okay.  Could you do me a
20   favor, read the highlighted text to yourself and
21   let me know when you are finished.
22       A    Okay.
23       Q    So would you agree, sir, that what is
24   described for the level three watch is that there
25   should be six observations of a prisoner on this

SA000962

Clifton Mitchell

Page 45

1   watch status every hour?

2          A       Between the inmate minder and the

3   officer.

4          Q       Yes, that is -- in fact, I'll break

5   it down, sir.  The officers are required to see

6   the prisoner on a level three watch status once

7   every 30 minutes; correct?

8          A       Yes.

9          Q       So that is two per hour; correct?

10          A       Yes.

11          Q       And the inmate monitors are required

12   to see the prisoner on level three status every

13   15 minutes, so four per hour; is that correct?

14          A       Correct.

15                  MR. KOLANSKY:  Objection.  John,

16   would you establish, please, if you are going to

17   ask that question, I don't have an objection to

18   the overall question, but would you establish

19   that they see them at the same times as the

20   officers do as well or that they stagger them so

21   that they are on the ten and the 20 or -- because

22   you haven't established that.

23                  You say six times an hour, but it

24   could be that inmates or guards interpret it as

25   on the 15 and the 45, as opposed to every 15

SA000963

Clifton Mitchell

Page 46

1  minutes.  Could you just discuss that, please?

2  BY MR. FEINBERG:

3       Q     Mr. Mitchell, would you agree that

4  the person's cell, when they are on level three

5  status, that there will be six occasions with

6  someone looking into their cell to check on them

7  every hour?

8       A     Yes.

9       Q     All right.  With regard to the inmate

10 monitors, which we just looked at with Exhibit 6,

11 I'll show you one other exhibit.

12             This is previously marked as Exhibit

13 P-7, watch and observation procedures.  Do you

14 see Exhibit P-7 in front of you, sir?

15      A     Yes.

16      Q     I'm scrolling down to Page 5 and 6.

17 Let me just show you this highlighted text on the

18 bottom of page five.  This references inmate

19 monitor forms.  Do you see where my cursor is,

20 sir?

21      A     Yes.

22      Q     I'll scroll down now to the top of

23 Page 6, and read into the record the text next to

24 lowercase letter E, which states:  It is the

25 module officer's responsibility to assure that

SA000964

Clifton Mitchell

Page 47

1    inmate monitors are using IMFs, inmate monitor

2    forms correctly.

3              Sir, would you agree that that was a

4    well-understood duty for correctional officers

5    back in 2018?

6        A    Yes.

7        Q    So the responsibility of the inmate

8    monitor is to actually go to the cell and look

9    into it, would you agree; sir?

10       A    Yes and no.

11       Q    Why do you say that?

12       A    Because the inmate may not be in the

13   cell.

14       Q    Okay.  Fair point.  So the inmate

15   monitor has to get eyes on the inmate who is the

16   subject of the check; right?

17       A    Correct.

18       Q    All right.  And so the purpose of

19   these forms, sir, is, can we agree, to make sure

20   that the person who is on that regular watch

21   check, the level three set of checks, is safe and

22   alive; correct?

23       A    Yes.

24       Q    All right.  So obviously, if the

25   prisoner on level three status is walking around,

SA000965

Clifton Mitchell

Page 48

1    then that can be noted by the inmate monitor;

2    correct?

3         A    Yes.

4         Q    Okay.  Would you also agree, sir,

5    that it is the responsibility of the module

6    officer, meaning the officer working on the

7    housing block, to ensure that the inmate monitor

8    is doing his job?

9         A    Yes.

10        Q    So in other words, an inmate monitor

11   can't just -- strike that.  If, in a hypothetical

12   example, an inmate monitor was literally sitting

13   on his bed in his cell and just filling out the

14   form without checking on the prisoner who is the

15   subject of the watch, that would be completely

16   improper for the inmate monitor; correct?

17        A    Yes.

18        Q    And it would be the officer's

19   responsibility to make sure that the inmate

20   monitor was doing his job; is that correct?

21        A    Yes.

22        Q    So, sir, in your position as the

23   deputy warden back in August of 2018, if you

24   directed placement on level three status, that

25   meant you expected officers to do their checks no

SA000966

Clifton Mitchell

Page 49

1    more than every 30 minutes; is that correct?

2         A     Yes.

3         Q     And you directed that officers should

4    ensure that inmate monitors were doing their

5    checks at least once every 15 minutes; is that

6    correct?

7         A     Per the procedure.

8         Q     Yes.  Okay.  And the procedure which

9    we just described, which could be seeing the

10   person on the cell block or seeing the person in

11   their cell, et cetera, wherever the person could

12   be found; is that correct?

13        A     Yes.

14        Q     All right.  In other words, someone

15   has eyes on that prisoner six times every hour;

16   is that correct?

17        A     Yes.

18        Q     And when you order people who are

19   working under your supervision to do that, your

20   expectation is it is going to be done; is that

21   correct?

22        A     Yes.

23        Q     If it is not done, they are violating

24   your order; is that correct?

25        A     Violating policy.

SA000967

Clifton Mitchell

Page 50

1             MR. KOLANSKY:  Objection to the form.

2   BY MR. FEINBERG:

3       Q    Okay.  They are violating -- and that

4   was my next question.  If it is not done, they

5   are violating the policy; is that correct?

6       A    Yes.

7       Q    And as we discussed, the policy is

8   present to help -- or it's aimed at, as far as

9   you understand, preserving the safety of people

10  incarcerated in the facility; is that correct?

11      A    Yes.

12      Q    So if you violate the policy -- when

13  I say you, I am talking generally, so if officers

14  violate the policy, they are placing, at risk,

15  the safety of the person they are supposed to be

16  protecting; is that correct?

