# Exhibit 21 Supplement
# Metellus Deposition

SA001008

Carl Metellus

Pages: 16, 17, 18, 41, 42, 50, 51, 52, 53, 54, 55, 57, 58, 59, 60, 63, 66

Dated: December 22, 2020

SA001009

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES JOSEPH FREITAG,      :
JR.,as ADMINISTRATOR of      :
the ESTATE OF CHARLES        :
JOSEPH FREITAG, SR.,         :
               Plaintiff     :
                             :   No. 2:19-cv-05750-JMG
      VS                     :
                             :
BUCKS COUNTY; PRIMECARE      :
MEDICAL, INC.; STEPHAN       :
BRAUTIGAM, PMHNP;            :
JESSICA MAHONEY, PSY.D;      :
AVIA JAMES, LPC;             :
CHRISTINA PENGE, LPC;        :
JOHN DOES 1-10,              :
               Defendants    :

_____
_____


ZOOM DEPOSITION OF CARL METELLUS


DATE AND TIME:  December 22, 2020, 11:31 a.m.


_____
_____


KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT

230 SOUTH BROAD STREET, SUITE 1303

PHILADELPHIA, PENNSYLVANIA 19102

(215) 922-7112 1-877-KLW-DEPO

www.klwreporters.com

Carl Metellus

Page 16

1     Q.    When you heard about the suicide, did

2  you recall having received and sent an e-mail about

3  that same person?

4     A.    I want to say by the time I heard of

5  the suicide or at the very moment I heard it was a

6  suicide, maybe the name wasn't attached, so maybe I

7  didn't have no recollection that it was the same

8  person I had to put an alert on until I came into

9  work and, you know, put the pieces together.

10     Q.    Okay.  And that was on the -- well,

11  we're assuming the Monday that followed the

12  suicide; is that correct?

13     A.    Yes.

14     Q.    All right.  At any point, did anyone

15  come ask you questions?

16         By anyone, anyone from the county, any

17  of the correctional facility investigators, any of

18  them come ask you questions about your knowledge of

19  Mr. Freitag and his situation prior to his suicide?

20     A.    Prior to his suicide, you're asking?

21     Q.    No.  I asked a long question.

22         In the wake of his death, did anyone,

23  any of the investigators come ask you questions

24  about what you knew?

25     A.    Yes, after -- after his death, I

SA001011

Carl Metellus

1   believe I was questioned by Frank Bochenek, the

2   lead investigator.

3          Q.     When did that happen?

4          A.     Where?  I'm sorry.

5          Q.     Yeah.  When did that happen?

6          A.     I could not tell you for a fact.

7          Q.     What specifically did Mr. Bochenek ask

8   you about?

9          A.     I believe he asked me about my e-mail.

10                Or let me rephrase that.  I believe he

11  asked me if I put the alerts on OMS and, you know,

12  what steps I took after putting the alert in.

13         Q.     Okay.  We'll come back and talk about

14  that a little bit more later, but before I do that,

15  let me note that I think you're referring to an

16  investigation or additional investigation that

17  Mr. Bochenek conducted in October of 2019, about 14

18  months after Mr. Freitag's suicide.  And you'll

19  correct me if I am wrong once we get into these

20  documents.

21                I mention that now, though, to ask does

22  that timeframe sound right to you, that

23  Mr. Freitag's suicide occurred October of 2018,

24  then there was a gap of time before Mr. Bochenek

25  came and asked you those questions?

Carl Metellus

Page 18

1      A.      Can you repeat the question?

2      Q.      Sure.  Do you remember a long period of

3  time passing between the suicide and when

4  Mr. Bochenek came and asked you questions about the

5  watch?

6      A.      I believe when he asked me to forward

7  him the e-mail, yes, some time had passed.

8      Q.      Okay.  And, in fact, we don't have

9  the -- well, I'll put the exhibit back up in front

10  of you.

