# Exhibit 59 Supplement Weber Deposition

SA001029

Thomas Weber

Pages: 29, 30, 31, 32, 34, 35, 36, 50, 51

Dated: June 9, 2021

SA001030

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES JOSEPH FREITAG,        :   NO. 2:19-cv-05750-JMG
JR., as Administrator of       :
the ESTATE OF CHARLES          :
JOSEPH FREITAG, SR.,           :
            Plaintiff          :
                               :
       vs.                     :
                               :
BUCKS COUNTY; PRIMECARE        :   CIVIL ACTION - LAW
MEDICAL, INC.; STEPHAN         :
BRAUTIGAM, PMHNP;              :
JESSICA MAHONEY, PSY.D.;       :
AVIA JAMES, LPC;               :
CHRISTINA PENGE, LPC;          :
CORRECTIONAL OFFICER           :
MOODY; CORRECTIONAL            :
OFFICER MURPHY; and            :   JUDGE JOHN M. GALLAGHER
CORRECTIONAL OFFICER           :
YOUNG,                         :
            Defendants         :

_____

ZOOM DEPOSITION OF THOMAS WEBER, ESQUIRE

DATE AND TIME:  Wednesday, June 9, 2021
                at 2:30 p.m.

_____

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112   1-877-KLW-DEPO

Thomas Weber, Esquire

Page 29

1  timelines that I've outlined?

2          A.   Yes.

3          Q.   Second, is that consistent with your
4  understanding of what the practice was at Bucks County in
5  that time frame?

6               MR. NINOSKY:  Object to the form.

7               THE WITNESS:  Yes.

8  BY MR. FEINBERG:

9          Q.   My understanding from Dr. Cassidy, in
10 particular, in her testimony is that mental health staff
11 would leave the facility by 4:00 p.m.  Is that your
12 understanding as well?

13         A.   That was when their -- yeah, their
14 workday would end.  Yes.

15         Q.   All right.  So their workday was -- I
16 forget the start time -- but 6:30 or 7:00 a.m.  Does that
17 sound right?

18         A.   I think it's 6:00 to 4:00, was 6:00 to
19 4:00.

20         Q.   So after 4:00 p.m. Monday through Friday
21 there would be no mental health staff in the facility;
22 correct?

23         A.   Correct.

24         Q.   And Friday 4:00 p.m. until Monday 6:00
25 a.m. there are no mental health staff in the facility.

Page 30

```
 1   Is that correct?
 2            A.   I'm sorry, I didn't hear that.
 3            Q.   Sure.  Friday, 4:00 p.m., the end of the
 4   regular work week, until Monday, 6:00 a.m., the start of
 5   the regular work week, there were no mental health staff
 6   in the building.  Is that correct?
 7            A.   Yes, unless one was called in for an
 8   emergency.
 9            Q.   Okay.  Now, my understanding also from
10   both Bucks County witnesses who have testified and
11   PrimeCare witnesses who have testified, is that the
12   majority -- the significant majority of -- of situations
13   where people were taken to court and then brought back to
14   the facility, those people would return to the facility
15   from court after 4:00 p.m.  Is that consistent with your
16   understanding, sir?
17                 MR. NINOSKY:  Object to the form, but you
18   can answer if you have an understanding.
19                 THE WITNESS:  Generally that's my
20   understanding of how transports occur from court in all
21   counties.
22   BY MR. FEINBERG:
23            Q.   Okay.  And do you have any reason to
24   dispute the characterization, with regard to Bucks
25   County, when you connect the two lines of testimony that
```

Thomas Weber, Esquire

Page 31

1   I've just outlined for you, that mental health staff were
2   not available in the facility in the majority of
3   situations when people return from court?
4              MR. NINOSKY:  Object to the form.  You
5   can answer.
6              THE WITNESS:  Correct.
7   BY MR. FEINBERG:
8         Q.   Who within PrimeCare, whether at the
9   County level or at the corporate level, was responsible
10  for determining staffing rules in that time frame of,
11  let's say -- and, I'm sorry.
12             Let me withdraw that question and note
13  for the next several questions the time frame I'm
14  referring to is June of 2018 to August of 2018 when Mr.
15  Freitag was in the facility.
16        A.   What?
17        Q.   Was that a yes, sir?
18             MR. NINOSKY:  Jon, you broke up.  You'll
19  have to restate that for us, please.
20             MR. FEINBERG:  Yeah, okay.
21  BY MR. FEINBERG:
22        Q.   For the next several questions -- thank
23  you, John.  The next several questions, sir, the time
24  frame I'm going to refer is -- is when Mr. Freitag was in
25  the facility from June of 2018 through August of 2018.

1   Understood?
2           A.   Yes.
3           Q.   Okay.  In that time frame who within
4   PrimeCare, whether at the corporate level or the County
5   level, was responsible for determining staffing --
6   determining staffing?
7           A.   What aspect of staffing?
8           Q.   Well, whose decision was it to have no
9   mental healthcare available in the building after 4:00
10  p.m. Monday through Friday?
11               MR. NINOSKY:  Object to the form.
12               THE WITNESS:  We were approached to
13  assume the mental health component of the patient care
14  at the facility under the terms that it had previously
15  been provided, in terms of hours.  We made
16  recommendations to increase the number of employees but
17  the hours were what they were and that's what we were
18  asked to provide.
19  BY MR. FEINBERG:
20          Q.   Now, I've seen from previous
21  documentation that -- well, strike that.
22               Remind me, sir, when did PrimeCare enter
23  Bucks County as the medical provider?
24          A.   As the medical provider, I want to say
25  2014.

