# Exhibit 60 Supplement Mahoney Deposition

SA001041

Jessica Mahoney

Pages: 22, 100, 101, 102, 104, 105, 115, 116, 123, 124, 126, 135, 136, 137, 140, 146, 147, 149, 150, 159, 160, 161, 162, 169, 175, 177, 178, 188, 196, 197, 198, 199, 200, 201, 204, 205

Dated: January 29, 2021

SA001042

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CHARLES JOSEPH FREITAG,       :
JR.,as ADMINISTRATOR of       :
the ESTATE OF CHARLES         :
JOSEPH FREITAG, SR.,          :
         Plaintiff     :
                      :   No. 2:19-cv-05750-JMG
     VS                      :
                      :
BUCKS COUNTY; PRIMECARE       :
MEDICAL, INC.; STEPHAN        :
BRAUTIGAM, PMHNP;             :
JESSICA MAHONEY, PSY.D;       :
AVIA JAMES, LPC;              :
CHRISTINA PENGE, LPC;         :
JOHN DOES 1-10,               :
         Defendants     :

_____

_____


ZOOM DEPOSITION OF JESSICA MAHONEY


DATE AND TIME:  January 29, 2021, 9:06 a.m.


_____

_____


KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT

230 SOUTH BROAD STREET, SUITE 1303

PHILADELPHIA, PENNSYLVANIA 19102

(215) 922-7112 1-877-KLW-DEPO

www.klwreporters.com

Jessica Mahoney

Page 22

1   sentencing was causing anxiety.

2           Also, did you -- did you recall that

3   Mr. Freitag had concerns about losing his job

4   throughout the time of July and August of 2018?

5   A.      Yes, but I believe that he had reported

6   that he had gotten word that he would be able to

7   keep his job.

8   Q.      Okay.  That was assuming that he would

9   get out of custody, right?

10  A.      Correct.

11  Q.      All right.  Do you have any idea what

12  his mental state was after his sentencing?

13  A.      No.

14  Q.      I know you didn't speak to him.

15          Literally, what I'm asking is did

16  anybody tell you what his mental state was after

17  sentencing?

18  A.      No.

19  Q.      Would you agree that, as a matter of

20  mental health care, it would have been important to

21  know what his mental health status was after his

22  sentencing?

23  A.      Yes.

24          MR. NINOSKY:  Object to the form.  It's

25  again speculation.

SA001044

Jessica Mahoney

Page 100

1    every single encounter?

2         A.    Yes.

3         Q.    Okay.

4               MR. FEINBERG:  All right.  That's a

5    good point for a break.

6               Why don't we take five minutes and come

7    back and pick up from there.

8               MR. NINOSKY:  Great, thank you.

9               (Recess taken from 10:34 a.m. until

10   10:45 a.m.)

11   BY MR. FEINBERG:

12        Q.    Ms. Mahoney, let's get back on the

13   record.

14               Let me ask, during the break that we

15   just took, did you realize any of your previous

16   testimony was incorrect or incomplete?

17        A.    No.

18        Q.    Okay.  I'm gonna talk just about some

19   general principles about governing the way that you

20   practice -- that govern the way you practice as a

21   mental health clinician.

22               Can we just agree that your -- one of

23   your central roles is to protect the health and

24   safety of the patient you're working with?

25               MR. NINOSKY:  Object to the form.  You

Jessica Mahoney

Page 101

1   can answer.

2              THE WITNESS:  I didn't hear you.

3   BY MR. FEINBERG:

4        Q.    You could not hear me or you could not

5   hear John Ninosky?

6        A.    I could not hear him, John.

7              MR. NINOSKY:  I objected, but you can

8   answer the question.

9              THE WITNESS:  Yes.

10  BY MR. FEINBERG:

11       Q.    Okay.  And related to that, if you get

12  the sense that any patient is at risk of harming

13  themselves, you're gonna do something about that,

14  right?

15             MR. NINOSKY:  Object to the form.  You

16  can answer.

17             THE WITNESS:  Yes.

18  BY MR. FEINBERG:

19       Q.    All right.  And that's -- in fact,

20  that's the main -- given that you've told me that

21  in every single encounter you have you're

22  conducting a suicide risk assessments, a suicide

23  risk assessment, pardon me, you're looking to

24  determine whether that risk is practice; is that

25  correct?

Jessica Mahoney

Page 102

1          A.      Yes, yes.

2          Q.      All right.  I want to talk more

3    specifically about suicide risks.

4                  I assume, now that you've worked in a

5    correctional environment for the past five years,

6    you're familiar with the potential risks of suicide

7    that could come up in that environment; is that

8    right?

9          A.      Yes.

10         Q.      All right.  Once you started working

11   for PrimeCare, that was your -- the first time you

12   worked in a correctional facility; is that correct?

13         A.      Um, I did an undergrad or, like, a

14   practicum in my doctorate at a juvenile center.

