# Exhibit 61 Supplement Scordellis Deposition

SA001081

Emily Scordellis

Pages: 16, 46, 52, 53, 54, 56, 60

Dated: May 7, 2021

SA001082

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
CHARLES JOSEPH FREITAG, JR., as : No.: 2:19-cv-05750-JMG
ADMINISTRATOR of the ESTATE      :
of CHARLES JOSEPH FREITAG, SR.,  :
                                 :
          Plaintiff              :
                                 :
     v.                          :
                                 :
Bucks COUNTY; PRIMECARE MEDICAL  : CIVIL ACTION - LAW
INC.; STEPHAN BRAUTIGAM, PMHNP;  :
JESSICA MAHONEY, PSY.D.; AVIA    :
JAMES, LPC; CHRISTINA PENGE,     :
LPC; CORRECTIONAL OFFICER        :
MOODY; CORRECTIONAL OFFICER      :
MURPHY; and CORRECTIONAL         : JUDGE JOHN M. GALLAGHER
OFFICER YOUNG,                   :
                                 :
          Defendants             :
```

ZOOM DEPOSITION OF EMILY SCORDELLIS, Psy.D.

DATE AND TIME:  Friday, May 7, 2021
                at 10:43 a.m.

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
424 Fleming Pike, Hammonton, New Jersey 08037
(215) 922-7112  1-877-KLW-DEPO
www.klwreporters.com

Dr. Emily Scordellis

Page 16

```
1    A.   That's correct.
2    Q.   Okay.  At any point during that time period,
3    did you determine that any PrimeCare employee acted
4    contrary to any PrimeCare policy or directive in
5    their dealings with Mr. Freitag?
6    A.   No.
7    Q.   During that time period, did you determine
8    that any PrimeCare policy or practice should be
9    changed as a result of what you learned about this
10   case?
11        MR. NINOSKY:  Object to the form as to
12   should, but you can answer the question.
13        MR. FEINBERG:  That's a fair objection.  Let
14   me note the -- let me change that question.
15   BY MR. FEINBERG:
16   Q.   Did you decide or were you aware of any
17   decision to change a practice or procedure as a
18   result of the circumstances leading to Mr. Freitag's
19   death?
20   A.   Yes.
21   Q.   Okay.  What did you -- what specifically?
22   A.   The placement of all state-sentenced inmates
23   going on Level 2 suicide precautions upon their
24   return from court.
25   Q.   Were there any others besides that?
```

Dr. Emily Scordellis

Page 46

```
1      Q.   And Dr. Cassidy, we went through this in her
2   deposition testimony, she told me that mental health
3   staff were generally available between 6 or 6:30 a.m.
4   and 4 p.m.  Is that consistent with your
5   recollection?
6      A.   Yes.
7      Q.   So who made the decision that mental health
8   staff would be available in those time frames; and my
9   follow up to that, to refine the question, is, was
10  that a decision made on the local level by Bucks
11  County or by the PrimeCare corporate level?
12     A.   If I recall correctly, that was the previous
13  schedule held by CFG, so we had continued it at that
14  time.
15     Q.   Who made the decision to continue that
16  schedule?
17     A.   When we transitioned the staff, they had
18  pre-established schedules.
19     Q.   So they just stayed with those schedules?
20     A.   Correct.
21     Q.   You mentioned CFG.  I know the company, but
22  I forget the acronym.  Do you know what CFG stands
23  for?
24     A.   Child Family Guidance.
25     Q.   And that company provided the mental health
```

1          Do you remember learning that the decision
2    to make staff available later in the day was
3    connected in any way to a desire to have mental
4    health staff available when people returned from
5    court?
6       A.   I'm not sure if you're asking if the change
7    occurred so that people could be there later and when
8    that happened?  Just to make sure, to clarify.
9    BY MR. FEINBERG:
10      Q.   Yeah, let's do this.  Let me ask a couple
11   more foundational questions.  Okay.  Let's do this.
12   Let's back up even further.
13          Can we agree that before the change was
14   made, whenever it was made, there typically would not
15   be mental health staff available in the building when
16   people came back from court?  Do you remember hearing
17   that?
18          MR. NINOSKY:  Object to the form.  You can
19   answer.
20          THE WITNESS:  I believe that's correct, yes.
21   BY MR. FEINBERG:
22      Q.   Okay.  And just, you know, full disclosure,
23   what I've been told is that most times people came
24   back from court sometime around 4 or after.
25          Understood?

