# Exhibit 63 Supplement Second Nottingham Deposition

SA001097

James Nottingham (Deposition 2)

Pages: 14, 20, 21, 22, 23, 24, 25, 27, 28, 36, 38, 39, 52, 53, 68, 82, 83, 88, 89

Dated: April 26, 2022

SA001098

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CHARLES JOSEPH FREITAG,    :    CIVIL ACTION - LAW
JR., as Administrator of   :
the ESTATE OF CHARLES      :
JOSEPH FREITAG, SR.,       :
            Plaintiff      :
                           :
     vs.                   :
                           :    NO. 2:19-cv-05750-JMG
BUCKS COUNTY; PRIMECARE    :
MEDICAL, INC.; STEPHAN     :
BRAUTIGAM, PMHNP;          :
JESSICA MAHONEY, PSY.D.;   :
AVIA JAMES, LPC;           :
CHRISTINA PENGE, LPC;      :
CORRECTIONAL OFFICER       :
MOODY; CORRECTIONAL        :
OFFICER MURPHY; and        :
CORRECTIONAL OFFICER       :
YOUNG,                     :
            Defendants     :    JUDGE JOHN M. GALLAGHER
_____
```

ZOOM DEPOSITION OF JAMES H. NOTTINGHAM

DATE AND TIME:  Tuesday, April 26, 2022
                at 10:05 a.m.

_____

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112  1-877-KLW-DEPO

Page 14

1            A.    Never.

2            Q.    Okay.  I'm going to Page 68 of the

3    transcript, and you'll see there's text highlighted at

4    the bottom of Page 68 and then going onto the top of Page

5    69.  Could you please read that to yourself and let me

6    know when you're finished.

7            A.    (Witness reviewed document.)  Okay.

8            Q.    All right, sir.  When I asked you this

9    question in May of 2021, I interpreted your answer to be

10   that you had never heard of any problems or issues with

11   the way Correctional Officers were supervising Inmate

12   Monitors in their work.  Is that an accurate

13   interpretation of your testimony?

14           A.    Yeah.  I was -- I was the Training

15   mode -- Lieutenant at the time, as it clearly states

16   right there, so, no, I didn't -- I think my answer is

17   correct right there.

18           Q.    Okay.

19           A.    I just didn't remember you asking me

20   that, that's all.

21           Q.    I see.  All right.  Now, the -- the

22   document, which I've actually just put in front of you on

23   the screen -- and this will be newly marked -- pardon

24   me -- as Exhibit P-35.  The document which caused the

25   parties in this case to want to conduct this deposition

1  agree -- to ensure that best practices are in place at

2  each facility they are asked to examine; correct?

3          A.    I think --

4                MR. KOLANSKY:  Object.

5                THE WITNESS:  I think that's what I

6  said, but you put it through purposely -- I mean, more

7  professionally than I did.

8  BY MR. FEINBERG:

9          Q.    Okay.  Well, thank you, sir, for the

10 compliment.  In -- can I -- can we assume that Bucks

11 County -- we can take this down since we're not talking

12 specifically about the document now.  Can we assume that

13 Bucks County likes to have or wants to have best

14 practices in place to preserve the health and safety of

15 inmates in its custody?

16         A.    Absolutely.

17         Q.    So the purpose of going through this

18 accreditation process is to ensure that Bucks County's

19 practices are up to standard in order to meet that goal;

20 correct?

21         A.    Yes.

22         Q.    Did Bucks County want to have

23 accreditation by NCCHC?

24         A.    Absolutely, yes.

25         Q.    So when NCCHC pulled Bucks County, in

Page 21

1    this document that we were reviewing just a moment ago,

2    that a standard was not met, did Bucks County try to do

3    something to meet that standard?

4              A.    Yes.

5              Q.    Okay.  And we'll come back to that.  You

6    mentioned, when I asked you specifically about Bucks

7    County's supervision -- or pardon me -- about the

8    supervision of Inmate Monitors, you said NCC- -- NCCHC

9    was not happy with it.  What did you mean by that?

10             A.    In their -- in their -- in their report

11   right there it says that we -- we weren't consistent, so

12   that's what I mean by that.  We didn't meet their

13   standards.

14             Q.    Okay.  Don't Bucks County Correctional

15   Officers have a responsibility to consistently observe

16   inmate workers doing their jobs?

17             A.    Yes.

18             Q.    So would you agree that NCHC [sic] --

19   NCCHC found that Bucks County was not living up to that

20   responsibility?

