# Exhibit 65
# Reed Deposition

SA001129

Kelly Reed

Pages: 5, 12, 13, 27, 28, 29, 30, 32, 33, 34, 35, 37, 38, 45, 48, 49, 50, 51, 52

Dated: May 5, 2021

SA001130

Kelly Reed

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHARLES JOSEPH FREITAG, | : | NO. 2:19-cv-05750-JMG |
| JR., as Administrator of | : | |
| the ESTATE OF CHARLES | : | |
| JOSEPH FREITAG, SR., | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| BUCKS COUNTY; PRIMECARE | : | CIVIL ACTION - LAW |
| MEDICAL, INC.; STEPHAN | : | |
| BRAUTIGAM, PMHNP; | : | |
| JESSICA MAHONEY, PSY.D.; | : | |
| AVIA JAMES, LPC; | : | |
| CHRISTINA PENGE, LPC; | : | |
| CORRECTIONAL OFFICER | : | |
| MOODY; CORRECTIONAL | : | |
| OFFICER MURPHY; and | : | JUDGE JOHN M. GALLAGHER |
| CORRECTIONAL OFFICER | : | |
| YOUNG, | : | |
| Defendants | : | |

---

ZOOM DEPOSITION OF KELLY REED

DATE AND TIME:  Wednesday, May 5, 2021
                at 1:15 p.m.

---

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112  1-877-KLW-DEPO
www.klwreporters.com

Kelly Reed

Page 5

1    dispense with some of my early instructions and

2    description of the case, since you've already heard them.

3    If at any point, however, you'll -- you feel like I'm

4    asking you a question where I've left something out, you

5    don't have the details, let me know and then I'll go back

6    and explain.

7              A.    Perfect.

8              Q.    Just to -- to wrap that up, though, do

9    you have a general understanding of what this case is

10   about and the incident that it concerns?

11             A.    Yes, I do now.

12             Q.    Very good.  Do you have -- have you ever

13   testified in a deposition before?

14             A.    No.

15             Q.    Have you ever testified in court before?

16             A.    As a victim.

17             Q.    So in a -- in a criminal matter.  Is that

18   correct?

19             A.    Yes.

20             Q.    How long ago was that?

21             A.    A couple years now.

22             Q.    Generally, you understand what it means

23   to testify under oath.  Can I assume that?

24             A.    Yes.

25             Q.    And you understand that this proceeding,

A. Yes.

Q. Haven't left for any other jobs. Is that correct?

A. Correct.

Q. Could you walk me through then the various responsibilities and titles that you've had from '03 through the present?

A. So I started as a Case Manager. That was in '03. I was employed as a Case Manager for about 11 years, and then I was promoted to Community Corrections Manager. That was over at a separate building, the Community Corrections Center, but still under the DOC. Did that for about four years, and then I was promoted again to -- back then it was Assistant Warden.

Q. And that title changed. Is that correct?

A. Yes, it changed three times.

Q. And now it is Deputy Warden of -- my goodness, you've told me seven times now and I forget -- Deputy Warden of Treatment?

A. Close. It's one of the three. No. It's Deputy Superintendent of Programs now.

MR. KOLANSKY: What did you have for lunch, Jon?

MR. FEINBERG: Not enough, apparently.

Kelly Reed

Page 13

1  So, let's -- well, I'm not one to stand on ceremony,

2  Jeff, as you know, so titles don't mean anything to me.

3  BY MR. FEINBERG:

4         Q.    So, Ms. Reed, let's -- let's discuss now

5  the -- the responsibilities in your current job.  I take

6  it, despite the change in titles, you've had the same

7  responsibilities.  Is that correct?

8         A.    Correct.

9         Q.    Could you tell me what you do on a

10 day-to-day basis?

11        A.    So I oversee all the treatment areas,

12 Medical, Mental Health, the Case Managers, Drug and

13 Alcohol.  I assist with policy.  I ensure that all

14 departments are up and running.  I conduct grant writing

15 and grant reporting.  The list goes on.  I also oversee

16 PREA.  I'm the PREA Coordinator at the moment.

17        Q.    You mentioned -- the first two items you

18 mentioned were that you oversee Medical and Mental

19 Health.  Did I hear you correctly?

20        A.    Yes.

21        Q.    Now, obviously, I'm aware that PrimeCare

22 Medical provides the medical and mental health

23 practitioners who work in that unit.  Is that correct?

