# Exhibit 66
# Bochenek Deposition

SA001151

Frank Bochenek

Pages: 31, 32, 35, 36, 40, 41, 42, 43, 44, 52, 53, 54, 55, 56, 57, 61, 62, 66, 70, 71

Dated: May 5, 2021

SA001152

Frank Bochenek

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


CHARLES JOSEPH FREITAG,      :    NO. 2:19-cv-05750-JMG
JR., as Administrator of     :
the ESTATE OF CHARLES        :
JOSEPH FREITAG, SR.,         :
            Plaintiff        :
                             :
       vs.                   :
                             :
BUCKS COUNTY; PRIMECARE      :    CIVIL ACTION - LAW
MEDICAL, INC.; STEPHAN       :
BRAUTIGAM, PMHNP;            :
JESSICA MAHONEY, PSY.D.;     :
AVIA JAMES, LPC;             :
CHRISTINA PENGE, LPC;        :
CORRECTIONAL OFFICER         :
MOODY; CORRECTIONAL          :
OFFICER MURPHY; and          :    JUDGE JOHN M. GALLAGHER
CORRECTIONAL OFFICER         :
YOUNG,                       :
            Defendants       :

_____


            ZOOM DEPOSITION OF FRANK BOCHENEK


        DATE AND TIME:   Wednesday, May 5, 2021
                         at 2:30 p.m.


_____


                KAPLAN LEAMAN & WOLFE
        COURT REPORTING & LITIGATION SUPPORT
         230 SOUTH BROAD STREET, SUITE 1303
          PHILADELPHIA, PENNSYLVANIA 19102
          (215) 922-7112  1-877-KLW-DEPO
                www.klwreporters.com

SA001153

Frank Bochenek

Page 31

1          Q.     When you say recording, you're referring
2    to an audio recording?
3          A.     That is correct.
4          Q.     And I -- I think what you said is that's
5    their usual practice.  You don't know whether that
6    happened in this case.  Is that correct?
7          A.     That is correct.  I was not present for
8    this.  I don't know.
9          Q.     Now, we know from other documents -- it's
10   not described here -- that -- but we know that Mr.
11   Freitag was on a watch, a Level 3 watch at the time of
12   his suicide.  Were you aware of that, sir?
13         A.     I learned of that after the incident.
14   Yes.
15         Q.     Now, after -- I know that you were
16   involved in some discussion -- let me strike that for one
17   second and take this document down.  I know that you were
18   involved in a discussion about the watch levels in
19   October of 2019.  When between the death in August of
20   2018 and October of 2019 did you first learn that Mr.
21   Freitag had been on a watch status at the time of his
22   death?
23         A.     I learned shortly after the incident
24   that he had been placed on a watch status.
25         Q.     So that -- I took the document down with

Frank Bochenek

Page 32

1   the interview, but I know that you've read it recently so

2   can we agree that it appears that Officer Young --

3   neither Officer Young nor Officer Moody were asked about

4   whether they had conducted any watch of Mr. Freitag?

5           A.    Yes, I don't know.

6           Q.    So yes, they were not asked and no, you

7   don't know why.  Is that correct?

8           A.    No, I'm sorry, that's incorrect.  I

9   confused you.  I do not know if they were asked, and I

10  do not know.  I wasn't present.

11          Q.    Okay.  Great.  Well, and we agree that

12  there's -- if they were asked, that you would expect it

13  would be referenced in the Investigation Report.  Is that

14  correct?

15          A.    Correct.

16          Q.    And since it's not there, you can at

17  least draw the assumption that they were not asked.  Is

18  that correct?

19          A.    Correct.

20          Q.    And assuming that that assumption is

21  correct, it sounds like you don't know why they were not

22  asked.  Is that correct?

