# Exhibit 68
# Cassidy Deposition

SA001181

Abbey Cassidy

Pages: 40, 41, 42, 73, 87, 89, 90, 91, 93, 97, 98, 101, 102, 103, 104, 111, 112, 114, 115, 116, 117, 118, 121, 122, 123, 124, 125, 126, 127, 129, 130, 131, 132, 133, 134, 136, 137, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 152, 155, 158, 159, 160, 162, 168, 171, 172, 173

Dated: March 23, 2021

SA001182

Abbey Cassidy, Psy.D.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PENNSYLVANIA
NO. 2:19-CV-05758-JMG

_____

CHARLES JOSEPH FREITAG, JR.,
AS ADMINISTRATOR OF THE ESTATE
OF CHARLES JOSEPH FREITAG, SR.,

        Plaintiff,

   vs.

BUCKS COUNTY, et al,

        Defendants.

_____


\*    \*    \*    \*

TUESDAY, MARCH 23, 2021

\*    \*    \*    \*


    Recorded deposition of ABBEY CASSIDY, Psy.D,
taken pursuant to notice, was held via Zoom
Videoconference, at 9:00 a.m., on the above
date, before Lori A. Porto, a Certified Court
Reporter.


KAPLAN, LEAMAN & WOLFE
230 SOUTH BROAD STREET, SUITE 1303
PHILADELPHIA, PENNSYLVANIA 19102
(215) 922-7112
www.klwreporters.com

Abbey Cassidy, Psy.D.

Page 40

1               We normally had a daily briefing with

2       the warden and some of the jail staff, I do monthly

3       meetings to discuss -- it is, sort of, a huge

4       treatment team meeting with the county, probation, PD

5       office, DA, jail staff, to check on our severely

6       mentally ill inmates, and we do that as far as

7       treatment planning, if they are getting close to

8       being released, so we can get set them up in the

9       community with what they need.

10              We have weekly interdisciplinary team

11      meetings to discuss any individuals who have been on

12      a watch status for a long period of time to see, you

13      know, how we can work with them to get them towards

14      their goals more, out of their cells and into more

15      programming.

16              I have a lot of tri-quarterly meetings

17      that I go to with providers in the community.

18              I think that is, sort of, a overview.

19      Q.      Now, my understanding, back in August of

20      2018, at least, is that mental health staff were in

21      the building maybe 8:00 a.m. to 5:00 p.m.

22              Does that sound right?

23      A.      At that time, our hours were -- at that

24      time, our hours were 6:00 a.m., we usually had a

25      couple in by 6, but we were generally out of here by

Abbey Cassidy, Psy.D.

Page 41

1    4.

2          Q.     Is that still the case?

3          A.     No.

4                 We've expanded our hours a little bit

5    since then, but we still come in -- we have a few

6    people coming in at 6.

7                 We recently hired a psych nurse and he

8    generally stays a little bit later, until 4:30, 5:00

9    some days, and we have a counselor position now, who

10   also stays until 5:00 p.m.

11         Q.     What are your hours?

12         A.     My hours are typically -- I come in

13   between 6 and 6:30 and I stay until 2:30 or 3.

14         Q.     Was there a specific reason for hiring

15   the psych nurse and a counselor to stay a little bit

16   later?

17         A.     So, the counselor position was there, we

18   just changed her hours.

19                The psych nurse was just a new position

20   that we wanted to bring in for a while.  We've been

21   trying to find one to, sort of, help out with the

22   medication list and everything.

23                We just wanted to expand our hours a

24   little bit more.

25                What we found a lot of times was, when,

Abbey Cassidy, Psy.D.

Page 42

1   you know, people do come back from court, they

2   weren't coming back in time for us to see them or we

3   would have people that were being brought in and

4   asking to be seen, so we wanted to expand the time

5   that we were in the office.

6       Q.      All right.

7               So coming back from court specifically,

8   is that right?

9       A.      Yes.

10              A lot of times, they weren't getting

11  back until after we were already out of the office,

12  so if there was somebody that needed to be seen, we

13  weren't able to see them.

14      Q.      I will come back and ask you about that

15  in a little bit.

16              And, with that change of having people

17  available until 5 or 5:30, have you generally been

18  able to cover people who are coming back from court?

19      A.      Yes.

20      Q.      When was that change made?

21      A.      That I don't recall.

22              We had -- I don't know exactly the

23  date, but I think when we had a counselor resign, we

24  decided, before we hired a new counselor, to change

25  the hours, so they would be here longer.

Abbey Cassidy, Psy.D.

Page 73

1              MR. FEINBERG:  Let me ask a question

2    first.

3              Doctor Cassidy, I just highlighted text

4    right here.

5              Let me read it and tell me if you agree

6    with it.

7              Inmates may become suicidal at any time

8    during their incarceration.  Suicidal behavior is

9    more likely in critical periods of time, including

10   commitment and the first several days thereafter,

11   court hearings, sentencing, new criminal charges, et

12   cetera.

13             Do you agree with that description

14   that's provided in this policy?

15             THE WITNESS:  I do, yes.

16   BY MR. FEINBERG:

17        Q.    Okay.

18             And, even though I'm showing you a

19   Bucks County policy, and, as your counsel pointed

20   out, a policy that may have been revised in August of

21   2019, the principle that I reviewed with you is a

22   principle that you certainly understood back in 2018,

23   is that correct?

24        A.    Correct, yes.

25        Q.    So my question -- although I mentioned

Abbey Cassidy, Psy.D.

Page 87

1    procedures that were in place as of August of '18.

2                    Do you understand that?

3         A.    Yes.

4         Q.    All right.

5                    So, if someone came back from court who

6    was on the mental health caseload, in other words,

7    someone who had been seen by mental health providers,

8    was there any procedure in place to ensure that they

9    would be seen by mental health staff?

10        A.    I don't believe -- no, not if they were

11   just on our caseload.

12        Q.    Were there any unique circumstances

13   where -- strike that.

14        If you wanted to see someone when they came --

15   let me ask it a different way.

16                    You qualified your answer a little bit

17   as emphasizing caseload.

18                    So, if I'm understanding you correctly,

19   there wasn't any kind of specific procedure in place

20   where, you know, prisoner number 1 is on mental

21   health caseload, he will be seen when he comes back.

22                    Did I understand you correctly?

23        A.    Correct.

24        Q.    Okay.

25                    Were there other circumstances where

Abbey Cassidy, Psy.D.

Page 89

1    are, number 1, an officer who runs that unit, is that

2    correct?

3            A.      Correct.

4            Q.      And also a case manager, is that

5    correct?

6            A.      Correct.

7            Q.      To my understanding, a case manager

8    essentially provides liaison services between the

9    prisoner and the community, scheduling appointments

10   and so on.

11                   Is that your understanding as well?

12           A.      Sort of.

13                   The jail case managers are the ones

14   that are responsible for checking in with the inmates

15   on the blocks, we also have one at reception, so they

16   do initial interviews, and they do, I guess, a little

17   coordination with probation and the community.

18           Q.      Well, my real question was, do the case

19   managers -- I didn't ask it this way, but let me ask

20   it now.

21                   Did the case managers, to your

22   knowledge, have any mental health training?

23           A.      No.

24           Q.      Is it fair to say that, under the

25   previous procedure, the only way someone would be

Abbey Cassidy, Psy.D.

Page 90

1    seen by mental health is if either a correctional

2    officer or a case manager asks for it?

3         A.    Correct.

4         Q.    And is it also accurate to say that the

5    people who we are talking about, an officer or a case

6    manager, do not have mental health training?

7         A.    Correct.

8              They receive the suicide-prevention

9    trainings, the officers.

10             They receive a suicide-prevention

11   training, but that is usually the extent.

12        Q.    Got it, all right.

13             Can we agree that, notwithstanding the

14   suicide-prevention standing that you conduct, suicide

15   risk factors are to the always easy to identify for a

16   layperson or a person without mental health training?

