# Exhibit 69
# Penge Deposition

SA001247

Christina Penge

Pages: 32, 33, 80, 81, 82, 83, 103, 104, 131, 132, 135, 136, 137, 149, 176, 177, 188, 190, 200, 201, 203, 204, 205, 207, 208, 209, 210, 211, 212, 213, 226, 227, 229, 230, 231, 232, 236

Dated: January 27, 2021

SA001248

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CHARLES JOSEPH FREITAG,      :
JR.,as ADMINISTRATOR of      :
the ESTATE OF CHARLES        :
JOSEPH FREITAG, SR.,         :
              Plaintiff      :
                             :   No. 2:19-cv-05750-JMG
        VS                   :
                             :
BUCKS COUNTY; PRIMECARE      :
MEDICAL, INC.; STEPHAN       :
BRAUTIGAM, PMHNP;            :
JESSICA MAHONEY, PSY.D;       :
AVIA JAMES, LPC;             :
CHRISTINA PENGE, LPC;         :
JOHN DOES 1-10,              :
              Defendants     :

_____
_____

ZOOM DEPOSITION OF CHRISTINA PENGE

DATE AND TIME:  January 27, 2021, 9:07 a.m.

_____
_____

KAPLAN LEAMAN & WOLFE
COURT REPORTING & LITIGATION SUPPORT

230 SOUTH BROAD STREET, SUITE 1303

PHILADELPHIA, PENNSYLVANIA 19102

(215) 922-7112 1-877-KLW-DEPO

www.klwreporters.com

Christina   Penge

1      Q.      Okay.   So the reason why we went

2   through all that is what I want to ask you is, at

3   any point did you learn what happened at that

4   meeting?

5            And I'm talking about back in 2018, not

6   recently in your discussions with your counsel.

7            MR. NINOSKY:   Object to the form, but

8   you can answer.

9            THE WITNESS:   Yes.   Emily, who had gone

10   to that meeting, was our regional director.

11   BY MR. FEINBERG:

12      Q.      Is that Scordellis?

13      A.      Yes.   I can't -- yes.

14      Q.      S-c-o-r-d-e-l-l-i-s?

15      A.      Yes.   Discussed this meeting and

16   discussed any policy or procedure changes that were

17   discussed during that meeting.

18      Q.      Okay.   When you say Emily discussed

19   this meeting, what do you mean?

20            Was there a meeting that you had

21   privately with her or was that a group meeting?

22      A.      That was a group meeting with the

23   mental health staff that didn't attend.

24      Q.      When did the meeting take place?

25      A.      I don't recall.

Christina   Penge

1        Q.      What did Emily tell you?

2        A.      Um, that going forward, anybody with a

3    state sentence would be automatically put on a

4    Level 2 is what the outcome -- she just discussed

5    the outcome.

6        Q.      Okay.  And I understand what you've

7    said, but let me ask one or two follow-ups.

8              You may have already answered this, but

9    did Emily tell you the process or the reasoning for

10   why that conclusion was reached?

11       A.      Yes.  They said they just wanted to be

12   cautious and that they felt that was a better way

13   of being cautious about when people come back and

14   have a state sentence, which was -- I mean, that's

15   pretty much it.

16              It was just their way of kind of making

17   sure that there was a protective factor.

18              MR. NINOSKY:  Jon, can you do me a

19   favor and just give me a continuing objection to

20   any questions about the mortality review, the

21   document or anything that came out of it?

22              I've already lodged this argument with

23   the Court, but I just want to preserve the

24   objection.  Is that okay with you --

25              MR. FEINBERG:  Yeah.

Christina   Penge

Page 80

1    five just to get a cup of coffee.

2              MR. FEINBERG:  Yes.  Let's take five

3    minutes.  It's 10:27.  Let's get back 10:32, 10:33.

4              (Recess taken from 10:28 a.m. until

5    10:35 a.m.)

6    BY MR. FEINBERG:

7         Q.    We are back on the record now after a

8    short break.

9              Did you realize during the break that

10   any of your previous testimony was incorrect or

11   incomplete?

12        A.    No.

13        Q.    Okay.  I want to ask you about just

14   some of the general rules that govern the way

15   you've practiced as a mental health clinician while

16   working at the Bucks County Correctional Facility.

17             Would you -- can I assume and am I

18   correct in assuming that your most important job

19   while working with patients was to protect the

20   health and safety of the patient?

21        A.    Yes.

22             MR. NINOSKY:  Object to the form.

23   BY MR. FEINBERG:

24        Q.    Okay.  That was the central role of

25   your job as a mental health clinician; is that

Christina   Penge

Page 81

1    correct?

2                  MR. NINOSKY:  Object to the form.  You

3    can answer if you can.

4                  THE WITNESS:  There's multiple factors,

5    but that's one of them.

6    BY MR. FEINBERG:

7        Q.    Okay.  Well, is there anything that

8    would be more important than protecting the health

9    and safety of the person that you were seeing?

10                 MR. NINOSKY:  Object to the form.

11                 THE WITNESS:  I'd definitely say safety

12   is important, but I also have to take in all

13   different accounts and also what else was part of

14   my job as just being part of a staff.