17            MR. KOLANSKY:  Objection.  Calls for

18  a conclusion.

19  BY MR. FEINBERG:

20      Q    You can answer, sir.

21      A    Yes.

22            MR. FEINBERG:  Okay.  Let's go off

23  the record.

24            (Break.)

25  BY MR. FEINBERG:

SA000968

Clifton Mitchell

Page 52

1      A      Problems -- you have to -- there is

2   two different issues, inmates versus officers.

3      Q      Okay.  Well, I think you told me

4   before that officers were responsible for inmate

5   monitors, so let me ask it that way.

6             Did anyone ever raise with you any

7   questions or any concerns about officer's

8   supervision of inmate monitors?

9      A      If there were problems with inmate

10  monitors, they were fired and other ones were

11  hired.

12     Q      Okay.  Meaning -- they, meaning the

13  inmate monitors; is that correct?

14     A      Meaning the officers would fire the

15  inmate monitors and hire new monitors to replace

16  them.

17     Q      Got it.  So if I understand you

18  correctly then the responsibility to supervise

19  inmate monitors and to determine whether they

20  were doing their jobs was a responsibility

21  carried out by officers; is that correct?

22     A      Correct.

23     Q      So the question that I intended to

24  ask, and I acknowledge that maybe it was poorly

25  phrased, was from your perspective, as an

SA000969

Clifton Mitchell

Page 55

1   that better than me.

2       Q     All right.  Well, let me ask you this

3   question:  Do you remember ever -- do you

4   remember any suicide which led to a conclusion

5   that an officer had not properly conducted the

6   cell checks that were required under relevant

7   policies?

8       A     No.

9       Q     Let me ask you some more specific

10  questions about Mr. Freitag.  I showed you, at

11  the beginning of the deposition, the e-mail that

12  Paul Lang sent to you and that you responded back

13  to him.

14            And in your e-mail to him, you

15  suggest that he should give you a call.  Can I

16  assume that you did, in fact, speak with Mr.

17  Lang?

18      A     Yes.

19      Q     What do you remember Mr. Lang telling

20  you, if anything?

21      A     As in the e-mail, he said he was

22  concerned about him and I said okay.

23      Q     Do you remember knowing anything

24  about Mr. Freitag's case, his criminal case that

25  is, at that point in time?

SA000970

Clifton Mitchell

Page 57

1   suicide attempts?

2        A     No.

3        Q     All right.  Can I assume from the

4   e-mail -- strike that.  Let me actually pull this

5   up.  This is the e-mail that Dr. Cassidy sent to

6   the mental health staff that's been previously

7   marked as Exhibit P-24.

8              Now, I understand that Dr. Cassidy is

9   reporting something that you said to her, and you

10  didn't write this e-mail, but Dr. Cassidy

11  reports, as highlighted here on Exhibit P-24,

12  Deputy Warden Mitchell wanted him, referring to

13  Mr. Freitag, seen because he is somewhat older,

14  is here on serious charges, aggravated assault

15  and has sentencing coming up.  Do you recall

16  saying any of those things to Dr. Cassidy?

17       A     I probably did.

18       Q     Okay.  So is it fair to say, sir,

19  that when -- based even on the limited knowledge

20  that you may have had concerning Mr. Freitag's

21  charges and his demographic factors, you had some

22  reason to be concerned about him?

23       A     I had concern because I had gotten

24  the call.

25       Q     Okay.  And once you get a concern

SA000971

Clifton Mitchell

Page 58

1  like that communicated to you, sir, is it your

2  default reaction to inform the mental health

3  staff?

4       A    It depends on where the call was

5  coming from initially and how much first-hand

6  knowledge I have, but ordinarily, I would

7  probably do the same thing.

8       Q    Okay.  In these circumstances,

9  someone told you there were concerns about mental

10 health, and can I assume, sir, you don't have

11 mental health training?

12      A    Well, just basic training.

13      Q    Okay, but you --

14      A    Not a doctor.

15      Q    You are not a clinician?  You can't

16 make a mental health diagnosis; right?

17      A    Yeah, I don't play one on Sunday.

18      Q    Okay.  All right.  So in that case,

19 sir, if there were questions about mental health

20 status, it is -- naturally, you would defer those

21 questions to the mental health staff; is that

22 correct?

23      A    Correct.

24      Q    And can I assume, given your

25 administrative responsibilities, that you had

SA000972

Clifton Mitchell

Page 63

1   case concerning a rather high-profile murder in

2   Bucks County; is that correct?

3       A    Correct.

4       Q    All right.  But Mr. Freitag didn't

5   stand out in any way like Mr. DiNardo; is that

6   correct?

7       A    No, sir.

8       Q    Am I correct --

9            MR. KOLANSKY:  Meaning yes, sir?  He

10  asked you if he is correct.  Is he correct?  You

11  said no, sir and he asked --

12           THE WITNESS:  Freitag didn't stand

13  out for me.

14           MR. KOLANSKY:  Did not.  Okay.

15  BY MR. FEINBERG:

16      Q    So am I correct in understanding that

17  the first communication you would have had about

18  Mr. Freitag's sentencing was in this e-mail from

19  Exhibit 1 that I have now in front of you from

20  Ara, A-R-A, Kimbrough, K-I-M-B-R-O-U-G-H?  Do you

21  see that, sir?

22      A    Yes.  Yes.

23      Q    All right.  So the --

24      A    Ara Kimbrough is -- he did, and I

25  think still is the records office supervisor.

SA000973

Clifton Mitchell

Page 64

1          Q      All right.  So you were -- so Mr.

2     Kimbrough sent that e-mail to you and also to

3     Assistant Warden Budd, B-U-D-D, noting received

4     six to 12 years for AA, meaning aggravated

5     assault, no misconducts or detainers.  Can we

6     agree that e-mail was sent at 3:52 p.m.; right?