11              Showing you P-1 again, and I'm

12  highlighting for you a date, Wednesday, October

13  23rd, 2019, it looks like you forwarded this e-mail

14  chain to Mr. Bochenek; is that right?

15      A.      Correct.

16      Q.      All right.  So is it your assumption

17  then that you would have had a conversation with

18  Mr. Bochenek about these matters at some point in

19  that timeframe?

20      A.      Yes.

21      Q.      Okay, thank you.

22              Since that time, since you spoke to

23  Mr. Bochenek in October of 2019, have you had

24  occasion to speak to anybody about Mr. Freitag --

25      A.      No.

Carl Metellus

Page 41

1  manager supervisor, did you have documents like

2  this available to you, either electronically or in

3  a binder somewhere?

4      A.     Yes.

5      Q.     All right.  Let's see.

6             There's some text that's highlighted

7  here in the middle of the page.  I'm running my

8  curser over it now.

9             Do you see that, sir?

10      A.     Yes, I do.

11      Q.     The text that I'll read into the record

12  is as follows:  Suicidal behavior is more likely at

13  critical periods of time, including commitment,

14  which I assume is the first admission to the

15  facility, right?

16      A.     Yes.

17      Q.     It continues, and the first several

18  days thereafter, court hearings, sentencing, new

19  criminal charges, after adjudication, and the

20  sentence continues.

21             I take it, are these principles

22  familiar to you, sir?

23      A.     Yes.

24      Q.     Something like this happens, you're

25  newly admitted to the jail, you have a hearing, you

Carl Metellus

Page 42

1   have a sentencing, the risk for suicide is, in

2   general, more likely to be present; is that

3   correct?

4          A.     Yes.

5          Q.     So my question is, now with this

6   principle in mind, are there any procedures in

7   place that you're aware of to specifically address

8   the increased risk of suicide after a sentencing?

9          A.     I believe that's why that e-mail was

10  generated, to notify the administrators that this

11  offender received a six to 12-year sentence.

12         Q.     Okay.  So, again, that's helpful, to my

13  understanding.

14                Would it be accurate then to say that

15  this is an ad hoc procedure, meaning that it's

16  decided on a case-by-case basis how these decisions

17  get made?

18         A.     Yes.

19         Q.     Okay.  Let me show you one other

20  document.  It's gonna take me a minute to put this

21  in front of you.

22                This will be Exhibit P-16.

23                All right.  Do you see a document in

24  front of you that says PrimeCare Medical,

25  Incorporated mortality review?

SA001015

Carl Metellus

Page 50

```
1        A.      Yes.

2        Q.      Who is John Valiant?

3        A.      Case manager.

4        Q.      Okay.  And who is Breanne Morrow?

5        A.      Case manager.

6        Q.      Do you have any idea why the two of

7   them were on that e-mail?

8        A.      I know why Morrow -- Morrow is on the

9   e-mail because she is the 4:00 to 12:00 case

10  manager in reception port.

11       Q.      I see.  So she would have been working

12  at that time; is that right?

13       A.      She would have just been coming in,

14  correct.

15       Q.      Okay.  And how about Valiant, do you

16  have any idea why he was on the e-mail?

17       A.      I don't remember.

18       Q.      Okay.

19       A.      I didn't send the e-mail, but I don't

20  remember why his name was on it.

21       Q.      I see.  All right.  So deputy warden's

22  e-mail says, unlock, my sure he's on a watch.

23               Maybe there's a typo there, but why

24  don't you tell me how you understood that e-mail

25  when you received it?
```

SA001016

Carl Metellus

Page 51

1        A.      The way I received it was, unlocked, he

2    would not be placed on any administrative lock, and

3    to make sure he is on an observation watch.

4        Q.      Okay.  What does it mean to be unlocked

5    versus locked?

6        A.      It means if you're locked, then you

7    would be restricted.