Thomas Weber, Esquire

Page 34

1      A.     Yes.
2      Q.     Did PrimeCare make any recommendations
3  about the hours at which mental health staff would be
4  available?
5      A.     Not at that time, no.
6      Q.     Were those -- were the hours for
7  availability of mental healthcare staff the subject of
8  any negotiations?
9      A.     No.
10     Q.     Well, for example, did the County put out
11 an RFP for mental healthcare?
12     A.     No.
13     Q.     This was part of ongoing -- an ongoing
14 business relationship.  Is that how it worked?
15     A.     Yeah.  The -- the Director of the
16 Department of Health there, you know, had seen our
17 operations on the medical side.  He perceived some
18 utility from combining the services for coordinated
19 care, approached us and asked if we would be willing to
20 do so.  And after some period of time, you know, we
21 agreed and then were able to come to terms and start the
22 care.
23     Q.     Who is the director from the County?
24     A.     Dr. Damsker, David.
25     Q.     D-A-M-S-K-E-R?

Thomas Weber, Esquire

Page 35

```
 1            A.    I believe so.
 2            Q.    Let me ask it this way.  Do you recall
 3   personally -- strike that.
 4                  In the course of these negotiations I
 5   assume PrimeCare became aware of what hours mental
 6   healthcare staff would be expected to work.  Is that
 7   correct?
 8                  MR. SCOTT:  Objection.
 9                  THE WITNESS:  Yes.
10   BY MR. FEINBERG:
11            Q.    The hours being 6:00 to 4:00, Monday
12   through Friday; correct?
13            A.    Yes.
14            Q.    At any time did you personally raise any
15   concerns that that may not provide enough coverage for
16   mental healthcare needs of prisoners?
17                  MR. NINOSKY:  Object to form.
18                  THE WITNESS:  No.  It's --
19   BY MR. FEINBERG:
20            Q.    Did anyone within PrimeCare --
21            A.    -- rather exhaustive coverage.
22            Q.    Yeah.  I spoke over you, Mr. Weber, so if
23   you could just repeat your answer.
24            A.    No.  I mean it's rather exhaustive
25   full-time coverage.
```

Thomas Weber, Esquire

Page 36

1      Q.   Did anyone raise any concerns about the
2   availability -- anyone within PrimeCare raise any
3   concerns about the hours at which mental healthcare would
4   be available?
5      A.   No.
6      Q.   Did anyone from the County make any
7   suggestions that mental healthcare staff -- it would be
8   helpful to have mental healthcare staff available for
9   longer time periods during the day or during the weekend?
10     A.   I don't believe so, no.
11     Q.   Did anyone, PrimeCare or Bucks County,
12  ever raise any concerns that having mental healthcare
13  staff leave at 4:00 p.m. would prevent mental healthcare
14  staff from being available when people returned from
15  court?
16          MR. NINOSKY:  Object to the form.
17          THE WITNESS:  No.
18  BY MR. FEINBERG:
19     Q.   Was there -- so, in sum, it sounds like
20  there was no consideration at that time, any time before
21  August of 2018, of having mental healthcare staff in the
22  building after 4:00 p.m.  Is that correct?
23     A.   That's correct.
24     Q.   In the -- I guess nearly -- well, 80 as
25  of next week, facilities where PrimeCare has a contract

Page 50

1  BY MR. FEINBERG:
2       Q.   Yeah.  All right.  I've got to remember
3  what the question was.  Is there -- I think it's this.
4  Is it correct then, sir, that there is no contractual
5  provision or any other rule that you're aware of which
6  would have prevented PrimeCare from making the staffing
7  change before it actually happened?
8            MR. NINOSKY:  Object to the form.
9            THE WITNESS:  Given the caveat that we
10 would let them know beforehand -- and I guess they could
11 object and say, you know, that's during meal time,
12 everyone is gonna be on lockdown so there's no use doing
13 it -- but there's no impediment or policy that doesn't
14 allow us to propose and sell that change.
15 BY MR. FEINBERG:
16      Q.   And it sounds like -- you talked about
17 that meal time -- that's speculating about a concern that
18 the County would raise.  Is that correct?
19      A.   We -- we encounter that at times, count,
20 meal time.  There are certain times throughout the day
21 that you know you're not going to get patients so you do
22 more administrative work during those windows so....
23      Q.   When the change was made in early 2019,
24 whenever it was, there was no objection from the County.
25 Is that correct?

Thomas Weber, Esquire

Page 51

 1          A.    That's correct.
 2          Q.    Are you aware of any audits or studies
 3    that have been done since this change was made, which
 4    would document how many people are seen in that time
 5    period between 4:00 and 5:00 p.m. by mental healthcare
 6    staff?
 7          A.    No, I am not aware of any studies.  I am
 8    just thinking about our EMR and whether -- I assume the
 9    data can be pulled, but I'm unaware of any studies.
10          Q.    And really what I'm getting at is this,
11    Mr. Weber, is that, you know, once the change was made
12    has anyone gone back and looked to decide -- to see, was
13    this an effective use of resources now that we've made
14    this change?  Do you know of anything like that?
15          A.    Not any actual statistical review.
16          Q.    Have you heard any, at least anecdotally,
17    any discussion from the mental health staff or anyone
18    else at PrimeCare corporate on this topic?
19          A.    It was viewed as, you know, a positive
20    change at the time it occurred, and I have not heard
21    anything that says that change, that view of how it
22    would work, has changed to the negative.
23          Q.    You used the passive voice to describe
24    how it was viewed -- and that's not a critique -- so my
25    question is who -- who informed you that it was viewed