15         Q.      Okay.  So first time working in a

16   postgraduate environment; is that correct?

17         A.      Correct.

18         Q.      Did you have any special training about

19   the specific risks of suicide that may be present

20   in a correctional environment?

21         A.      Not when I initially started.

22                 (Discussion held off the record.)

23   BY MR. FEINBERG:

24         Q.      So specifically in the correctional

25   environment, would you agree that there are always

Jessica Mahoney

Page 103

1   potential risks for a suicide among the population

2   you're dealing with?

3           MR. NINOSKY:  Object to the form, but

4   you can answer.

5           THE WITNESS:  Yes.

6   BY MR. FEINBERG:

7       Q.    And particular criminal justice

8   involvement is often associated with mental health

9   disorders, drug abuse and so on.  Wouldn't you

10  agree?

11      A.    Yes.

12      Q.    And those factors, including mental

13  health disorders, drug abuse, those are consistent

14  with a potential enhanced risk for suicide; is that

15  correct?

16          MR. NINOSKY:  Object to the form.  As

17  far as you can, you can answer.

18          THE WITNESS:  Yes.

19  BY MR. FEINBERG:

20      Q.    So, and issues associated with criminal

21  justice involvement -- strike that.

22          Would you agree that as a person

23  progresses through their criminal case while

24  they're detained in the facility, there may be

25  moments that could enhance -- or moments in that

Jessica Mahoney

Page 104

1    case which could enhance the risk?

2              MR. NINOSKY:  Object to the form as to

3    enhanced, but you can answer if you can.

4              THE WITNESS:  Sometimes.

5    BY MR. FEINBERG:

6        Q.    Okay.  We still are getting that

7    feedback.  I want to make things easy for Jamie.

8              Why don't we try, Ms. Mahoney, try

9    logging out and then logging right back in?

10       A.    Okay.

11             (Discussion held off the record.)

12   BY MR. FEINBERG:

13       Q.    Ms. Mahoney, before we had you log out

14   and then log back in, we were talking about risks

15   of suicide in the correctional environment.

16             Just as an example, would you agree, as

17   a clinician, that when someone is dealing with

18   restrictions on liberty, isolation from family,

19   fear of violence in the prison, that these are all

20   things that may present risk factors for suicide?

21       A.    Yes.

22       Q.    All right.  Also, consequences of court

23   dates, for example, a conviction, a denial of bail,

24   a sentencing, those are all things that can present

25   risks of suicide; is that correct?

Jessica Mahoney

Page 105

1                     MR. NINOSKY:  Object.  Object to the

2     form.  You can answer.

3                     THE WITNESS:  Yes.

4     BY MR. FEINBERG:

5          Q.     Is it safe to say, based on your

6     understanding of those risk factors, that those are

7     issues that you are -- that you are on the lookout

8     for whenever you are working with someone under

9     your care?

10         A.     Yes.

11         Q.     And if you learn about a specific

12    factor that may present a risk of suicide for that

13    specific person, you'll do something about that; is

14    that correct?

15                    MR. NINOSKY:  Object to the form.  It

16    presumes something can be done about a static

17    factor, but you can answer if you can.

18                    THE WITNESS:  Yes.  When we're made

19    aware of some -- a factor like that, we do meet

20    with each patient.

21    BY MR. FEINBERG:

22         Q.     Okay.  And if you learn that that

23    factor is present, and your counsel noted an

24    objection to static factor, then you will consider

25    potential changes to the precautions that are in

Jessica Mahoney

Page 115

1        Q.      I'm going to read that out loud.

2                Patients may become suicidal at any

3    time during their incarcerations.  Suicidal

4    behavior is more likely at critical periods of

5    time, including commitment and the first several

6    days thereafter, court hearings, sentencings, and

7    then the sentence continues.

8                My question for you is, are there any

9    special procedures in place that you know of to

10   address critical -- let me highlight the text --

11   critical periods of time?

12               For instance, is there a notification

13   that you get or a special locked system -- lock

14   system in place to address those critical periods?

15       A.      No, not specifically.

16       Q.      All right.  By the way, can I -- I

17   assume you agree with the sentence that I just

18   referenced in the record, that patients can become

19   suicidal and especially at those critical periods;

20   is that right?

21       A.      Correct.  We have -- we are notified

22   sometimes of those things, so -- and we get our

23   information through various channels.

24               So sometimes we'll find out about court

25   hearings, sometimes through the actual patient.

SA001051

Jessica Mahoney

Page 116

1  Other times we'll see that they have a court date

2  when we have access to a list of who goes out for

3  court each day, when our case managers review that.

4          But most of our information regarding

5  these things actually comes directly from the

6  patient.

7      Q.    Okay.  I think I missed the first part

8  of what you said.

9          You said sometimes you'll get

10 notification about a court hearing through -- and

11 then I lost you.  Can you tell me that again?