```
1      A.   Okay.
2      Q.   Do you have any reason to dispute that
3  characterization?
4      A.   No.
5      Q.   Okay.  And given what we've established,
6  that mental health staff were not available after
7  4 p.m., then, by definition, mental health staff were
8  not there to see people when they came back from
9  court.
10          Agreed?
11     A.   Agreed.
12     Q.   Were you -- I don't think we have discussed,
13 but would you generally agree that any developments
14 over the course of a person's criminal case could
15 affect their risk of self-harm?
16          MR. NINOSKY:  Object to the form, but you can
17 answer.
18          THE WITNESS:  Potentially.
19 BY MR. FEINBERG:
20     Q.   Yeah.  People go to court and they have bail
21 denied.  That may increase their risk of suicide;
22 right?
23     A.   Potentially.
24     Q.   People go to court, they get convicted of a
25 crime, that may affect their risk of suicide; is that
```

Page 54

1  correct?
2      A.   Potentially.
3      Q.   People go to court, they get sentenced to a
4  lengthy period of imprisonment, that may affect their
5  risk of suicide; is that correct?
6      A.   Potentially.
7      Q.   Okay.  So my understanding was that if there
8  was any decision made upon a return from court about
9  a need for precautions in that time period, it would
10 be made by mental health staff.  Were you aware of
11 that practice?  Pardon me.  Made by non-mental health
12 staff, that is, correctional staff?
13           MR. NINOSKY:  Object to the form, but you can
14 answer.
15           THE WITNESS:  That's my understanding, yeah.
16 BY MR. FEINBERG:
17     Q.   Okay.  And just to show you, to give you a
18 defined example of this, were you aware that Mr.
19 Freitag was on a Level 1 watch -- pardon me, Level 3
20 watch when he came back from court on the -- in the
21 late afternoon of August 24th?
22     A.   Yes, I did know that.
23     Q.   All right.  And were you aware that that
24 Level 1 watch was instituted as a result -- pardon
25 me.  I keep saying Level 1.

Dr. Emily Scordellis

Page 56

1  throughout your review of the facts in this case; is
2  that right?
3      A.   Correct.
4      Q.   Okay.  So can we agree, the purpose of me
5  going through this right now, can we agree that when
6  Mr. Freitag returned from court, the decision that
7  was made about watch was made by correctional staff?
8      A.   Agreed.
9      Q.   And I take it that was standard practice at
10 that time because there were no mental health staff
11 in the building; is that correct?
12         MR. NINOSKY:  Object to form.
13         THE WITNESS:  I can't speak to standard
14 practice.  In this case, it appears to be that way.
15 BY MR. FEINBERG:
16     Q.   Okay.  And can I assume that PrimeCare
17 was -- well, strike that.
18         Is it correct to say that PrimeCare was
19 aware that that's what would happen if there were no
20 mental health staff available in the building?
21         MR. NINOSKY:  Object to the form, but you can
22 answer if you know.
23         THE WITNESS:  Can you rephrase that, please?
24         MR. FEINBERG:  Sure.
25

Dr. Emily Scordellis

Page 60

1    Q.   All right.  Please read it to yourself and
2  then let me know when you're finished.
3    A.   Okay.
4    Q.   All right.  Let me focus just on one portion
5  of Dr. Cassidy's deposition -- of testimony you just
6  read.
7         My question to her on line 19 of page 93
8  was, was the motivation in shifting the schedule to
9  make mental health clinicians available for people
10 coming back from court; and her answer was, I believe
11 so.
12        Now, obviously, Dr. Cassidy, from her
13 testimony, didn't know with certainty.  Do you know
14 with certainty, was the decision to make staff
15 available later in the day tied in any way to having
16 clinicians available for after court?
17        MR. NINOSKY:  Object to the form, but you can
18 answer.
19        THE WITNESS:  I don't recall with any
20 certainty that that was why it -- why the change was
21 made, but I would say it stands to reason.
22 BY MR. FEINBERG:
23   Q.   Okay.  So it sounds like you might be in the
24 same boat as Dr. Cassidy in not knowing; is that
25 correct?

WWW.KLWREPORTERS.COM

SA001090