21             MR. KOLANSKY:  Objection, form of the

22   question.

23             You can answer.

24             THE WITNESS:  So we were not fulfilling

25   their standards, in their opinion, according to that

SA001102

Page 22

1    report.  Our standards that we had at that time, we were

2    fulfilling.  We just didn't meet their -- their

3    standards.

4    BY MR. FEINBERG:

5          Q.    Were the standards that you had in place

6    at that time appropriate?

7          A.    Yes.

8          Q.    Were the standards that you had --

9          MR. KOLANSKY:  I'll note for the record

10   that that was 2017, sometime before your client passed;

11   is that right?

12   BY MR. FEINBERG:

13         Q.    Were the standards that were in place at

14   that time sufficient to protect inmate welfare?

15         A.    Yes, they were.

16         Q.    So is it your testimony, sir, that the

17   procedures that were in place, where officers were not

18   consistently observing the inmates while they were

19   performing their watches, appropriate?

20         A.    I believe they were at the time, and the

21   changes we made, made it better.

22         Q.    Okay.  So is it fair to say, sir, that

23   once NCHC [sic] provided you with this accreditation

24   report, Bucks County was aware that there were issues in

25   officers' compliance with their responsibilities?

Page  23

1                      MR. KOLANSKY:  Objection, form of the

2      question, and that's not what he said.

3                      But go ahead, you can answer.

4                      MR. FEINBERG:  Jeff, the purpose of a

5      deposition is to ask the witness if I'm right or wrong

6      in characterizing something.  That's --

7                      MR. KOLANSKY:  That's fine.

8                      MR. FEINBERG:  -- my question.

9                      MR. KOLANSKY:  That's fine, but when it

10     appears to be one question later -- and I don't think

11     Captain Nottingham will be fooled -- but when it appears

12     to be an effort to twist testimony, I'm going to object.

13                     MR. FEINBERG:  All right.  Well, now

14     that you've instructed the witness that I'm trying to

15     fool him, we'll see what his testimony is.

16                     Go ahead, Captain.

17                     MR. KOLANSKY:  Well, I instructed him

18     that before we started, but that's okay.  Go ahead.

19                     I'm just kidding.  Go ahead.

20                     THE WITNESS:  Sir, could you repeat the

21     question, please?

22                     MR. FEINBERG:  Yeah.  Lori, would you

23     please read back the last question.

24                     (Whereupon, the Reporter read back the

25     referred-to question.)

SA001104

Page 24

1                    THE WITNESS:  So we weren't aware until

2       they made that -- that report.  They made us aware of

3       that.

4       BY MR. FEINBERG:

5            Q.    Okay.  Thank you.  And that's exactly my

6       question.  Once this report was provided to Bucks County,

7       then Bucks County knew, okay, we've got an issue with

8       officers doing what they're supposed to do regarding

9       supervision of Inmate Monitors; correct?

10                   MR. KOLANSKY:  Objection, form of the

11      question.

12                   You may answer.  You can answer.

13      BY MR. FEINBERG:

14           Q.    You can answer, sir.

15           A.    Again, the procedures we had in place at

16      the time were adequate to our standards, what we

17      believed, the officers who were supervising the inmates,

18      and the watch standards were adequate.

19                   Once we got that report from them, we

20      took their advice and we made some -- we implemented

21      some changes.

22           Q.    They gave you that advice for good

23      reasons; right?

24           A.    I would say so, yeah.

25           Q.    They wanted to -- they wanted to provide

Page 25

1   you with guidance about how you could improve practices

2   at Bucks County to protect the safety of inmates in your

3   custody; right?

4           A.    I'll agree with that.

5           Q.    And once they gave you that guidance, you

6   said -- when I say you, Bucks County collectively said --

7   we ought to do this because these people know what

8   they're talking about; right?

9           A.    I agree.

10          Q.    All right.  So getting back on the topic

11  that led us down this line of questions concerning the

12  NCCHC report -- I'm sorry.  Let me ask it this way.

13                When you gave your testimony back in May

14  of 2021 about -- and I guess I'll put the transcript

15  back up in front of you -- where I asked you about any

16  problems in the way officers were conducting themselves

17  in their supervision of Inmate Monitors, and your answer

18  was, no, sir, were you aware at that time of the NCCHC

19  report that we've just been reviewing?

20          A.    No, I wasn't aware of it at the time.

21          Q.    If you had been aware of the report at

22  that time, would your answer to my question have been

23  different?