24        A.    Yes.

25        Q.    What -- what involvement do you, on the

Kelly Reed

Page 27

1    professionals refer to this generically as bad news

2    category.  Have you ever heard that phrase before?

3              A.    Yes.

4              Q.    And -- and -- and maybe it sounds

5    obvious, but any type of incidents, including denial of

6    bail, denial of parole, receiving a sentence, getting

7    convicted, those are all consequences that could increase

8    the risk of suicide.  Is that correct?

9              A.    Absolutely.

10             Q.    And to show you specifically the -- in

11   the policy, the text that's highlighted there -- why

12   don't I just read it.  Inmates may become suicidal at any

13   time during their incarceration.  Suicidal behavior is

14   more likely at critical periods of time, including

15   commitment and the first several days thereafter, court

16   hearings, sentencings and so on.

17             Did what I just read, does -- is that

18   consistent with your basic understanding of how risks of

19   suicide may be present in a -- in an inmate population?

20             A.    Yes.

21             Q.    All right.  Given that knowledge -- I'm

22   sorry, before I even get there, can I assume that you're

23   here on Bucks -- Bucks -- on behalf of Bucks County, that

24   Bucks County was fully aware of the increased risk during

25   these time periods?

Kelly Reed

Page 28

1          A.     Yes.

2          Q.     And I assume Bucks County would be aware

3    that failing to address risks at these time periods could

4    increase the risk of suicide or self-harm.  Is -- is that

5    correct?

6          A.     Yes.

7          Q.     And that risk was -- was obvious to Bucks

8    County.  Is that correct?

9          A.     Yes.

10          Q.     What practices were in place in August of

11    2018 to address this increased risk of suicide or

12    self-harm when people came back from court at these

13    critical time periods?

14          A.     So Case Managers are required to touch

15    base with the inmates once they're sentenced or even

16    after any other court date if we find a need.  The only

17    thing is, is our policy does not quote the amount of

18    time that they -- like should they check in immediately,

19    should -- do they have 72 hours.  So there's no

20    timeframe noted, and there still isn't any noted to this

21    day.

22                 However, when they do come back from

23    court, if they are sentenced to a lengthy sentence, our

24    Records Department usually flags it, contacts

25    Administration, as well as the person that's on Case

Kelly Reed

Page 29

1    Manager-wise, so that way we can touch base with them and

2    make a referral, if necessary.

3              If Mental Health is not around, we would

4    certainly put them in a -- on a watch level.  If we

5    believed that they presented in a way that we deemed

6    appropriate, the person be placed on watch.

7         Q.   Is it fair to say that in August of 2018,

8    the expectation or any decisions to be made by watch

9    would be made by correctional staff?

10        A.   Yes.  If Mental Health was not present,

11   absolutely, we would have to evaluate any person and

12   place them on a watch status if we thought it was

13   appropriate.

14        Q.   I'm going to come back in a moment to

15   talk about -- or actually, that's the last topic about

16   whether Mental Health was available.

17        A.   Okay.

18        Q.   My understanding is that in 2018 Mental

19   Health left the facility no -- no later than 4:00 p.m.

20   Is that your recollection, as well?

21        A.   I would like to say yes.  I'm not a

22   hundred percent sure though.

23        Q.   I'll show you some documents to confirm

24   that we're on the same page there.  All right.  Before we

25   do that, though -- let me ask you, when people come back

Kelly Reed

Page 30

1   from court, is -- was there a typical time -- first, even

2   more basic, how are prisoners -- pre-COVID, how were

3   prisoners transported from the prison to court?

4           A.   By the Sheriff's Department and usually

5   it is around the same time every single day.  Our p.m.

6   court run came back maybe 3:00, 4:00 o'clock, sometimes

7   later, so it did vary a little bit, but it was right

8   around that timeframe.  By the time they were back in

9   process, et cetera, before they can be seen by anybody

10  else, it -- it does take a little bit of time.

11          Q.   All right.  So if they come back at 3:00

12  or 4:00 p.m., it's usually after 4:00 p.m. that they're

13  actually back in the facility and could be seen by

14  someone.  Is that correct?

15          A.   Correct.

16          Q.   So when a -- in that time period, again,

17  back in 2018, for someone in that position, coming back

18  in the late afternoon, decisions about watch would be

19  made by correctional staff, as we've established.  Is

20  that correct?

21          A.   Correct.

22          Q.   Now, obviously, correctional staff don't

23  have mental health training.  Is that right?