23          A.    Correct.

24          Q.    Now, I know -- it sounds like the

25  immediate focus of the investigation was to determine

Frank Bochenek

Page 35

1           Q.    Right, and I take it that's -- remains
2    your conclusion today, you've never seen any -- anything
3    to the contrary.  Is that correct?
4           A.    Correct.
5           Q.    Once the determination was made that it
6    was a suicide, was there -- and which sounds like it was
7    made pretty -- pretty quickly on -- on that day.  Is that
8    correct?
9           A.    Yes.
10          Q.    Once that determination was made, was
11   there any other purpose for your investigation?
12          A.    I -- I don't understand what you mean,
13   any other purpose.
14          Q.    Let me ask it this way.  Yeah.  Once the
15   -- once you knew it was a suicide, was there anything
16   else that you had left to do in your investigation?
17          A.    Well, there was -- we believed that it
18   was a suicide, and until all the documents were
19   received, the Coroner's report and all the other
20   subsequent, then we concluded that it was definitely a
21   suicide.  But till that point in time, we continued to
22   interview and look at different aspects to make certain
23   that there was no other involvement.
24          Q.    Got it.  All right.  And I take it that
25   the key conclusion that you would have received would

SA001156

Frank Bochenek

Page 36

1   have been the finding of the Medical Examiner, who

2   concluded that it was a -- was a death by suicide.  Is

3   that correct?

4           A.    That's correct.

5           Q.    Once you had that conclusion, was there

6   any other purpose to your investigation?

7           A.    No, sir.

8           Q.    I want to come back to the point we

9   discussed before about whether you looked into any

10  officer conduct.  And let me ask that question by

11  focusing specifically on this.  You mentioned to me that

12  you learned that Mr. Freitag was on a -- a watch;

13  correct?

14          A.    Correct.

15          Q.    How did you learn that, by the way?

16          A.    Through the OMS records that it was

17  indicated he was on a Level 3 CMHS regular watch with

18  observation.

19          Q.    Were you aware -- well, strike that.

20  Given that you were not assigned to work on a housing

21  module or supervise officers on a housing module, did you

22  have under -- any understanding as to what officers'

23  obligations were to comply with watch procedures?

24          A.    Specifically, no, but I do know that

25  under their routine, so to speak, or their job

Frank Bochenek

Page 40

1    '18 and October of '19?

2            A.    The investigation was being conducted by

3    Onisick and Disandro, and I was just reviewing it.   I

4    was referring information to the Director and Deputy

5    Director my concerns about, first of all, the cup, also

6    about watch status, how confusing they were, and that

7    they should be looked into.

8                  Again, the watch statuses and those

9    procedures did not fall under investigations, so that

10   wasn't my area of investigating whether or not they were

11   done correctly.   That would be falling under the

12   Administration.

13           Q.    And let's look at your memo from October

14   of 2019.   And I want to ask about the precursors to this

15   memo in a little bit, but first I want to highlight one

16   sentence in the middle of the document.

17                 (Exhibit shown.)

18                 First of all, let's confirm, Exhibit P-10,

19   is this your memo?

20           A.    Yes.

21           Q.    All right.   Now, there's a dark line that

22   appears on it.   We're not exactly sure where that came

23   from.   It appears to be an artifact of the way this

24   document was produced, so I'll ask you to disregard that.

25                 It sounds like -- strike that.   Let me --

SA001158

Frank Bochenek

Page 41

1   let me ask would you agree.  You were asked some

2   questions in a meeting with Lindsay Hayes, Emily

3   Scordellis and Dr. Abbey Cassidy, and then you wrote a

4   memo about the conversation that ensued.  Is that

5   correct?

6           A.    Correct.

7           Q.    The question was -- and that's what's

8   highlighted -- and I take it that you're referring to a

9   question that was posed by Mr. Hayes.  Is that correct?

10          A.    Correct.

11          Q.    The question was, Did the investigator

12  look into the watch issue and check with the Module

13  Officers to see if the watch was put into place.  Is that

14  the question that you were asked in October of 2019?