17        A.    That is correct.

18        Q.    In other words, in your training, I take

19   it that you have a lot of experience, not to mention

20   reading, and evaluation of other circumstances, where

21   you can identify risk factors that a layperson might

22   not be able to?

23        A.    Correct.

24        Q.    Can we also agree that a suicidal person

25   does not always give a clear indication of their risk

SA001190

Abbey Cassidy, Psy.D.

Page 91

1    of suicide?

2              Right?

3         A.    That's correct.

4         Q.    For instance, not every suicidal person

5    will say, I'm thinking of killing myself, is that

6    correct?

7         A.    That is correct.

8         Q.    You smiled there because that is kind of

9    obvious?

10        A.    It is true.

11        Q.    From a mental health clinician's

12   perspective, if someone else comes in and sees you

13   and says, no, I'm not suicidal at all, that doesn't

14   end your inquiry, you're going to look much further,

15   correct?

16        A.    Correct.

17        Q.    Can we agree then -- well, strike that.

18        At any point did anyone from PrimeCare, either

19   corporate or anyone in the mental health unit at

20   Bucks County, ever raise any concerns about the fact

21   that correctional staff were being left with the

22   responsibility to seek out mental healthcare for

23   people coming back from court?

24        A.    Not to my knowledge.

25        Q.    Did anyone ever say -- when I say -- let

SA001191

Abbey Cassidy, Psy.D.

Page 93

1    testimony that, at some point since August of 2018,

2    you shifted the schedule of mental health clinicians,

3    so that there is someone in the facility until 5 or

4    5:30.

5              Did I understand you correctly?

6        A.    Until 5:00, yes.

7        Q.    In my note, I also wrote that someone --

8    that one of the benefits of doing that is that a

9    mental health clinician will be available when

10   prisoners who have gone out to court return from

11   court.

12             Did I understand you correctly?

13       A.    Yes.

14       Q.    Is it your understanding that, unless

15   there is some unusual circumstance, prisoners are

16   back from court before 5 p.m.?

17       A.    Usually, yes.

18       Q.    Okay.

19             What was -- more directly, was the

20   motivation in shifting that schedule to make mental

21   health clinicians available for people coming back

22   from court?

23       A.    I believe so.

24       Q.    I don't want to hold you to the decision

25   if it wasn't yours.

SA001192

Abbey Cassidy, Psy.D.

Page 97

1              Before I do that, let me make sure I'm
2    understanding correctly.

3              Prior to this change being made, do I
4    understand correctly that, when people came back from
5    court, the only way they would have a mental health
6    assessment is if either the officer in reception or
7    the case manager in reception asked for it?

8         A.    Yes.

9              I believe there were also occasions --
10   I don't think so in this case.  But, I believe, if
11   somebody was back, the jail gets made aware of it,
12   but I don't know who gets those records or how all
13   that works, but, I believe that, if it's like a state
14   sentence, that goes up to the assistant warden,
15   deputy warden, and all of that.

16             So, if there were cases in the past,
17   where one of them would contact our department and
18   say, hey, so-and-so is coming back from court, we
19   might want to check-in with them.

20             If they come back and they seemed super
21   upset, they would be referred to a case manager from
22   reception.

23        Q.    We know in this case that Deputy Warden
24   Mitchell, Clifton Mitchell -- can I assume you know
25   Deputy Warden Mitchell?

SA001193

Abbey Cassidy, Psy.D.

Page 98

1    A.    Yes.

2    Q.    He is no longer at the facility?

3    A.    Correct.

4    Q.    My understanding is that Deputy Warden

5   Mitchell started an e-mail chain about placing

6   Mr. Freitag on a level 3 status after his return from

7   sentencing.

8              Were you aware of that at any point?

9    A.    Yes, I believe I was made aware of that.

10   Q.    Okay.

11             So if that is the case -- let me ask

12  you this.

13             To your understanding, did Deputy

14  Warden Mitchell have any mental health training?

15   A.    Not to my knowledge.

16   Q.    Can we assume, if there was a decision

17  about what level precaution to place a person on made

18  by the Deputy Warden, that is not made by somebody

19  with mental health training?

20             Is that correct?

21   A.    Correct.

22   Q.    Do you remember discussing or having any

23  concerns about the fact that, in that situation, the

24  correctional officer or supervisor without mental

25  health training was making a decision that could have

SA001194

Abbey Cassidy, Psy.D.

Page 101

1    in state prison.

2              I take it you are aware of that.

3       A.    Correct.

4       Q.    Let's change the year.

5              Let's say Mr. Freitag's incident

6    occurred in 2021.

7              He was in the prison for two

8    and-a-half, three months, had been on your caseload,

9    clinicians working under your supervision had seen

10   him a dozen times.

11             He goes out to court, comes back, he

12   receives that sentence.

13             What would happen if that happened

14   today?

15             MS. MINEHAN:  Object to the form.

16             It is a hypothetical question that you

17   are posing here, so all the facts in the case can't

18   be accounted for, but, if you can give a general

19   answer in response to his hypothetical, that is fine.

20             THE WITNESS:  If it was today and he

21   received that state sentence, he would be placed on a

22   minimum of level 2 suicide watch.

23             I can't say for sure if the jail would

24   contact us when he was on his way back or not.

25             He is someone who we had been, from

Abbey Cassidy, Psy.D.

Page 102

1   reviewing the depositions, tasked with seeing him

2   upon return from court, we were tasked to see him on

3   Monday.

4              So, if it was somebody like that and he

5   got back early enough, we would try to see him that

6   day.

7   BY MR. FEINBERG:

8       Q.    I will show you the records in just a

9   little bit.

10             It looks like mental health staff knew

11  for weeks or months that his sentencing was going to

12  occur on Friday, the 24th of August, and the

13  appointment was scheduled for Monday, the 27th, so

14  there's about a three-day gap.

15             Would you agree based on your review of

16  the documents?

17      A.    Correct.

18      Q.    Do I understand you correctly that

19  today, given that he was someone that had been seen

20  repeatedly by mental health staff, someone determined

21  that there was a need to see him for a court

22  follow-up, then that would happen when he got back

23  from court currently?

24             Correct?

25      A.    Correct, provided he was back before 5.

SA001196

Abbey Cassidy, Psy.D.

Page 103

1    Q.    There are two assumptions built in
2  there.
3            It sounds like, from your previous
4  testimony, the way it works these days, most people
5  are back from court by 5:00 p.m.?
6    A.    Correct.
7    Q.    That is outside the pandemic equation
8  and I think the record showed Mr. Freitag got back to
9  the facility sometime around 4:00 p.m.
10           Is that consistent with the usual
11  practice to your understanding?
12           MS. MINEHAN:  What practice?
13           Can you rephrase it?
14           MR. FEINBERG:  That was a bad question,
15  I will acknowledge that.
16           If he got back to the prison around
17  4:00 p.m., is that consistent with how things
18  typically happened with people coming back from
19  court?
20           MS. MINEHAN:  As far as the time?
21           MR. FEINBERG:  Yes.
22           THE WITNESS:  Yes, they usually got
23  back later in the afternoon.
24  BY MR. FEINBERG:
25    Q.    So, if today is March 23rd, 2021,

Abbey Cassidy, Psy.D.

Page 104

1   barring a pandemic, he goes into court, he comes

2   back, he's someone that there has been a

3   determination that he should be seen after court,

4   someone is going to come see him right after he gets

5   back from court, is that correct?

6          A.    Yes.

7                MS. MINEHAN:  Objection to the

8   hypothetical, but go ahead.

9   BY MR. FEINBERG:

10         Q.    Where do the evaluations -- can I call

11  them post-court evaluations?

12               Would that be an accurate summary?

13         A.    Yes.

14         Q.    Where did the post-court evaluations

15  take place?

16               Did they take place in the reception

17  area or is the person brought to the mental health

18  unit?

19         A.    Generally, we would go up to the

20  reception area.

21               They do have a couple of interview

22  rooms up there that they allow us to use in cases

23  like that.

24         Q.    So you could have a private setting

25  there, is that correct?

Abbey Cassidy, Psy.D.