15   BY MR. FEINBERG:

16       Q.    Well, let me be more specific.  I mean,

17   if you got an indication that a patient under your

18   care was a potential risk to harm him or herself,

19   that would be at the top of your priority list to

20   try to prevent that from happening; is that

21   correct?

22                 MR. NINOSKY:  Object to the form.  You

23   can answer.

24                 THE WITNESS:  To screen for it and

25   determine safety level, yes.

Christina   Penge

Page 82

1    BY MR. FEINBERG:

2         Q.    Okay.  And I assume you strive to do

3    that in every encounter you have; is that correct?

4         A.    Yes.

5         Q.    So, in connection with the question I

6    asked just a minute ago, is it fair to assume that

7    anytime you have an indication that there's a risk

8    that someone could harm themselves, you're gonna do

9    something about it; is that right?

10             MR. NINOSKY:  Object to the form,

11   because there's all kinds of risk factors, and just

12   because -- every person has a risk faster for

13   suicide, and simply having a risk factor doesn't

14   equate to being potentially suicidal or being

15   placed on some sort of a suicide level.

16             So I don't think she can answer that

17   question as phrased, Jon, because you can't equate

18   risk factor with suicidality on a one-to-one, and

19   everybody has the potential for suicidality so

20   everybody would be put under a formal level.

21             MR. FEINBERG:  Maybe I didn't ask that

22   question the right way.  Let me try it again.

23             MR. NINOSKY:  And maybe I'm reading too

24   much into it.  I apologize if I did.

25   BY MR. FEINBERG:

Christina  Penge

1      Q.      Would you agree, Ms. Penge, that if you

2    made the determination that someone was a risk to

3    harm themselves, you would do something about it?

4      A.      Yes.

5      Q.      In general, would you tend to err on

6    the side of caution if you had any questions about

7    a risk of suicide?

8      A.      Yes.  So I would screen them and make

9    sure that I'm screening for safety.

10     Q.      Okay.  So -- and maybe that's the

11   fundamental point, right?

12             If you have any questions and you

13   have -- about what level of concern you should

14   have, then you conduct a screening; is that

15   correct?

16     A.      Yes.

17     Q.      And is that screening the same type of

18   suicide risk assessment that we discussed right

19   before our break?

20             MR. NINOSKY:  The form?  You mean the

21   form?

22             MR. FEINBERG:  Yes, that's what I meant

23   to say.

24             MR. NINOSKY:  Okay.

25             THE WITNESS:  Yes, I could -- yes, we

Christina   Penge

1   those specific words to yourself.  I'm just

2   describing a thought process.

3              Did anything like that thought process

4   occur to you?

5              MR. NINOSKY:  Object to the form.

6              THE WITNESS:  No.  I've never been in a

7   jail prior to Bucks County, so I had no -- I had no

8   way of even comparing it to anything else.

9   BY MR. FEINBERG:

10     Q.     Okay.  So if I understand you

11   correctly, you assumed -- and am I understanding

12   you that you assumed that whatever was happening

13   there in terms of treatment planning was what was

14   supposed to happen?

15     A.     Yes.

16     Q.     All right.  The second portion of the

17   text I asked you to read here, I'll just read this

18   into the record.

19              Patients may become suicidal at any

20   time during their incarceration.  Suicidal behavior

21   is more likely at critical periods of time,

22   including commitment and the first several days

23   thereafter, court hearings, sentencing, and then

24   the sentence continues, but I'll stop there.

25              I take it that's consistent with your

SA001256

Christina   Penge

1    understanding?

2         A.      Yes, those would be part of risk

3    factors.

4         Q.      Okay.  Do you know whether there were

5    any policies or procedures in place to address the,

6    quote, critical periods of time during the

7    incarceration?

8                 MR. NINOSKY:  Object to the form.  You

9    can answer.

10                THE WITNESS:  I mean, they would still

11   be screened like anything else.

12                There wasn't really anything

13   necessarily special, besides just taking into

14   account what was happening and talking with the

15   person or, like I said, an outside person, if they

16   had additional information, if they provided that,

17   taking that into account as well.

18   BY MR. FEINBERG:

19        Q.      Okay.  And I understand your answer,

20   but let me just give you a more specific set of

21   facts.

22                If a person has a trial coming up where

23   they're going to -- it's a jury trial and they

24   could be found not guilty or found guilty, is there

25   any kind of notification that you put into a chart

Christina   Penge

Page 131

1    you -- well, strike that.  Let me ask that a

2    different way.

3                  Did you ever learn during the course of

4    your treatment that his arrest was as a result or

5    connected with a suicide attempt?

6                  MR. NINOSKY:  Object to the form, but

7    you can answer.

8                  THE WITNESS:  From my understanding,

9    the arrest was related to property destruction and

10   not related to a suicide attempt.

11   BY MR. FEINBERG:

12        Q.    Okay.  And, again, I don't want to

13   split hairs here, but --

14        A.    Okay.

15        Q.    -- really what I'm trying to get at is

16   did you learn that he was locked up because of

17   something that happened at the same time of or in

18   connection with a suicide attempt?