7          A      Yes.

8          Q      It looks like then that you forwarded

9     the e-mail to, as we have already established,

10    the case manger staff; is that correct?

11         A      Yes.

12         Q      And it looks like you jumped on it

13    pretty quickly and just did it three minutes

14    later at 3:55 p.m.; is that correct?

15         A      Yes.

16         Q      The text reads, unlock, my sure he is

17    on a watch.  I think I have interpreted it, and I

18    want you to tell me if I am correct in that the

19    my was a typo?

20         A      Yes.

21         Q      What you intended to say was make

22    sure; correct?

23         A      Correct.

24         Q      All right.  All right.  So the

25    message that you communicated three minutes after

SA000974

Clifton Mitchell

Page 65

1   you received the first mail was unlock, make sure

2   he is on a watch?

3       A    Yes.

4       Q    What did you -- for someone who has

5   not -- has not worked in the Bucks County

6   Correctional Facility, what were you

7   communicating with that e-mail, sir?

8       A    The intent was for them to interview

9   and make a determination what level he should be

10  on.  I don't make those determinations, just to

11  make sure that he was on a watch.

12      Q    Okay.  Now, when you said unlock, do

13  I understand correctly that different levels of

14  watch have different provisions concerning

15  whether the cell is locked?

16      A    Yes, but in this case, he was already

17  unlocked.  That was -- you know, that was -- you

18  know, I didn't expect this to be litigated in

19  this manner.

20          As you can see, it is close to 4:00

21  and I'm ready to leave, and in my mind, I was

22  saying the guy is already unlocked, to make sure

23  that he is on a watch and to evaluate.

24          They know the process, to go through

25  and interview and make the determination of what

Clifton Mitchell

Page 66

1  level it should be on.

2      Q    Okay.  And it looks like Mr. Metellus

3  then is the one who made the decision level

4  three; is that correct, sir?

5      A    Yeah.

6      Q    And I see that you were not copied on

7  the e-mail here, but it was sent to Brianne

8  Morrow, who is another case manager; is that

9  correct?

10      A    Correct.

11      Q    All right.  And can I assume that --

12  well, strike that.  So you are saying, sir, that

13  you didn't know what level of watch he would be

14  placed on?

15      A    No.

16      Q    And your interpretation is that

17  unlock meant that that was his status now --

18      A    That was his current --

19      Q    -- that he be placed on --

20      A    That was his current status that I

21  was aware of.

22           (Court reporter interruption.)

23  BY MR. FEINBERG:

24      Q    I apologize.  I believe I may have

25  interrupted Mr. Mitchell, so let me try this

SA000976

Clifton Mitchell

Page 67

1   again.  Mr. Mitchell, bottom line is this:  You

2   wanted to make sure that Mr. Freitag was on some

3   level of watch; is that correct?

4        A    Yes.

5        Q    And if someone directed that Mr.

6   Freitag would be placed on a watch level, your

7   expectation is that officers were going to comply

8   with the directives of that watch level; is that

9   correct?

10       A    Correct.

11       Q    So if someone made the decision that

12  he should be placed on level three watch, you

13  would expect, as we have described, that officers

14  would see him within every 30 minutes; is that

15  correct?

16       A    Whatever the level called for.

17       Q    Okay.  And well, since we are dealing

18  with level three here, that is what you would

19  expect; is that correct?

20       A    Yes.

21       Q    And you would expect, with level

22  three, that inmate monitors would be seeing Mr.

23  Freitag every 15 minutes; is that correct?

24       A    Yes.

25       Q    Did you think there was anything else

SA000977

Clifton Mitchell

Page 68

1    you needed to do besides sending this e-mail?

2          A     No.

3          Q     And, sir, I'm not suggesting that,

4    I'm just asking.  Can I assume that as the deputy

5    warden, if you send a directive to people

6    reporting to you as their supervisor, that they

7    will do what you tell them; right?

8          A     Yes.

9          Q     All right.  Mr. Freitag's suicide was

10   the next morning, Saturday, August 25th.  How did

11   you hear about it?

12         A     You said it was Saturday?

13         Q     Correct.

14         A     I probably got a phone call.

15         Q     Okay.  Do you remember going into the

16   facility?  You have already told me that you were

17   on the block; is that right?

18         A     Yeah.  I think I was.

19         Q     I'll show you one document just to

20   refresh your recollection.  This is Exhibit 13,

21   report prepared by Mr. Bochenek, and the text

22   here reads, this investigator, meaning Mr.

23   Bochenek, Director Christopher Pirolli, Warden

24   Paul Lagana, Deputy Warden Cliff Mitchell,

25   Assistant Warden Lil Budd, CMHS Director Abbey

SA000978

Clifton Mitchell

1       Q       And my understanding then is that the

2    presumption was any time someone comes back from

3    court and they have got a state sentence, they

4    will be placed on a level two precaution.  Do you

5    recall discussion over that, sir?

6       A       Yes.

7       Q       Did you offer any opinions or any

8    thoughts as part of that conversation?

9       A       I agreed with it, but there were

10   other issues, aside from the mortality issues

11   versus the state commitments that I was concerned

12   with -- you know, with the records office and so

13   forth and so on.

14      Q       What were those issues that you were

15   concerned about, sir?

16      A       Well, again, you know, sometimes

17   there were mitigating circumstances with regard

18   to the sentence, the length of the sentence, the

19   individual who received the sentence, you know,

20   to -- I'll give you a candid example.

21      Q       Before you do that, sir, can I make

22   sure I understand what you are saying first?