8        Q.      I apologize, sorry.  I missed that.

9    Could you repeat that?

10       A.      If they were locked, they'd be

11   restricted.

12       Q.      Okay.  Is -- when we're talking about

13   levels of suicide precautions, is there a

14   difference between unlocked status versus locked

15   status, if you know?

16       A.      Yes.

17       Q.      Okay.  Describe that to me.

18       A.      If they were on a Level 2 or Level 1

19   suicide watch, they would be restricted.  They

20   would be locked.

21       Q.      Okay.  Meaning when the -- when

22   prisoners have access to the day room in their

23   housing area, that person is locked in their cell;

24   is that correct?

25       A.      Correct.

Carl Metellus

Page 52

1      Q.      Would people who are on locked status

2   be moved to a specific unit within the prison?

3      A.      It depends what -- what locked status

4   they were going onto.

5      Q.      Okay.  Well, and what I'm getting at

6   with that question is, let's say you're put on

7   Level 2 and you're in one of the regular, general

8   population housing units.

9      A.      I'm sorry.  I cut you off.  There's

10  construction going on behind me, and I cannot hear

11  you at all.

12     Q.      Okay, sure.  Can you hear now, sir?

13     A.      Yes, I'm sorry.

14     Q.      Okay.  Let me try that question again.

15              If you're being placed on Level 2

16  status and you're in a cell in a general population

17  housing area, first, Level 2 would mean you're

18  going to be locked in your cell; is that correct?

19     A.      Correct.

20     Q.      Would you be moved to a different

21  housing area?

22     A.      It depends.

23     Q.      Okay.  What does it depend on?

24     A.      It depends on what housing unit you are

25  on at the time and whether there was availability

Carl Metellus

Page 53

1    on another housing unit.

2         Q.     Okay.  And what factors about the

3    housing unit would impact the need to move, if any?

4         A.     Well, if the offender was already on

5    the housing unit that could accommodate a Level 2,

6    then they would remain.

7         Q.     Okay.

8         A.     If they -- yeah, exactly.

9         Q.     And what is it about the housing area

10   that would be necessary to accommodate a Level 2?

11        A.     In a perfect world, you would have them

12   in a single cell that is just for one offender, but

13   if space is not available so as to house that

14   person in a single cell, then they'd remain in a

15   double cell at times.

16        Q.     Okay.  All right.  Now, so that's the

17   phrase that Mr. Mitchell or Deputy Warden Mitchell

18   used, unlock.

19             When he said make sure he's on a watch,

20   how did you interpret that?

21        A.     Well, he said my sure he's on a watch.

22        Q.     Right.

23        A.     But I interpreted it as make sure he's

24   on a watch.

25        Q.     Got it.  And that was -- that's your

SA001019

Carl Metellus

Page 54

1    interpretation of what he said.

2              You're interpreting "my" as a typo and

3    that he meant to say "make;" is that correct?

4         A.    Correct.

5         Q.    All right.  When -- so assuming that

6    Deputy Mitchell -- Warden Mitchell said, make sure

7    he's on a watch, what did that mean to you in terms

8    of level of watch?

9         A.    Make sure he is at a minimum of a Level

10   3 regular watch mental health.

11        Q.    Okay.  Now, Deputy Warden Mitchell did

12   not say Level 3.

13             Did you draw that conclusion based on

14   your understanding of the procedures that were

15   available?

16        A.    I drew that conclusion because it said

17   unlock.

18        Q.    Got it, thank you.  Okay.  So unlock

19   and on a watch means it can't be Level 2 because

20   Level 2 would be locked; is that correct?

21        A.    Correct.

22        Q.    All right, thank you.  Do you have any

23   idea how Deputy Warden Mitchell made the decision

24   that this was the level of precaution that should

25   be instituted?

SA001020

Carl Metellus

Page 55

1        A.      No, I do not.

2        Q.      Okay.  Did you ever talk to him about

3    that?  And when I say ever, I'm talking about at

4    any time on August 24th or anytime from August 24th

5    until today?