12     A.    Through the patient.

13     Q.    Ah.

14     A.    Like, there's not -- the jail system is

15 the one that gets in all of that information, and

16 there's not a specific way that they pass that to

17 us.

18     Q.    Okay.

19     A.    Unless they think it's important.

20     Q.    So, for instance, and what I am

21 envisioning, and I'm not suggesting that PrimeCare

22 has this, but is there any system where there's a

23 record of who's going to sentencing on what date,

24 which matches that up with people who are on a

25 mental health caseload?

SA001052

Jessica Mahoney

Page 123

1      Q.      All right.  And is it my understanding

2  that Level 3 is not used -- this is what it says.

3  Level 3 is not used for suicide prevention; is that

4  right?

5      A.      Correct.

6      Q.      How do you make the decision to put

7  someone on Level 3?

8              Can you give me an example of a

9  situation where you would think Level 3 was

10  appropriate?

11     A.      We generally don't actually put anyone

12  on Level 3.

13     Q.      Okay.  And is that present day or are

14  you referring back to 2018?

15     A.      Referring back.  It's been -- it's a

16  stepdown.  It's supposed to be a stepdown level

17  from Level 2.

18     Q.      Okay.  And is that your -- is it

19  accurate to say that since you've arrived at Bucks

20  County, that's been the practice that you're aware

21  of, Level 3 is never -- strike that.  Let me ask it

22  a different way.

23              Is it your understanding that Level 3

24  is always used for a stepdown?

25     A.      Or most always.

Jessica Mahoney

Page 124

1          Q.      Okay.  And why is that?

2          A.      Because of the level of care involved

3    in it.

4                  If we're seeing somebody and we're

5    questioning whether they're stable and need some

6    more support, and we think that they need a Level

7    3, most of the time we will put them on a 2.  We'll

8    go with a more restrictive until we can figure out

9    what's going on.

10                 Level 3 is kind of reserved for --

11   reserved for somebody that comes in that's

12   identified as a significant mental illness.

13   They're automatically placed on a Level 3.

14         Q.      Okay.  And so that would be someone

15   with significant mental illness but not immediate

16   risk of suicide; is that correct?

17         A.      Correct.

18         Q.      Okay.  Given that Level 3 is not

19   intended for suicide risk; is that correct?

20         A.      Right.

21                 MR. NINOSKY:  Object to the form.

22   BY MR. FEINBERG:

23         Q.      Was there -- which I'm just about to

24   turn to the records for Mr. Freitag, but -- and

25   we'll get there shortly.

Jessica Mahoney

Page 126

1   break it down if she knows for both.

2              MR. FEINBERG:  Sure.  I realized it

3   right as I asked the question, John, so it's a fair

4   objection.

5              So, Jamie, hopefully this will clear it

6   up for you.  Same for Ms. Mahoney.

7   BY MR. FEINBERG:

8        Q.    The day of Mr. Freitag's sentencing,

9   August 24th of 2018, do you know who made the

10  decision to place Mr. Freitag on Level 3 status?

11       A.    I believe it was Cliff, along with the

12  case manager, Ms. Alyss (phonetic).

13       Q.    Okay.  And if I'm understanding

14  correctly, what you're explaining is that as far as

15  PrimeCare practice goes, if you have any concerns

16  about a person's risk, it's Level 2 is the default

17  as opposed to Level 3; is that right?

18       A.    Yes.

19       Q.    Is it accurate to say then that if you

20  had learned about Mr. Freitag's sentence in August

21  of 2018, you would have placed him on Level 2

22  status?

23             MR. NINOSKY:  Object to the form.

24  You're asking her to speculate, have information

25  and go back without knowing what was going on at

Jessica Mahoney

Page 135

1  circumstances of his arrest?

2       A.     Yes.  Not in depth, but he said why he

3  was here.

4       Q.     What do you remember him saying?

5       A.     I don't actually.  I only know what I

6  wrote.  I don't remember specifics.

7       Q.     Yeah, and by the way, as I noted, we'll

8  go through the records in just a minute.

9              Right now I just want to try to

10 understand what you remember about him, whether

11 anything about him was memorable, whether your

12 encounters were memorable and so on.

13             And, in fact, that's a good segue to my

14 next question, which is, is there anything that

15 stands out in your head about what occurred during

16 your evaluations, something that he said or the way

17 he presented, anything like that?

18      A.     No.

19      Q.     Were you concerned about his risk of

20 suicide at any point during his incarceration?

21             MR. NINOSKY:  Object to the form, but

22 you can answer.