24          A.    If I was made aware of that, I would

25  have -- I would have been asking a lot of questions

SA001106

Page 27

1    officer.

2              Q.    And, sir -- and maybe the question is

3    difficult because I'm asking in a -- as a hypothetical,

4    and I acknowledge that.

5              What I'm asking you is that if someone

6    handed you this document, Exhibit 35, at some point in

7    2016 or 2017, and then I asked you the questions that I

8    asked you, your answer, I assume, would have been, oh,

9    yeah, I heard about what NCCHC found, and they told us

10   we ought to change our practices; right?

11             A.    Let me put it to you this way.  If

12   somebody handed me that document right there that's on

13   the screen and I read that, I would be asking questions

14   after that.  Like I said, I'd be like, are we changing

15   anything?  What are we doing to adhere to this

16   recommendation?  That would be my question.

17             Q.    Okay.  And then when I asked you that

18   question in May of 2021, you would have had a different

19   base of knowledge if you had these documents; is that

20   correct?

21             A.    Yes.  I would've -- I would've -- you

22   know, I would've been handed something that said that

23   there's a fault somewhere --

24             Q.    Okay.

25             A.    -- here's a recommendation.

Page 28

1           Q.    And so when I asked you those questions

2    in May of 2021, you did not know about this reporting

3    about a fault, to use your words, regarding procedures at

4    Bucks County, but now you are aware, having reviewed

5    these documents; is that correct?

6           A.    That's correct.

7                 MR. KOLANSKY:   Objection.

8    BY MR. FEINBERG:

9           Q.    Have you done anything else besides

10   review documents from NCCHC in order to prepare for

11   testimony on these topics?

12          A.    No.

13          Q.    Have you spoken to anybody else within

14   the County, whether it's the Warden or the -- and I'm

15   sorry.  I'm forgetting the title of the highest ranking

16   officer at the County.

17                Really, my question is, have you spoken

18   to any of the supervisory staff about these NCCHC

19   documents to prepare for this deposition?

20          A.    No, no one.

21          Q.    Based on the review of the documents that

22   you have conducted so far, are you prepared to testify

23   today about the various things that happened throughout

24   the history of NCCHC's work on these topics?

25          A.    To the best of my ability, yes.

SA001108

Page 36

```
 1   BY MR. FEINBERG:
 2           Q.    You can answer.
 3           A.    I don't -- I don't agree with the word
 4   failure, your words.  I would say --
 5           Q.    I'll phrase it -- I can phrase it
 6   differently.
 7                 Would you agree, sir, that -- that Bucks
 8   County needed to make changes in the way it was
 9   conducting procedures in order to ensure the protection
10   of people in its custody?
11           A.    I believe that the recommendations made
12   by NCCHC provided us insight into making our watch
13   procedures better and keeping the inmates safer.
14           Q.    And so maybe we're saying the same thing
15   but using different words.  In summary, sir, that Bucks
16   County wanted to make changes in order to ensure the
17   safety of the prison population?
18           A.    I'll agree with that.
19           Q.    What remedies which -- I won't use the
20   word remedy.  What changes did Bucks County make
21   following receipt of the reports from NCCHC?
22           A.    We added another -- we added another
23   form where the officer actually does an observation.  It
24   was called the officers observation watch.
25                 (Court Reporter clarification.)
```

SA001109

Page 38

1            Would you repeat the question?

2       Q.    What documents do you have in front of

3  you?

4       A.    I have the report from NCCHC.  I have

5  Captain Landis's Incident Report, and I have the Suicide

6  Prevention Program policy in front of me.

7       Q.    All right.  Thank you.  Sir, before we

8  change topics -- we changed topics.  We were talking

9  about what actions Bucks County took following receipt of

10 information from NCCHC.  You've identified the creation

11 of a form.  What else happened?

12      A.    Well, we made those changes and made the

13 officers aware in, in-service training.  In our lineup

14 roll call, repeatedly the changes were given to staff.

15            Now, when you asked me that type of

16 question like that, do you mean up till right now, to

17 this date what changes, or just specifically to that

18 report?

19      Q.    Let's have -- well, let's confine it to

20 between the issuance of that report in 2016 and 2017

21 through August of 2018.

22      A.    So everything I just stated right there

23 then.  That's -- that's about accurate for the -- that

24 time frame.

25      Q.    All right.  So there are, to make sure

SA001110

Page 39

1    I've got it, the creation of a new form and an in-service

2    training, also informing officers at lineup and roll

3    call; is that correct?