24          A.   No, we do, it's just limited, not to the

25  extent that, you know, a psychiatrist or psychologist

Kelly Reed

Page 32

1   their checks.  Is that correct?

2          A.     Correct.

3          Q.     Now, I know this is outside of the topics

4   that we're going to address with you today, but let me

5   ask.  Have you ever heard any discussion, in your

6   position, about problems with Correctional Officers or

7   Inmate Monitors complying with checks?

8          A.     Yes.

9          Q.     When did you hear about those problems?

10         A.     Throughout my career.  The number of

11  watches has always been an issue.  There is a lot of

12  complaints.  Whether or not they were completing all

13  their tasks, I can't really comment on that because I

14  never oversaw that directly, but I can say that officers

15  complained on a regular basis.

16                Nowadays there are still complaints, and

17  from time to time we do see issues where we have to

18  redirect staff to correct the problem.

19         Q.     Let me -- let me drill down on that.  You

20  said the complaints have to do with the number of

21  watches.  I think I can make an assumption about why

22  that's a complaint, but could you articulate it for me,

23  as you understand it, at least?

24         A.     The lack of time to make sure that

25  they're following policy and procedure accurately.

Kelly Reed

Page 33

```
1          Q.    Got it.  All right.  So in other words,
2    officers are saying to you, in essence, we have to watch
3    so many people on our units we don't have time to do it
4    all.  Is that correct?
5          A.    Sometimes, yes, with all the other daily
6    duties that come about, yes.
7          Q.    And the complaint is that because they
8    don't have time -- well, strike that.  Then apparently
9    the -- the concern, from your perspective, is that if
10   they don't have time to do all the watches, then they're
11   not complying with what they're supposed to do on --
12   under the watch.  Is that correct?
13         A.    That's a concern, yes.
14         Q.    You mentioned that you've heard that
15   complaint throughout your career since you started in
16   2003.  Is that correct?
17         A.    Yes.
18         Q.    Can you -- can you even estimate for me
19   how many times you've heard that complaint?
20         A.    Probably hundreds.
21         Q.    So hundreds of times between 2003 and the
22   present you've heard officers say, we just don't have
23   enough time to do the watches we're supposed to do.  Is
24   that correct?
25         A.    Correct.
```

SA001140

Kelly Reed

Page 34

1          Q.    What actions, if any, has the

2    Administration taken to address those complaints?

3          A.    I can't speak about my 11 years as a

4    Case Manager, but when I came back over here in the

5    Deputy spot, I mean, we supplied an extra officer on

6    certain modules to ensure that all their duties are

7    completed, especially if they are saying that they

8    cannot complete X, Y and Z, whether it includes watches

9    or not.

10              I mean, there -- there -- there's a lot

11    of things that we have done.  We -- we do checks with the

12    supervisors now.  Even if Mr. Nottingham commented on

13    this, you still want me to explain a little bit?

14          Q.    And before you get into it, can -- can I

15    just -- you said at the beginning, but I didn't make a

16    note of it, when did you start in the Deputy

17    Superintendent position?

18          A.    Two years ago in --

19          Q.    Okay.  So from 2019?

20          A.    '19.  Sorry, I'm talking over you.

21          Q.    That's quite all right.  Please continue,

22    and you can tell me about what else has been done since

23    you took that position in 2019.

24          A.    Okay.  We sent sergeants down to the

25    modules to make sure that all the watches are accurate

Kelly Reed

Page 35

1  and reflect appropriately in the computer, as well as

2  what they have on the module.

3          PrimeCare now sends out a digital form

4  through email, so we have it in writing versus word of

5  mouth.  We're documenting more.  The conversation saying,

6  hey, this person is off watch, so it's now documenting

7  who -- who that was relayed to and by who.

8          There's just a lot more effort into make

9  -- making sure it goes smoothly.

10          Q.    If I understand your testimony then,

11  prior to you being in that position in 2019, from your

12  understanding, these complaints about officers' inability

13  to comply with their watch obligations were made with

14  regularity all throughout your career.  Is that correct?

15          A.    Yes.

16          Q.    Are you aware of any steps that were

17  taken before 2019 to address those concerns?

18          A.    I am not aware.

19          Q.    Since you've taken those measures from

20  2019 through the present, have those complaints

21  decreased?