15          A.    That's correct.

16          Q.    You then wrote, Investigators did not

17  look into the issue.  Did I read that correctly?

18          A.    Correct.

19          Q.    So it sounds like that when you wrote in

20  October of 2019, that no one had looked into this

21  question of watch.  Is that correct?

22          A.    Well, there was discussion about that.

23  That's how I learned how the -- the -- the -- the watch

24  was issued to him.  He was placed on the watch, but it

25  was no investigation.  It was just a question with the

SA001159

Frank Bochenek

Page 42

1   Administration, where it was or how it came about.

2           Q.   At any point before October of 2019, did

3   the -- and by the way, when you -- and I'm sorry, let me

4   start over.  You -- it sounds like what you're describing

5   is some kind of interfacing with the Administration.  Is

6   that correct?

7           A.   Correct.

8           Q.   Would that be the Director?

9           A.   That would be the Director and Deputy

10  Director, yes.

11          Q.   Director Pirolli and who's the Deputy

12  Director?

13          A.   David Kratz.

14          Q.   Kratz, K-R-A-T-Z?

15          A.   Correct.

16          Q.   Yeah.  What -- what it sounds like you're

17  describing is that there's some kind of discussion at

18  some point with both Director Pirolli and Deputy Director

19  Kratz; correct?

20          A.   Correct.

21          Q.   At any point between August of 2018 and

22  October of 2019, did either of those men say to you,

23  look, Mr. Bochenek, we gotta find out whether the

24  officers did their job in this case?

25          A.   Not -- not directly.  I reported to them

SA001160

Frank Bochenek

Page 43

1    the findings of the video review.

2           Q.    And that -- those findings were reported

3    in October of 2019.  Is that correct?

4           A.    And also, I think, before that, back --

5    I think Mr. Onisick also indicated the review of the --

6                 (Court Reporter interrupted.)

7                 I also believe that Mr. Onisick had

8    indicated in his report or review of the video showing

9    that the officers were doing their rounds.  As far as, in

10   particular, for the watch itself, no.  We did not look

11   into that, per se, because it wasn't under our

12   Administration.  It was under the Administration, not

13   under investigations.

14          Q.    Got it.  Okay.  So it sounds like then

15   that no one in the Administration asked you to look into

16   it.  Is that correct?

17          A.    Correct.

18          Q.    When I say it, I'm referring to whether

19   the Inmate Monitors were looking into the cell as

20   required under the watch.  Is that correct?

21          A.    That's correct.

22          Q.    And you did not affirmatively take the

23   step of looking into that until you had this meeting with

24   Lindsay Hayes in October of 2019.  Is that correct?

25          A.    I believe so, yes.

Frank Bochenek

Page 44

1          Q.     If anyone would have been responsible to

2    looking into the question of whether the officers had

3    done their job, that would have been the Security

4    leadership.  Is that correct?

5          A.     That's my understanding, yes.

6          Q.     Captain Durning, was it?

7          A.     Initially, but at that time it was

8    Captain Landis who was the captain at the time.

9          Q.     At which time, October of 2019?

10         A.     Of '18 when the -- when the unfortunate

11   incident occurred.

12         Q.     Got it.  And you don't recall any

13   discussion with either Captain, whatever the time period,

14   about the monitoring.  Is that -- about the Inmate

15   Monitor position.  Is that correct?

16         A.     Yeah, I don't -- I -- I do not recall,

17   yes.

18         Q.     Before this case occurred with Mr.

19   Freitag, did you have any knowledge as to how the

20   monitoring procedures were supposed to work?

21         A.     No, sir.

22         Q.     Is this case the first situation with --

23   well, strike this -- strike that.  So do I understand you

24   correctly that it was only in connection with this case

25   that you learned about what was supposed to happen with

Frank Bochenek

Page 52

1          Q.    I think we got on this topic by talking

2    about complaints that you heard over the course of your

3    career that Inmate Monitors were not doing their jobs

4    properly.  Am I remembering correctly that you said that

5    you heard occasional reports like that?