Page 101

1    in state prison.

2                  I take it you are aware of that.

3         A.      Correct.

4         Q.      Let's change the year.

5                  Let's say Mr. Freitag's incident

6    occurred in 2021.

7                  He was in the prison for two

8    and-a-half, three months, had been on your caseload,

9    clinicians working under your supervision had seen

10   him a dozen times.

11                 He goes out to court, comes back, he

12   receives that sentence.

13                 What would happen if that happened

14   today?

15                 MS. MINEHAN:  Object to the form.

16                 It is a hypothetical question that you

17   are posing here, so all the facts in the case can't

18   be accounted for, but, if you can give a general

19   answer in response to his hypothetical, that is fine.

20                 THE WITNESS:  If it was today and he

21   received that state sentence, he would be placed on a

22   minimum of level 2 suicide watch.

23                 I can't say for sure if the jail would

24   contact us when he was on his way back or not.

25                 He is someone who we had been, from

SA001199

Abbey Cassidy, Psy.D.

Page 102

1    reviewing the depositions, tasked with seeing him

2    upon return from court, we were tasked to see him on

3    Monday.

4            So, if it was somebody like that and he

5    got back early enough, we would try to see him that

6    day.

7    BY MR. FEINBERG:

8        Q.    I will show you the records in just a

9    little bit.

10           It looks like mental health staff knew

11   for weeks or months that his sentencing was going to

12   occur on Friday, the 24th of August, and the

13   appointment was scheduled for Monday, the 27th, so

14   there's about a three-day gap.

15           Would you agree based on your review of

16   the documents?

17       A.    Correct.

18       Q.    Do I understand you correctly that

19   today, given that he was someone that had been seen

20   repeatedly by mental health staff, someone determined

21   that there was a need to see him for a court

22   follow-up, then that would happen when he got back

23   from court currently?

24           Correct?

25       A.    Correct, provided he was back before 5.

SA001200

Abbey Cassidy, Psy.D.

Page 103

1       Q.      There are two assumptions built in
2   there.
3               It sounds like, from your previous
4   testimony, the way it works these days, most people
5   are back from court by 5:00 p.m.?
6       A.      Correct.
7       Q.      That is outside the pandemic equation
8   and I think the record showed Mr. Freitag got back to
9   the facility sometime around 4:00 p.m.
10              Is that consistent with the usual
11  practice to your understanding?
12              MS. MINEHAN:  What practice?
13              Can you rephrase it?
14              MR. FEINBERG:  That was a bad question,
15  I will acknowledge that.
16              If he got back to the prison around
17  4:00 p.m., is that consistent with how things
18  typically happened with people coming back from
19  court?
20              MS. MINEHAN:  As far as the time?
21              MR. FEINBERG:  Yes.
22              THE WITNESS:  Yes, they usually got
23  back later in the afternoon.
24  BY MR. FEINBERG:
25      Q.      So, if today is March 23rd, 2021,

SA001201

Abbey Cassidy, Psy.D.

Page 104

1    barring a pandemic, he goes into court, he comes

2    back, he's someone that there has been a

3    determination that he should be seen after court,

4    someone is going to come see him right after he gets

5    back from court, is that correct?

6         A.    Yes.

7              MS. MINEHAN:  Objection to the

8    hypothetical, but go ahead.

9    BY MR. FEINBERG:

10        Q.    Where do the evaluations -- can I call

11   them post-court evaluations?

12             Would that be an accurate summary?

13        A.    Yes.

14        Q.    Where did the post-court evaluations

15   take place?

16             Did they take place in the reception

17   area or is the person brought to the mental health

18   unit?

19        A.    Generally, we would go up to the

20   reception area.

21             They do have a couple of interview

22   rooms up there that they allow us to use in cases

23   like that.

24        Q.    So you could have a private setting

25   there, is that correct?

SA001202

Abbey Cassidy, Psy.D.

Page 111

1              Actually, I will take the highlight off
2    because that might make it hard to read.
3              I would ask you to read that note to
4    yourself, doctor, and let me know what you are
5    finished.
6         A.    Okay.
7         Q.    So the note references Mr. Freitag
8    having recent suicide attempts, being placed on level
9    2, and so on.
10              My reason for showing you this is to
11   ask you whether, on or around June 4th of 2018, which
12   was Mr. Freitag's admission to the facility, do you
13   remember learning about him, hearing anything about
14   him, any of his conditions, anything like that?
15        A.    Yes, I would have.
16              Anybody who comes into this place on a
17   level 1 or level 2, I look up their situation, to see
18   what is going on, what with we need to look out for.
19              MS. MINEHAN:  Doctor, just make sure
20   you listen to his question.
21              He asked about your recollection.
22              THE WITNESS:  Okay, I'm sorry.
23   BY MR. FEINBERG:
24        Q.    Let me ask you a slightly different
25   question.

SA001203

Abbey Cassidy, Psy.D.

Page 112

1          Mr. Freitag's arrest was, I think, fair
2    to say, a high-profile event.
3          Were you aware, either from reading in
4    the news or hearing things at the prison, about what
5    happened that led to his incarceration?
6          A.    Yes.
7          At the time of the incident, I did see
8    the article on what had happened.
9          Q.    Do you remember hearing that his arrest
10   was in connection with a suicide attempt, that he cut
11   his arms and then drove through his ex-wife's house?
12         A.    I don't recall hearing it verbally, but
13   I read about it.
14         Q.    When you read about it at that time and
15   then he was admitted to the facility in June of 2018
16   and you learned about his admission, did you connect
17   your previous knowledge of him and his admission?
18         A.    Yes.
19         Q.    Okay.
20         In other words, when he came into the
21   facility, it sounds like you said to yourself, oh, I
22   remember this case, so you were aware, not just from
23   the records, but you were aware from what you saw on
24   the news, is that correct?
25         A.    That is correct.

Abbey Cassidy, Psy.D.

Page 114

1   licensing situation?

2        A.      I would have reviewed the documentation,

3   yes.

4        Q.      Okay.

5                So my question is -- strike that.

6        For more background, what the records show us

7   is that Mr. Freitag was admitted to the facility on

8   June 4th because he was found guilty by a jury at his

9   trial and, at that point, the judge revoked his bail,

10  which resulted in his admission, and then, for the

11  two and-a-half or three months that followed, he was

12  incarcerated while awaiting his sentencing in late

13  August.

14                Does that sound correct to you, doctor?

15       A.      Yes.

16       Q.      Okay.

17                And it sounds like you are familiar --

18  you were aware that Mr. Freitag was anxious about his

19  sentencing and that was the topic of much discussion

20  with the clinicians working under your supervision,

21  is that correct?

22       A.      Correct.

23       Q.      So, here, on June 5th, when Ms. Mahoney

24  conducted the suicide risk assessment, there was an

25  identification of new legal issues, is that correct?

Abbey Cassidy, Psy.D.

Page 115

1       A.      Correct.

2       Q.      So my question to you is -- well, I'll

3   represent to you that there are no suicide risk

4   assessments that I see at any point after June 6th of

5   2018, at least in terms of this instrument that we've

6   been reviewing.

7               Is there any reason why there would not

8   have been a suicide risk assessment conducted in

9   connection with his sentencing given that there is

10  this box to check for someone who is newly sentenced?

11              MS. MINEHAN:  Other than what she's

12  already testified to today?

13              MR. FEINBERG:  Yes.

14              THE WITNESS:  I'm not sure I understand

15  the question.

16              We didn't see him after he was

17  sentenced.

18              MR. FEINBERG:  And that's -- well,

19  obviously, he killed himself before he was seen,

20  correct?

21              THE WITNESS:  Right.

22  BY MR. FEINBERG:

23      Q.      Had Mr. Freitag been seen under the new

24  arrangement that you have now, with a clinician

25  available, would you expect that person to conduct

Abbey Cassidy, Psy.D.

Page 116

1    the suicide risk assessment that we're looking at

2    right now?

3                    MS. MINEHAN:  Same objection,

4    hypothetical, but you can answer.