19                  MR. NINOSKY:  Object to the form, but

20   you can answer.

21                  THE WITNESS:  Yes, I was aware of that

22   detail.

23   BY MR. FEINBERG:

24        Q.    Okay.  Did he mention that to you or is

25   that something that you just learned from another

SA001258

Christina   Penge

Page 132

1   source?

2        A.      He discussed that.

3        Q.      Okay.  When you say he discussed that,

4   I take it that's something that took place during

5   your clinical encounters?

6        A.      Yeah, he mentioned why he was in jail.

7        Q.      All right.  Throughout the course of

8   Mr. Freitag's time in custody, I think you've

9   already mentioned he was on and off the various

10  precautions, Level 2, Level 3; is that correct?

11       A.      Yes.

12       Q.      This is a little tangential, but I want

13  to ask it now.  I'm showing you what's been marked

14  as Exhibit P-4.

15              That text, is that text too small for

16  you to read, ma'am?

17       A.      Yeah.

18       Q.      I'm going to try to enlarge it.  Do you

19  see up at the top here there's reference to the

20  Offender Management System?

21       A.      I initially saw it, now I just see the

22  bottom of the screen.

23       Q.      Oh, let me -- how about now?  Can you

24  see it?

25       A.      Hum-um.

Christina   Penge

Page 135

1       Q.      Okay.  We'll get to that.  The reason I
2   asked the question now, though, is with this
3   document in front of us there's this ending officer
4   ID, 3581.
5               Do you have any idea what that is?
6       A.      No.
7       Q.      I'll put that away.
8               All right.  We've talked a little bit
9   about Mr. Freitag expressing some anxiety about his
10  sentencing.
11              Was that -- how often did that come up
12  in your discussions with him?
13      A.      Um, more so towards the actual
14  sentencing court date, not as much prior to that.
15      Q.      All right.  What do you remember him
16  saying, in general?
17      A.      Um, he was just nervous about with the
18  restrictions he might have and how that would
19  affect his job.  He kept on saying he was going on
20  probation.
21      Q.      So he made clear to you -- strike that.
22              It was clear to you that his
23  expectation was that he was going to have a
24  noncustodial sentence; is that right?
25      A.      Correct.

SA001260

Christina   Penge

1      Q.     And to make sure we're talking about

2   the same thing, noncustodial means not in jail,

3   right?

4      A.     Correct.

5      Q.     Did he tell you the basis for that

6   expectation?

7      A.     He told me that his lawyer said that

8   there was a higher likelihood that he was going to

9   go on probation.  He might have mentioned once that

10  there was jail time, but for the most part our

11  conversations focused around probation.

12     Q.     Did you have any reason to trust or

13  distrust the representations he was making about

14  the likelihood of his criminal consequences?

15     A.     No.

16     Q.     You mentioned that he was nervous about

17  the restrictions that would be placed on him

18  following his sentence.

19            Based on what you said about probation,

20  did you understand those -- are you describing

21  those as being restrictions connected with

22  probation?

23     A.     Yes.  He was just concerned how that

24  would affect his job.  He had no idea what -- what

25  that -- you know, like, what that type of sentence

Christina  Penge

Page 137

1   would entail and how that would change the way in

2   which he had to go to work.

3        Q.    In your practice -- strike that.

4              Do you remember ever cautioning him to

5   not get his hopes up about any specific result?

6              MR. NINOSKY:  Object to the form.  You

7   can answer.

8              THE WITNESS:  Yeah, we have had that

9   discussion of what would happen if you were kind of

10  in that situation.

11             In the last conversation we had, he was

12  just, like, nope, we're sure that we're getting

13  probation and wasn't really listening about that

14  part.  He wasn't worried about it.

15             He was a hundred percent sure, for the

16  most part, that he was gonna get probation.

17  BY MR. FEINBERG:

18       Q.    Did that concern you?

19             MR. NINOSKY:  Object to the form.  You

20  may answer.

21             THE WITNESS:  Given his demeanor, and

22  we hadn't gotten any other outside information to

23  the contrary, it did not concern me.

24  BY MR. FEINBERG:

25       Q.    At any point, did it cross your mind

Christina   Penge

1    long.

2        Q.    Do you ever remember him mentioning

3    anything along the lines of the sentence that he

4    received, which was a -- for your benefit, I'll

5    represent to you it was a sentence of six to 12

6    years in prison, meaning a minimum.  I mean that is

7    at least six years.

8            With that explanation, do you remember

9    him ever saying, boy, I could go to jail for at

10   least another six years?

11       A.    No.

12       Q.    Back to your memory of what he said and

13   what he was acknowledging as a possibility.  If I'm

14   understanding you correctly, while he mentioned

15   possible jail time, by the time his sentencing came

16   around toward the end of August, was he convinced

17   or did he communicate that he was convinced he was

18   receiving probation?

19       A.    Yes.

20       Q.    And as you said, wasn't listening to

21   any suggestions of other possibilities; is that

22   right?