23      A       Yes.

24      Q       Yeah.  My question for you is this:

25   First, it sounds like what you are describing,

Clifton Mitchell

Page 76

1    A    Yes.  From a general perspective with

2  regard to, again, the totality of the institution

3  and the occupants of the institution.

4    Q    Okay.  All right.  That is helpful

5  information to have, sir.  The question I

6  intended to ask you, and this was a good

7  digression though, but the question I intended to

8  ask was:  Did you have any other concerns about

9  the way Mr. Freitag's case was handled that were

10  raised in the mortality review?

11    A    Well, I guess the one issue was --

12  that I was concerned with was the HIPAA.

13    Q    How do you mean?

14    A    Not having all the information that

15  might have helped make a different decision one

16  way or the other about anything.  It wasn't just

17  him.

18        If you don't have all the information

19  at the time to make an intelligent decision on

20  any matters, it makes you handcuffed.  You are

21  kind of handcuffed.

22    Q    Oh, okay.  So are you referring to

23  the fact that the correctional staff who made the

24  decision to place Mr. Freitag on level three did

25  not have all the information about his background

Clifton Mitchell

Page 77

1    in their possession?

2        A      Well, I didn't.

3        Q      Right.  And --

4        A      And I was the one referring it to

5    them from the standpoint of, you know, you talked

6    about his mental health and the suicides.

7        Q      Right.  So you didn't.  And

8    obviously, we, as lawyers in this case, we have

9    access to all of the information, which you did

10   not have at that time.  So just to confirm, you

11   didn't know that he had two prior suicide

12   attempts; is that correct?

13       A      Correct.

14       Q      You did not know that one of his

15   suicide attempts was what, in fact, led to his

16   arrest, prosecution, conviction and

17   incarceration; is that correct?

18       A      Correct.

19              MR. KOLANSKY:  Objection to form.

20   BY MR. FEINBERG:

21       Q      You did not know that he had been

22   expressing, for weeks, anxiety about his

23   sentencing; is that correct?

24       A      No.

25       Q      You did not know anything about what

Clifton Mitchell

Page 78

1   his expectations were going into sentencing; is

2   that correct?

3       A     No.

4       Q     And you did not know, given your

5   answer to that last question, that a six to 12

6   year sentence for his crimes was utterly shocking

7   to Mr. Freitag?  You had no idea; is that

8   correct?

9       A     It may have been shocking to him, but

10  not to me.

11      Q     Okay.  Well, you were not in any

12  position to know how he would react because you

13  hadn't spoken to him; is that correct?

14      A     Correct.

15      Q     And can I assume that no one on the

16  correctional side had spoken to Mr. Freitag about

17  the mental health impact of his sentencing?

18      A     I don't know.

19      Q     Okay.  Now, my understanding, sir, is

20  that at that time in 2018, mental health staff

21  were not available in the facility when people

22  came back from court; is that correct, sir?

23      A     It depends on what time they came

24  back from court.

25      Q     Okay.  Well, I'll represent to you,

SA000982

Clifton Mitchell

Page 80

1    now and that is my question.

2    BY MR. FEINBERG:

3        Q    Mr. Mitchell, back in August of 2018,

4    do you know -- do you remember when mental health

5    staff left the facility?

6        A    I had no recall the records of their

7    attendance, attendance logs and so forth and so

8    on.  I don't know the specific answer to the

9    question.

10       Q    Can we assume though that if mental

11   health staff were in the facility when people

12   returned from custody, that instead of you asking

13   case managers, without mental health training, to

14   make these decisions, you would have done

15   something else, namely reaching out to mental

16   health staff?

17             MR. OSBORNE:  Object to the form.

18   BY MR. FEINBERG:

19       Q    Does that sound right, sir?

20       A    Generally, yes.

21       Q    Okay.  And, again, my question is not

22   aimed at quizzing you, I'm just trying to make a

23   logical conclusion here.

24             We went through a whole series of

25   questions about information that neither you, nor

Clifton Mitchell

Page 83

1   is some kind of monthly meeting between medical

2   and the director and so forth and so on and it

3   may have come out of that.

4        Q     Okay.  Would --

5             MR. KOLANSKY:  When counsel asks if

6   you recollect, that is a yes or no question.  It

7   is not a "it might have" come out of whatever.

8             THE WITNESS:  Okay.

9   BY MR. FEINBERG:

10       Q     Yeah.  And that is -- well, my next

11  question for you, sir, is would you attend those

12  monthly meetings?

13       A     No.  I have.

14       Q     All right.  So then the more specific

15  question is:  Do you remember being in attendance

16  at a meeting where this specific issue was

17  addressed?

18       A     No.

19       Q     All right.  Can we assume, sir, based

20  on your previous deposition testimony, that if

21  mental health staff were regularly in the

22  building until 5 or 5:30, in Mr. Freitag's

23  situation, you would have contacted mental health

24  staff once he got back to the building?

25            MR. KOLANSKY:  Objection.  Calls for

Clifton Mitchell

Page 84

1    speculation.

2    BY MR. FEINBERG:

3         Q     You can answer, sir.

4         A     Yes.

5         Q     I mean, that is completely consistent

6    with what you just said, right, that if there

7    were mental health concerns that you were not

8    prepared to address, given your base of

9    knowledge, they would naturally be the people to

10   address the issues; is that correct, sir?

11        A     Correct.

12        Q     All right.  One -- I asked you at the

13   beginning, sir, about the site visit -- strike

14   that.

15              In October of 2019, to confirm, you

16   had not a single contact with anyone in the

17   correctional facility following your retirement;

18   is that correct?

19        A     That is correct.

20        Q     Didn't speak to a single person who

21   worked there about things that were happening

22   there?