6        A.      No, I did not.

7        Q.      All right.  And I take it if the deputy

8    warden gives you a directive, you follow his

9    directive; is that right?

10       A.      Correct.

11       Q.      Got it.  Now, you don't report directly

12   to him.  Instead, you report to Assistant Warden

13   Budd.

14               But in the hierarchy, Deputy Warden

15   Mitchell is in a position to give you a directive;

16   is that correct?

17       A.      Correct.

18       Q.      Did you have any reason at that time to

19   question the level of watch that Deputy Warden

20   Mitchell instructed you to place?

21       A.      No.

22       Q.      Thank you, sir.  All right.  Now, so

23   you got that e-mail from him or I assume up got

24   that e-mail sometime between 3:55 and 4:11, and

25   then I have highlighted the text that you described

Carl Metellus

Page 56

1    the actions you took here in your e-mail.

2              Do you see what I've highlighted?

3         A.    Yes, sir.

4         Q.    All right.  Let's make sure we

5    understand what you've said.

6              What does it mean to say that you maxed

7    him, m-a-x-e-d?

8         A.    Changed his custody level.

9         Q.    Okay.  And tell me more about that.

10   What -- what does that mean -- what is his custody

11   level?

12        A.    His custody level at the time, I

13   believe, was a medium custody.

14             He was changed to max custody A due to

15   the state sentence.

16        Q.    Okay.  Max custody, what was the phrase

17   you used after max custody?

18        A.    I'm sorry.  A is how it's noted in the

19   OMS system.

20        Q.    Okay.  Letter A, the capital --

21        A.    Letter A is correct.

22        Q.    Okay.  What does that mean in terms of

23   Mr. Freitag's experience in the prison or his

24   housing area?

25        A.    Explain to me, what does what mean?

SA001022

Carl Metellus

Page 57

1    Q.    Sure.  Well, let me ask it this way:

2    So my understanding from having taken however many

3    depositions of prison officials concerning

4    classification is your security classification will

5    affect what privileges you have access to, will

6    affect where you can be housed, will affect, you

7    know, visitation hours and so on.

8         Can you tell me, Mr. Freitag going from

9    medium to maximum, what changes would have been --

10   would he have experienced or had taken place?

11   A.    There's certain restrictions, so, yes,

12   he wouldn't be able to -- he would not be able to

13   work off the module.  He'd be excluded from certain

14   programming.

15   Q.    Okay.  Any changes in his cell or the

16   housing unit where he was located?

17   A.    No.

18   Q.    The Level 3 alert that you added, am I

19   correct that that is the instruction you got from

20   Deputy Warden Mitchell?

21   A.    Yes.

22   Q.    All right.  So basically what you did

23   when you heard or received notification, unlock,

24   make sure he's on a watch, to you that means a

25   Level 3; is that correct?

SA001023

Carl Metellus

Page 58

1          A.      Yes.

2          Q.      All right.  So then you put that

3     notification in the OMS system; is that correct?

4          A.      Correct.

5          Q.      All right.  Then you say in this

6     e-mail, could you notify the module of the capital

7     R capital W.  What does that mean?

8          A.      That means to notify the module

9     officers of the regular watch.

10          Q.      Okay.  Is regular watch the same way of

11     saying Level 3?

12          A.      Yes.

13          Q.      All right.  Meaning a 30-minute watch

14     by the officers; is that correct?

15          A.      30-minute watch by the officers,

16     15-minute watch by the offender, the watcher.

17          Q.      That's the inmate monitor; is that

18     correct?

19          A.      Yes.

20          Q.      And we'll come back to that in a

21     minute.

22                  The e-mail, by the way, I neglected to

23     ask you at the beginning, was sent to Breanne

24     Morrow.  And that is -- she is the 4:00 to 12:00

25     case manager?