23             THE WITNESS:  Um, on that initial

24 intake, yes, because he had been placed on a Level

25 2.  He had reported to the nurse, you know, that he

Jessica Mahoney

Page 136

```
 1   had the suicide attempt that seemed pretty severe,

 2   based on how he reported it.

 3              So, yeah, I would say when he initially

 4   got here that I was somewhat concerned.

 5        Q.    Throughout the course of your time with

 6   him, the encounters that you went through with him,

 7   did that concern increase or decrease?

 8        A.    I'm not sure how to answer that.

 9        Q.    Okay.  And maybe it's not a fair

10   question.

11              But, you know, sometimes -- I guess

12   what I'm trying to get at is, was there a point

13   during his incarceration where you thought to

14   yourself, oh, boy, this risk is really increasing,

15   we've got to be careful, or, by the same token,

16   where he seemed to be doing better and his symptoms

17   were abating, anything like that?

18        A.    In my meetings with him, no, I don't

19   think I ever thought that he was more at risk than

20   when he got here.

21        Q.    Do you remember, leading up to his

22   sentencing, discussions about his concerns related

23   to that sentencing?

24              MR. NINOSKY:  Object to the form.  You

25   can answer.
```

SA001057

Jessica Mahoney

Page 137

1                    THE WITNESS:  Yes, I do remember us

2    having a conversation about his level of anxiety

3    related to court.

4    BY MR. FEINBERG:

5         Q.     What do you remember him saying?

6         A.     That he was feeling anxious about

7    court, and he was anxious about numerous things

8    that would occur after court as far as his job.

9                    I was trying to figure out the words I

10   wanted to use, that's why.

11                   His family relationship and kind of

12   getting those back into somewhat of a resemblance

13   of life.  It seemed to be less related to court,

14   more related to after court.

15        Q.     Do you remember him communicating any

16   expectation as to what the result of his sentencing

17   would be in terms of what the judge would do?

18        A.     Not specifically with me, but I do

19   remember conversations with other clinicians about

20   what was expected and case managers.

21        Q.     Okay.

22        A.     What was happening.

23        Q.     By the way, can I assume from your

24   answer that -- that in a typical situation you'll

25   consult with your colleagues about the care you're

SA001058

Jessica Mahoney

Page 140

1       Q.      And the case manager at that point was
2   Ms. Betz?
3       A.      I don't remember.
4       Q.      Okay.
5       A.      I know that -- I know that Jessie was
6   here, but for a period they were both here.
7       Q.      Okay.  Let me just ask a couple of
8   follow-ups then.
9               What, if anything, do you remember
10  hearing about the expectation of Mr. Freitag's
11  order?
12      A.      It was expected that he would go to
13  court and be released onto probation.  I believe
14  that probation had even come out to get an address
15  and kind of a plan for him for after court.
16      Q.      Okay.  And what, if anything, did that
17  expectation lead to from the perspective of mental
18  health clinicians?
19      A.      It sort of directed where we went with
20  our treatment.  If that was the expectation, we
21  would have worked with him on that when we met him.
22              Okay, this is what's expected.  Where
23  are you going?  Do you have a place to go and kind
24  of what's your plan.
25      Q.      Okay.  By the same token, would there

Jessica Mahoney

Page 146

1   operate with this on a computer screen and using a

2   full digital system, and we've only got hard

3   copies, so we'll do our best.

4          A.     Okay.

5          Q.     Understood?

6          A.     Understood.

7          Q.     All right.  I want to show you a

8   document from the intake evaluation that was

9   conducted on Mr. Freitag, or intake assessment, by

10  a nurse on June 4th of 2018.

11                And this is at Page 46 for counsel.

12                Let me ask you just to read this text

13  that I have highlighted here, and let me know when

14  you're finished.

15         A.     Do you want me to read it out loud

16  or --

17         Q.     No, I'm sorry.  Please read it to

18  yourself --

19         A.     Okay.

20         Q.     -- and let me know when you're done,

21  and I'll ask you some more questions.

22         A.     Okay.

23         Q.     The information that's communicated

24  here about Mr. Freitag's previous suicide attempts,

25  multiple suicide attempts, inpatient

Jessica Mahoney

Page 147

1    hospitalization at Friends Hospital, scars on his

2    right front forearm, do you recall learning that

3    information when you had your first encounter with

4    Mr. Freitag in June of 2018?

5         A.    I would have read that after I met with

6    him.

7         Q.    Okay.  So is it safe to say then that

8    at some point you certainly became aware of these

9    factors in Mr. Freitag's background; is that right?

10        A.    Yes.

11        Q.    And I assume, based on everything we've

12   been discussing, that these factors alone are

13   enough to have you concerned that he is at risk of

14   suicide; is that correct?

15        A.    Yes.

16        Q.    All right.  So is it fair to say that

17   once -- as soon as Mr. Freitag comes in with that

18   history, he's already someone who you're going to

19   be watching out for in terms of suicide risk; is

20   that right?

21             MR. NINOSKY:  Object to the form.  You

22   can answer.

23             THE WITNESS:  That would have shown to

24   us that at that moment he was more at risk than

25   someone else without that risk, so yeah.