4           A.    Yes.

5           Q.    Was there anything else that the County

6    did to -- in response to the NCCHC reporting between 2016

7    and August of 2018?

8                 MR. KOLANSKY:  That he recalls at this

9    time?

10                MR. FEINBERG:  Obviously.

11                MR. KOLANSKY:  Okay.

12                THE WITNESS:  I -- I thought I just

13   answered that.  I didn't -- did you add something into a

14   different question?

15   BY MR. FEINBERG:

16          Q.    No.  I was confirming, sir, that we've --

17   we've exhausted your recollection as to what happened.

18          A.    Yes.  Between that time frame, at this

19   time that's all I can remember.

20          Q.    All right.  Can you remember anything

21   else that's happened after August of 2018?

22          A.    Till this -- till today, till present

23   today --

24          Q.    Correct.

25          A.    -- 2022?  Yes --

SA001111

Page 52

1    or an interplay between the County and PrimeCare's

2    policies for addressing accreditation issues?

3            A.    Not all the time.  I mean, I believe

4    that PrimeCare has their standards.  Sometimes we are on

5    the same page and sometimes we're not.

6            Q.    When it comes to something like suicide

7    prevention, are you on the same page?

8            A.    Yes.

9            Q.    That's absolutely critical for what the

10   County does and what PrimeCare does; correct?

11           A.    Oh, it's critical.  It's critical that

12   we work in conjunction with one another.

13           Q.    Sure.  So when you're told -- when I say

14   you, meaning the County, you're told by NCCHC that your

15   standards are -- could be improved, it doesn't matter

16   whether it's you or PrimeCare; that's something that the

17   County would take very seriously; right?

18           A.    Oh, we would definitely take into

19   consideration.  And that's the whole point of this

20   conversation.  I think I agreed with that.

21           Q.    Yep, sure.  And once the County -- or

22   pardon me -- what I'm trying to get at is that the County

23   had to make two different sets of improvements in order

24   to get the accreditation.  Would you agree to that, sir?

25                 MR. KOLANSKY:  Objection again.

SA001112

Page 53

```
 1                   THE WITNESS:  I would.
 2   BY MR. FEINBERG:
 3         Q.    Okay.  One set of improvements was in
 4   2017 -- or pardon me.  One set of improvements was in
 5   2016.  The other set was in 2017.  Is that correct?
 6         A.    So the one in -- the one in '16 we made
 7   the adjustment, we got the accreditation.  Then they
 8   recommended another one a year later, in March of '17 --
 9         Q.    Well, let's --
10         A.    -- we got the accreditation.
11               (Court Reporter clarification.)
12               We got the accreditation.  So I'll agree
13   with that.
14         Q.    Now, the date on the accreditation in
15   Exhibit 35 is May of 2017.  Do you see that, sir?
16         A.    Yep.
17         Q.    To your knowledge, was there any
18   accreditation prior to May of 2017?
19         A.    No.  I'm only going off the documents I
20   have in front of me here.
21         Q.    Okay.
22         A.    When I see congratulations, I think we
23   got the accreditation.
24         Q.    Okay.  And that's in May of 2017 as we
25   know from the date of the letter; correct?
```

SA001113

Page 68

1    doesn't matter.

2            Q.    So would you agree that the

3    responsibility to supervise an Inmate Monitor is far

4    different from the responsibility to serve an inmate who

5    was just housed on the -- housed on the block?

6            A.    It's -- it's still supervision, but

7    there's different responsibilities.

8            Q.    Sure.  The Inmate Monitor has a job to do

9    to protect the safety of people in the -- in the unit;

10   correct?

11           A.    Has a -- has a job to do and to provide

12   safety for the individual that they're watching, yes.

13           Q.    So when the officer supervises the Inmate

14   Monitor, there's that added responsibility; correct?

15           A.    To the officer.  Absolutely, I'll agree

16   with that.

17           Q.    All right.  And my --my question to you

18   is, have you ever seen any document -- other than

19   Exhibit 7, which was Standard Operating Procedure 4.60,

20   have you seen any other document which discusses, in

21   terms of training or guidance or anything like that,

22   officers' responsibilities to supervise Inmate Monitors?

23           A.    I don't -- I don't recall anything

24   written down, but I -- like I said, it's like -- it's

25   like an unwritten rule.  We -- we supervise monitors.