22          A.    I would like to say yes.

23          Q.    Now, when you say -- I -- your answer is

24  a beautiful one, and I -- I understand that you,

25  obviously, have some aspirations in your position, so my

SA001142

Kelly Reed

Page 37

1  obligations.  Is that correct?

2         A.    Yes.

3         Q.    Before you became the Deputy

4  Superintendent in 2019, given your position, I take it

5  you didn't have any authority to implement the procedures

6  that you've described.  Is that correct?

7         A.    Correct.

8         Q.    Who -- who did have authority at that

9  point?

10        A.    It was Lillian Budd.

11        Q.    Oh, got it, okay.  She was the Assistant

12 Warden?

13        A.    Correct.

14        Q.    So let's go back to -- I think we got on

15 this topic because I asked you that when a Case Manager

16 makes an assignment of a watch, the assumption that is

17 built in is that the officer will actually do the job.

18 Is that right?

19        A.    Correct.

20        Q.    And it sounds like, given what you've

21 described, that assumption back in 2018 was not a -- not

22 always a valid assumption.  Is that correct?

23        A.    Yes.

24        Q.    Because there were -- it was known to

25 Bucks County at that point, in 2018, that the watches may

Kelly Reed

Page 38

1    not be completed as required.  Is that correct?

2            A.    I don't wanna say that they're -- they

3    weren't going to be completed, but it was never

4    validated after the fact.

5            Q.    Got it.  Okay.  So -- and let me restate

6    my question and then use your -- your language.  The

7    assumption that the watch would be completed was not a

8    valid one because no one was doing the checking and

9    monitoring to ensure that officers were doing their job.

10   Is that correct?

11           A.    It was their duty to do so, but I don't

12   believe there was any follow through from Administration

13   to confirm that everybody is following rules and

14   regulations of the facility.

15           Q.    Got it.  And for that reason, what you've

16   just said, that's why once the assumption was made on

17   August 24th, 2018, that officers would check on Mr.

18   Freitag, that was not a valid assumption.  Is that

19   correct?

20                 MR. KOLANSKY:  Objection to the form of

21   the question.

22                 THE WITNESS:  Yes.

23   BY MR. FEINBERG:

24           Q.    Now, so we've discussed that Mr. Freitag

25   was placed on a Level 3 watch when he came back after he

SA001144

Kelly Reed

Page 45

1  August, 2018, the nature of and any reasons for any such

2  changes.

3              I take it you're prepared to testify

4  about that topic.  Is that correct?

5              A.    Yes.

6              Q.    We've already -- you've already described

7  for me that back in 2018, your expectation is that people

8  who were coming back from court in the afternoon would

9  get back after 4 o'clock.  Is that right?

10             A.    Correct.

11             Q.    And your understanding is that Mental

12 Health staff were not available after 4:00 p.m.  Is that

13 correct?

14             A.    Correct.

15             Q.    Let's do -- and just to review something

16 that we touched on before, but to dive in a little

17 deeper, the mental health training that Case Managers

18 have, would you agree, is not sufficient to fully assess

19 someone's risk of suicide?  Is that correct?

20             A.    Yes, agreed.

21             Q.    Are you -- are you familiar with a

22 document or a psychological instrument called a Suicide

23 Risk Assessment?

24             A.    I'm aware of it, but I don't believe

25 I've ever seen it.

Kelly Reed

Page 48

1          A.     No, I don't recall.

2          Q.     To my understanding, there has been a

3    change made that Mental Health staff are now available

4    until at least 5:00 p.m. for people -- when people return

5    from court.  Is that your understanding, as well?

6          A.     Yes, but unfortunately they recently

7    lost a few employees, so I'm not sure which person was

8    responsible for staying until 5 o'clock, so I can't

9    comment.  It was just recent.  And then they're also

10   losing another individual.  So I would hope that they're

11   here to 5:00 still and managing, but I -- I don't -- I

12   can't really comment on that today.

13         Q.     Got it.  Okay.  So -- so that's a

14   personnel issue as opposed to a policy issue.  Is that

15   correct?

16         A.     Right.  It's their intention that

17   somebody was here till 5:00.

18         Q.     And you used the phrase -- I think I

19   heard you say, hopefully they'll fill that position.  Is

20   that right?

21         A.     Yes.  You know, sometimes it does take

22   time to fill positions.

23         Q.     Sure.  Can you articulate for me then

24   why, from your perspective in your role, it's important

25   to have Mental Health staff available when people return

SA001146

Kelly Reed

Page 49

1  from court?