6          A.    Yes.

7          Q.    Did you ever hear reports about Inmate

8    Monitors falsifying information on their monitor forms?

9          A.    I wanna say I have, but I can't say

10   anything in particular what I recall of the incidents.

11         Q.    And do you recall any conversation about

12   those -- about those incidents, about how you would need

13   to -- there was a need to address those falsifications,

14   increase supervision, anything like that?

15         A.    I do recall conversations about that,

16   but whom and what I can't -- I don't know exactly who.

17         Q.    I mean, at the risk of stating the

18   obvious, sir, if an Inmate Monitor is supposed to observe

19   a prisoner and then falsifies a report, that's a

20   significant concern; right?

21         A.    I agree.

22         Q.    The Inmate Monitors are -- are there for

23   a reason; right?

24         A.    Correct.

25         Q.    Their job is to make sure that a person

SA001163

Frank Bochenek

Page 53

1   who might be at risk of hurting him or herself or maybe

2   they're going through detox and have medical situations,

3   the Inmate Monitor's job is to call attention to

4   Correctional staff or Medical staff if it's needed.  Is

5   that correct?

6          A.    That's correct.

7          Q.    So if an Inmate Monitor is writing false

8   information about an observation when they're not

9   actually conducting the observation, that's something

10  that would be of great concern to Bucks County.  Is that

11  correct?

12         A.    I agree.

13         Q.    Am I correct then in understanding that

14  no one -- that prior to October of 2019, no one connected

15  these dots that you did when you looked at the video

16  after your conversation with Mr. Hayes?

17         A.    I'm not aware.

18         Q.    You're not aware of anyone making that

19  conclusion.  Is that correct?

20         A.    Correct.

21         Q.    And I'll represent to you, sir, that the

22  only document that I've seen and -- well, strike that.

23  Let's back up.  Can we agree that anytime there's a death

24  or a suicide in the prison, with the investigation that

25  follows there's fairly extensive documentation that's

Frank Bochenek

Page 54

1    prepared.  Is that correct?

2            A.     That is correct.

3            Q.     The purpose of that documentation is to

4    figure out what happened and make a record of it.  Is

5    that correct?

6            A.     Correct.

7            Q.     And you can draw -- when I say you, I

8    mean the Administration in general, can draw lessons from

9    what happened.  Is that correct?

10           A.     Correct.

11           Q.     And can use those lessons to try to

12   prevent, as you've described it, unfortunate incidents

13   from happening again.  Is that correct?

14           A.     Correct.

15           Q.     So if there was any investigation into

16   the specifics that you and I have been reviewing for the

17   past ten minutes or so about Inmate Monitors, you would

18   expect it to have been documented.  Is that correct?

19           A.     Correct.

20           Q.     I'll represent to you that the only

21   document that I've seen produced by your attorneys or any

22   other party in this case about the Inmate Monitor issue

23   was produced in October of 2019.  Do you understand that

24   representation?

25           A.     I do.

SA001165

Frank Bochenek

Page 55

1          Q.    Do you have any reason to dispute that

2    representation -- or strike that.  Would you agree that

3    there are no -- there appears to be no other

4    documentation of any investigation into this issue prior

5    to October of 2019?

6          A.    I believe that's fair to say.

7          Q.    Do you know why that is?

8          A.    I do not.

9          Q.    And, once again, if anyone would have

10   been responsible for conducting this specific

11   investigation prior to October of 2019, it would have

12   been the Captain of Security.  Is that correct?

13         A.    That would be correct.

14         Q.    By the way, one other topic and this may

15   fall outside your -- your coverage.  I just took the

16   testimony of Deputy Superintendent Kelly Reed.  Ms. Reed

17   was likely not in that position -- well, no, she would

18   have been in that position before you retired.  Do you

19   know Ms. Reed?