5                    THE WITNESS:  Yes, it would be -- per

6    our policy, yes, I would expect it to be done.

7    BY MR. FEINBERG:

8         Q.    Okay, all right.

9                    In fact, let me add that -- I

10   understand counsel objected and I'm asking a

11   hypothetical, but, if Mr. Freitag got sentenced

12   today, March 23rd, 2021, came back to the facility,

13   he's on the mental health caseload, a clinician would

14   go see him and conduct one of these suicide risk

15   assessments on this long form, is that correct?

16                   MS. MINEHAN:  Objection to the form.

17                   I thought she said if needed.

18                   MR. FEINBERG:  Well, that is my

19   question.

20                   Is that what you would expect,

21   Doctor Cassidy?

22                   THE WITNESS:  If needed.

23                   We don't see everybody that is

24   receiving a sentence when they come back.

25   BY MR. FEINBERG:

SA001207

Abbey Cassidy, Psy.D.

Page 117

1      Q.     Well, I think you told me that, under

2  the terms of the hypothetical that I outlined --

3  Mr. Freitag is someone who had been seen more than a

4  dozen times by clinicians working under your

5  supervision, right?

6      A.     Yes.

7      Q.     Someone who had expressed significant

8  anxiety over his sentencing, is that right?

9      A.     From what I understand, yes.

10     Q.     In those circumstances, you would expect

11 a clinician to go see him, correct?

12              MS. MINEHAN:  Objection to the form.

13              Again, it's a hypothetical, you're not

14 including all the signs and symptoms, and this person

15 is not someone that provided clinical care to

16 Mr. Freitag.

17              MR. FEINBERG:  You can answer the

18 question, Doctor Cassidy.

19              THE WITNESS:  Okay.

20              So, yes, hypothetically, I would expect

21 them to be seen.

22 BY MR. FEINBERG:

23     Q.     And, in connection with that, to button

24 this up, you would expect them to conduct this

25 suicide risk assessment using the form that we

Abbey Cassidy, Psy.D.

Page 118

1    discussed, is that correct?

2        A.      Correct.

3        Q.      Let's go to the next document.

4                I'm going to page 184.

5                Well, let me ask you, Doctor Cassidy --

6    the reason I'm at this page is to show you that there

7    were only two suicide risk assessments on

8    Mr. Freitag, one on June 5th, conducted by Jessica

9    Mahoney, which we were just reviewing, and another

10   that looks like it was started on June 6th with Avia

11   James.

12               Do you see that?

13       A.      Yes.

14       Q.      I'll just go to the end of this section.

15               The last entry for a suicide risk

16   assessment is in the middle of page 189 and that is

17   on June 6th.

18               Can we agree there were no further

19   suicide risk assessments conducted on this long form

20   on Mr. Freitag?

21       A.      Yes.

22       Q.      Let's go back to an earlier page.

23               This is an entry entered by, bear with

24   me a second, bottom of page 114, June 6th, with Avia

25   James -- let's do this.

SA001209

Abbey Cassidy, Psy.D.

Page 121

1          A.      That is correct.

2          Q.      You would have expected her to have done

3    that, is that correct?

4          A.      Yes.

5          Q.      And there is no notation as to whether

6    it was done, is that correct?

7          A.      Not that I'm aware of.

8          Q.      Okay.

9                  You haven't seen anything, is that

10   right?

11         A.      Correct.

12         Q.      Okay.

13                 I want to go back up to the top of this

14   page and I want to show you a note entered by

15   Ms. Penge on June 11th.

16                 We're at the bottom of page 113.

17                 Bear with me for one second, please.

18                 I want to highlight one phrase here.

19                 If you need to read the rest of the

20   note to answer my question, please take the time to

21   do it.

22                 Ms. Penge made a finding on June 11th

23   of 2018 that Mr. Freitag had limited insight and

24   judgment.

25                 Do you see that?

Abbey Cassidy, Psy.D.

Page 122

1          A.      Yes.

2          Q.      I questioned Ms. Penge on that

3    assessment in her deposition testimony.

4                  Did you read that portion of the

5    deposition in which I asked her about those

6    assessments?

7          A.      I did.

8          Q.      And my understanding or my recollection

9    is that Ms. Penge made that finding on five separate

10   occasions between June 11th of 2018 and mid-August of

11   2018.

12                 Does that sound right to you based on

13   what you've reviewed recently?

14         A.      I believe so, yes.

15         Q.      Do you remember Ms. Penge ever coming

16   and speaking to you about concerns about

17   Mr. Freitag's insight and judgment?

18         A.      I don't recall.

19         Q.      Okay.

20                 When you hear an assessment that

21   someone has limited insight and judgment, does that

22   raise any concerns to you about risk of suicide?

23         A.      Risk of suicide, no.

24         Q.      Does it raise any concerns with you

25   about mental health status?

Abbey Cassidy, Psy.D.

Page 123

1      A.      Possibly.

2      Q.      Can you just give me -- and I understand

3  I'm asking you in a limited context, but, just a

4  standard situation, a clinician says, this person has

5  limited inside and judgment, where does your head go

6  in terms of your clinical evaluation?

7      A.      Sorry, I didn't hear the end of that.

8      Q.      That's good, because it wasn't a good

9  question, so let me try a different one.

10             When you hear someone making an

11  assessment that a person has limited insight and

12  judgment, what is your thought process about the

13  person's possible mental health condition?

14     A.      If that's something I saw, whether

15  someone was coming to me with it or writing it, I

16  would absolutely want more information.

17             The population that we work with, I

18  would say the majority of them have limited insight

19  and judgment, and that doesn't put them at risk for

20  suicide, so I would need to look for additional

21  factors there that we would need to be concerned

22  about.

23     Q.      Let me show you one other note.

24             This is a note by Jessica Mahoney from

25  June 15th of 2018.

Abbey Cassidy, Psy.D.

Page 124

1                This one splits the page again, so

2    let's do what we did before.

3                Please read the bottom of 111 and, when

4    you are done, I will flip to the next page.

5        A.    Okay.

6        Q.    I'm on page 112 now.

7        A.    Okay.

8        Q.    Did you see the reference to the fact

9    that Mr. Freitag discussed wanting mental health to

10   follow-up after he goes to court in August?

11       A.    Yes.

12       Q.    All right.

13               Now, with Ms. Mahoney conducting this

14   evaluation, can we assume you would have reviewed

15   this note?

16       A.    Yes.

17       Q.    Do you remember having any discussions

18   with Ms. Mahoney about the need for follow-up with

19   Mr. Freitag after he went to court in August?

20       A.    I don't recall having any conversations.

21       Q.    Can we agree that, given Mr. Freitag's

22   indication here that he wanted to see mental health

23   after court and that he had two prior attempts for

24   suicide and that he was in custody because of a

25   suicide attempt, his arrest was connected to a

Abbey Cassidy, Psy.D.

Page 125

1    suicide attempt, that his sentencing presented a risk

2    factor for suicide?

3              MS. MINEHAN:  Objection to the form.

4              You're asking her to speculate about

5    what he was thinking when he disclosed this to

6    Mahoney.

7              You can answer, if you understand.

8              MR. FEINBERG:  Let me clarify, Doctor

9    Cassidy.

10             I'm asking the question based on your

11   vast clinical experience.

12             You knew three things, right?

13             You knew Mr. Freitag had two suicide

14   attempts, that's number 1, number 2, you knew he

15   tried to kill himself by driving through his

16   ex-wife's house, which lead to his arrest and his

17   conviction and incarceration, and, number 3, you knew

18   that Mr. Freitag expressed seeing mental health after

19   he went to court in August.

20             When I say you, I mean you

21   collectively, the mental health unit, was aware of

22   all those facts at this point on June 15th of 2018,

23   correct?

24             MS. MINEHAN:  Objection.

25             You are cherry-picking facts from the

Abbey Cassidy, Psy.D.

Page 126

1  record and ignoring the mitigating factors as well,

2  but I'm not directing her not to answer the question.