23       A.    Right.  He wasn't really soaking it in.

24   He heard me, but he just wasn't really factoring it

25   in.

SA001263

Christina   Penge

1    his job, whether or not he could return to his job.

2    BY MR. FEINBERG:

3         Q.    Okay, great.  And would you also agree

4    that based on the policies we've looked at,

5    including the PrimeCare policy, Exhibit 22, which

6    referenced how factors throughout the period of

7    incarceration, including the critical developments

8    in a criminal case, could also impact suicide risk,

9    that's something that I imagine would have been in

10   your mind, right, given the fact that Mr. Freitag

11   had concerns about, quote, his case?

12              MR. NINOSKY:  Object to the form.  Is

13   there a question there, Jon?

14              MR. FEINBERG:  Yeah.

15   BY MR. FEINBERG:

16        Q.    Is that something that was in your mind

17   from the moment you first learned about

18   Mr. Freitag?

19              MR. NINOSKY:  That he was worried about

20   his case?

21              MR. FEINBERG:  Yes.

22              MR. NINOSKY:  Okay.  You can answer if

23   you can.

24              THE WITNESS:  Okay.  Yeah.  Really, the

25   focus was more on, like, the possibility of losing

SA001264

Christina   Penge

Page 177

1   his job, so that was something that was a

2   discussion.

3   BY MR. FEINBERG:

4         Q.     Okay.  And it's -- you know, I suppose

5   we could try to isolate it, but did you understand

6   that his -- the loss of his job was tied directly

7   with the consequences from his criminal case?

8         A.     In his perception, that's what I got

9   from him, yes.

10        Q.     Okay.  In other words, the reason he

11  would lose his job is because he was convicted of a

12  felony and could be placed on probation, which

13  would have prevented him from going to work, right?

14        A.     Right, there's a possibility that he

15  discussed with us, yeah.

16        Q.     Okay.  All right.  So then let's talk

17  about your first encounter with Mr. Freitag, which

18  is on, as we said, June 11th.

19               Your note goes over two pages here.

20  I'm going to shrink it down a little bit so

21  hopefully you can see it all at once.

22               Can you see that text already?  All

23  right?

24        A.     Yeah.

25        Q.     Okay.  For the record, bottom of Page

Christina   Penge

Page 188

1              Or that there was an appointment

2     scheduled; is that correct?

3          A.     Yes.

4          Q.     And now we see August 27th, three days

5     after the date of sentencing, that's when the

6     appointment was scheduled; is that right?

7          A.     Correct.

8          Q.     And is it -- based on some other

9     testimony you gave, is it my -- is it correct that

10    the appointment was scheduled for the Monday after

11    the Friday sentencing, because no one would be

12    present in the facility over the weekend?

13         A.     Correct.

14         Q.     Okay.  And was that always the case in

15    your time with PrimeCare, that someone who had an

16    event on Friday where there may be a need for

17    mental health evaluation after, if it happened on a

18    Friday, the appointment would be scheduled for a

19    Monday?

20         A.     Typically.  It would only be if they

21    came in, back from the -- like, with the afternoon

22    group, but that was rare.

23              Most people, they left for court early

24    in the morning; they didn't come back till, like,

25    5:00 at night, 5:30.

SA001266

Christina   Penge

Page 190

1          Q.      Who was typically Dr. Cassidy; is that
2     correct?
3          A.      (Nods head up and down.)
4          Q.      Okay.  I'm not sure I heard an answer.
5     Was it --
6          A.      Yes, correct.
7          Q.      All right, thank you.  Skip that.
8                  Oh, actually, I'll show you one other
9     thing just in connection with what we were looking
10    at.
11                 Acknowledging, once again, this is not
12    your encounter, this is Ms. Mahoney's encounter on
13    June 15th, there's text that's not highlighted here
14    at the bottom of Page 111 that says, he discussed
15    wanting MH, mental health, to FU after he goes to
16    court in August, mental health to follow up.
17                 Piecing that together, the appointment
18    that we saw scheduled for August 27th, that appears
19    to arise out of this encounter; is that right?
20         A.      Correct.
21         Q.      My question for you is, do you remember
22    Mr. Freitag saying to you at any point throughout
23    his time there that he wanted to see someone after
24    sentencing?
25         A.      No.  However, when he got to that last

SA001267

Christina   Penge

Page 200

1                   How did you reach that determination?

2        A.       He was pretty verbal in that

3   conversation and very expressive, and in reading

4   the note that he had previously said, he actually

5   made statements that he thought he needed the Level

6   3.

7                   So I didn't see that he was a risk

8   factor in necessarily hurting himself, just more of

9   a kind of concern than anything.

10       Q.       Now, part of the Level 3 watch is not

11  just observations, but also regular mental health

12  check-ins; is that correct?

13       A.       Correct.

14       Q.       My understanding is that three times

15  per week would be the rule under Level 3?

16       A.       Yes.

17       Q.       Monday, Wednesday, Friday.  Was that

18  the typical practice?

19       A.       Correct.

20       Q.       Okay.  So when Mr. Freitag made that

21  expression to Ms. James, and as you understood it

22  when you saw him on August 6th, did you view that

23  as him feeling like he needed to have a sounding

24  board from a mental health professional?