23        A     No.

24        Q     So you have no idea what may have

25   happened on any site visit by a mental health

SA000985

Clifton Mitchell

Page 86

1          A      No.

2          Q      All right.  Can we agree that the

3    text shows it is dated August 25, 2018, refers to

4    Charles Freitag, and it notes LVL, level three

5    mental health watch; is that correct, sir?

6          A      Yes.

7          Q      So can we agree that as of the

8    morning of August 25, 2018, Mr. Freitag -- strike

9    that.

10               As of the morning of August 25, 2018,

11   the module officers, bravo module, had been

12   alerted to the fact that Mr. Freitag was on a

13   level three watch; is that correct, sir?

14         A      Yes.

15         Q      All right.  The next document I want

16   to show you -- I assume you have not watched any

17   video from that morning about what happened on

18   that block?

19         A      No.

20         Q      All right.  I am showing you now

21   Exhibit 11, which is a report prepared by a

22   Daniel Onisick, O-N-I-S-I-C-K.  Do you know Mr.

23   Onisick?

24         A      Yes.

25         Q      Mr. Onisick, the second page of his

SA000986

Clifton Mitchell

Page 87

1   report, do you see here a timeline with bullet

2   points that I'm highlighting?

3        A    Yes.

4        Q    All right.  Would you agree that

5   there is a reference to a check of cell B3, where

6   Mr. Freitag was, at 10:21.  Do you see that, sir?

7        A    Yes.

8        Q    And do you see that the next thing

9   observed and -- strike that.  Before I go on, let

10  me know -- I'm saving you the time of reviewing

11  the entire document, that what is reported here

12  is the officer's watched surveillance video from

13  that unit and then made a time record of what

14  they observed.  Do you understand what I have

15  just described?

16       A    Yes.  Somebody watched the tape and

17  wrote down times.

18       Q    Okay.  Great.  We are on the same

19  page.  It looks like the next thing that happens

20  after the cell check on 10:21 is at 10:55, so 34

21  minutes and 11 seconds later, an inmate looked in

22  Mr. Freitag's cell and alerted correctional

23  officers to what happened.  Do you see that, sir?

24       A    Yes.

25       Q    Can we agree that that 34-minute

SA000987

Clifton Mitchell

Page 88

1   period is longer than what officers are required

2   to do on the level three watch?

3        A    Yes.

4        Q    All right.  Now, you told me before,

5   in no uncertain terms, that level three -- the

6   policies regarding level three watch are not just

7   like do your best?  It is a directive; right?

8        A    Yes.

9        Q    I want to show you some deposition

10  testimony from one of the officers working on

11  this block.  His name is James Young.  Do you

12  remember any interactions with Officer James

13  Young?

14       A    No.

15            MR. FEINBERG:  Bear with me for a

16  moment.  This will be Mr. Young's deposition

17  testimony for counsel's benefit on Page 78.  Sir,

18  I'm going to ask you to read --

19            MR. KOLANSKY:  Jon, enlarge that,

20  please.

21  BY MR. FEINBERG:

22       Q    Yeah.  Let's do this, let's see -- I

23  want to make sure I am in the right place.  Sir,

24  I'm going to ask you read the highlighted text

25  here.  Let me know when you are finished, and I

Clifton Mitchell

Page 89

1    will move it over to the next page.

2              And before you do that, sir, let me

3    note, so this is my questions of Mr. Young and

4    Mr. Young giving me answers.  The A is his answer

5    and the Q is my question.

6        A     I'm familiar with them, familiar with

7    pages like this.

8        Q     Okay.  All right.  Fair enough.  Have

9    you read the text that I highlighted?

10       A     Yes.

11       Q     All right.  I'll scroll over to the

12   next page, and I'll ask you to read down to here.

13       A     Okay.

14       Q     All right.  So would you agree --

15   obviously, the document speaks for itself, but in

16   sum and substance, would you agree Officer Young

17   says, it is perfectly fine to do the level three

18   watch by waiting 34 minutes between checks.  That

19   is what he says; right?

20       A     On the column previous where it says

21   the spirit of the policy, that is not the policy.

22       Q     All right.  Yeah.  So would you agree

23   that he didn't comply with the policy; is that

24   right?

25              MR. KOLANSKY:  Objection to the form.

Clifton Mitchell

Page 90

1    BY MR. FEINBERG:

2          Q     Is that correct, sir?

3          A     Not in my view.

4          Q     All right.  Did you -- in fact, let

5    me -- I do want to show you some video, sir.

6    What I'll be showing -- and, again, just to

7    confirm, sir, you told me you have not seen any

8    of this video; is that correct?

9          A     No.

10         Q     All right.

11         A     Not that I recall.

12         Q     All right.  I'm putting up on the

13   screen now -- for counsel's benefit, this is the

14   portion of the video of the B module from August

15   25, 2018 starting at 10:13 a.m.

16               I'm scrolling forward to seven

17   minutes and 29 seconds.  So, sir, I'm moving my

18   cursor in front of what I believe to be cell

19   three where Mr. Freitag was housed.  Do you see

20   where I am doing that, sir?

21         A     Yeah.  okay.  It's by the stairwell.

22         Q     Yeah.  Okay.  So I'm going to hit

23   play, and in the next ten seconds, you will see

24   an officer conduct a check in that cell.

25               All right.  I'll stop it there at

SA000990

Clifton Mitchell

Page 91

1   7:37.  Would you agree that it looks like an

2   officer looked into Mr. Freitag's cell.  That is

3   obvious; right?

4        A    Yes.

5        Q    My understanding is that that is

6   Officer Murphy, who I believe is still here with

7   us, and we will get his testimony later, and my

8   understanding is that this also -- if you add --

9   we are seven minutes and 37 seconds in from a

10  video that started at 10:13 a.m., we are right at

11  10:21 a.m.; okay?  Do you agree with me, sir?