SA001024

Carl Metellus

Page 59

1        A.      Correct.

2        Q.      Okay.  And what did you expect to

3   happen after you sent that e-mail to Breanne

4   Morrow?

5        A.      I expected her to phone the module

6   officer to alert them of the regular watch that was

7   placed on Freitag.

8        Q.      Do you know whether she did that?

9        A.      No, I do not.

10       Q.      Do you -- in a situation like this, do

11   you ever follow up and ask the case manager under

12   your supervision whether they did what you've asked

13   them to do?

14       A.      Not unless there was a reason for me

15   to.

16       Q.      Okay.  Was there any reason for you to

17   follow up with Breanne Morrow?

18       A.      Not that I could recall.

19       Q.      All right.  Did you remember Breanne

20   Morrow writing or contacting you back and saying

21   that she was unable to do so or that she did, in

22   fact, do so or anything like that?

23       A.      I don't have any correspondence stating

24   that fact.

25       Q.      Okay.  And I think you don't recall

SA001025

Carl Metellus

Page 60

1   having any correspondence about that?

2        A.      No.

3        Q.      Okay.  Do you -- and given that this

4   e-mail chain was sent to Mr. Bochenek on October

5   23rd of 2019, do I understand correctly that there

6   were no further e-mails on this chain after you

7   sent the e-mail to Breanne Morrow on the afternoon

8   of August 24th?

9        A.      Right.  There was no further

10  correspondence of mine.

11       Q.      Okay.  Do you know whether anyone spoke

12  to Mr. Freitag about the decision to place him on

13  watch?

14              In other words, were you present for

15  any conversations or did you hear about any

16  conversations?

17       A.      No, I was not present for any

18  conversations.

19       Q.      I'm sorry.  Could you say that again?

20       A.      No, I was not present for any

21  conversation.

22       Q.      Did you ever hear of any conversations?

23       A.      No.

24       Q.      Do you recall hearing any conversations

25  or being a part of any conversations or hearing any

SA001026

Carl Metellus

Page 63

1      Q.     Okay.  Two watches by the officer and
2  four watches by the inmate monitors; is that
3  correct?
4      A.     That's correct.
5      Q.     And I assume -- and have you placed
6  people on Level 3 alerts before?
7      A.     Yes, I have.
8      Q.     All right.  Here you did it at the
9  instruction of Deputy Warden Mitchell; is that
10  correct?
11      A.     Correct.
12      Q.     But when you've done it in the past,
13  you've done so and you've assumed that there will
14  be six watches taking place every hour; is that
15  correct?
16      A.     Correct.
17      Q.     And in your experience, can I assume
18  that when you put someone on a Level 3 watch, you
19  do that because you believe that six watches per
20  hour is necessary to properly protect the person;
21  is that correct?
22      A.     Correct.
23      Q.     When you put someone on a watch, is
24  there ever any follow-up with the module officers
25  by you to make sure that it gets done?

SA001027

Carl Metellus

Page 66

1                Anything like that ever happen?

2        A.      Not that I can remember.

3        Q.      Yeah.  And would that be your

4   responsibility anyway?

5        A.      Would it be my responsibility?

6        Q.      Yes.

7        A.      If I know I did not contact them to

8   begin with, then yes, it would have been my

9   responsibility.

10       Q.      Okay.  It sounds like what you're

11  saying then is that if -- once the officers are

12  alerted to the fact that there's a watch in place,

13  it's their responsibility, it's their job

14  responsibility to comply with that watch; is that

15  correct?

16       A.      Correct.

17       Q.      Which means in the terms of

18  Mr. Freitag, it would be their responsibility to

19  make sure they, the officers, are looking in his

20  cell twice every hour; is that correct?

21       A.      Correct.

22       Q.      And it would be their responsibility to

23  make sure the inmate monitors are looking in the

24  cell four times an hour; is that correct?

25       A.      Correct.

SA001028