SA001061

Jessica Mahoney

Page 149

1   prisoner when they come into the facility; is that

2   correct?

3        A.    No.

4              MR. NINOSKY:   Object to the form.

5   BY MR. FEINBERG:

6        Q.    Yeah, okay.  Tell me, what is this then

7   that --

8        A.    The mental health intake form would be

9   a form that we would complete if somebody was

10  tasked to us as had a mental health history.

11       Q.    Got it, okay.  So scrolling down here

12  in the middle of the page on 76, next to suicidal

13  ideation, it sounds like this is something you

14  discussed with him, is that right, because you've

15  made a note here about his report of thoughts of

16  suicide in the past year.

17       A.    Yes.

18       Q.    And he said three times, with the most

19  recent being September 27 -- 2017; is that right?

20       A.    Yes.

21       Q.    Do you remember learning at the time on

22  September 2017 was actually the time that he slit

23  his -- or cut himself on the arm and drove his

24  truck through his ex-wife's house?

25       A.    Yes.

SA001062

Jessica Mahoney

Page 150

1      Q.     Did he report that to you in this
2   encounter?
3      A.     No.
4      Q.     How did you learn it then?
5      A.     I don't think he ever actually reported
6   that to me and told me about it.
7      Q.     What do you remember what sort -- where
8   you got the information?
9      A.     It had to have been somebody talking
10  about it in here, but I had known about it.  But it
11  was never him that told me that.
12     Q.     All right.  You noted here, he shared
13  that he sometimes -- bottom of Page 77.
14            He shared that he sometimes starts to
15  have thoughts of harming himself when he becomes
16  depressed; is that right?
17     A.     Um-hmm, yes.
18     Q.     And that's something that he
19  acknowledged to you; is that correct?
20     A.     Correct.
21     Q.     And I take it based on --
22            MR. NINOSKY:  That's a different form
23  now, Jon.
24            MR. FEINBERG:  Yeah, you're right.
25  You're right.  This is Ms. James from later.  So

SA001063

Jessica Mahoney

Page 159

1   you've asked him, specific questions?

2        A.     Not necessarily.  It's based on

3   information that I gained through the intake

4   process.

5        Q.     All right.  So the responsibility to

6   family or others, how did you make that

7   determination that that was a protective factor for

8   him?

9        A.     He mentioned family and that he has a

10  close relationship with them and that they're

11  supportive of him.

12       Q.     Finally, in terms of his current level

13  of self-harm or risk, you determined moderate.

14              How is that determination -- how do you

15  make that determination?

16       A.     Those categories correspond directly

17  with our levels.

18       Q.     Okay.

19       A.     Severe would be under constant watch,

20  high would be Level 1, moderate is Level 2, and low

21  would be someone that's on a psych observation or

22  no level.

23       Q.     Got it.  And so I guess my question

24  then is, when you check off moderate here on this

25  form --

SA001064

Jessica Mahoney

Page 160

1          A.       Um-hmm.

2          Q.       -- are you making a diagnostic

3     determination at that point that he is a moderate

4     risk?

5                   MR. NINOSKY:  Object to the form.  You

6     can answer.

7                   THE WITNESS:  Yes.

8     BY MR. FEINBERG:

9          Q.       Well, okay.  Take me through the

10    process, okay?

11                  So, you know, with Mr. Freitag you've

12    described you saw him in the medical unit, you came

13    back and went to your computer and you filled out

14    this form; is that correct?

15         A.       Yes.

16         Q.       When you got to -- I assume this screen

17    comes up, estimated current level of self-harm,

18    suicidal risk, right?

19         A.       Um-hmm.

20         Q.       You clicked the button -- is that a

21    yes?

22         A.       Yes.

23         Q.       And you clicked the button for

24    moderate; is that correct?

25         A.       Correct.

SA001065

Jessica Mahoney

Page 161

```
1        Q.      Why did you click the button for
2    moderate?
3        A.      He was on the Level 2.  I wasn't moving
4    him off of a Level 2, and he had some risk factors
5    that I had checked off.  But he wasn't currently
6    expressing thoughts of harming himself.
7        Q.      Okay.  Is it fair to say then that you
8    made a diagnostic determination that he was, in
9    fact, a moderate risk at that point?
10       A.      Yes.
11               MR. NINOSKY:  Object to the form, you
12   can answer.
13   BY MR. FEINBERG:
14       Q.      All right.  So, for instance, just if
15   he had been on a Level 2 at that point, but then at
16   the time of your evaluation you were convinced that
17   he's fine, there's no risk at this point, we can
18   step him down, you would have indicated low risk;
19   is that right?
20       A.      Yes.
21       Q.      And at that point he would have been
22   stepped down to a Level 3; is that correct?
23       A.      There's a bunch of other steps, but
24   yes.
25       Q.      Okay.  Well, all right.  So, yeah, tell
```

SA001066

Jessica Mahoney

Page 162

1    me, what stepdowns?