SA001114

Page 82

1              Can you read the highlighted text to

2     yourself.  We're on Page 50, from lines 4 through 13,

3     and let me know when you're finished.

4              A.    (Witness reviewed document.)  I'm

5     finished.

6              Q.    All right.  So, sir -- and for context,

7     this portion of Mr. Young's testimony concerned questions

8     on the very same topics that I've been asking you about,

9     about responsibility to supervise Inmate Monitors.  Would

10    you agree that in Mr. Young's view, he says it's not

11    mandatory for officers to review Inmate Monitor forms as

12    part of his supervision of the Inmate Monitor?

13              MR. KOLANSKY:  Objection to the form of

14    the question.  You can answer it.

15              THE WITNESS:  I can't speak for Officer

16    Young, but I believe that, according to his statement

17    here, that he was inaccurate on his statement.

18    BY MR. FEINBERG:

19              Q.    Do you have any idea how Officer --

20    strike that.  So when you say he's inaccurate, he's

21    interpreting his responsibilities incorrectly; is that

22    right?

23              A.    Yes.

24              Q.    Do you have any understanding as to why

25    Officer Young would tell me in December of 2020 this

Page 83

 1   testimony or give me this testimony in December of 2020,

 2   having received the training that you've described

 3   previously?

 4                   MR. KOLANSKY:  Objection to the form of

 5   the question.  Go ahead.

 6                   THE WITNESS:  So I believe the only way

 7   he would give that kind of answer is that you might have

 8   made him nervous or maybe he didn't hear the question.

 9   I --

10   BY MR. FEINBERG:

11           Q.    Well --

12           A.    Can I say one thing?  So I'm at 10

13   percent on my tablet here.  I'm about ready to move so I

14   can plug it in, so can you give me like 10 seconds?

15           Q.    Sure.

16                 (Short pause.)

17           A.    All right.  Thank you.

18           Q.    Sir, you've -- you've -- you've suggested

19   that perhaps Mr. Young was nervous when he was talking to

20   me or just mistaken.

21                   I asked you at the beginning of today's

22   deposition whether you recalled going through, in May of

23   2021 with me, a number of different statements that

24   Mr. Young made in his deposition.

25                   Let me kind of reframe the question now.

Page 88

1  conversation.

2          Q.    All right.  Let me show you one other

3  portion of your testimony, sir.  It's at Page -- first --

4  yeah, while -- while we go by it -- at Page 118, would

5  you read the highlighted text there from your testimony.

6          A.    (Witness reviewed document.)  Finished.

7          Q.    All right.  So, sir, you told me in May

8  of 2021 that if you had spoken to Mr. Young you would've

9  disciplined him.  I take it your conclusion is the same

10 today?

11         A.    Yes.

12         Q.    The final portion I wanted to ask you

13 about in your deposition transcript, sir, is I asked you

14 this series of questions on --

15               MR. KOLANSKY:  Page?

16 BY MR. FEINBERG:

17         Q.    -- Page 121.  Could you read that portion

18 of the transcript to yourself, and let me know when

19 you're finished.

20         A.    (Witness reviewed document.)  I'm done.

21         Q.    So, sir, obviously you told me that --

22 that you thought that you might speak to Officer Young

23 and Officer Moody about their actions on the cell block

24 where Mr. Freitag killed himself on August 25th of 2018.

25 Did you ever do that?

SA001117

Page 89

1                    MR. KOLANSKY:   Objection.   This is,

2    again, outside the scope of this deposition, and it is

3    inappropriate to go into this now.   You keep -- you

4    don't get a second bite at the apple, Jon.

5    BY MR. FEINBERG:

6           Q.    You can answer, sir.

7           A.    So to answer your question, no, I never

8    spoke to him.

9           Q.    Why not?

10                   MR. KOLANSKY:   Objection.

11   BY MR. FEINBERG:

12          Q.    You can answer.

13          A.    So when I finished the -- the deposition

14   back then, I -- I thought about it.   I did think about

15   it, and I said to myself, I don't want to jeopardize the

16   case.

17                   So I know I swore an oath and I -- I

18   swear to tell the truth, but I also believed in these

19   depositions -- I think they're to be kept private, also,

20   and there shouldn't be any -- disseminating any

21   information forward until everything is resolved.

22                   So at that point there was nothing

23   resolved.   I was speaking as a -- on my -- on my

24   emotions at the time, so that's why I never followed up.

25   I kinda had a calmer perspective afterwards.

SA001118