2          A.    I think we should have Mental Health

3  staff available throughout the evening, honestly.

4  Unfortunately, a lot of issues arise in the evening when

5  they are not here.  And we do have to make judgment

6  calls and, of course, we overestimate, for lack of a

7  better word.  Like we would put somebody on a Level 1

8  when, in reality, the person should only be on a Level 2

9  just to be cautious.  So it would be beneficial if we

10  actually had Mental Health staff here longer throughout

11  the day.

12          Q.    Got it.  Are there ever situations where

13  you're concerned that you might be underestimating?

14          A.    Not typically.

15          Q.    One of the set of facts that we've

16  discussed in the Freitag case -- and let me -- I'm going

17  to make some representations to you about the facts in

18  the case and Counsel can feel free to object, I'm just

19  giving you my understanding -- is that Mr. Freitag was in

20  custody between June, early June and August 25th of 2018.

21  And throughout that time he communicated to Mental Health

22  staff that he was deeply anxious about his upcoming

23  sentencing.  Were you aware of any of those facts before?

24          A.    No.

25          Q.    And early on in the period of his

SA001147

Kelly Reed

Page 50

1  incarceration, he advised Mental Health staff that he

2  wanted to see someone following his sentencing.  Can I

3  assume you were not aware of that, as well?

4          A.    I was not aware.

5          Q.    Because his sentencing was scheduled to

6  take place on a Friday, August 24th of 2018, the earliest

7  appointment that could be made at that time for him to

8  see a mental health practitioner was on the following

9  Monday, the morning of August 27th.  Were you aware of

10 those facts?

11         A.    No.

12         Q.    Dr. Abbey Cassidy in her deposition

13 several weeks ago, I believe testified that given Mr.

14 Freitag's presentation over the past -- over the previous

15 two and a half months before his death, it would have

16 been clinically appropriate for him to be seen

17 immediately upon return from court.  Again, that's my

18 representation.  Had you ever heard that before?

19         A.    No.

20         Q.    Okay.  I -- I make all those factual

21 representations to you to lead up to this question.

22 Following or at any time in your position since January

23 of 2019, has there ever been any discussion about the

24 fact that you've gotta have mental health care available

25 to conduct risk assessments with people who they've spent

Kelly Reed

Page 51

1    months seeing?

2              A.    On top of that, Abbey has reached out to

3    case management staff, as well, in the event her staff

4    isn't here to make them aware, hey, when this person

5    goes to court, this is the level -- appropriate level

6    they need.  I don't recall that ever happening in the

7    past.

8              Q.    So that's something that's happened

9    recently since you took your position.  Is that correct?

10             A.    Maybe even before that, but as a Case

11   Manager, I remember that never happening.

12             Q.    So -- and you may not have the basis to

13   know this, but are you -- are you making an assumption

14   that that may be something that happened after Mr.

15   Freitag's death in August of 2018?

16             MR. KOLANSKY:  Objection, form of the

17   question.

18   BY MR. FEINBERG:

19             Q.    He's just putting that on the record --

20             A.    Oh.

21             Q.    -- but you can answer the question.

22             A.    Okay.  Yes, that would be my assumption.

23             Q.    And it sounds like, from your

24   perspective, a prisoner who has a -- a history of mental

25   illness, when they come back from court, they should be

SA001149

Kelly Reed

Page 52

1   seen.  Is that correct?

2          A.   Yes.

3               MR. KOLANSKY:  Objection.  Outside the

4   scope of the witness's testimony.

5   BY MR. FEINBERG:

6          Q.   Can -- let me do this.  I've asked --

7   I've asked the parties to provide me with records of when

8   this change was made to have an employee available in the

9   late afternoon following court, and the only thing that I

10  think I've seen to date is a document that I'm pulling up

11  now -- I think this is the first time I'm introducing

12  it -- is Exhibit P-30.

13              (Exhibit shown.)

14              This is a -- an email -- first, do you

15  see, Ms. Reed, Exhibit P-30 in front of you?

16         A.   Yes.

17         Q.   Take a moment just to read -- there's a

18  lot of redactions here, but take a moment to read this

19  text and let me know when you finish.

20              MR. KOLANSKY:  Jon, can I ask just where

21  this came from?  Did it come from us?

22              MR. FEINBERG:  No, it came from John

23  Ninosky's office earlier in the case.

24              MR. KOLANSKY:  Gotcha.

25              THE WITNESS:  Okay.

SA001150