20         A.    I do.

21         Q.    Ms. Reed recalled for me that throughout

22   the course of her career she heard a number of different

23   complaints from Correctional Officers that they were not

24   able to comply with their watch obligations because they

25   had too many responsibilities.  First of all, do you

Frank Bochenek

Page 56

1    understand how -- what I've described there?

2            A.    I do believe I understand that.

3            Q.    Did you ever hear any complaints like

4    that yourself in your position?

5            A.    I've heard a lot of complaints from

6    staff saying they couldn't fulfill their duties of a lot

7    of things, so yes.

8            Q.    When you say a lot of things, are you

9    talking beyond watch procedures?

10           A.    Yes.

11           Q.    What was the nature of those complaints?

12           A.    In general, they're saying that they had

13   too much -- too many duties and too many

14   responsibilities to fulfill everything, but that was a

15   complaint from all staff --

16           Q.    A complaint from --

17           A.    -- in general.

18           Q.    A complaint from all staff that you heard

19   all the time.  Is that correct?

20           A.    In general, yes.

21           Q.    Do you recall specifically anyone in the

22   Administration concluding or saying that we need to

23   address those complaints because it's preventing us from

24   keeping prisoners safe?

25           A.    I have -- I didn't hear that, but I have

Frank Bochenek

Page 57

1   heard talk that they have to review and improve the

2   situation.

3          Q.    Are you aware of any steps that were

4   taken to improve that situation?

5          A.    I am not.

6          Q.    I want to ask you more specific questions

7   about the meeting with Lindsay Hayes.  And for that

8   purpose, I'm going to pull up the memo that we were

9   reviewing before, Exhibit P-10.  As I'm doing that, sir,

10  do you recall actually being present with Mr. Hayes for

11  purposes of a meeting?

12              (Exhibit shown.)

13         A.    I was in the room with a group of

14  others, yes.

15         Q.    How many times did -- did you meet with

16  Mr. Hayes?

17         A.    In regards to this, it's the only time.

18         Q.    So the memo which you have in front of

19  you, Exhibit P-10, do I understand correctly that the

20  only time that you met with him was on October 23rd of

21  2019?

22         A.    Correct.

23         Q.    How did that meeting come about -- or I'm

24  sorry -- more specifically, how was it that you ended up

25  in the meeting?  Who invited you is really what I'm

SA001168

Frank Bochenek

Page 61

1   incident, which sounds like your focus was on whether

2   there was a crime; right?

3           A.   Correct.

4           Q.   You then looked and you saw that he had

5   been placed -- he meaning Mr. Freitag -- had been placed

6   on watch at 1500, 3:00 p.m. on Friday.  Is that correct?

7           A.   Correct.

8           Q.   Then you conducted a follow-up

9   investigation.  Is that correct?

10          A.   Correct.

11          Q.   The statement no Level 3 watch sheet,

12  what -- what does that mean?

13          A.   The Inmate Monitor watch sheet.

14          Q.   Now, we -- is that the same document that

15  we were looking at, Exhibit P-9?

16          A.   No, there was one prior to that that was

17  no -- not found.

18          Q.   Got it.  Okay.  So there's one that's

19  supposed to be prepared for each shift.  Is that correct?

20          A.   That's correct.

21          Q.   So there would not have been -- there was

22  not an inmate or Level 3 watch sheet prepared for the

23  afternoon or evening shift of August 24th; correct?

24          A.   We don't know if it was prepared or not,

25  but there was no one -- no report was ever found.  So I

SA001169

Frank Bochenek

Page 62

1    don't know if it was done or not.  I can only assume it

2    was not.

3           Q.    Got it.  Where are those reports supposed

4    to be kept?