3           I want it to be clear that you are

4  posing hypotheticals with limited facts based upon

5  the record and also questioning someone who did not

6  provide any clinical care to this patient.

7  BY MR. FEINBERG:

8      Q.    Doctor, do you agree with my assessment?

9      A.    Yes.

10     Q.    Okay.

11           And, because his sentencing posed a

12  risk factor, you would expect that the mental health

13  clinicians working under your supervision would

14  address that, is that correct?

15     A.    Correct.

16     Q.    I want to show you, in terms of

17  scheduling, what Ms. Mahoney did.

18           I am going to page 141.

19           We can see here that there's an

20  appointment scheduled for 8-27-18.

21           Do you see that?

22     A.    Yes.

23     Q.    And it looks like it was scheduled by

24  Jessica Mahoney on June 15th of 2018.

25           Is that correct?

Abbey Cassidy, Psy.D.

Page 127

1          A.     Yes.

2          Q.     And, based on what we were just

3    reviewing, can we draw the conclusion that

4    Ms. Mahoney scheduled that appointment following her

5    encounter with Mr. Freitag on June 15th?

6          A.     Yes.

7          Q.     And, in fact, we know here that this

8    appointment was scheduled at staff request, mental

9    health follow-up after trial, is that right?

10         A.     Yes.

11         Q.     So, when we look at this, we know that

12   his sentencing was on August 24th, which was a

13   Friday, and the appointment was scheduled for

14   August 27th, which was a Monday, is that right?

15         A.     Yes.

16         Q.     And, based on our previous discussion

17   about the fact that typically there was no staff

18   available after return from court in the late

19   afternoon, this was the first available appointment

20   for Mr. Freitag to be seen after his sentencing, is

21   that right?

22         A.     It would have been, yes.

23         Q.     Okay.

24                Do you recall -- whether it happened on

25   June 15th with Ms. Mahoney or any time after, do you

SA001216

Abbey Cassidy, Psy.D.

Page 129

1  BY MR. FEINBERG:

2      Q.      Did anyone after-the-fact, after

3  Mr. Freitag died in August, did anyone ever say, you

4  know, we should have seen him when he came back from

5  court on Friday, the 24th, or I wish he was seen on

6  Friday, the 24th?

7      A.      Do we wish we saw him when we got back,

8  if we would have been there, I can say for myself,

9  yes.

10             I don't recall if anyone talked with me

11  about that after-the-fact.

12     Q.      All right.

13             So, you gave two answers, one is,

14  sitting here in March of 2021, you do think that, but

15  you don't remember anyone saying that back in that

16  time period, is that right?

17     A.      Correct.

18     Q.      This might be an obvious question, but

19  why is it, sitting here today you say, I wish we did

20  see him when he came back from court on Friday, the

21  24th?

22     A.      I probably thought that at the time as

23  well.

24             I don't recall anyone saying it to me

25  at the time, but, from my own perspective, I'm sure

SA001217

Abbey Cassidy, Psy.D.

Page 130

1   that's something that went through my mind at the

2   time, you know, I wish he would have gotten back

3   before we left.

4        Q.     Can I assume that you thought that

5   because you believed that a mental health evaluation

6   would have allowed you to assess his suicide risk?

7                Is that right?

8        A.     It would have.

9                I can't speculate and say I'm a hundred

10  percent sure it would have prevented what happened,

11  but it would have given us a chance to do a more

12  thorough assessment at the time.

13       Q.     Can we agree that, if Mr. Freitag was

14  placed on constant watch when he returned from court,

15  it would have been difficult for him to kill himself

16  in the manner in which he killed himself?

17               MS. MINEHAN:  Objection to the form.

18               Again, you're giving her a series of

19  hypotheticals.

20               She's not here as an expert and you are

21  asking her to speculate about what may or may not

22  have happened, so you're treating her as an expert

23  and you're presenting her with hypotheticals and I

24  don't think that's appropriate.

25  BY MR. FEINBERG:

Abbey Cassidy, Psy.D.

Page 131

1      Q.      Doctor Cassidy, have you ever seen or

2   heard of a single incident in the course of your

3   career where a person has killed themselves while on

4   a constant watch status?

5      A.      I have not.

6      Q.      So would you agree that it would be very

7   difficult to imagine a situation where someone on

8   constant watch status would be able to kill

9   themselves?

10      A.      I would agree.

11      Q.      Would you agree that it would be very

12   difficult for someone to kill themselves at Bucks

13   County Correctional Facility if they were on level 1

14   status?

15      A.      I would agree that it would be more

16   difficult, yes.

17      Q.      Would you agree that, while level 2

18   allows the person more freedom, it would be hard for

19   someone to kill themselves while they are on level 2

20   status?

21      A.      It would be more difficult, yes.

22      Q.      And, in fact, that is why you have a

23   policy in place now that places people on level 2

24   status when they come back from court and receive a

25   state sentence, is that correct?

Abbey Cassidy, Psy.D.

Page 132

1          A.      To my understanding, yes.

2          Q.      Okay.

3                  So, going back to August of 2018 and

4   the thought process that you had after Mr. Freitag's

5   death, it sounds like what was going through your

6   head was a thought process about what could have been

7   done to prevent Mr. Freitag's death.

8                  Is that correct?

9          A.      That is correct.

10                 That is something that goes through my

11  head any time, you know, with the foresight that we

12  have, that is something that is normal for a

13  psychologist, when there is a suicide, to look at it

14  and say, is there something that could have been done

15  differently.

16         Q.      And, it sounds like, in your head, at

17  that time, number one, you were thinking it would

18  have been nice if we could have evaluated Mr. Freitag

19  when he came back from court.

20                 Correct?

21         A.      Correct.

22         Q.      And you were also thinking it would have

23  been nice if we could have put him on a level of

24  precaution which could have prevented him or made it

25  more difficult for him to harm himself after he came

SA001220

Abbey Cassidy, Psy.D.

Page 133

1  back from court, is that correct?

2            MS. MINEHAN:  Same objection as before.

3            You are asking her to testify as an

4  expert witness in this case based upon a

5  hypothetical.

6            MR. FEINBERG:  You can answer, Doctor

7  Cassidy.

8            MS. MINEHAN:  You can ask her what she

9  generally was thinking about at the time.

10           MR. FEINBERG:  Lori, would you read

11  back the question, please?

12           (DESIGNATED QUESTION IS READ)

13  BY MR. FEINBERG:

14      Q.    Doctor Cassidy, you heard the question

15  that I asked before.

16           Was that your thought process?

17      A.    I don't know that it was my thought

18  process that if we had put him on -- I mean, yes, if

19  he had been placed on a level 2, it would have made

20  it more difficult for him to harm himself.

21           My thought process was, you know, I

22  wish we could have been there maybe to assess him.

23           I'm not saying if we assessed him and

24  he had the risk factors, but also had the protective

25  factors, which he did have at the time, there's a

SA001221

Abbey Cassidy, Psy.D.

Page 134

1  chance that we might not have placed him on a level

2  2.

3              I can't say that for sure.

4  BY MR. FEINBERG:

5      Q.    So, the bottom line is, you don't know

6  because there was no assessment conducted, is that

7  correct?

8      A.    Correct.

9      Q.    And there was no assessment conducted

10  because PrimeCare practice at that point did not

11  allow for an assessment to be conducted upon a return

12  from court, is that right?

13              MS. MINEHAN:  Objection to the form.

14              Go ahead.

15              THE WITNESS:  It could have been

16  conducted if we were in the facility.

17  BY MR. FEINBERG:

18      Q.    It sounds like, in a theoretical sense,

19  it could have been conducted, but in practical

20  reality, it didn't happen that way, because there was

21  no one available when people came back from court.

22              Correct?

23      A.    Correct.

24      Q.    By the way, we've been going for a

25  little while, and this is taking a little longer than

SA001222

Abbey Cassidy, Psy.D.

Page 135

1   I expected.

2            Do you need a break now?

3      A.    I'm okay.

4      Q.    Okay.

5            Let's do this.

6            We're going to come to a good

7   transition point in a little bit, so let's go for

8   another ten minutes or so.