25       A.       Yes.

SA001268

Christina   Penge

Page 201

1       Q.      Do you remember -- it's not noted here,

2    but do you remember any discussion of Mr. Freitag's

3    concerns about his criminal case, meaning his

4    upcoming sentencing, in this encounter?

5       A.      No.  My recall is that he was just

6    frustrated about the cell.  That was the most

7    prominent, that he was more agitated coming in with

8    that than anything.  And given his demeanor, as you

9    can see, I didn't take him off Level 3.  I kept him

10   on.

11      Q.      Now, your next encounter with

12   Mr. Freitag was on August 10th, which would have

13   been, I imagine that -- that's a Friday.  Because

14   you're seeing him on Monday, the 6th.  You see him

15   again on Friday, the 10th.

16              The intervening encounter was with

17   Ms. Mahoney on August 8th, and that is here at Page

18   120, at the top of this page.

19              I assume you would have reviewed this

20   when you saw Mr. Freitag on August 10th; is that

21   correct?

22      A.      Correct.

23      Q.      You see the note here stating,

24   according to Ms. Mahoney, he shared that he has bad

25   anxiety and that it seems to be increasing as his

SA001269

Christina   Penge

Page 202

1  court date gets closer.  Patient shared that he

2  worries about what is going to happen and how this

3  is going to affect his life once he is out.

4              MR. NINOSKY:  Object to the form in

5  that you are reading accurately highlighted

6  portions, but not the subjective component in its

7  entirety, but go ahead.

8              MR. FEINBERG:  I'll note that.

9  BY MR. FEINBERG:

10     Q.     My question for Ms. Penge -- my

11  question for you, Ms. Penge, is this:  Do you

12  remember when you saw him on August 10th seeing

13  that note and thinking, okay, well, this is

14  something that we're going to have to continue to

15  address?

16     A.     Well, it is probably something I

17  brought up to see how he's doing on it, but also in

18  her note she had put the statement that he was to

19  see psychiatry to -- about his medication, so -- so

20  it affected that piece then, too.

21     Q.     Now, my -- it does not look like he saw

22  psychiatry until August 15th, about a week later.

23  So let's -- we can come to that, but let's talk

24  next about your appointment with Mr. Freitag on

25  August 10th.

SA001270

Christina  Penge

1          Why don't you take a minute to read

2    that note, and then I'll ask you a few questions

3    about it.

4          A.    Okay.

5          Q.    It looks, here at the top in the

6    subjective portion, where you note that he is

7    sharing about anxiety related to the upcoming court

8    date; is that correct?

9          A.    Yes.

10         Q.    All right.  And by the way, it says

11   trial.

12              I understand that you're not an

13   attorney and not a criminal defense practitioner,

14   but did you at that time understand the distinction

15   between a trial and a sentencing?

16         A.    No, I do.  I'm wondering if that was a

17   statement he might have made and I used that

18   terminology in there.

19         Q.    Okay, all right.  What do you remember

20   him saying about the upcoming court date that he

21   had for August 24th?

22         A.    Again, it was about, okay, if I go on

23   probation, what would happen to my job?  Like,

24   would I keep my job?

25              Because at that point there wasn't any

SA001271

Christina   Penge

Page 204

1    word back yet about whether or not he still had his

2    job in place.  So that -- I recall that was -- that

3    tended to be like an over-encompassing worry about

4    it.

5           It wasn't really about the sentencing.

6    It was mainly about his -- about his job.

7       Q.    Okay.  You note again that he had

8    limited insight and judgment.

9           What about this encounter led you to

10   draw that conclusion?

11      A.    It's related to the anxiety, that he

12   just had limited understanding of, like, you know,

13   we can't make assumptions ahead of time.  That's

14   not -- you know, you have to kind of take one day

15   at a time, and how can we control what we can't

16   control, things of that nature.

17      Q.    Okay.  So if I'm understanding you

18   correctly, that limited insight and judgment, was

19   that connected to his -- the statements he made

20   about what would happen to his job in relation to

21   his criminal case?

22      A.    Right.  So just discussing what can we

23   control and what can't we control in this

24   situation, in this present moment, and his

25   immediate inability just to kind of work that out

SA001272

Christina   Penge

1   with a second.

2        Q.     All right.  In other words, he -- to

3   make sure I understand the specifics, he's telling

4   you, I'm concerned about all these things that are

5   going to happen, you know, as a consequence of my

6   criminal case.  I might lose my job.

7             And it sounds like you were counseling

8   him to say -- to realize, look, that's beyond your

9   control at this point.  There's lawyers involved,

10  there's a judge involved and so on.

11            Is that -- again, not putting words in

12  your mouth, but that is an accurate summary of

13  the -- of the conversation?

14       A.     Yeah, pretty much, yeah.

15       Q.     And when you note that he had limited

16  insight and judgment, is that you saying that he

17  had a hard time comprehending the advice that you

18  were giving him about how to address that anxiety?