12       A    Yes, appears so.

13       Q    All right.  So I want to fast forward

14  all the way to 10:56 at 41 seconds in -- pardon

15  me, 41 -- we will start at 41:35.

16            I'll ask you to watch that same

17  location, cell three, and I will represent to you

18  that because we are 41 minutes in from a video

19  that started at 10:13, we are at that 10:55 --

20  10:54, 10:55.

21            You see there is a prisoner walking

22  towards Mr. Freitag's cell, he looks in, and then

23  it looks like he says something to the officers

24  at the booth.  Would you agree with me, sir?

25       A    Yes.

Clifton Mitchell

Page 92

1      Q      All right.  I'll represent to you

2   with that testimony from Officer Moody and

3   Officer Young, that this is when Mr. Freitag was

4   discovered.

5               The person in white, who was Mr.

6   Monachelli made the -- alerted to them of what

7   was happening at 10:55, 34 minutes after the last

8   check.  Do you understand everything I have laid

9   out so far, sir?

10      A      Yes.

11      Q      All right.  Do you have any idea what

12   the officers were doing in that time period?

13   Since you watched the video, I assume the answer

14   is no.  Can we agree on that, sir?

15      A      Yes.

16      Q      All right.  I want to go back to the

17   beginning where we watched -- we were seven and a

18   half minutes in.  I'm actually right at the

19   moment there.  We are at 7:43 with Officer Murphy

20   standing by the door.

21               Do you see here where I am pointing

22   my cursor, there is someone sitting at the

23   podium?

24      A      Yes, stand --

25      Q      That person --  I am sorry, say that

Clifton Mitchell

Page 93

1   again, please.

2        A      Standing, I guess.

3        Q      Yeah.  Okay.  Yeah.  He is present at

4   the podium.  My understanding --

5               MR. KOLANSKY:  For the record, on the

6   inside of the podium.

7               MR. FEINBERG:  I'm sorry?

8               MR. KOLANSKY:  For the record, on the

9   inside of the podium; correct?

10              MR. FEINBERG:  Yeah.  Sure.

11              MR. KOLANSKY:  Okay.

12  BY MR. FEINBERG:

13       Q     So that is Mr. Young, Correctional

14  Officer Young.  He identified himself as the

15  person wearing the hat.

16              I'm going to play this on fast

17  forward at -- I think we can do 30 times the

18  speed, and I'll ask you just to focus on that

19  podium and just keep an eye on Officer Young.  At

20  11:29, so four minutes have gone by, he walked

21  out.  Would you agree?

22       A      Yeah.  I don't see him there.

23       Q      Yeah.  Okay.  See there he is.  I

24  backed it up.  We are now at 11:16.  He is

25  walking off the block.  Would you agree?

SA000993

Clifton Mitchell

Page 94

1       A     No.

2       Q     Oh, can you tell where he is going?

3       A     It appears as if he is walking

4    towards the alcove door to the yard.

5       Q     Got it.  Okay.  So I'll fast forward,

6    he come back pretty shortly.  There is another

7    officer on the block there at 12:29.  All right.

8    At 15:35, Mr. Young is back.  So would you agree

9    he has been gone for four minutes, give or take?

10      A     Yes.

11      Q     All right.  Now, I'll represent to

12   you, sir, my -- and I'll play this on fast action

13   here, at 30 times the speed, that Mr. Young sits

14   at that booth from all the way up to the time

15   that Mr. Freitag is discovered.

16            I'll ask you to keep your eye on that

17   booth.  My question will be, do you agree that he

18   is basically sitting there the entire time?

19            MR. KOLANSKY:  Standing.

20   BY MR. FEINBERG:

21      Q     Well, all right.  Sitting -- he is

22   present there for the entire time?  Agreed, sir?

23   Well, that will be my question.

24      A     It appears so, and other people

25   standing behind it also.

SA000994

Clifton Mitchell

Page 95

1      Q    All right.  We have gotten to the
2  point 41 minutes in where Mr. Freitag is
3  discovered.
4           Did you agree with what I
5  represented, that other than the four minutes or
6  so where Mr. Young left the podium, he was there
7  for that entire 34-minute period sitting or
8  standing behind the podium?
9      A    Appears so.
10     Q    Yeah.  Do you know of any reason or
11  did you see any reason why Officer Young would
12  not have been able to check in Mr. Freitag's cell
13  in that time period?
14     A    I don't know.
15     Q    Do you know of any reason why Officer
16  Young did not comply with the level three watch
17  as you have described was required?
18           MR. KOLANSKY:  Objection to the form
19  of the question.
20  BY MR. FEINBERG:
21     Q    You can answer.
22     A    I don't know.
23     Q    All right.  Do you know whether --
24  you told me before that no one asked you
25  questions about this before, and you really had

Clifton Mitchell

Page 96

1   no idea about whether checks were taking place.

2   Did I understand your previous testimony

3   correctly?

4         A     Can you rephrase that question?

5         Q     Yeah.  Sure.  Let me say it a

6   different way.  Can we just agree, sir, that

7   there -- this is a clear example of Officer Young

8   not complying with his responsibilities under the

9   suicide watch protocol?

10              MR. KOLANSKY:  Objection.

11              THE WITNESS:  Yes.

12  BY MR. FEINBERG:

13        Q     You can answer.

14        A     It appears so.

15        Q     All right.  Which is something

16  obviously that, as you said, would violate rules,

17  that to your understanding, are intended to

18  protect people in the facility; is that correct?

19        A     Yes.

20        Q     All right.  I'm going to go back to

21  the document that I showed you before, the inmate

22  monitor form.  I'm sorry I don't have it in front

23  of you.  This is Exhibit 9.