2         A.    So I would need to -- I would review

3    that with Dr. Cassidy.  I would update our medical

4    record to show that, and then I have to go into the

5    jail system and change the alert, and then usually

6    call the block officer as well to make him aware

7    that we made the change.

8         Q.    Were there -- it sounds like when you

9    made the determination -- I'm sorry.  Were you --

10        A.    Well, we also send out an e-mail --

11        Q.    Okay.

12        A.    -- of level changes to -- like, I think

13   there's 60 or 70 people on that e-mail.

14        Q.    Sixty or 70, is that what you said?

15        A.    I don't know if it's that many, but

16   it's a lot, yes.  It's like a copy and paste

17   situation on that chunk of e-mails.

18        Q.    When you made the determination that he

19   was a moderate risk, it sounds like there were two

20   things in your head.

21              One was that he was already Level 2.

22   Two is that he had risk factors which he outlined,

23   including first arrest and then a significant legal

24   change; is that correct?

25        A.    Yeah, and it would have also been based

SA001067

Jessica Mahoney

Page 169

1  before, the -- when Ms. James took him off Level 3

2  status.

3              Does that sound right to you?

4       A.    Yeah, that is what it looks like she

5  did here.

6       Q.    Okay.  Let me just ask you to read the

7  subjective portion of the bit I've highlighted, and

8  we're here at Page 114.  Read that to yourself, and

9  let me know when you're finished.

10      A.    Okay.

11      Q.    So there's reference here to the fact

12  that Mr. Freitag was anxious whenever he was

13  thinking about his case and possibly losing his job

14  of 25 years.

15              Seeing that, does that refresh your

16  recollection of hearing about Mr. Freitag's

17  concerns early on in his incarceration?

18      A.    Yeah.

19      Q.    Okay.  And, in fact, when you saw

20  Mr. Freitag for the next time after your previous

21  encounter on June 6th, can I assume that you would

22  have gone back and looked at that note from

23  Ms. James?

24      A.    Yes.

25      Q.    Your next note is just one page up

Jessica Mahoney

Page 175

1    conduct.

2        A.      Okay.

3        Q.      Do you remember him talking

4    specifically about that?

5        A.      No.

6        Q.      Did you tell him anything about that?

7                Did you give him any advice or any

8    information about what happens when you go off of

9    SSRI medications?

10       A.      No.

11       Q.      The phrase here, he discussed wanting

12   mental health to follow up after he goes to court

13   in August, what do you remember about that request

14   or why did he say that?

15               What was his specific reason, if you

16   know?

17       A.      Just because he figured he would need

18   somebody to talk to afterwards.  I think at some

19   point he even said, am I going to get to say

20   good-bye before I go home.

21               So I think it was kind of a dual --

22   depending on which way court went would be why he

23   wanted to follow up with us.

24       Q.      Okay.  And he was saying that as early

25   as June 15th?

Jessica Mahoney

Page 177

1          Q.      Do you remember -- is that a yes?

2          A.      Yes.  Sorry.

3          Q.      Do you remember thinking at that time

4     that the sentencing was part of -- was an important

5     part of your evaluation as to what his risk level

6     was?

7                  MR. NINOSKY:  Object to the form.  You

8     can answer.

9                  THE WITNESS:  Yes, sentencing would be

10    one of those concerning events.

11    BY MR. FEINBERG:

12         Q.      Okay.  And, in fact, just to -- I'll

13    acknowledge I'm challenging your suggestion that he

14    just wanted to say good-bye, because I want to show

15    you what happened -- what appears to have happened

16    in terms of scheduling.

17                 I'm showing you Page 141, which is the

18    task list; is that correct?

19         A.      Okay, yes.

20         Q.      And it looks like here there's an

21    appointment created for August 27th of 2018.

22                 Do you see that?

23         A.      Um-hmm, yes.

24         Q.      And it looks like you created it on

25    June the 15th; is that correct?

SA001070

Jessica Mahoney

Page 178

1        A.      Yes.

2        Q.      And that's -- we were just looking at

3   the note from June 15th; is that right?

4        A.      Yes.

5        Q.      And putting things together, it looks

6   like after you had this discussion with Mr. Freitag

7   on June 15th, he said he wanted to see someone

8   after court, so you went in and made sure that

9   appointment was scheduled; is that correct?

10        A.      Yes.

11        Q.      The appointment was for August 27th,

12   which was the Monday after his sentencing; is that

13   right?

14        A.      Yes.

15        Q.      If he was gonna go home after his

16   sentencing, he likely would have walked out the

17   door of the courthouse; is that right?

18        A.      No.

19        Q.      He would -- would he have come back to

20   the facility and still been there on Monday?