5           A.    Initially -- that -- that's always been

6    a question which was very difficult to pin down.  It was

7    -- my understanding, it was with the Administration in

8    Ops -- in Operations or it was in the Mental Health

9    office, or it was in PrimeCare Medical office.  The

10   sheets were always sent to different -- three different

11   units, my understanding, and that added to the confusion

12   of trying to obtain copies of documents.

13          Q.    Who -- who -- who would make the decision

14   about where to send the documents?

15          A.    I don't know.

16          Q.    So it sounds like what you're describing

17   is that there was no set procedure or at least there was

18   not a uniform understanding of the procedure of where to

19   send the watch sheets.  Is that correct?

20          A.    It appeared to me there was no uniforms

21   -- yes.

22          Q.    Had you ever -- did you ever hear

23   anything to the contrary?

24          A.    I have not.

25          Q.    Let's continue on with your findings here

SA001170

Frank  Bochenek

Page 66

1             Q.     Did you specifically ask them to go

2   interview Young and Moody?

3             A.     Initially, I -- I explained to Mr.

4   Onisick at the day that all the officers needed to be

5   interviewed, all staff related to this incident would

6   be, so -- but I did not specifically say go talk to

7   Moody and Young about anything in particular.

8             Q.     Why not?

9             A.     'Cause I told them to go interview them.

10            Q.     Well, we know they -- they were

11  interviewed back in 20- -- August of 2018 when the

12  incident --

13            A.     Right.

14            Q.     -- occurred; right?

15            A.     That's correct.

16            Q.     Now, 14 months later you realized that no

17  Inmate Monitor was checking on the cell; correct?

18            A.     Correct.

19            Q.     My question is why -- why didn't you ask

20  Disandro or Onisick to go back and interview Moody and

21  Young about the Inmate Monitor issue?

22            A.     I have no -- no answer for that.  Just

23  didn't.

24            Q.     Is that something that, given your

25  position, you would have liked to have done?

Frank Bochenek

Page 70

1          A.     Since that time, yes.  Standard

2    procedure for all Administrators were to do visual

3    tours, when they could, to double check and make sure

4    that officers are following their duties and performing

5    their duties, their assigned duties.

6          Q.     So that's since October of 2019?

7          A.     Yes.

8          Q.     Was there any document issued or any

9    directive issued requiring those visual tours by

10   supervisors?

11         A.     I don't recall any documents, but I do

12   know that there was some type of correspondence to the

13   Administrative staff to -- to conduct these, what they

14   call, video tours -- visual tours of the modules.

15         Q.     I'm sorry, did you say video tours or

16   visual tours?

17         A.     Video tours, I'm sorry.  They are video

18   tours.

19         Q.     Does that mean reviewing video

20   surveillance footage?

21         A.     That is correct.

22         Q.     Do you recall when that correspondence

23   was issued?

24         A.     I don't recall.

25         Q.     And do I understand you correctly that

Frank Bochenek

Page 71

1  that practice of video tours was instituted following the

2  October, 2019 interaction with Lindsay Hayes?

3          A.      Correct.

4          Q.      Was there -- and it sounds like you're --

5  is it your understanding that that practice was

6  instituted as a result of the discussion with Lindsay

7  Hayes concerning the Freitag case?

8          A.      I don't recall if it was specifically

9  regarding that interview and about the Freitag case, but

10  I do know that that was a concern and that was a

11  directive put out.

12          Q.      Do you remember who issued the

13  correspondence?

14          A.      I believe it was Deputy Director Kratz.

15          Q.      And do I understand correctly that prior

16  to the correspondence that you believe came from Deputy

17  Director Kratz, there was no such practice requiring such

18  video tours?  Is that correct?

19          A.      I believe there was no such requirement,

20  but that it was spoke about that Administrators should

21  conduct these tours.

22          Q.      Jeff, I'll just note that to the extent

23  that correspondence exists, I'll -- I'll make that a

24  discovery request.  I'll confirm that in --

25                  MR. KOLANSKY:  Made note of it.  Yeah, do