9            MS. MINEHAN:  Jon, how much longer do

10  you have?

11           MR. FEINBERG:  Lori, this is off the

12  record.

13           (OFF-THE-RECORD DISCUSSION)

14  BY MR. FEINBERG:

15     Q.    Doctor Cassidy, I'm at page 110.

16           Do you see a note here from July 31st

17  prepared by Avia James?

18     A.    (Indicating).

19     Q.    Is that a yes?

20     A.    Yes.

21     Q.    Okay.

22           Do me a favor and read that to yourself

23  and let me know when you are finished.

24     A.    Okay.

25     Q.    So, we see the reference at the top of

Abbey Cassidy, Psy.D.

Page 136

1   this, which says, please check-in today, 7/31, at the

2   request of Deputy Warden Mitchell.

3            Is that something you wrote?

4       A.    Yes, that would have been me.

5       Q.    Okay.

6            So this goes back to the note we looked

7   at at the very beginning of the deposition.

8            You created this entry and Ms. James is

9   the one that conducted the evaluation, is that right?

10      A.    Correct.

11      Q.    Do you remember speaking -- since Deputy

12  Warden Mitchell is on here, do you remember speaking

13  to Deputy Warden Mitchell about Mr. Freitag leading

14  up to the inquiry that you sent out to the

15  clinicians?

16      A.    I don't recall speaking to him.

17      Q.    I'll represent to you that my

18  understanding is the reason Deputy Warden Mitchell

19  reached out to you is that Mr. Freitag's lawyer, a

20  man named Paul Lang, L-a-n-g, called the facility

21  based on concerns that had been communicated to him

22  by the family.

23            I acknowledge, I'm just telling you

24  that.

25            Does that refresh your recollection

Abbey Cassidy, Psy.D.

Page 137

1    about learning any of those facts?

2         A.    It does.

3               Again, I don't remember exactly

4    speaking to Deputy Warden Mitchell, so I can't say I

5    remember it, but it makes sense.

6         Q.    Okay.

7               The bottom line is, you got some

8    indication that there was a reason to be concerned

9    about Mr. Freitag, Deputy Warden Mitchell

10   communicated that to you, you then asked your

11   clinicians to go see him, is that correct?

12        A.    Correct.

13        Q.    And, I take it, when you put that task

14   out there, whoever shows up for work that day will

15   see that task on the list, and then go call

16   Mr. Freitag down.

17               Is that correct?

18        A.    That's correct.

19        Q.    Do you remember speaking with Ms. James

20   after this encounter about what she learned from

21   Mr. Freitag?

22        A.    I don't recall.

23        Q.    Would that have been part of your

24   standard practice, to go speak to her after the

25   encounter?

Abbey Cassidy, Psy.D.

Page 140

1        Q.      I am going to switch documents.

2                I am going to show you now something

3    that occurred on August 1st.

4                This is the e-mail we reviewed earlier.

5                It's been marked as Exhibit 24.

6                We were just reviewing the note from

7    Ms. James on July 31st and now we are switching over

8    to your e-mail from August 1st.

9        A.      Yes.

10       Q.      Can you explain to me what the origin of

11   this e-mail was, why you sent it to the staff?

12       A.      So this would have been the day after

13   she saw him, it looks like, and she placed him on a

14   level 3 as a precaution.

15       Q.      Take the time to read this e-mail before

16   I ask you questions about it.

17       A.      So I believe I probably had a

18   conversation with Deputy Warden Mitchell, I honestly

19   don't recall, and, if it was a verbal conversation, I

20   wouldn't have documented it.

21               It looks like this was the day after he

22   was seen, so, while I don't recall, I would have

23   updated Deputy Warden Mitchell generally on the

24   circumstances.

25               If he requested somebody to be seen, he

SA001226

Abbey Cassidy, Psy.D.

Page 141

1    would have asked me to follow-up with him afterwards.

2            So, although I don't remember it, most

3    likely, we had a conversation saying, let's keep him

4    on level 3, we'll check-in with him, you know, at

5    least a level 3, and then go from there.

6        Q.    Now, when -- I think you said that if

7    you -- let me make sure I heard you correctly.

8            You said if you did have a verbal

9    conversation with him, you would have documented it

10   or you would not have documented it?

11       A.    I would not have documented it.

12       Q.    I think you told me before, when you

13   searched your e-mails concerning Mr. Freitag, you

14   didn't see any other e-mails besides this one dated

15   August 1st.

16           Correct?

17       A.    Correct.

18       Q.    By the way, let's confirm who the

19   recipients are.

20           We already discussed Avia James,

21   Christina Penge, Stephan Brautigam, and Jessica

22   Mahoney.

23       A.    Uh-huh.

24       Q.    Who is Jennifer Betz?

25       A.    Our case manager at the time.

Abbey Cassidy, Psy.D.

Page 142

1      Q.      Did she have a clinical role?

2      A.      She was bachelor level, so, no, no.

3      Q.      Is Jessica Heron, H-e-r-o-n?

4      A.      She was our other case manager at the

5   time, mental health case manager, so, again, no

6   clinical.

7      Q.      So, the people on this distribution,

8   which I'm highlighting here, did that comprise the

9   entire mental health staff as of August 1st?

10     A.      There's also my administrative

11  assistant, but I don't believe he was involved with

12  Mr. Freitag, so I didn't put him on this, but that's

13  the rest of my department at the time.

14     Q.      All right.

15             So, piecing this together, can you tell

16  me why you sent this e-mail?

17     A.      I just wanted my staff to all be on the

18  same page.

19             Typically, if we have a situation like

20  that, I like them to be aware, so that we can all,

21  sort of, keep an eye on him.

22     Q.      In other words, this sentence that I'm

23  highlighting here -- well, first of all, would you

24  agree that what you were doing here was highlighting

25  the risk factors that gave mental health clinicians a

SA001228

Abbey Cassidy, Psy.D.

Page 143

1  reason to be concerned about Mr. Freitag's risk of

2  suicide?

3        A.    Yes.

4              Those would be the risk factors that we

5  were aware of.

6        Q.    In fact, the text I highlighted, he was

7  older, serious charge, sentencing coming up, history

8  of suicide attempts, including a recent one in

9  September, did I summarize that correctly?

10       A.    Yes.

11       Q.    In fact, the last sentence or the last

12 phrase of your e-mail, since he strikes several of

13 the increased risk factors, that's just summarizing

14 what you said earlier in the e-mail, is that correct?

15       A.    Yes.

16       Q.    When you say level 3 appears appropriate

17 for now, it sounds like, am I assuming correctly,

18 that you agreed with Ms. James' decision to place him

19 on level 3 status?

20       A.    Yes.

21       Q.    When you say we need to keep a close eye

22 on him, was that you advising the clinical staff that

23 they should, maybe I'm stating the obvious, that you

24 wanted people to keep watch for him, is that correct?

25       A.    Yes, that's correct.

SA001229

Abbey Cassidy, Psy.D.

Page 144

1      Q.     When you said here at the beginning of
2  the e-mail that he should be on level 3 for at least
3  a few weeks, can you define what a few weeks meant?
4      A.     I mean, this was August 1st and his
5  sentencing was August 24th, so I guess that could be
6  interpreted differently by people, but I would
7  interpret it as or I meant, you know, he needs to
8  stay on level 3 until sentencing.
9      Q.     Okay.
10         Did any -- strike that.
11         Just to confirm this, your expectation,
12  that you believe you were communicating in this
13  e-mail, is he should be on level 3 up through the
14  time of his sentencing, is that correct?
15      A.     Yes.
16      Q.     Would you expect, based on this e-mail
17  that you sent, that, if any of the clinical providers
18  working under your supervision decided to remove him
19  from level 3, they would come talk to you about it?
20      A.     Given that, yes.
21      Q.     Do you remember having any conversations
22  with anyone about Mr. Freitag's care after you sent
23  this e-mail on August 1st?
24      A.     I do not recall.
25      Q.     Can you expect or would you expect that,

SA001230

Abbey Cassidy, Psy.D.