19       A.     Right.  So right in that moment as

20  we're having that conversation, he had a hard time

21  kind of comprehending what helps manage all that.

22       Q.     All right.  And that's consistent with

23  what you had seen prior; is that correct?

24       A.     Yes.

25       Q.     And consistent with what you saw moving

SA001273

Christina   Penge

Page 206

1   on, as we'll get to in your notes in just a minute;

2   is that correct?

3        A.     It may have been.  I'd have to look at

4   the context.

5        Q.     Okay.  And we'll look through the next

6   notes.

7               As a matter of fact, let's go right to

8   the next encounter, which was August 14th.

9               So that would have been the Monday --

10  or actually, no, I'm sorry.  If the 10th is a

11  Friday, you are seeing him then on a Tuesday.

12              Do you have any idea why there was not

13  a Monday encounter?

14       A.     Um, it may have -- it may have been due

15  to just the amount of people we had to see on the

16  Level 3, especially over the weekends, because the

17  weekends, like you said, there's no mental health

18  provider.

19              So if -- if anybody was assigned a

20  Level 3 by either correctional officers or

21  correctional counselors or medical had people put

22  on Level 2 or anything like that, they tended to be

23  seen first, and then we would check in to make sure

24  nobody else needed to be seen right that second if

25  there was a great concern about them.

SA001274

Christina   Penge

1                 But I don't know the circumstances on

2     that specific date, why we had a delay.

3         Q.     Okay.  Take a moment to read your note

4     from August 14th, then I'll ask you some questions.

5         A.     Okay.

6         Q.     The indication here, he got more of a

7     confirmation that his job will be available, what

8     does that mean?

9         A.     From what I recall, I believe a lawyer

10    called him, either his lawyer or he got ahold of

11    his postmaster, and he was told he was able to keep

12    his job.

13                From what I recall, he was going to

14    have EAP for mental health services, and they had a

15    more plan employees for when he is released.

16        Q.     I'm sorry.  What does EAP mean?

17        A.     Employment assistance program for --

18    they can -- you can call in and he can get

19    counselors or addiction treatment or medical help.

20                They're kind of almost like a case

21    manager or -- which is provided by the work plan.

22        Q.     You made the determination once again,

23    at the top of Page 119, client had limited insight

24    and judgment.

25                I'll ask you the same question I've

SA001275

Christina   Penge

Page 208

1   asked you before.  What factors caused you to reach

2   that conclusion here?

3        A.      For this specific moment, it probably

4   was still just making sure we're talking about what

5   he can and can't control.

6               A lot of times in jails that typically

7   ends up being the reason for limited insight and

8   judgment is because they are in jail.

9               So I can't specifically recall the

10  whole conversation.  I remember that specific

11  piece, but he still was having that kind of just

12  being able to, like, focus on what can he control

13  right in this instance and, you know, what can't we

14  control from the outside and how we handle that.

15              And he had previous therapy, so we've

16  always talked with him about the coping skills, and

17  he as able to discuss that.

18       Q.      Okay.  One quick note about the

19  encounter with the psychiatrist, which was

20  Mr. Brautigam.

21              That takes place here on August 15th,

22  and we're on Page 118.  Is that correct?

23       A.      Yes.

24       Q.      All right.  And there's a note here,

25  understanding again that you did not participate in

Christina   Penge

Page 209

1   this encounter, that Mr. Freitag told Mr. Brautigam

2   that he, Mr. Freitag, had court on August 24th and

3   was hoping for release.

4            I assume that was consistent with what

5   he had been telling you, right?

6        A.    Yes.

7        Q.    There's also a note that his affect was

8   anxious and a diagnosis of unspecified depression.

9            Do you see that?

10       A.    Yes.

11       Q.    I take it you would have been aware of

12   those findings when you saw Mr. Freitag again on

13   August 17th, which would have been the Friday that

14   week, as we see here on Pages 117 and 118; is that

15   correct?

16       A.    Correct.

17       Q.    All right.  And it looks like your

18   finding here is consistent with what Mr. Brautigam

19   wrote, that Mr. Freitag was anxious awaiting

20   sentencing; is that right?

21       A.    Yes.

22       Q.    What do you remember about him saying

23   about the sentencing?

24       A.    More that he's smiling.  He was

25   interactive that day.  He just said he was anxious

Christina   Penge

Page 210

1   because he was very happy about his family being

2   there and that he was just anxious just to get it

3   completed.  He just wanted it done so that he could

4   move on.

5        Q.     Do you remember him expressing any

6   anxiety about the specific outcome of the hearing?

7        A.     That specific one, no, I don't remember

8   him talking about that.  I think it was more about,

9   like, just getting through the court date and being

10  able to come out on the other end.

11       Q.     Okay.  Now, there's yet again a finding

12  of limited insight and judgment.  All right?

13              What factors led you to reach that

14  conclusion?

15       A.     The self-forgiveness, just

16  remembering -- he just struggled with like -- he

17  did discuss, like, I created a mess, which he was

18  more open about.

19              But just being able to say, like,

20  being -- having him able to take time and focus on,

21  you know, how do we forgive ourselves and move

22  forward and using our coping skills.