24              Are these documents things that you

25  would look at with any regular basis during your

Clifton Mitchell

Page 97

1    time there, sir?

2         A     Just while touring.

3         Q     Okay.  Then in that case, let me take

4    20 seconds just to explain.  There are

5    abbreviations that are written all down the form

6    there, and based on the previous testimony, our

7    understanding is that every notation from Mr.

8    Freitag on this document said that he was L, in

9    his cell and F, sleeping.  Do you see that, sir?

10        A     Yes.

11        Q     All right.  So now I'm showing you

12   the morning -- so I have scrolled over to the

13   second page.  And do you see here from 8:00 down,

14   all the way through 10:45, every reference says

15   LF, Mr. Freitag in his cell sleeping; is that

16   correct?

17        A     Yep.

18        Q     We also see the inmate monitor's

19   initials HC, and we know from previous testimony

20   that that refers to a person named Hugh Caldwell.

21              I don't expect you to know him, but I

22   just mention his name because I'm going to ask

23   you more about him later.  Do you understand what

24   I have described so far for this form, sir?

25        A     Yes.

SA000997

Clifton Mitchell

Page 98

1      Q     All right.  I'm going to ask you

2   specifically about 9:15.  There is a reference

3   there that says Mr. Freitag is in his cell

4   sleeping.  Do you see that, sir?

5      A     Hold on a minute.

6      Q     Sorry.  Let me go back.

7      A     Yeah.  You got it highlighted there.

8      Q     I spoke over you, and I am sorry.

9   You see that; is that correct?

10      A     Yes.

11      Q     All right.  I am going to pull

12   another video out.  This is a video from 8:13

13   a.m.  For counsel's benefit, this is Bates

14   stamped 460.  All right, sir.

15          So this starts at 8:13 a.m, and I'm

16   going all the way forward to about 59 minutes in,

17   58:44.

18          Do you see the man in the uniform?

19   He is white and he appears to have light gray

20   hair.  Do you see --

21      A     I see the cursor.  I see the cursor.

22      Q     Okay.  That is Mr. Freitag, I'll

23   represent that to you.  And I'm going to play

24   this here, so we know -- I'm sorry.

25          By the way we are starting 8:13 a.m.,

SA000998

Clifton Mitchell

Page 99

1   58 minutes in, that means we are at 9:11 or 9:12

2   a.m. that morning.  Do you understand what I have

3   outlined, sir?

4        A     Yeah.  You see -- you are basically

5   saying he is walking there at 9:15 --

6        Q     Right.

7        A     -- but he is supposed to be laying on

8   the bed.

9        Q     Yeah.  So I'll just play this through

10  on quick action here again, 30 times the speed.

11  The video ends, and just for the sake of

12  completeness, I'll show you the beginning of the

13  next video at 9:13 a.m.

14             For counsel's benefit, this is Bates

15  stamped 441.  I got the wrong one.  Sorry.

16  Sorry.  I keep doing the wrong one.  Let me get

17  rid of that.  There it is.  All right, sir.

18             So now we are starting at 9:13 and

19  there is Freitag again.  I'll fast forward.  I've

20  gone two minutes and 20 seconds in, so we are now

21  at 9:17 or 9:18.  Did you see him walk into his

22  cell?

23        A     Yeah.  He went -- that was the med

24  cart.

25        Q     Yeah.  Okay.  So what you saw was Mr.

SA000999

Clifton Mitchell

Page 100

1   Freitag waiting in line for medications at 9:15

2   a.m.; is that correct?

3          A     Yes.

4          Q     So can we agree, perhaps this is

5   obvious, but let's put it on the record, that

6   this statement that Mr. Freitag was sleeping in

7   his cell at 9:15 a.m. is false?

8          A     Yes.

9          Q     All right.  I'm going to spare you

10  the time of watching the entire video again to

11  show you that there were no apparent inmate

12  monitor observations of Mr. Freitag in his cell.

13                Instead, I will show you Exhibit 10

14  and just allow you to read the text.  Exhibit 10,

15  for your reference, is Mr. Bochenek's report from

16  October of 2019, so 14 months later, and do you

17  see where my cursor is in the middle of this page

18  and I've highlighted some text?

19         A     Yes.

20         Q     Could you please read that

21  highlighted text to yourself and let me know when

22  you are finished?

23                And let me also note, before you do

24  that, sir, there is a long black line through

25  this document.

SA001000

Clifton Mitchell

Page 101

1        A      Yeah.

2        Q      I don't know what that is.  That is

3    how this was presented to me.  So I will ask you

4    to do your best to read around that and let me

5    know when you finished reading this highlighted

6    text.

7        A      Okay.

8        Q      So the one sentence I'll highlight

9    for you, sir, is in reviewing the video, there

10   was no inmate monitor observed checking on the

11   inmate.  Do you see that, sir?

12       A      Yes.

13       Q      So can we agree, going back to

14   Exhibit 9, that all of these references from the

15   inmate monitor, Mr. Caldwell, purporting to show

16   that Mr. Freitag was sleeping in his cell are

17   false statements?

18              MR. KOLANSKY:  Objection to the form.

19   You can answer.

20   BY MR. FEINBERG:

21       Q      Would you agree, sir?

22       A      Yeah.  It appears that way.

23       Q      Okay.  The last point on this, sir.

24   I showed -- everything that I have just shown

25   you, I showed to Officer Young, and I asked him

SA001001

Clifton Mitchell

Page 102

1   whether he had done his job of supervising the

2   inmate monitor properly.

3              And I'm going to ask you to read his

4   deposition testimony, and then ultimately, I'm

5   going to ask you whether you agree with his

6   assessment.

7              I'm going to ask you to read -- it is

8   a few pages, but I think it will go quickly.