21        A.      Maybe.  He would have definitely had to

22   come back to the facility.

23        Q.      Got it, okay.  Well, and -- that sounds

24   like that's a correctional issue in terms of how

25   they process people for release; is that right?

SA001071

Jessica Mahoney

Page 188

1        A.       No.

2        Q.       All right.  The first thing you noted

3    on his concerns is that he had bad anxiety and that

4    it was increasing as his court date got closer.  He

5    was worried about what was going to happen, how it

6    was going to affect his life.

7                 Do you remember anything specific he

8    said about those concerns?

9        A.       No.

10        Q.       Do you remember what he -- before, when

11    you told me about those -- the concerns he raised,

12    it was, you know, about getting his life together.

13                 Is that consistent with your

14    recollection from this particular incident?

15        A.       I don't actually recall.

16        Q.       Would you agree that based on this --

17    on his explanation, this sentencing proceeding

18    appeared to be a significant source of anxiety?

19                 MR. NINOSKY:  Object to the form,

20    significant, but you can answer his question.

21                 THE WITNESS:  Based on what I wrote, he

22    was anxious about court, so yes.

23    BY MR. FEINBERG:

24        Q.       You made the determination that he

25    appeared to be in the low risk for self-harm.

Jessica Mahoney

Page 196

1               Do you know -- does anything stand out
2   about this one?
3               Do you remember any conversation?
4        A.    I just remember him being hopeful and
5   sort of anxious, but almost like an excited anxious
6   type of energy, where he just kind of wanted to go
7   and find out what was gonna happen and just, you
8   know, get back to his life.
9        Q.    Okay.  He noted that his lawyer was
10  confident he was gonna get out.
11              Did you ever -- did you have any
12  understanding either way as to what his range of
13  possibilities was at sentencing?
14       A.    No.  From everything that I had been
15  told or had been relayed to me, it was as set in
16  stone as it can be when you go to court that he was
17  going to have probation and be released.
18       Q.    And who provided you that information
19  besides Mr. Freitag?
20       A.    The case managers would have relayed
21  that.  I'm not sure if it came directly through
22  them or from Dr. Cassidy to me first, but that's
23  how it was relayed.
24       Q.    Okay.  Do you remember having any
25  conversation with Mr. Freitag in this encounter or

SA001073

Jessica Mahoney

Page 197

1  in that encounter, in any other encounter, for that

2  matter, where you said keep an open mind, you never

3  know what's gonna happen?

4       A.     No.

5       Q.     Okay.  Obviously, you know that did not

6  come to pass for Mr. Freitag.

7              He received a stiff jail sentence of

8  six to 12 years; is that right?

9              You blanked out.  Can you answer that?

10      A.     Yes.

11      Q.     Okay.  And is it accurate to say that

12  was beyond -- well beyond Mr. Freitag's

13  expectations as he had communicated them to you?

14             MR. NINOSKY:  Object to the form.  You

15  can answer.

16             THE WITNESS:  Yes.

17  BY MR. FEINBERG:

18      Q.     Based on what you knew about his mental

19  health status at that time, do you believe that he

20  was prepared to accept that sentence or prepared to

21  deal with that sentence once it was imposed?

22             MR. NINOSKY:  Object to the form,

23  speculation, but you can answer if you can.

24             THE WITNESS:  I don't know.

25  BY MR. FEINBERG:

SA001074

Jessica Mahoney

Page 198

1      Q.     Okay.  Is that something -- based on

2    your interactions with him, and it sounds like you

3    developed a nice working relationship with him, if

4    you found out that he got a sentence of six to 12

5    years, would you have said to yourself at that

6    time, oh, boy, that's gonna be really hard for him

7    or a significant development for him, we should

8    speak with him?

9                MR. NINOSKY:  Object to the form,

10   speculation.  You can answer if you can.

11               THE WITNESS:  Anytime someone were to

12   get a sentence that they weren't expecting, we

13   would follow up with them.

14   BY MR. FEINBERG:

15     Q.     Okay.  So that's something -- and --

16   but not specific to Mr. Freitag, but that's just a

17   common factor, right?  You know that that's going

18   to cause the need for mental health intervention if

19   you've already been working with that person?

20               MR. NINOSKY:  Object to the form.  You

21   can answer.

22               THE WITNESS:  Not necessarily.  I mean,

23   people handle all sorts of news that I think would

24   be tragic that they don't think.

25   BY MR. FEINBERG:

Jessica Mahoney

Page 199

1          Q.       Okay.

2          A.       It's going to be relative to him.  I

3    wouldn't have known one way or the other whether he

4    was going to have difficulty handling that

5    sentence.

6          Q.       But based on, number one, his anxiety

7    about sentencing and, number two, his expectation

8    that he was getting out sounds like that's what

9    would have driven your expectation that -- that he

10   would need mental health intervention; is that

11   correct?