Page 145

1    if you did have a conversation with anyone about

2    Mr. Freitag's status after this e-mail, especially in

3    light of the content of the e-mail communicating

4    concerns about him, that you would have documented

5    it?

6          A.    Yes.

7          Q.    So, just to confirm, you don't remember

8    and don't have any record of anyone coming back to

9    check with you about Mr. Freitag's situation

10   following August 1st, is that correct?

11         A.    Correct, I don't recall.

12         Q.    You don't remember and don't have any

13   documentation of anyone coming back to talk with you

14   about removing him from level 3, is that correct?

15         A.    That is correct, yes.

16         Q.    You don't remember and don't have any

17   documentation about anyone coming to talk to you

18   about how to handle his post-sentencing care, is that

19   correct?

20         A.    Correct.

21         Q.    And I take it that you would assume,

22   based on your relationship with clinicians and based

23   on what was communicated in this e-mail, that, if any

24   of those things happened or there were any concerns

25   about those things, they would come talk to you,

Abbey Cassidy, Psy.D.

Page 146

1    correct?

2         A.      Correct.

3         Q.      Let's leave the e-mail and go back to

4    the chart.

5                 Do you have the medical chart that we

6    were looking at before in front of you, doctor?

7         A.      Yes.

8         Q.      By the way -- I have another question

9    about the e-mail.

10                I know we don't have it in front of us,

11   but your e-mail made the connection between

12   Mr. Freitag's risk factors and his sentencing coming

13   up at the end of August, correct?

14        A.      Correct.

15        Q.      Can I assume that you would have

16   expected that your clinicians working under your

17   supervision would have been attuned to that fact,

18   that Mr. Freitag's risk factors were connected to

19   sentencing as sentencing approached?

20        A.      Correct.

21        Q.      I'm going to page 120.

22                This is a note from August 8th prepared

23   by Jessica Mahoney.

24                Take a moment to read that note to

25   yourself, doctor, and let me know when you are

SA001232

Abbey Cassidy, Psy.D.

Page 147

1    finished.

2         A.    Okay.

3         Q.    Would you agree that Ms. Mahoney, based

4    on the text I'm highlighting here, noted that

5    Mr. Freitag's anxiety seemed to be increased as his

6    court date approached?

7         A.    Correct.

8         Q.    Ms. Mahoney made an indication or

9    indicated that he was a low risk for self-harm.

10             Do you see that assessment?

11        A.    I do, yes.

12        Q.    Do you have any idea what led her to

13   make that assessment?

14             MS. MINEHAN:  Objection to the extent

15   you're asking her to get in the mind of Ms. Mahoney.

16             MR. FEINBERG:  My question is whether

17   you ever communicated with her about it or drew any

18   conclusions based on what she knew or your

19   discussions or anything like that.

20             THE WITNESS:  I mean, I would just go

21   -- based off of reading her note, he's presenting

22   appropriately.

23             That is one where she definitely would

24   have come to me if she thought he needed to be on a

25   higher level.

SA001233

Abbey Cassidy, Psy.D.

Page 148

1   BY MR. FEINBERG:

2        Q.     At that point he was on level 3, right?

3        A.     Correct.

4        Q.     Let's go to another note, we're moving

5   ahead in time, to August 17th.  It's a note entered

6   by Christina Penge on August 17th.

7               Let's do what we did before.

8               Read the portion at the bottom of this

9   page, let me know when you are finished, and I will

10  scroll up.

11       A.     Okay.

12       Q.     We see here that Ms. Penge has made the

13  decision to remove Mr. Freitag from level 3?

14       A.     I see that.

15       Q.     Can I assume, based on what we discussed

16  before, Ms. Penge did not come speak to you about

17  that?

18               MS. MINEHAN:  Objection to form.

19               Go ahead.

20               THE WITNESS:  Correct.

21               I don't recall her speaking with me

22  about that.

23  BY MR. FEINBERG:

24       Q.     Can we assume, based on what we

25  discussed about your e-mail, that that was contrary

Abbey Cassidy, Psy.D.

Page 149

1    to your expectations of the clinical staff working

2    under your supervision?

3          A.    Yes.

4          Q.    Just to put a final point on it, you

5    sent an e-mail, you expected people to come talk to

6    you if he was going to -- strike that.

7                You expected people to be -- let me try

8    it one more time.

9                You expected Mr. Freitag to be on level

10   3 status through the date of his sentencing, is that

11   correct?

12         A.    Yes.

13         Q.    And you expected that, if there were

14   going to be any changes to that, someone would come

15   talk to you about it, is that right?

16         A.    Correct.

17         Q.    Ms. Penge did not do that as far as you

18   recall, is that correct?

19         A.    I don't recall.

20         Q.    And you don't have any e-mail

21   communication or other documentation suggesting that

22   you did speak with her, is that correct?

23         A.    Correct.

24         Q.    So that would have been contrary to your

25   expectations, correct?

SA001235

Abbey Cassidy, Psy.D.

Page 150

1        A.      Correct.

2        Q.      Ms. Penge, once again, made the

3   determination that she believed Mr. Freitag had

4   limited insight and judgment.

5                Do you see that again?

6        A.      Yes.

7        Q.      I believe -- without going through all

8   the records, I believe this is the third time she

9   made that finding.

10               Is that something you would have liked

11  to have known about from Ms. Penge's assessment at

12  that time?

13       A.      If she had concerns, yes.

14       Q.      Well, given that she removed him from

15  level 3 while also finding him to have limited

16  insight and judgment, is that something you would

17  have liked to have had the opportunity to discuss

18  with her?

19               MS. MINEHAN:  Objection to form, but

20  you can answer.

21               THE WITNESS:  I would have liked her to

22  come to me about him being removed from level 3.

23               The limited insight and judgment, I

24  would like to be able to review everything else, not

25  take that as a factor in itself, but the removal from

SA001236

Abbey Cassidy, Psy.D.

Page 152

1    made?

2          A.      Yes.

3          Q.      And, if she was making an assessment

4    that he didn't understand the consequences of the

5    sentencing, is that something you would have liked to

6    have discussed with him?

7          A.      Yes, to at least get more information.

8          Q.      Okay.

9                  Because, it sounds like, if sentencing

10   is a risk factor or if a bad result at sentencing is

11   a risk factor and Mr. Freitag was not appreciating

12   the possibility of that bad result, that is something

13   that would have had an impact on his suicide risk, is

14   that correct?

15         A.      Potentially, yes.

16         Q.      And something that you would have wanted

17   to discuss with Ms. Penge, is that correct?

18         A.      Correct, yes.

19         Q.      Let's just do one last note on the chart

20   here and then we'll take a break.

21                 This is actually the last encounter

22   that any mental health clinician had with Mr.

23   Freitag, on August 23rd, on page 116.

24                 Read that note to yourself, please, and

25   let me know when you are finished.

Abbey Cassidy, Psy.D.

Page 155

1    wouldn't concern me so much.

2                    Being nervous about sentencing is true

3    for most of our population.

4                    The limited insight and judgment I

5    would want to examine further.

6                    If I'm just taking the note, in and of

7    itself, and not everything else involved, it would

8    be, yes, I would have wanted her to come talk to me.

9    BY MR. FEINBERG:

10        Q.     Okay, and that is a fair point.

11                    My question was isolated just to your

12   reaction from this point.

13                    It sounds like, from your previous

14   testimony, based on the whole constellation of issues

15   discussed with Mr. Freitag over a two and-a-half to

16   three-year period, that would have been your reaction

17   at this point, right, you will have wanted him seen

18   when he came back from court, is that correct?

19        A.     That would be correct.

20                    MR. FEINBERG:  Why don't we -- let's go

21   off the record.

22                    (OFF-THE-RECORD DISCUSSION)

23                    (BRIEF RECESS)

24   BY MR. FEINBERG:

25        Q.     So, Doctor Cassidy, we took a break for

SA001238

Abbey Cassidy, Psy.D.