23       Q.     You removed him, at the conclusion of

24  this appointment, from Level 3 status; is that

25  right?

SA001278

Christina   Penge

Page 211

1          A.      Right, um-hmm.

2          Q.      Why did you do that?

3          A.      He was in a better mood.  He had just

4   seen medical -- I mean psychiatry.

5              He had -- he had talked about improved

6   mood, so I removed him because there was less of

7   the mood from before and less symptoms presenting.

8          Q.      Okay.  Now, at that point, he had spent

9   the better part of three weeks expressing anxiety

10   while on Level 3 status, expressing anxiety about

11   his upcoming court date; is that right?

12          A.      Yes.

13          Q.      And that court date was, at that point,

14   just a week away; is that right?

15          A.      Correct.

16          Q.      And throughout that time -- in fact,

17   throughout the previous two-and-a-half months, you

18   had noted that he had limited insight; is that

19   correct?

20          A.      Yes.

21          Q.      And throughout that time you had noted

22   that he had limited judgment; is that correct?

23          A.      Yes.

24          Q.      And he was -- throughout that time was

25   anxious about the hearing; is that right?

SA001279

Christina  Penge

Page 212

1                    MR. NINOSKY:  Object to the form.

2     BY MR. FEINBERG:

3          Q.    Is that right?

4          A.    Yes.

5          Q.    And, in fact, there had been changes

6     back and forth throughout that time of his

7     depressive mood; is that correct?

8          A.    There was at least one.  Yeah, there

9     was at least one change in that, yes.

10         Q.    All of those factors during that time

11    period could be considered or are considered risk

12    factors for suicide, are they not?

13                    MR. NINOSKY:  Object to the form.

14                    THE WITNESS:  They could be, given a

15    change in demeanor and interactions.  He didn't --

16    the protective factors were more inclined on this

17    day than the previous days.

18    BY MR. FEINBERG:

19         Q.    When you decided to remove him from

20    Level 3 status, did you consult with anyone about

21    that decision?

22         A.    Not that I recall.  I don't recall

23    talking to anybody to consult about changing it.

24                    We often when we remove people, we tell

25    our coworkers that we've removed them so that we

SA001280

Christina   Penge

Page 213

1   can keep it like -- you know, so that everyone is

2   on the same page.  That's pretty much it.

3          Q.     I'm sorry.  Were you finished with your

4   answer?

5          A.     Yes.

6          Q.     Do you remember that happening at all

7   in these circumstances?

8          A.     I talked to my coworkers pretty

9   regularly.  I probably did they will them.  I can't

10   recall this specific day.

11          Q.     Do you have -- did you have any

12   concerns about Mr. Freitag at this point, a week

13   out from his sentencing, which he had been

14   expressing anxiety about?

15                 MR. NINOSKY:  Object to the form.

16                 THE WITNESS:  No, I had no concerns,

17   because we were gonna follow up with him as -- as

18   indicated for our Level 3.  So we were going to see

19   him pretty much three days the following week.

20   BY MR. FEINBERG:

21          Q.     Was there any cost to keeping him on?

22                 When I say cost, I'm not talking about

23   financially.  I'm just talking about, you know, in

24   terms of harm to him or any inefficiencies for

25   mental health providers.

SA001281

Christina   Penge

Page 226

1       Q.      All right.   What do you remember him

2   saying specifically to cause you to write that?

3       A.      He just said he was just nervous about

4   the court date, about the sentencing.

5               We dis -- again we discussed like what

6   he had to say in, what would he do.

7               We reviewed that we did have him in for

8   an appointment Monday.  We discussed that, that

9   he -- and that we were a support and that he could

10  call us any time or send a sick call or ask

11  officers.

12              We always -- that always would be the

13  best, because we could always ask the officer if

14  this was an emergency.

15              But I just remembered him just wanting

16  to get to the trial -- get through the sentencing

17  and get that done.

18      Q.      Before I ask you further questions,

19  there's a note here at the bottom.   It says,

20  entered by Christina Penge, LPC, at staff request.

21              What does that phrase at staff request

22  mean?

23      A.      I have no idea.

24      Q.      Okay.   You made a finding yet again

25  that he has limited insight; is that correct?

SA001282

Christina   Penge

Page 227

```
 1          A.      Yes.

 2          Q.      You made a finding once again that he

 3     had limited judgment; is that right?

 4          A.      Yeah.

 5          Q.      And that's the -- I think the fifth

 6     time that you've made that specific finding.

 7                  What was it about the way he presented

 8     himself that caused you to make that conclusion?

 9          A.      Just contextual, just his nervousness.

10     Just hyper-focused on the trial.  I mean not the

11     trial, I'm sorry, the sentencing.

12                  I can't fully -- I can remember him

13     smiling and being engaged, but there wasn't

14     anything specific per se, just to -- kind of his

15     hyper-focused-ness and him being more focused on

16     the sentencing.

17                  That's pretty much it.

18          Q.      And, yes, to tie this into something we

19     talked about at the very beginning of the

20     deposition, was his limited insight and judgment

21     also connected to his expectations that he was

22     getting out of jail?

23          A.      Yes.

24          Q.      All right.  So you made this specific

25     finding that this is someone who is not -- he was
```

Christina   Penge

Page 229

1    can answer.