9   Let's start at Page 105, Line 10.  I'll highlight

10  this text.

11             Please read that page, let me know

12  when you are finished, I'll move to the next

13  page.

14      A     I don't have anything on my screen.

15      Q     Oh, I'm sorry.  There.  Do you have

16  it now?

17      A     Yeah.

18      Q     Okay.  Go ahead.  Read that text, let

19  me know when you are done.

20      A     Does that end with the actual making

21  on that side?

22      Q     No.  I am going -- that is why I have

23  highlighted.  Now I'm asking you to read --

24  because I have to scroll over, sir, so I'm going

25  to -- are you able to see that text?  Is that

Clifton Mitchell

Page 103

1    large enough?

2        A    I'm trying.

3        Q    How about now?

4        A    Yeah.  I'm good.  I'm good.

5        Q    Okay.  So read that page, please.

6        A    Okay.

7        Q    Let's read Page 106 now.  Oh, yeah,

8    107, I apologize.

9        A    Okay.

10       Q    Now I'm showing you just the first

11   part of 108.  I'll highlight what I'm asking you

12   to look at.

13       A    Okay.

14       Q    Obviously, from this testimony, Mr.

15   Young had no idea whether Mr. Caldwell, the

16   inmate monitor, was looking in Mr. Freitag's

17   cell; agreed?

18       A    Yes.

19       Q    Mr. Young also -- pardon me.  Bear

20   with me for one second.  Well, let me ask it this

21   way:  Did Officer Young do his job in compliance

22   with the level three directive, sir?

23            MR. KOLANSKY:  Objection.

24            THE WITNESS:  Doesn't appear so.

25   BY MR. FEINBERG:

SA001003

Clifton Mitchell

Page 104

1      Q     All right.  In fact, this appears

2   like this is a serious violation of the

3   directive, would you agree?

4            MR. KOLANSKY:  Objection.  Calls for

5   a conclusion.

6   BY MR. FEINBERG:

7      Q     You can answer.

8      A     It appears so.

9      Q     Can I assume -- well, I'll represent

10  to you, sir, that when I asked Mr. Young about

11  these issues on -- whenever we did this

12  deposition, it was in late December, this was the

13  first time anyone had raised these questions with

14  him.

15           Do you know whether anyone asked

16  questions about what happened following Mr.

17  Freitag's suicide concerning whether officers

18  complied with their responsibilities?

19     A     I can't assume.

20     Q     Okay.  So you don't know; is that

21  right?

22     A     I don't know for a fact.

23     Q     All right.  I'll show you one more

24  exhibit, sir.  This will be the last document I

25  show you.  Exhibit 27, this is a newly marked

SA001004

Clifton Mitchell

Page 108

1   showed you, you saw -- you heard Officer Young's

2   testimony about his understanding and his

3   obligations, you saw the inmate monitor form

4   purporting to show observations which never

5   happened, and you read Mr. Caldwell's statement,

6   what would you do?

7            MR. KOLANSKY:  Calls for speculation.

8   Objection.

9   BY MR. FEINBERG:

10       Q     And let me note that objection.  Mr.

11   Mitchell, you worked for the prison for 35 and a

12   half years.  You put in your time.  You put in

13   your service.  You strike me as a person who

14   understood how to supervise.

15            My question is:  If you learned this

16   information back then, based on all of that, what

17   would you have done?

18            MR. KOLANSKY:  Same objection.

19            THE WITNESS:  Can I answer now?

20   BY MR. FEINBERG:

21       Q     Please.

22       A     Well, obviously, there would have to

23   be an evaluation of the information in the video

24   as seen, but definitely, there would have to be

25   an intensive effort to retrain and follow up to

SA001005

Clifton Mitchell

Page 110

1   one presented facts like these to you during your

2   time there as deputy warden; is that correct?

3        A     No, sir.

4              MR. FEINBERG:  Let's go off the

5   record for just a moment.

6              (Break.)

7   BY MR. FEINBERG:

8        Q     Okay.  Mr. Mitchell, we are back on

9   the record after a short break.  Did you realize

10  during that break that any of your previous

11  testimony was incorrect or incomplete?

12       A     No, sir.

13       Q     All right.  Just a couple of very --

14  of questions to wrap up.  First, given everything

15  that we discussed, sir, concerning compliance

16  with directives under the level three watch, do

17  you have any regrets about the way the county or

18  its officers handled this situation concerning

19  Mr. Freitag?

20       A     That it was unfortunate.

21       Q     Okay.  When you say that was, what is

22  the that you are referring to?

23       A     No, I said it was unfortunate.

24       Q     All right.  Unfortunate in the way

25  that the officers conducted themselves complying

SA001006

Clifton Mitchell

Page 111

1    with the level three watch, is that what you are

2    saying?

3              MR. KOLANSKY:  Objection.

4    BY MR. FEINBERG:

5         Q    Is that a yes?

6         A    Yes.

7         Q    Yeah.  And not only the officers, but

8    in terms of the officer's supervision of the

9    inmate monitors; is that correct, sir?

10        A    Yes.

11        Q    All right.  So that covers it from my

12   questions.  I've noted that throughout the

13   deposition, you appear to have been taking notes;

14   is that correct, sir?

15        A    That is what I do.

16        Q    Yeah.  Okay.  And that's -- it's not

17   a critique.  Notes taken during the course of a

18   deposition are discoverable information, so I'm

19   going to ask you on the record to save those

20   notes, provide them to your counsel, Mr.

21   Kolansky, and I'll discuss with Mr. Kolansky how

22   to handle those notes.  Understood, sir?

23        A    Yeah.  Sure.

24        Q    All right.

25        A    A lot of doodling on them.

SA001007