12               MR. NINOSKY:  Object to the form.

13               THE WITNESS:  I would -- yeah, I mean,

14   I would say that it would have been probably

15   upsetting that it hadn't gone the way he would have

16   wanted it to go, and we should check in.

17   BY MR. FEINBERG:

18         Q.       Right, okay.  And adding to his

19   expectations and his anxiety, there obviously also

20   was his mental health diagnosis and his previous

21   suicide attempts; is that right?

22         A.       Um-hmm.

23         Q.       Is that a yes?

24         A.       Yes.  Sorry.

25         Q.       So when you combine those four factors,

SA001076

Jessica Mahoney

Page 200

1  one, mental health diagnoses; two, previous suicide

2  attempts; three, his anxiety about sentencing; and,

3  four, his expectations about sentencing, that is,

4  getting out, all of that combined, once the result

5  was imposed, would give you reason to want to have

6  a mental health encounter with Mr. Freitag; is that

7  correct?

8              MR. NINOSKY:  Object to the form, but

9  you can answer.

10             THE WITNESS:  Well, anxiety isn't

11  really a risk factor for suicide.

12             All of the other ones, yes, I would say

13  would have been changing -- things that have

14  changed or were important for us to follow up on.

15  BY MR. FEINBERG:

16     Q.    Okay.  So can we agree, sitting here,

17  that the three factors then, one -- let me do the

18  list again to make sure we're talking about the

19  same thing.

20             One, his mental health diagnoses; two,

21  his history of suicide attempts; and, three, a

22  sentence that was wildly outside of his

23  expectations, those factors were changes which, in

24  your judgment, constitute suicide risk factors; is

25  that correct?

Jessica Mahoney

Page 201

1              MR. NINOSKY:  Object to the form.

2              THE WITNESS:  Yeah, those are listed on

3    the form.

4    BY MR. FEINBERG:

5         Q.     All right.  And, in fact, the last

6    factor would be sentencing -- the imposition of a

7    sentence far outside his expectations is something

8    consistent with the procedures -- or the PrimeCare

9    policies identifying significant legal

10   developments; is that correct?

11        A.     Yes.

12        Q.     And if you conducted a suicide risk

13   assessment, we've already reviewed the box is

14   checked for new legal development; is that correct?

15        A.     Yeah.

16        Q.     So if a -- and I understand you didn't

17   do this, but if you had conducted a formal suicide

18   risk assessment with Mr. Freitag after his

19   sentencing on September -- or August 24th of 2018,

20   you would have expected to have checked off those

21   factors; is that correct?

22        A.     Yes.

23        Q.     And I take it that, based on everything

24   you're saying, you would have expected to find an

25   increased risk of suicide, over and above what you

SA001078

Jessica Mahoney

Page 204

1    watch procedure was required, in this case Level 3

2    watch, that they would have -- that correctional

3    staff would have ensured compliance with that watch

4    status; is that correct?

5         A.    Yes.

6         Q.    All right.  In other words, if Level 3

7    watch is imposed by correctional staff, which

8    requires two correctional officer visits per hour

9    and four observations by inmate monitors, you would

10   expect that all of those would have taken place; is

11   that right?

12        A.    Absolutely.

13        Q.    All right.  And if those aren't -- if

14   those are not taking place, then mental health

15   can't be alerted to what any urgent issue might be;

16   is that correct?

17             MR. NINOSKY:  Object to the form.

18             THE WITNESS:  Yes.

19             MR. NINOSKY:  You can answer the

20   question.  You can answer.

21             THE WITNESS:  Oh, I did.  Sorry, yes.

22             MR. NINOSKY:  Can you say it again,

23   please, because we didn't hear it, and I want to

24   make sure the court reporter got an answer since we

25   did talk over one another.

SA001079

Jessica Mahoney

Page 205

1              THE WITNESS:  Yes.  That is accurate.

2    BY MR. FEINBERG:

3        Q.    At any point after Mr. Freitag's

4    suicide, Ms. Mahoney, did you go back and look at

5    your notes about your encounters with him?

6        A.    Yes.

7        Q.    When did you do that?

8        A.    The only time I actually remember is

9    most recently, late last week, when I knew I had

10   this coming, and then when I -- when the lawsuit

11   was made public.

12       Q.    Okay.  So you looked at the notes to

13   see what happened in connection with the lawsuit.

14   I understand that.

15             What I'm asking is, you got the call

16   the Saturday, the 25th of August, in 2018, that

17   Mr. Freitag had killed himself, right?

18             Is that a yes?

19       A.    Yes.  Sorry.

20       Q.    Okay.  When you got back to work --

21   well, actually, when you went into the building on

22   Saturday afternoon and then you went -- I assume

23   you went back to work on Monday, the 27th, at any

24   point then did you go back and look at your notes?

25       A.    I -- yes, I'm sure I did.  I don't

SA001080