Page 158

1          And then that message was forwarded

2    along to Carl Metellus, who I understand at that

3    point was the supervising social worker or counselor?

4          A.     Yeah, I believe he was one of the

5    supervisors of the case managers at the time.

6          Q.     Okay, thank you.

7          And then Mr. Metellus said, I max'd

8    him, which talked about his classification, added a

9    level 3 alert, and then asked to have the module

10   officers notified.

11          Do you follow along with everything I

12   outlined?

13          A.     Yes.

14          Q.     So, basically, in summary, the

15   correctional staff finds out Mr. Freitag got the six

16   to 12-year sentence, they put him on a level 3

17   status, and they asked that to be communicated to the

18   officers.

19          Is that consistent with your

20   understanding of what happened on his return?

21          A.     Yes.

22          Q.     At that point, 3:52 p.m., there were no

23   mental health staff available in the prison, is that

24   correct?

25          A.     They would have been here and they would

Abbey Cassidy, Psy.D.

Page 159

1    have been preparing to leave.

2         Q.    So everyone would have been out of there

3    by 4, is that correct?

4         A.    Yes.

5         Q.    Obviously, since you haven't seen this

6    e-mail before, I assume you weren't copied on this

7    e-mail or it wasn't forwarded to you from some other

8    source.

9         A.    Correct.

10        Q.    Can I assume then that neither you nor

11   any other mental health clinician would have been

12   alerted to the correctional officer and supervisor --

13   I'm sorry, let me withdraw that.

14              Can I assume, based on what you just

15   said, that neither you nor any mental health

16   clinician was alerted to the decision made by

17   correctional staff to place Mr. Freitag on level 3

18   status?

19        A.    Correct.

20        Q.    Is that consistent with the policy and

21   the practice at that time, that there was no, to your

22   knowledge, PrimeCare or Bucks County practice

23   requiring communication between correctional

24   officials and mental health officials in these

25   circumstances?

Abbey Cassidy, Psy.D.

Page 160

1           MS. MINEHAN:  Objection to the form,

2    but you can answer.

3           THE WITNESS:  To my knowledge, yes.

4    BY MR. FEINBERG:

5       Q.     If you had learned -- I'll completely

6    acknowledge this is hypothetical.

7           Given everything you knew about

8    Mr. Freitag leading up to his sentencing on August

9    24th of 2018, if you had learned Mr. Freitag received

10   a sentence of six to 12 years, what would you have

11   done?

12          MS. MINEHAN:  Same objection.

13          MR. FEINBERG:  You can answer.

14          THE WITNESS:  I can't say I'm hundred

15   percent sure what I would have done, but, given the

16   information, I most likely would have suggested a

17   level 2 or requested a level 2 if we were not there

18   to see him.

19          If I still had someone else in the

20   building, I would send them up to see him.

21   BY MR. FEINBERG:

22      Q.     So it sounds like there are two things.

23          One is that you would have liked to

24   have assessed him, is that correct?

25      A.     If we were there, yes.

Abbey Cassidy, Psy.D.

Page 162

1    about whether my understanding is correct.

2                Doctor, with that clarification, is my

3    understanding of your testimony correct?

4                THE WITNESS:  Can you read that?

5                There was a loudspeaker going off.

6                MR. FEINBERG:  Not to mention arguing

7    between counsel.

8                Lori, would you mind reading the

9    question back?

10               I'll save the time.

11               Doctor Cassidy, am I understanding

12   correctly that, based on the universe of information

13   you had and the fact that his sentencing was

14   connected to risk factors for suicide, that's why you

15   would have wanted to assess him at that time?

16       A.    That would be correct, yes.

17       Q.    If you had the information that is

18   communicated in this e-mail chain that we were

19   reviewing, correct?

20       A.    Correct.

21       Q.    Barring your assessment, your default

22   position would have been level 2, is that correct?

23       A.    Correct.

24       Q.    And level 2 involves stripping the cell,

25   15-minute checks, and so on, is that correct?

Abbey Cassidy, Psy.D.

Page 168

1    would present anything about the medical aspects of

2    the chart, and then, your boss, Doctor Scordellis,

3    presented about the mental aspects of the case, is

4    that correct?

5          A.     That is correct.

6          Q.     Now, we know, as a result of the

7    mortality review, that there was a decision made to

8    ensure that state commitments and high-profile cases

9    are placed on a level 2, is that correct?

10         A.     Yes.

11         Q.     In fact, rather than have you guess,

12   I'll show you the document that I have from this

13   meeting.

14                It's been previously marked as Exhibit

15   P-16.

16                Do you see that in front of you now?

17         A.     Yes.

18         Q.     When you scroll down to the third page,

19   that's what I was reading from when I asked you the

20   question just a moment ago, that phrase there, state

21   commitments and high-profile cases are placed on a

22   level 2?

23         A.     Yes.

24         Q.     Okay.

25                My question for you, Doctor Cassidy, is

SA001243

Abbey Cassidy, Psy.D.

Page 171

1    Freitag was on a level 2, he wouldn't have been able

2    to kill himself?

3         A.    Not that I recall.

4         Q.    You learned, I assume, that the

5    instrument that he used to kill himself was a hard

6    plastic cup that had been broken off into a shard.

7              Did you learn that at some point?

8         A.    Yes.

9              I learned that the day I was actually

10   down on the unit prior to him being taken out of the

11   facility.

12        Q.    Did you see the shard in the cup in the

13   cell?

14        A.    I didn't see the shard in the cup, I

15   believe I saw a picture of it at some point.

16        Q.    I will spare you those pictures from the

17   cell, but I'm showing you now a photo which is marked

18   P-25.

19              I will represent to you that these

20   photos were from the district attorney's office

21   investigative file and these were taken of

22   Mr. Freitag's cell.

23              You can see there is two cups and maybe

24   a third there in and around the sink.

25              Do you see that?

SA001244

Abbey Cassidy, Psy.D.

Page 172

1       A.      Yes.

2       Q.      And is it your understanding that the

3  shard was broken off from a cup that looks like this?

4       A.      That was my understanding, yes.

5       Q.      Do you know whether those cups would be

6  -- actually, strike that.

7               I realize that, when level 2 status is

8  implemented, that requires a stripping of the cell.

9               Is that correct?

10      A.      That is correct.

11      Q.      A stripping of the cell, in lay terms,

12  that means that items which could be deemed dangerous

13  are taken from the cell, is that correct?

14      A.      That is correct, yes.

15      Q.      Am I correct in assuming that it is the

16  correctional staff that does the stripping of the

17  cell?

18      A.      Yes.

19      Q.      With that caveat, I understand your

20  knowledge base here, but do you have any idea whether

21  these cups are taken from a cell when it's stripped?

22              MS. MINEHAN:  Don't speculate.

23              THE WITNESS:  Can you repeat that?

24              You froze up for a second.

25              MR. FEINBERG:  Oh, sure, I'm sorry.

SA001245

Abbey Cassidy, Psy.D.

Page 173

```
 1                  Do you have any idea whether these
 2    cups, which we're looking at in Exhibit P-25, would
 3    be taken from a cell under county policy when
 4    correctional officers strip the cell?
 5                  MS. MINEHAN:  Don't guess.
 6                  THE WITNESS:  Per county policy, they
 7    should not have any hard plastic cups in their cell.
 8    BY MR. FEINBERG:
 9         Q.    Okay.
10                  And that was your understanding backing
11    in August of 2018 as well?
12         A.    Correct.
13         Q.    Again, I'm not holding you to this, but,
14    as far as you know, if Mr. Freitag was placed on
15    level 2 status in August of 2018, those cups would
16    have been removed from his cell under county policy,
17    is that correct?
18         A.    Yes.
19         Q.    You were aware that Mr. Freitag was
20    placed, as we discussed, on level 3 status on
21    August 25th, 2018, is that correct?
22         A.    Correct.
23         Q.    Were you aware that, under that
24    practice, that officers were supposed to check
25    Mr. Freitag every 30 minutes?
```