2              THE WITNESS:  He appeared to just be

3    happy and excited to hopefully get his job back and

4    to get done.

5              Like I said, I don't think he was

6    fully -- he seemed to not fully grasp that he could

7    return, although he was acknowledging that he would

8    be coming back to see us.

9    BY MR. FEINBERG:

10       Q.    All right.  That he could not grasp

11   that he would return to the jail; is that correct?

12       A.    Correct.

13       Q.    All right.  So, to make sure I

14   understand, I think what you're saying is that he

15   did not grasp that he might have to serve more time

16   in jail; is that right?

17       A.    He understood it.  He just wasn't -- I

18   don't know how else to explain it.  But he

19   understood that there was a possibility.

20       Q.    Right.

21       A.    But he wasn't fully, like, allowing

22   himself to, I guess, believe that.

23       Q.    Okay.  And the word that comes to mind

24   the way I'm listening to you talk is acknowledge.

25              He was not acknowledging that as a

SA001284

Christina   Penge

Page 230

1   possibility; is that correct?

2          A.      Sort of, yes.

3          Q.      And did that concern you about him,

4   going into sentencing?

5          A.      No, because we had that discussion

6   about if you return, you know, that we're going to

7   see you no matter what, that the staff is here.  If

8   we're not here, that you can contact anybody, and

9   somebody will be able to see you or, you know, help

10  you, because medical staff is still there on the

11  weekend.

12              So, no matter what, we did have that

13  discussion about the availability of, you know,

14  PrimeCare to help him if he needed help.

15         Q.      Okay.  Now, just to summarize, he's

16  been telling you for two months he's anxious about

17  sentencing, right?

18         A.      Yes.

19         Q.      You've had an understanding from a

20  clinical judgment and also based on common sense,

21  based on your exposure to the criminal justice

22  system that he might be overly optimistic about his

23  chances; is that correct?

24         A.       I had -- at the time, I had no idea.  I

25  didn't -- I don't have any understanding of

SA001285

Christina   Penge

Page 231

1    sentencing.

2              I understand that there's a possibility

3    that, hey, he could get, you know, more time in

4    jail.  But I didn't know any -- I had no other

5    concept of --

6         Q.    Okay.  And perhaps I misstated it.  I'm

7    not trying to --

8         A.    Okay.

9         Q.    -- suggest anything here.

10             But to make sure I understand your

11   position, from your understanding, he was

12   singularly focused on his expectation of getting

13   out; is that correct?

14        A.    Right.

15             MR. NINOSKY:  Object to the form.

16             THE WITNESS:  And --

17   BY MR. FEINBERG:

18        Q.    All right.  You also knew at that point

19   his history of having multiple prior suicide

20   attempts, right?

21        A.    Correct.

22        Q.    Did it ever cross your mind that

23   whatever happened in that courtroom could just be

24   absolutely devastating for him?

25             MR. NINOSKY:  Object to the form.  You

SA001286

Christina   Penge

Page 232

1   can answer.

2              THE  WITNESS:   At that moment, no.   My

3   belief, he reported talking to his lawyer and that

4   he was going to get on probation, and that I didn't

5   have any inkling to the contrary.

6              So I did not -- in fact, his lawyers

7   have called us in the past to let us know that they

8   were concerned about somebody, and our director

9   would have that preemptively kind of known in case

10  she needed to be on the lookout.

11             So we never got any type of information

12  besides what was provided.

13  BY MR. FEINBERG:

14      Q.    Is there any reason you didn't do a

15  suicide risk assessment at this point?

16      A.    He made no statements.   His demeanor

17  was pleasant and interactive.   He was able to

18  express himself sufficiently.

19             There was no -- at the time, there was

20  nothing that anybody had reported from the block or

21  anywhere else that would object to keeping him off

22  of Level 3.   There was no concern at that time.

23      Q.    Is there any reason you didn't do a

24  mental status exam?

25      A.    The mental status is in the objective.

Christina   Penge

Page 236

1    to him that there's a range of possibilities and he

2    should be prepared for that range of possibilities;

3    is that correct?

4          A.      Correct.

5          Q.      And what he was having difficulty

6    acknowledging, which was -- was that range of

7    possibilities; is that correct?

8          A.      Correct.

9          Q.      And that over the course of your

10   interactions with him throughout August of 2017,

11   that's what led you to conclude on multiple

12   occasions that he had limited insight and judgment;

13   is that correct?

14         A.      Correct.

15         Q.      Okay, thank you.

16                 In terms of policy changes that

17   occurred since Mr. Freitag's death, we discussed

18   what happened as a result of the mortality review

19   process, that inmates coming back with state

20   sentences were placed on Level 2 status.

21                 You remember that testimony?

22         A.      Yes.

23         Q.      Are you aware of any other changes that

24   were made to protocols concerning -- or protocols

25   that we've discussed following Mr. Freitag's death?

SA001288