**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CHARLES JOSEPH FREITAG, JR., as | : | NO.: 2:19-cv-05750-JMG |
| Administrator of the ESTATE OF CHARLES | : | |
| JOSEPH FREITAG, SR., | : | CIVIL ACTION – LAW |
| Plaintiff | : | |
| | : | JUDGE JOHN M. GALLAGHER |
| v. | : | |
| | : | |
| BUCKS COUNTY; | : | |
| PRIMECARE MEDICAL, INC.; | : | |
| STEPHAN BRAUTIGAM, PMHNP; | : | |
| JESSICA MAHONEY, PSY.D.; | : | |
| AVIA JAMES, LPC; | : | |
| CHRISTINA PENGE, LPC; | : | |
| CORRECTIONAL OFFICER MOODY; | : | |
| CORRECTIONAL OFFICER MURPHY; and | : | |
| CORRECTIONAL OFFICER YOUNG, | : | |
| Defendants | : | JURY TRIAL DEMANDED |

**RESPONSE OF PRIMECARE DEFENDANTS TO
PLAINTIFF'S STATEMENT OF FACTS IN OPPOSITION
TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

I.     **The Defendants and Their Duty to Protect Prisoners from Harming Themselves**

1.     Defendant Bucks County operates the Bucks County Correctional Facility
(BCCF) and employs the individual defendant officers, Correctional Officer James Young and
Correctional Officer Robert Moody. Am. Compl, In 15, 22, Ex. 1, JA 4-5.

**RESPONSE:** Admitted.

2.     Defendant PrimeCare Medical, Inc., is the holder of a contract to provide medical
and mental health services to prisoners at BCCF and employs the individual defendant mental
health clinicians, Christina Penge and Jessica Mahoney. Am. Compl, I 16, 18, 20, Ex. 1, JA 4-5.

**RESPONSE:** Admitted.

3.     Correctional staff have a duty to ensure the protection of prisoners under their supervision. There are rules in place to ensure such protection, and officers have an obligation to follow those rules. Young Dep., Ex. 18 Supp., 19:20-20:1, 39:15-40:3, SA 857-58, 868-69; Moody Dep., Ex. 17 Supp., 37:2-16, SA 825; Mitchell Dep., Ex. 20 Supp., 36:12-24, SA 958; Nottingham Dep. 1, Ex. 19 Supp., 38:3-11, SA 915.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

4.     It is commonly understood that suicide and self-harm are ever-present risks in a prison population and that incarcerated people may become suicidal at any time during incarceration. Young Dep, Ex. 18 Supp., 37:21-38:2, SA 863-63; Moody Dep., Ex. 17 Supp., 33:17-20, SA 823.

**RESPONSE:** Admitted.

5.     Officers have a responsibility to be aware of suicide risks and to prevent people from harming themselves. Moody Dep., Ex. 17 Supp., 31:11-16, SA 822; Mitchell Dep., Ex. 20 Supp., 40:5-12, SA 955; Nottingham Dep. 1., Ex. 19 Supp., 39:1-4, SA 916.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

6.     Self-harming activity is common among the prison population at BCCF. Even if they do not intend to kill themselves, people are screaming for help "all the time" and engage in "superficial [cutting] for attention." Young Dep., Ex. 18 Supp., 51:1-25, 77:18-22, SA 877, 888.

**RESPONSE:** Admitted in part; denied in part.  It is admitted that Officer Young provided testimony consistent with this Statement of Fact.  It is denied that Officer Young's

testimony provides a sufficient foundation to state such activity is common among the prison population at BCCF.

7.     Likewise, mental health staff have a responsibility to protect the health and safety of patients under their care and to address risks that patients may harm themselves. Penge Dep., Ex. 69., 80:17-83:16, SA 1252-55; Mahoney Dep., Ex. 60 Supp., 100:22-102:1, SA 1045-47.

**RESPONSE:** Denied as stated.  Mental health staff has a duty to screen patients for the potential that the patient may harm himself.  If the patient so screens, mental health staff has a duty to take reasonable efforts to attempt to reduce the risk of self-harm by the patient.

8.     It is commonly understood in a prison environment that suicidal and self-harming behavior is more likely at critical time periods in a person's criminal case, such as after a denial of bail, a jury verdict, or sentencing. Cassidy Dep., Ex. 68, 73:7-24, SA 1187; Penge Dep., Ex. 69, 103:19-104:3, SA 1256-57; Mahoney Dep., Ex. 60 Supp., 104:22-105:10, 115:1-116:6, 177:3-10, SA 1049-50, 1051-52, 1070; Young Dep., Ex. 18 Supp., 38:3-15, SA 867; Moody Dep., Ex. 17 Supp., 33:21-34:2, SA 823-24; Metellus Dep., Ex. 21 Supp., 41:11-42:4, SA 1014-15; Reed Dep., Ex. 65., 27:4-20, SA 1135; SOP B-4.66, Ex. 2, JA 35.

**RESPONSE:** Denied as stated.  Inmates may become suicidal at any time during an incarceration.  Suicidal behavior is more likely in critical periods of time, including commitment and the first several days thereafter, court hearings, sentencing, new criminal charges, etc. Cassidy Dep., Ex. 68, 73:7-24, SA 1187 (Doc. 90-21, p. 7).

## II. Charles Joseph Freitag Sr.'s Admission to BCCF and His Concerning Risk of Suicide and Self Harm

9.      Charles Joseph Freitag, Sr., was admitted to BCCF on June 4, 2018, after a jury in the Bucks County Court of Common Pleas found him guilty of aggravated assault and related charges. At 57-years-old, the conviction resulted from Mr. Freitag's first-ever arrest, and his admission to BCCF was the first time he had ever been incarcerated. Before his incarceration, Mr. Freitag had a 25-year career working for the U.S. Postal Service, and he took great pride in that career. Am. Compl. I 33-54, Ex. 1, JA 7-9.

**RESPONSE:** Admitted in part; denied in part. It is admitted that Joseph Freitag was admitted to BCCF on June 4, 2018, after a jury convicted him of aggravated assault and related charges. The remainder of this Statement of Fact is denied. Plaintiff is simply relying upon an allegation in the Amended Complaint. A plaintiff cannot rely on unsupported allegations in their complaint to survive a motion for summary judgment. *Graudins v. Retro Fitness, LLC*, 921 F. Supp. 456, 463 (E.D. Pa. 2013), citing *Shah v. Bank of Am.*, 346 Fed. Appx. 831, 833 (3d Cir. 2009).

10.      Mr. Freitag's arrest and conviction arose out of a series of mental health challenges related to the death of several close family members and contentious divorce proceedings. In 2017, he attempted suicide twice. He went on medications and was hospitalized, but stopped taking the medications. The sudden cessation of his medication led to a further downward spiral in his mental health. Am. Compl. In 33-54, Ex. 1, JA 7-9.

**RESPONSE:** Denied. Plaintiff is simply relying upon an allegation in the Amended Complaint. A plaintiff cannot rely on unsupported allegations in their complaint to survive a

motion for summary judgment. *Graudins v. Retro Fitness, LLC*, 921 F. Supp. 456, 463 (E.D. Pa. 2013), citing *Shah v. Bank of Am.*, 346 Fed. Appx. 831, 833 (3d Cir. 2009).

11.     On September 13, 2017, Mr. Freitag used a blade to make several cuts in his arms and then drove his truck through the exterior wall of his ex-wife's home in Fallsington, Pennsylvania. When police arrived at the scene, he was making suicidal statements. He was arrested on aggravated assault and related charges. Crim. Compl., Ex. 57, JA 757-58; Am. Compl. In 44-48, Ex. 1, JA 8.

**RESPONSE:** Admitted in part; denied in part.  It is admitted that Mr. Freitag was arrested (and ultimately convicted) of aggravated assault and related charges after driving his car into his ex-wife's home.  The remainder of this Statement of Fact is denied in that Plaintiff cannot rely on unsupported allegations in their complaint to survive a motion for summary judgment. *Graudins v. Retro Fitness, LLC*, 921 F. Supp. 456, 463 (E.D. Pa. 2013), citing *Shah v. Bank of Am.*, 346 Fed. Appx. 831, 833 (3d Cir. 2009).

12.     Upon his conviction and admission to BCCF on June 4, 2018, mental health staff quickly became aware of the circumstances of his incarceration and the fact that Mr. Freitag was at risk of self-harm and suicide. Cassidy Dep., Ex 68., 111:7-112:25, 114:4-15, SA 1203-05; Mahoney Dep., Ex. 60 Supp., 135:19-136:4, SA 1056-57; Penge Dep., Ex. 69., 131:3-132:6, SA 1258-59.

**RESPONSE:** Admitted.

13.     Within hours of his admission to BCCF, Mr. Freitag was seen by a PrimeCare nurse who noted in an electronic medical record for Mr. Freitag that he had multiple suicide attempts with the most recent in September 2017, that he had inpatient psychiatric

hospitalizations in August and September 2017, that he had multiple scars on his right forearm from recent suicide attempts, and that Mr. Freitag repeatedly stated that he was "sorry for what [he] did." Medical Records, Ex. 45, JA 450.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag denied any current suicidal thoughts.  Medical Records, Ex. 45, JA 450 (Doc. 85-1, p. 47).

### III.    Mr. Freitag's Placement on Suicide Precaution Status

14.    At the time of Mr. Freitag's incarceration at BCCF, Bucks County and PrimeCare had in place a set of four different watch levels, defined in their "Suicide Prevention Policy," aimed at protecting incarcerated people at risk of harming themselves:

> (a) "Constant Watch," which required placement of the person in a "stripped cell" (where all property is removed from the cell) with an officer maintaining constant view of the person;
>
> (b) "Level 1," which required placement in a "stripped cell" with a suicide smock and a suicide blanket, with an "inmate monitor" (an incarcerated person assigned to assist officers in conducting watches) maintaining constant view of the person and an officer observing the person at random intervals not to exceed 15 minutes;
>
> (c) "Level 2," which imposed the same requirements as Level 1 with the only significant distinction being that the person would be dressed in a prison uniform as opposed to a suicide smock; and
>
> (d) "Level 3," which required an inmate monitor to observe the person's activities every 15 minutes and officers to observe the person's activities at random intervals not to exceed 30 minutes.

SOP B-3.23, Ex. 2, JA 24-25.

**RESPONSE:** Admitted in part; denied in part.  It is admitted that correctional officers were required to conduct observations of inmates placed upon a watch, and that the County

performed the watches at prescribed intervals. The remainder of this Statement of Fact is denied. PrimeCare's suicide prevention policy consisted of: Constant Watch; Suicide Watch Level I; Suicide Watch Level II, and Level III, Psychiatric Observation which is not a level of suicide watch. PrimeCare Suicide Prevention Program; Ex. 44, JA 397-401 (Doc. 84-14, pp 7-11).

15. The Level 3 precaution, which does not require a stripped cell, is rarely used by mental health clinicians. Typically, it is used only as a step-down procedure, after someone has been on a more protective status. If mental health clinicians have any questions as to whether someone is stable, the default procedure is Level 2. Mahoney Dep., Ex. 60 Supp., 123:11-124:20, 126:13-18, SA 1053-55.

**RESPONSE:** Denied as stated. Level III is not a level of suicide precaution. PrimeCare Suicide Prevention Program; Ex. 44, JA 400 (Doc. 84-14, p. 10). By way of further answer, Psychiatric Observation is generally a step down from Suicide Level II or someone with significant mental illness but not an immediate risk of suicide. Mahoney Dep., Ex. 60, SA 1053-1054 (Doc. 90-13, pp. 13-14).

16. After his first medical encounter with a PrimeCare nurse on June 4, 2018, *see supra* ¶ 13, Mr. Freitag was placed on Level 2 status, meaning that he was locked in a cell under the constant observation of an inmate monitor with an officer checking him no less than every 15 minutes. Medical Records, Ex. 45, JA 450.

**RESPONSE:** Admitted.

17.    The next day, June 5, Mr. Freitag met with defendant Mahoney for a mental health evaluation. As a result of that encounter, Mahoney determined that Mr. Freitag was at risk of suicide because of (among other things) his previous suicide attempt, which seemed "pretty severe." Mahoney Dep., Ex. 60 Supp., 135:19-136:4, SA 1056-57.

**RESPONSE:** Admitted.

18.    During this encounter, Mahoney learned that Mr. Freitag had three prior suicide attempts, with the third occurring in September 2017 when Mr. Freitag cut his arms and drove his truck into his ex-wife's house. Mahoney Dep., Ex. 60 Supp., 146:23-147:6, 149:21-150:11, SA 1060-63.

**RESPONSE:** Denied.  Ms. Mahoney would have read this information in the chart after she met with Mr. Freitag.  Mahoney Dep., Ex. 60, 147:5-6, SA 1061 (Doc. 90-13, p. 21).

19.    Mr. Freitag reported to Mahoney that he would start to have thoughts about harming himself whenever he got depressed. Mahoney Dep., Ex. 60 Supp., 150:14-20, SA 1063.

**RESPONSE:** Denied as stated.  Mr. Freitag reported that he **sometimes** starts to have thoughts of harming himself when he becomes depressed.  Mahoney Dep., Ex. 60 Supp., 150:14-17, SA 1063 (Doc. 90-13, p. 23) (emphasis added).

20.    Mr. Freitag also knew that he would have to go back to court to be sentenced. He expressed to clinicians that he was anxious whenever he thought about his case and the possibility of losing his job of 25 years. Mahoney Dep., Ex. 60 Supp., 169:11-24, SA 1068.

**RESPONSE:** Denied as stated.  Mr. Freitag, early on in his incarceration, would have anxiety whenever he was thinking about his case and possibly losing his job of 25 years. Mahoney Dep., Ex. 60 Supp., 169:11-18, SA 1068. (Doc. 90-13, p. 28).

21.     In this encounter with Mahoney and throughout his time at BCCF, Mr. Freitag expressed anxiety about his sentencing and losing his job. Mahoney Dep., Ex. 60 Supp., 137:5-8, SA 1058; Penge Dep., Ex. 69., 176:24-177:15, SA 1264-65.

**RESPONSE:** Admitted.

22.     Based on her evaluation, Mahoney determined that Mr. Freitag remained at a moderate risk of suicidal conduct and maintained him on the Level 2 watch through June 6. Mahoney Dep., Ex. 60 Supp., 159:23-161:10, SA 1064-66; Medical Records, Ex. 45, JA 683-84.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag was not expressing thoughts of harming himself.  Mahoney Dep., Ex. 60 Supp. 161:5-6, SA 1066 (Doc. 90-13, p. 26).

### IV.   Mr. Freitag's Request for Post-Sentencing Mental Health Follow-Up

23.     Defendant Mahoney next saw Mr. Freitag on June 15. She noted in the medical chart that Mr. Freitag "keeps feeling badly about being here" and that he wanted mental health staff to follow up with him after he went back to court in August because he "figured he would need somebody to talk to afterwards." Mahoney Dep., Ex. 60 Supp., 175:11-20, SA 1069, Medical Records, Ex. 45, JA 685-86.

**RESPONSE:** Admitted.

24.     When Mr. Freitag made this request on June 15, 2018, defendant Mahoney and PrimeCare staff knew three important factors regarding the risk that Mr. Freitag may attempt to harm himself in the future: (1) he had two prior suicide attempts, (2) he had tried to kill himself in

a third attempt by driving into his wife's house, and (3) he wanted to see mental health staff after he went back to court for sentencing. Cassidy Dep., Ex. 68., 123:23-126:9, SA 1212-1215.

**RESPONSE:** Admitted in part; denied in part. It is admitted that mental health staff knew items 1-3. It is denied that these factors are "important" and the record citation does not support this Statement of Fact. By way of further answer, Mr. Freitag attributed his driving into his wife's home as a result of not taking his prescribed medications and that he did not believe he would have done so if he was on his medications. Ex. 45, JA 685 (Doc. 86-3, p. 39). Additionally, Mr. Freitag had a pleasant mood, was calm, and cooperative. Ex. 45, JA 685 (Doc. 86-3, p. 39). Moreover, he was deemed to be a low risk of suicide as of June 15, 2018. Ex. 45, JA 685 (Doc. 86-3, p. 39).

25. In view of these factors, mental health staff knew they needed to address Mr. Freitag's concerns about going back to court for sentencing. Cassidy Dep., Ex. 68., 126:11-15, SA 1215.

**RESPONSE:** Admitted. By way of further answer, Mr. Freitag was scheduled for post sentencing follow-up months in advance of his sentencing. Moreover, this mental health follow-up appointment was scheduled for the first available day following sentencing.

26. Mahoney knew that Mr. Freitag's sentencing was scheduled for Friday, August 24, 2018. She made arrangements for the requested follow-up appointment to occur three days after sentencing, on Monday, August 27, 2018. Mahoney Dep., Ex. 60 Supp., 178:11-14, SA 1071; Penge Dep., Ex. 69., 190:11-20, SA 1267.

**RESPONSE:** Admitted. By way of further answer, this was the first available day following sentencing.

27.     Although Mahoney was scheduling the appointment two months in advance, the August 27 appointment was the earliest available appointment following Mr. Freitag's sentencing hearing because mental health staff anticipated that no clinicians would be available when Mr. Freitag came back from court on the afternoon of Friday, August 24 or at any time during the weekend. Cassidy Dep., Ex. 68., 127:16-22, SA 1216; Penge Dep., Ex. 69., 188:4-25, SA 1266; *see also infra* § VII.

**RESPONSE:** Admitted.  By way of further, answer, mental health providers are available and on call 24 hours per day, 7 days per week.  Weber Dep., Ex. 59, p. 54:4-11, JA 780 (Doc. 87-13, p. 20).   Security staff can contact the medical department or the mental health supervisor during hours when mental health staff is not physically in the building.   Mahoney Dep., Ex. 60, pp. 24:22-25:6, JA 783-784 (Doc. 87-14, pp. 3-4).   Further, Ms. Penge informed Mr. Freitag that he was going to be seen by mental health staff if he was sentenced to prison.  He was also informed by Ms. Penge that even if mental health staff was not in the building, he could ask anyone for help since medical staff was always in the building.  Penge Dep., Ex. 69, 230:2-14, SA 1285 (Doc. 90-22, p. 39).

## V.     Mr. Freitag's Mental Health Deteriorates Through July 2018

28.     In late July 2018, Mr. Freitag reported to his brother, Robert Freitag, in a telephone call from BCCF that he was "so depressed" and that he "didn't want to get out of bed anymore."

Robert Freitag grew concerned and reported the details of this phone call to Mr. Freitag's criminal defense attorney, Paul Lang. R. Freitag Dep., Ex. 62 Supp., 29:15-30:6, SA 1094-95.

**RESPONSE:** Admitted. By way of further answer, at no time did Mr. Freitag indicate to this brother that he was thinking of harming himself. R. Freitag Dep., Ex. 62 Supp., 29:12-16, SA 1094 (Doc. 90-15, p. 4).

29.     On July 31, 2018, Mr. Lang emailed BCCF Deputy Warden Clifton Mitchell to report that Mr. Freitag was "not doing well incarcerated and has a history of suicide attempts." Email to Dep. Warden Mitchell, Ex. 6, JA 42; Mitchell Dep., Ex. 20 Supp., 55:9-22, SA 970.

**RESPONSE:** Admitted in part; denied in part. It is admitted that Deputy Warden Mitchell requested that Mr. Freitag be evaluated by mental health staff as a result of information he received from Mr. Freitag's criminal defense attorney. The remainder of this allegation is denied because the record citation does not support the Statement of Fact.

30.     That same day, Deputy Warden Mitchell informed PrimeCare's mental health supervisor for BCCF, Dr. Abbey Cassidy, that Mr. Freitag's lawyer had expressed concerns about his mental health. Mitchell asked Cassidy to ensure that someone on the mental health staff would see Mr. Freitag. Cassidy Dep., Ex. 68., 136:17-137:12, SA 1224-25.

**RESPONSE:** Admitted.

31.     Mitchell indicated to Cassidy that he wanted Mr. Freitag seen because he was older, was facing serious charges, and had his sentencing hearing coming up. Mitchell Dep., Ex. 20 Supp., 57:8-24, SA 971.

**RESPONSE:** Admitted. By way of further answer, there was no indications that Mr. Freitag had suicidal thoughts or ideations.

32.     On the afternoon of July 31, Mr. Freitag was seen by PrimeCare mental health clinician Avia James. In a note regarding the encounter, James wrote that Mr. Freitag reported that he was an "emotional wreck," "thinking about everything he's done to himself and [his] family," "in disbelief' that he was in jail, and was "beating himself up." James noted that Mr. Freitag was "tearful and highly emotional." Medical Records, Ex. 45, JA 686.

**RESPONSE:** Admitted.  By way of further answer, Ms. James a non-party, assessed Mr. Freitag has having a low risk of suicide, and did not place him upon suicide precautions. Medical Records, Ex. 45, JA 686.

33.     At the conclusion of the encounter, James, with Mr. Freitag's agreement, placed Mr. Freitag on a Level 3 watch status, requiring that he be observed by an inmate monitor every 15 minutes and an officer at least once every 30 minutes. Medical Records, Ex. 45, JA 686; *supra*¶ 14.

**RESPONSE:** Admitted.

34.     The Level 3 status also included a presumption that Mr. Freitag would be seen by a mental health practitioner three times per week, and, in agreeing to placement on that status, Mr. Freitag indicated that he felt like he needed a sounding board with a mental health professional at this frequency. Penge Dep., Ex. 69., 200:20-201:10, SA 1268-69.

**RESPONSE:** Admitted in part; denied in part.  It is admitted that Psychiatric Observation involves regular evaluations by mental health staff and that Mr. Freitag indicated a willingness to have a sounding board from a mental health professional.  It is denied that Mr. Freitag requested a particular amount of frequency with mental health staff or a particular amount of times he needed a sounding board.

35.     After Mr. Freitag was evaluated, Dr. Cassidy spoke with Deputy Warden Mitchell about Mr. Freitag and agreed that the mental health staff would keep Mr. Freitag on a Level 3 watch and continue to check in with him. Cassidy Dep., Ex. 68., 140:17-141:5, SA 1226-27.

**RESPONSE:** Admitted in part; denied in part. It is admitted that Mr. Freitag was placed upon Psychiatric Observation and that this status was reported to Deputy Warden Mitchell. It is denied that Mr. Freitag was to be kept on this status for perpetuity.

36.     Dr. Cassidy believed that Mr. Freitag should stay on Level 3 watch status at least through his sentencing on August 24, 2018. Cassidy Dep., Ex. 68., 144:1-15, SA 1230.

**RESPONSE:** Admitted. By way of further answer, Mr. Freitag was evaluated the two days before his sentencing by mental health staff, and he was deemed a low risk of suicide. PrimeCare Records, Ex. 45, JA 520-521 (Doc. 85-4, pp. 3-4).

37.     On the morning of August 1, following the decision to place Mr. Freitag on Level 3 status and her discussion with Deputy Warden Mitchell, Dr. Cassidy sent an email to all mental health staff members, including defendants Mahoney and Penge. The email stated:

> Just a head's up on Freitag...
>
> He'll need to stay on a Level 3 for at least a few weeks. Deputy Warden Mitchell wanted him seen because he is somewhat older, is here on serious charges (Agg. Assault), and has sentencing coming up. He also has a history of suicide attempts, most recent being September of last year. Level 3 appears appropriate for now, but we need to keep a close eye on him as his sentencing date (8/24/18) approaches since he strikes several of the increased risk factors for suicide...

Cassidy Email, Ex. 6, JA 44.

**RESPONSE:** Admitted.

38.     When Dr. Cassidy sent her email, she was highlighting risk factors that she wanted clinicians to consider in further interactions with Mr. Freitag. In particular, she expected that each clinician would know that Mr. Freitag's risk factors were connected to his concerns about his sentencing. Cassidy Dep., Ex. 68., 142:17-143:15, 146:15-20, SA 1228-29, 1232.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag was evaluated the two days before his sentencing by mental health staff, and he was deemed a low risk of suicide. PrimeCare Records, Ex. 45, JA 520-521 (Doc. 85-4, pp. 3-4).

39.     Dr. Cassidy expected that if any of the clinicians wanted to remove Mr. Freitag from Level 3 watch status, they would first speak to her about that decision. Cassidy Dep., Ex. 68., 144:16-20, SA 1230.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag was evaluated the two days before his sentencing by mental health staff, and he was deemed a low risk of suicide. PrimeCare Records, Ex. 45, JA 520-521 (Doc. 85-4, pp. 3-4).

## VI.    Mr. Freitag's Increasing Anxiety and Diminishing Insight and Judgment as Sentencing Approached

40.     Mr. Freitag had multiple encounters with mental health clinicians between August 1, 2018, and August 23, 2018. Medical Records, Ex. 45, JA 687-690.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag was evaluated 10 times between August 1, 2018 and August 23, 2018, including the two days leading up to his sentencing.  Medical Records, Ex. 45, JA 687-690 (Doc. 86-3, pp. 41-42).

41.     On August 8, Mr. Freitag saw defendant Mahoney and reported to her that his anxiety was increasing as the court date approached. He was worried about what would happen at sentencing and how it would impact his life. Mahoney Dep., Ex. 60 Supp., 188:2-9, SA 1072; Cassidy Dep., Ex. 68, 147:3-7, SA 1233.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag denied any suicidal ideation, was calm, alert, and oriented.  He was deemed to be a low risk for self-harm.  Medical Records, Ex. 45, JA 688 (Doc. 86-3, p. 42).

42.     On August 10, Mr. Freitag saw defendant Penge. In that encounter, Mr. Freitag expressed concern about how his job would be impacted by his sentencing. Penge Dep., Ex. 69, 203:5-204:6, SA 1271-72.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag denied having any suicidal ideation, and he was deemed a low risk of self-harm.  Medical Records, Ex. 45, JA 688 (Doc. 86-3, p. 42).

43.     Penge had seen Mr. Freitag on prior occasions and noted that he showed "limited insight and judgment." She made that finding again on August 10. Cassidy Dep., Ex. 68, 121:22-122:14, SA 1210-11; Medical Records, Ex. 45, JA 688.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag denied having any suicidal ideation and he was deemed a low risk of self harm.  Medical Records, Ex. 45, JA 688 (Doc. 86-3, p. 42).

44.     Penge drew this conclusion about Mr. Freitag's mental health status because he had a difficult time accepting that there were factors outside his control that would determine whether he would be able to retain his job with the U.S. Postal Service. Penge Dep., Ex. 69, 204:17-205:21, SA 1272-73.

**RESPONSE:** Admitted.  Medical Records, Ex. 45, JA 688 (Doc. 86-3, p. 42).

45.     Penge next saw Mr. Freitag on August 14 and once again noted that he showed limited insight and judgment. Penge Dep., Ex. 69, 207:3-208:17, SA 1275-76.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag was cooperative, alert, oriented and denied being suicidal.  Medical Records, Ex. 45, JA 689 (Doc. 86-3, p. 43).

46.     The next day, August 15, Mr. Freitag saw PrimeCare's psychiatric nurse practitioner, Stephan Brautigam. Mr. Freitag informed Brautigam that he was hoping to be released from prison when he went to court. Brautigam wrote in his report of the encounter that Mr. Freitag's affect was anxious. Penge Dep., Ex. 69, 208:18-209:10, SA 1276-77.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag had a good mood, was future oriented, and denied being suicidal.  Medical Records, Ex. 45, JA 689 (Doc. 86-3, p. 43).

47.     Mr. Freitag then saw Penge again on August 17. As she had in previous encounters, she concluded that Mr. Freitag showed limited insight and judgment. She also noted that he was feeling anxious while awaiting sentencing. Penge Dep., Ex. 69, 209:11-210:18, SA 1277-78.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag denied any mental health concerns and being suicidal, and he discussed his plans for the future.  Medical Records, Ex. 45, JA 689 (Doc. 86-3, p. 43).

48.     During the encounter, Penge decided to remove Mr. Freitag from the Level 3 watch status that had been initiated on July 31. She did so because he was in a "better mood" and had seen someone from psychiatry. Penge Dep., Ex. 69, 210:23-211:7, SA 1278-79.

**RESPONSE:** Denied as stated.  Mr. Freitag was at a low risk of self-harm and denied being suicidal.  Medical Records, Ex. 45, JA 689 (Doc. 86-3, p. 43).  Additionally, he was removed from Psychiatric Observation because there was less of the mood from before and less symptoms presenting.  Penge Dep., Ex. 69, 211:5-7, SA 1279 (Doc. 90-22, p. 33).

49.     When Penge removed Mr. Freitag from Level 3 precautions, she knew he (a) had spent the previous three weeks expressing anxiety about his upcoming sentencing, (b) the court date was just a week away, (c) he had limited insight, (d) he had limited judgment, and (e) on at least one occasion he had shown a depressive mood. Penge Dep., Ex. 69, 211:8-212:9, SA 1279-80.

**RESPONSE:** Admitted in part; denied in part.  It is admitted that Ms. Penge had this information.  It is denied that this was the only information she had when she made the clinical decision to remove Mr. Freitag from Psychiatric Observation.  To the contrary, Ms. Penge also knew Mr. Freitag continually denied being suicidal, had an improved mood, and had less symptoms presenting.  Medical Records, Ex. 45, JA 689 (Doc. 86-3, p. 43).

50.     Penge did not consult with anyone when she removed Mr. Freitag from Level 3 watch status. Penge Dep., Ex. 69, 212:19-213:2, SA 1280-81.

**RESPONSE:** Admitted.  By way of further answer, as a licensed professional counselor (Penge Resume, Ex. 39, JA 368-369 (Doc. 84-9, pp. 2-3)), Ms. Penge was not required to consult

with anyone prior to removing Mr. Freitag from Psychiatric Observation per the PrimeCare Suicide Prevention Program. Ex. 44, JA 400-401 (Doc. 84-14, pp. 10-11).

51. Specifically, when Penge removed Freitag from Level 3 watch status, she did not speak to Dr. Cassidy about that decision. Cassidy Dep., Ex. 68, 144:21-146:2, 148:12-22, SA 1230-32, 1234.

**RESPONSE:** Admitted. By way of further answer, as a licensed professional counselor (Penge Resume, Ex. 39, JA 368-369 (Doc. 84-9, pp. 2-3)), Ms. Penge was not required to consult with anyone prior to removing Mr. Freitag from Psychiatric Observation per the PrimeCare Suicide Prevention Program. Ex. 44, JA 400-401 (Doc. 84-14, pp. 10-11). Additionally, Mr. Freitag was evaluated two times after he was removed from Psychiatric Observation and was placed back on that status when he returned to the prison after his sentencing.

52. Penge's actions in terminating the Level 3 watch status were not consistent with Dr. Cassidy's expectations for the clinicians working under her supervision. Cassidy Dep., Ex. 68, 148:24-150:1, 150:21-22, SA 1234-36.

**RESPONSE:** Admitted. By way of further answer, as a licensed professional counselor (Penge Resume, Ex. 39, JA 368-369 (Doc. 84-9, pp. 2-3)), Ms. Penge was not required to consult with anyone prior to removing Mr. Freitag from psychiatric observation per the PrimeCare Suicide Prevention Program. Ex. 44, JA 400-401 (Doc. 84-14, pp. 10-11). Additionally, Mr. Freitag was evaluated two times after he was removed from psychiatric observation (JA 521 (Doc. 85-4, p. 4) and was placed back on that status when he returned to the prison after his sentencing. Scordellis Dep., Ex. 61, p. 55:1-22, JA 789 (Doc. 87-15, p. 3).

53.     If Mr. Freitag's limited insight and judgment were preventing him from appreciating the possibility of an unexpected result at sentencing, that is something that could have had an impact on his suicide risk. Accordingly, Dr. Cassidy would have wanted to discuss these findings with Penge. Cassidy Dep., Ex. 68, 152:9-18, SA 1237.

**RESPONSE:** Admitted.  By way of further answer, as a licensed professional counselor (Penge Resume, Ex. 39, JA 368-369 ((Doc. 84-9, pp. 2-3)), Ms. Penge was not required to consult with anyone prior to removing Mr. Freitag from Psychiatric Observation per the PrimeCare Suicide Prevention Program.  Ex. 44, JA 400-401 (Doc. 84-14, pp. 10-11). Additionally, Mr. Freitag was evaluated two times after he was removed from Psychiatric Observation (JA 521 (Doc. 85-4, p. 4) and was placed back on that status when he returned to the prison after his sentencing.  Scordellis Dep., Ex. 61, p. 55:1-22, JA 789 (Doc. 87-15, p. 3).

54.     Following the termination of the Level 3 watch status, Mr. Freitag saw defendant Mahoney on August 22 for a "step-down" appointment. In that encounter, Mr. Freitag stated confidently to Mahoney that he would be released from prison after his sentencing. Mahoney Dep., Ex. 60 Supp., 140:9-15, 196:9-17, SA 1059, 1073.

**RESPONSE:** Admitted.  By way of further answer, Dr. Mahoney assessed Mr. Freitag as being a low risk for self-harm, and Mr. Freitag denied having any mental health concerns. Medical Records, Ex. 45, JA 521 (Doc. 85-4, p. 4).

55.     On August 23, Mr. Freitag met with defendant Penge for his last mental health encounter before sentencing. Once again, Mr. Freitag reported that he was nervous about his sentencing, and, once again, Penge noted that he had limited insight and limited judgment. Penge Dep., Ex. 69, 226:1-227:17, SA 1282-83.

**RESPONSE:** Admitted. By way of further answer, Mr. Freitag denied any immediate mental health concerns, denied any suicidal ideation, and Ms. Penge assessed Mr. Freitag as being a low risk of self-harm. Medical Records, Ex. 45, JA 520 (Doc. 85-4, p. 3) .

56. Penge found that Mr. Freitag had limited insight and judgment because he appeared not to fully comprehend that he could be coming back to the prison after sentencing. Penge Dep., Ex. 69, 229:1-230:2, 236:5-8, SA 1284-85, 1288.

**RESPONSE:** Admitted. By way of further answer, this was not concerning to Ms. Penge because she had informed Mr. Freitag that he was going to be seen by mental health staff if he was sentenced to prison. He was also informed by Ms. Penge that even if mental health staff was not in the building, he could ask anyone for help since medical staff was always in the building. Penge Dep., Ex. 69, 230:2-14 SA 1285 (Doc. 90-22, p. 39).

57. Mr. Freitag repeatedly told Penge that he was nervous about his sentencing, but that he believed he was going to get probation or some other noncustodial sentence. Penge Dep., Ex. 69, 135:8-136:11, SA 1260-61.

**RESPONSE:** Denied as stated. The record citation does not support that Mr. Freitag "repeatedly" told Ms. Penge that he was nervous about his sentencing.

58. Penge cautioned him not to get his hopes up, but Mr. Freitag "wasn't really listening," and he stated that he was a "hundred percent sure" that he was going to receive a sentence of probation, resulting in his release from prison and his ability to stay in his job. Penge Dep., Ex. 69, 136:5-137:16, 149:12-25. SA 1261-63.

**RESPONSE:** Admitted.

59.    Penge testified that it never crossed her mind that a sentence of incarceration could be absolutely devastating for Mr. Freitag. Penge Dep., Ex. 69, 231:22-232:5, SA 1286-87.

**RESPONSE:** Admitted.  By way of further answer, this was premised upon having no information to the contrary.  Penge Dep., Ex. 69, 232:2-12, SA 1287 (Doc. 90-22, p. 41).

60.    Based on what Penge observed about Mr. Freitag on August 23- that he was nervous about sentencing and that he had limited insight and judgment - and given Mr. Freitag's concerning presentation during the previous several months, Dr. Cassidy believed that Mr. Freitag should have been seen by mental health staff when he returned from court. Cassidy Dep., Ex. 68, 155:13-19, SA 1238.

**RESPONSE:** Denied.  Dr. Cassidy did not testify that Mr. Freitag "should" have been seen by mental health staff when he returned from court.

## VII.    PrimeCare's Deliberate Failure to Make Mental Health Care Available Following an Incarcerated Person's Return from Court

61.    PrimeCare and its staff were aware that suicidal behavior is more likely in critical periods of time in a person's criminal case, including after sentencing. Cassidy Dep., Ex. 68, 73:7-24, SA 1187; Penge Dep., Ex. 69, 103:19-104:3, SA 1256-57; Mahoney Dep., Ex. 60 Supp., 104:22-105:10, 115:1-116:6, 177:3-10, SA 1049-52, 1070.

**RESPONSE:** Admitted.

62.    Any time someone receives a sentence that they were not expecting, mental health staff would want to follow up with the person after that sentencing proceeding. Mahoney Dep., Ex. 60 Supp., 198:1-13, SA 1075.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag was scheduled for follow up after his sentencing.

63.     In 2018, the mental health staff at BCCF was available Monday through Friday, from 6:00 am until 4:00 pm. Cassidy Dep., Ex. 68, 40:19-41:10, SA 1184-85.

**RESPONSE:** Admitted.

64.     When BCCF prisoners went to court proceedings in the Bucks County Court of Common Pleas, in most cases they did not return from court and go through the readmission process at BCCF until after 4:00 pm. Reed Dep., Ex. 65, 30:4-15; 45:6-10, SA 1138, 1145.

**RESPONSE:** Admitted.

65.     As a result of this schedule, mental health staff were not available to see people for clinical evaluations when they returned from court. Reed Dep., Ex. 65, 5:2-5, 45:11-14, SA 1132, 1145; Budd Dep., Ex. 67, 53:4-9, SA 1180; Scordellis Dep., Ex. 61 Supp., 52:10-53:11, SA 1086-87; Weber Dep., Ex. 59 Supp., 29:20-23, 30:9-31:6, SA 1032-34.

**RESPONSE:** Denied.   Mental health providers are on call and available 24 hours per week, 7 days per week.  Weber Dep., Ex. 59, p. 54:4-11, JA 780 (Doc. 87-13, p. 20).

66.     These mental health clinician staffing practices had been in place at BCCF from the time when a prior private contractor provided mental health services at BCCF. PrimeCare entered into a contract with Bucks County for the provision of mental health services at BCCF in March 2018, and when it did so, it maintained the existing staff schedules without changes. Scordellis Dep., Ex. 61 Supp., 52:7-20, SA 1088; Weber Dep., Ex. 59 Supp., 32:8-18, SA 1035.

**RESPONSE:** Admitted.   Thus, mental health staff were physically in the building at least 10 hours per day, 5 days per week and on call the remaining time.

67.    PrimeCare did not propose any changes to the scheduling when assuming responsibility for mental health care in March 2018. Weber Dep., Ex. 59 Supp., 34:2-9, 35:1-36:23, SA 1036-38.

**RESPONSE:** Admitted.  Mental health staff were physically in the building at least 10 hours per day, 5 days per week and on call the remaining time.  Medical staff were in the building 24 hours per day.

68.    There were no contractual provisions that precluded PrimeCare from making a change to have mental health staff available at different times once it began providing mental health services at BCCF in March 2018. Weber Dep., Ex. 59 Supp., 50:1-14, 50:23-51:1, SA 1039-40.

**RESPONSE:** Admitted.

69.    Accordingly, in August 2018, there was no procedure in place to ensure that someone on the mental health caseload would be seen by mental health providers when returning from court. Cassidy Dep., Ex. 68, 87:5-11, SA 1188.

**RESPONSE:** Admitted.  By way of further response, Mr. Freitag was scheduled to be seen after his sentencing.  PrimeCare Records, Ex. 45, JA 515 (Doc. 85-13, p. 41).

70.    In the absence of available mental health staff, decisions about protective measures for people returning from court were left in the hands of correctional case managers or correctional officers. The only way a person returning from court would be seen for mental health evaluation would be for the correctional staff to specifically ask mental health staff for

intervention. Cassidy Dep., Ex. 68, 89:24-90:7, 97:3-8 SA 1189-91, 1193; Scordellis Dep., Ex. 61 Supp., 54:7-15, 56:4-14, SA 1088-89.

**RESPONSE:** Denied. Security staff can contact the medical department or the mental health supervisor during hours when mental health staff are not physically in the building. Mahoney Dep., Ex. 60, pp. 24:22-25:6, JA 783-784 (Doc. 87-14, pp. 3-4).

71. Bucks County had an expectation that when mental health staff were not available after court, correctional staff would make the decision about what precautions, if any, were required. Reed Dep., Ex. 65, 28:22-29:13, 30:16-21, SA 1136-8; Budd Dep., Ex. 67, 53:10-16, SA 1180.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. If a response is required, this Statement is denied. Security staff can contact the medical department or the mental health supervisor during hours when mental health staff are not physically in the building. Mahoney Dep., Ex. 60, pp. 24:22-25:6, JA 783-784 (Doc. 87-14, pp. 3-4).

72. The correctional case managers and officers charged with making decisions about the need for mental health care in these after-court situations do not have sufficient mental health training to fully assess someone's risk of suicide. Cassidy Dep., Ex. 68, 89:18-23, SA 1189; Reed Dep., Ex. 65, 45:15-20, SA 1145.

**RESPONSE:** Admitted. By way of further answer, this is why security staff can contact the medical department or the mental health supervisor during hours when mental health staff are not physically in the building. Mahoney Dep., Ex. 60, pp. 24:22-25:6, JA 783-784 (Doc. 87-14, pp. 3-4).

73.     Suicide risk factors are not easy for a layperson without mental health training to identify, since, for example, a suicidal person rarely admits outwardly that they are thinking of killing themselves. Thus, even if a person denies suicidality, that does not end the inquiry for a clinician because the clinician must look at multiple other factors beyond the patient's self-report. Cassidy Dep., Ex. 68, 90:13-91:16, SA 1190-91.

**RESPONSE:** Admitted.

**VIII.   Mr. Freitag's Sentencing and Placement on an Insufficiently Protective Watch**

74.     At Mr. Freitag's sentencing proceeding on August 24, a judge in the Bucks County Court of Common Pleas imposed a sentence of six-to-twelve years of imprisonment. That sentence was well beyond the expectations Mr. Freitag had communicated to mental health staff. Mahoney Dep., Ex. 60 Supp., 197:11-16, SA 1074.

**RESPONSE:** Admitted.

75.     Mr. Freitag's friends and family members who attended the sentencing knew that he would be distraught following the sentencing. His life-long friends, Thomas Hyers and Robert Miller, believed there was a good chance Mr. Freitag would try to kill himself. His brother, Robert Freitag, believed he should be on a suicide watch. R. Freitag Dep., Ex. 62. Supp., 42:1024, SA 1096; Hyers Dep., Ex. 70, 26:16-28:3, SA 1292-1294; Miller Dep., Ex. 71, 21:2-15, SA 1298.

**RESPONSE:** Denied.  None of these individuals reported any concerns to anyone at the prison.  Further, Robert Freitag spoke with Mr. Freitag on the phone from the prison after the sentencing and there was nothing about the conversation that indicated Mr. Freitag could harm himself.  R. Freitag Dep., Ex. 62, p. 47:11-16, JA 794 (Doc. 87-16, p. 5).

76.     When correctional staff at BCCF learned about Mr. Freitag's sentence, a lieutenant was circulated to administrative staff, including to Deputy Warden Mitchell, an email reporting on the length of the sentence. Mitchell Dep., Ex. 20 Supp., 63:16-22, SA 973.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.  By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

77.     The email was sent at 3:52 pm, right as mental health staff were leaving the facility for the day. Email between Dep. Warden Mitchell and Carl Metellus, Ex. 7, JA 46; Cassidy Dep., Ex. 68, 158:22-159:4, SA 1239-40; *supra* ¶ 46.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.  By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

78.     Three minutes after that email was sent, Mitchell forwarded the email to correctional case managers, including the case manager supervisor, Carl Metellus. Mitchell wrote in his email "Unlock, my sure he's on a watch." Mitchell Dep., Ex. 20 Supp., 64:21-65:3, SA 974-75; Email between Dep. Warden Mitchell and Carl Metellus, Ex. 7, JA 46.

**RESPONSE:**  This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.  By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

79.     The "my sure" statement was a typo; Mitchell's email indicated that Metellus should "make sure" Mr. Freitag was on a watch. Metellus understood Mitchell's directive to order that Mr. Freitag be placed on a Level 3 watch because the statement "unlock" meant that

Mr. Freitag should be placed in an unlocked cell. The only watch status that allowed for an unlocked cell was Level 3. Metellus Dep., Ex. 21 Supp., 50:21-51:25, 53:16-54-21, 57:18-58:1 SA 1016-17, 1019-20, 1023-24.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

80.    Based on that order, Metellus directed a case manager to inform the officers in Mr. Freitag's housing area to initiate the Level 3 watch procedures. Metellus Dep., Ex. 21 Supp., 58:20-59:7, SA 1024-25.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

81.    Mitchell, however, believed that Metellus was the person who made the decision for Level 3 watch, as he intended only to indicate that Mr. Freitag should be on some level of watch. Mitchell noted that when he sent the email to Metellus, it was close to 4:00 pm, he was getting ready to leave for the day, and he "didn't expect this to be litigated in this manner." Mitchell Dep., Ex. 20 Supp., 65:4-67:3, SA 975-77.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

82.    Mitchell was superior to Metellus in the chain of command. Thus, Metellus believed he was required to follow what he understood as Mitchell's directive to place Mr.

Freitag in an "unlock[ed]" watch, namely, Level 3. Metellus Dep., Ex. 21 Supp., 55:7-21, SA 1021.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation.

83.     When Mitchell sent his directive regarding the watch status, he was "handcuffed" in his decision-making because he did not have access to Freitag's mental health history. He did not have a full understanding of Mr. Freitag's prior suicide attempts, he did not know that a suicide attempt led to Mr. Freitag's incarceration, and he did not know how shocked Mr. Freitag would be by the sentence that was imposed. Mitchell Dep., Ex. 20 Supp., 76:18-78:14, SA 980-82.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer, it is admitted that security staff placed Mr. Freitag upon Psychiatric Observation. Further, medical staff and mental health staff are available 24 hours a day, 7 days a week either in the facility or by telephone for consultation about the medical or mental health needs of inmates incarcerated in BCCF. Weber Dep., Ex. 59, p. 54:4-11, JA 780 (Doc. 87-13, p. 20).

84.     Mitchell had only basic training on mental health issues and was not a clinician with the same ability as mental health staff to make clinical judgments. Mitchell Dep., Ex. 20 Supp., 58:8-23, SA 972; Cassidy Dep., Ex. 68, 98:4-21, SA 1194.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer,

medical staff and mental health staff are available 24 hours a day, 7 days a week either in the facility or by telephone for consultation about the medical or mental health needs of inmates incarcerated in BCCF. Weber Dep., Ex. 59, p. 54:4-11, JA 780 (Doc. 87-13, p. 20).

85. If mental health professionals had been in the facility when Mr. Freitag returned from court, Mitchell would have reached out to them to discuss precautions for Mr. Freitag. Mitchell Dep., Ex. 20 Supp., 80:10-20, 83:19-84:11, SA 983-85.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required. By way of further answer, medical staff and mental health staff are available 24 hours a day, 7 days a week either in the facility or by telephone for consultation about the medical or mental health needs of inmates incarcerated in BCCF. Weber Dep., Ex. 59, p. 54:4-11, JA 780 (Doc. 87-13, p. 20).

86. No mental health clinician was made aware of the decision to place Mr. Freitag on Level 3 status upon his return from sentencing. Cassidy Dep., Ex. 68, 159:14-19, SA 1240.

**RESPONSE:** Admitted.

87. From a mental health clinician's perspective, it would have been important to evaluate Mr. Freitag and assess his mental health status after his sentencing. Cassidy Dep., Ex. 68, 129:2-130:3, 132:16-21, 133:21-22, SA 1217-18, 1220-21; Mahoney Dep., Ex. 60 Supp., 22:19-23, SA 1044.

**RESPONSE:** Admitted. By way of further answer, that is why Mr. Freitag was scheduled for mental health follow-up after his sentencing.

88.     Because Mr. Freitag had expressed anxiety about his sentencing and communicated an expectation that he would be getting out of prison, mental health staff would have wanted an opportunity to evaluate him Mahoney Dep., Ex. 60 Supp., 199:6-16, SA 1076.

**RESPONSE:** Admitted.

89.     Such an assessment did not take place, however, because of PrimeCare's practice of not having any clinicians available when incarcerated people returned to BCCF after court. Cassidy Dep., Ex. 68, 134:5-23, SA 1222.

**RESPONSE:** Denied.  The assessment did not take place because Mr. Freitag did not ask a nurse, officer, or his family for mental health assistance after his sentencing.

90.     Following his sentencing, Mr. Freitag had multiple risk factors in place, including his mental health diagnoses, his history of suicide attempts, and a sentence that was wildly outside of his expectations. Mahoney Dep., Ex. 60 Supp., 200:20-201:11, SA 1077-78.

**RESPONSE:** Admitted.   By way of further answer, Mr. Freitag was able to move forward and put the criminal events behind him.  R. Freitag Dep., Ex. 62, p. 46:10-19, JA 793 (Doc. 87-16, p. 4).  He was relieved that his court proceedings were finished.  R. Freitag Dep., Ex. 62, p. 46:10, JA 793 (Doc. 87-16, p. 4).  Mr. Freitag was looking ahead, and his tone of voice was better than his brother expected.  R. Freitag Dep., Ex. 62, pp. 46-48, JA 793-795 (Doc. 87-16, pp. 4-6.

91.     If Dr. Cassidy had learned about the sentence of six-to-twelve years, she would have either asked a clinician to conduct an evaluation or requested placement on a Level 2 status

- that is, placement in a stripped cell with an inmate monitor constantly observing him. Cassidy Dep., Ex. 68, 160:7-20, 162:11-23, SA 1241-42; *supra* ¶ 14.

**RESPONSE:** Denied. This Statement of Fact is pure speculation. Dr. Cassidy testified that she could not say with 100% certainty what would have occurred if she had learned Mr. Freitag received a 6-12 year sentence. Cassidy Dep., Ex. 68, 160:14-15, SA 1241 (Doc. 90-21, p. 61).

## IX.   Rules for Correctional Staff Implementing the Level 3 Watch Status

92.     When a Level 3 watch is ordered, that means there has been a determination that six observations per hour is necessary to properly protect the person who is the subject of the watch, with an observation by an officer at least once every 30 minutes and an observation by an inmate monitor every 15 minutes. Metellus Dep., Ex. 21 Supp., 63:12-22, 66:10-25, SA 1027-28; Nottingham Dep. 1, Ex. 19 Supp., 45:13-46:13, SA 922-923.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

93.     When Mitchell issued the order to place Mr. Freitag on a watch, he expected that officers would check on Mr. Freitag as directed and that inmate monitors would do the same. Mitchell Dep., Ex. 20 Supp., 67:11-68:8, SA 977-78.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

94.     Policies concerning watches are directives, not suggestions or guidelines. The watch directives do not ask officers to "do their best." They are mandatory, and failure to follow

them leads to a risk of someone harming themselves. Nottingham Dep. 1, Ex. 19 Supp., 40:14-41:7, 43:18-22, SA 917-8, 920; Mitchell Dep. 41:3-19, 42:2-8, 87:18-88:8, SA 960-61, 987-88.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

95.    If the watch requires observations within a specific timeframe, officers are responsible for complying with that timeframe. Accordingly, once an order for a Level 3 watch has been issued, officers are expected to fulfill two responsibilities: (1) conduct their own checks every 30 minutes and (2) ensure that inmate monitors conduct their checks every 15 minutes. Failure to do so would violate Bucks County policy. Mitchell Dep., Ex. 20 Supp., 44:3-7, 48:22-50:6, SA 962, 966-968; Nottingham Dep. 1, Ex. 19 Supp., 44:23-45:8, 49:8-50:1, SA 921-22, 925-26.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

96.    Mental health staff, likewise, have the same expectations that correctional officers will comply with policies for watch procedures. Mahoney Dep., Ex. 60 Supp., 204:6-205:1, SA 1079-80.

**RESPONSE:** Admitted.

97.    When officers perform their observations, the purpose is to make sure that there is "living, breathing flesh" - that is, to make sure that each person in the housing module is present and alive. Murphy Dep., Ex. 16 Supp., 36:21-37:4, SA 810-811.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

98.     The use of inmate monitors results from Bucks County's determination that it does not have sufficient staff to fully ensure protection of people who may be a danger to themselves. As part of the use of inmate monitors, Bucks County expects that officers will carefully monitor the performance of inmate monitors working under their supervision. Nottingham Dep. 1 53:15-54:11, SA 928-29; Budd Dep., Ex. 67, 45:2-6, 49:15-21, SA 1178-79.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

99.     Defendant Correctional Officer James Young had worked at BCCF for nine years on the 6:00 am to 2:00 pm shift. For much of that time, he was assigned as the B Module housing officer charged with supervising incarcerated people assigned to that unit. Young Dep., Ex. 18 Supp., 27:5-22, SA 862.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

100.     On the B module, Young would regularly supervise people on various watch levels. Young Dep., Ex. 18 Supp., 31:2-8, SA 863.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

101.     Based on this experience, Young knew to pay attention to people on watch from the moment he started his shift. Young Dep., Ex. 18 Supp., 31:9-12, SA 863.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

102.     Additionally, based on their experience, Young and defendant Correctional Officer Robert Moody knew that a person who is the subject of a Level 3 watch should be seen six times per hour. Young Dep., Ex. 18 Supp., 47:12-48:6, SA 873-74; Moody Dep., Ex. 17 Supp., 45:1-9, 47:15-48:2, 49:19-23, SA 826-29.

**RESPONSE:** Admitted.

103.     Officer checks can be staggered, but should not be conducted more than 30 minutes apart. Young Dep., Ex. 18 Supp., 47:3-11, 54:12-22, SA 873, 878; Murphy Dep., Ex. 16 Supp., 37:17-38:4, SA 811-12.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

104.     Young and Moody knew that implementation of the Level 3 watch also requires ensuring that inmate monitors perform their watches every 15 minutes. If inmate monitors fail to perform their jobs, it is the same as if the officers failed to do their watches. Young Dep., Ex. 18 Supp., 46:6-47:2, 54:4-8, 58:5-20, SA 872-73, 878, 882; Moody Dep., Ex. 17 Supp., 50:19-22, 52:15-53:14, SA 830-32.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

105.     An inmate monitor must truthfully report their observations on an inmate monitor form. It would be improper for an inmate monitor to make up information on the form and say

that they observed the inmate on a watch when they had, in fact, not made the observation. Young Dep., Ex. 18 Supp., 57:12-58:4, SA 881-82.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

106.    This responsibility means that at least one of the officers assigned to the housing module must make sure that the inmate monitor completes a full and accurate monitor form, documenting observations of the person who is the subject of the watch. Young Dep., Ex. 18 Supp., 58:5-11, SA 882; Moody Dep., Ex. 17 Supp., 100:4-8, SA 850; Mitchell Dep. 46:22-47:6, 48:4-21, 52:17-22, SA 964-66, 969.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

## X.    Mr. Freitag's Death by Suicide on August 25, 2018

107.    For weeks prior to his August 24, 2018, sentencing, Mr. Freitag had resided in the B Module. Officer Young knew that Mr. Freitag had been assigned to that unit and had been on Level 3 watch multiple other times. He described Mr. Freitag as a "Model A" inmate because he did not know who he was—that is, because he never had any complaints of trouble from Mr. Freitag. Young Dep., Ex. 18 Supp., 59:5-23, 60:3-8, SA 883-84.

**RESPONSE:** Admitted.

108.    When Mr. Freitag returned to BCCF after receiving his six-to-twelve year sentence on August 24, 2018, Officer Young was on duty and escorted him back to the B Module, where he was assigned to Cell 3. Onisick Report, Ex. 9, JA 55.

**RESPONSE:** Admitted.

109.    On the morning of August 25, Officers Young and Moody were assigned as housing officers in the B Module on the 6:00 am to 2:00 pm shift. Officer Tory Murphy entered the B Module for a short time while Officer Moody was taking a break. Onisick Report, Ex. 9, JA 55; Murphy Dep., Ex. 16 Supp., 21:8-21, 39:5-12, SA 808, 813.

**RESPONSE:** Admitted.

110.    At 9:12 am, Mr. Freitag left his cell to obtain medication. He returned to his cell at 9:16 am. Onisick Report, Ex. 9, JA 54.

**RESPONSE:** Admitted.  By way of further answer, Mr. Freitag did not inform the nurse that he was suicidal nor did Mr. Freitag seek assistance from the nurse.

111.    Officers conducted checks on Mr. Freitag's cell at 10:04 am and 10:21 am. Officer Murphy was the officer who conducted the check at 10:21 am. Onisick Report, Ex. 9, JA 54; Murphy Dep., Ex. 16 Supp., 35:5-25, SA 809.

**RESPONSE:** Admitted.

112.    An inmate monitor checked Mr. Freitag's cell at 10:32 am. Gravette Report, Ex. 25, JA 208.

**RESPONSE:** Admitted.

113.    As of 10:55 am, no officer had checked Mr. Freitag's cell since 10:21 am, a period of 34 minutes. Onisick Report, Ex. 9, JA 54.

**RESPONSE**: This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

114.    As of 10:55 am, no inmate monitor had checked Mr. Freitag's cell since 10:32 am, a period of 23 minutes. Gravette Report, Ex. 25, JA 208; Onisick Report, Ex. 9, JA 54.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

115.    At 10:55 am, an incarcerated person who was not an inmate monitor happened to walk by Mr. Freitag's cell. He looked into the cell and immediately yelled to Officers Young and Moody that the person inside the cell was covered with blood. Moody Dep., Ex. 17 Supp., 64:6-65:15, SA 834-35; Young, Ex. 18 Supp., Dep. 82:24-83:10, SA 890-91.

**RESPONSE:** Admitted.

116.    Officer Moody went to the cell, saw Mr. Freitag in the cell covered with blood, and yelled to Officer Young to call a medical emergency. Officer Young did so and multiple officers and medical personnel reported to the B Module. Moody Dep., Ex. 17 Supp., 65:16-66:15, SA 835-36.

**RESPONSE:** Admitted.

117.    Mr. Freitag was found to have multiple wounds on his arms. He was pulled from the cell and, after resuscitation efforts were not successful, he was pronounced dead at 11:19 am. Onisick Report, Ex. 9, JA 53.

**RESPONSE:** Admitted.

118.    Investigators located several large and deep wounds on Mr. Freitag's arms. They observed large pools of blood on and under the bunk in Mr. Freitag's cell. The mattress was

smeared with blood. A pool of blood was found on the portion of the bunk that was underneath Mr. Freitag's body when he was found. Onisick Report, Ex. 9, JA 54.

**RESPONSE:** Admitted.

119. Medical staff reporting to the scene observed what appeared to be human tendons and arteries strewn about the cell. Medical Records, Ex. 45, JA 461.

**RESPONSE:** Admitted.

120. Investigators discovered a jagged piece of plastic near a pool of blood and determined that it came from a shattered plastic coffee cup of the type that BCCF made available for use by incarcerated people. They determined that Mr. Freitag had used the piece of plastic to gouge holes in his left and right arms. The Bucks County Coroner's Office later concluded that Mr. Freitag's death was a suicide caused by these self-inflicted wounds. Onisick Report, Ex. 9, JA 54-55.

**RESPONSE:** Admitted.

121. Forensic pathology expert testimony establishes that Mr. Freitag's death was a long process given the implement used and the depth and number of wounds. It would have taken at least 15 minutes from the time Mr. Freitag started cutting himself with the jagged portion of the plastic cup before he reached a point where he could not be saved. Sperry Report, Ex. 27, JA 271.

**RESPONSE:** Denied. It is denied that Mr. Freitag's death was a "long process." Further, the report indicates the process could have taken as little as 13 minutes.

**XI.** **Officer Young and Moody's Deliberate Failure to Follow the Level 3 Watch Protocol**

122.    When they started their shift at 6:00 am on August 25, defendants Young and Moody were aware that a Level 3 watch had been ordered for Mr. Freitag. Young Dep., Ex. 18 Supp., 66:19-22, SA 885; Moody Dep., Ex. 17 Supp., 63:11-64:1, SA 833-34; Mitchell Dep., Ex. 20 Supp., 86:1-14, SA 986.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

123.    Between the check at 10:21 am and when Mr. Freitag was discovered by another incarcerated person at 10:55 am, Officer Young can be seen on surveillance video standing behind a podium in the housing module with no sightline into Mr. Freitag's cell for the entire time except for an approximately four minute period when he went out in the yard. Mitchell Dep., Ex. 20 Supp., 91:14-95:9, SA 986-90.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

124.    Young was standing at the podium when Officer Murphy checked Mr. Freitag's cell at 10:21 am. Usually the officer stationed at the podium records information in a computerized log about when such checks take place. Young, however, did not do so. There is no reference to the check in the log, and there is no explanation for the absence of any such reference. Murphy Dep., Ex. 16 Supp., 42:8-16, 45:2-46:13, SA 814-16.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

125.    The failure to conduct a check within 30 minutes constitutes a failure to comply with officers' responsibilities under the Level 3 watch protocol and violates rules intended to protect people in the facility. Mitchell Dep., Ex. 20 Supp., 96:6-19, SA 996.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

126.    The inmate monitor who was assigned to monitor Mr. Freitag on the morning of August 25 was Hugh Caldwell. Young Dep., Ex. 18 Supp., 66:4-18, SA 885; Inmate Monitor Form, Ex. 32, JA 346-47.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

127.    Caldwell filled out an "inmate monitor form" indicating that he had observed Mr. Freitag on 20 occasions, every 15 minutes between 6:15 am and 10:45 am. Gravette Report, Ex. 25, JA 208; Inmate Monitor Form, Ex. 32, JA 346-47.

**RESPONSE**: This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

128.    Video surveillance footage, however, shows that Caldwell observed Mr. Freitag on only two occasions, once at 8:47 am and again at 10:32 am. Gravette Report, Ex. 25, JA 208; Moody Dep., Ex. 17 Supp., 95:8-17, SA 847.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

129.    The purpose of the inmate monitor form that Caldwell completed is to ensure that the person who is the subject of the watch is alive and safe. Mitchell Dep., Ex. 20 Supp., 47:18-23, SA 961.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

130.    At the time of his deposition on December 23, 2020, Young had no idea whether Caldwell ever made any observations of Mr. Freitag. Young Dep., Ex. 18 Supp., 101:6-102:7, SA 896-97.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

131.    Young did not recall ever looking at the form prepared by Caldwell. Young Dep., Ex. 18 Supp., 102:8-15, SA 897.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

132.    For that reason, Young and Moody did not know of the falsehoods on Caldwell's inmate monitor form. For example, Caldwell's form stated that Mr. Freitag was in his cell and sleeping at 9:15 am. Video surveillance footage, however, showed that Mr. Freitag was out of his cell obtaining medication at 9:15 am. Young Dep., Ex. 18 Supp., 102:16-105:15, SA 897-900; Moody Dep., Ex. 17 Supp., 86:20-91:20, SA 841-46; Mitchell Dep., Ex. 20 Supp., 97:11-100:8, 101:13-22, SA 997-1001.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

133.    In their deposition testimony in December 2020, neither Young nor Moody had any idea whether Caldwell looked in Mr. Freitag's cell at any point on the morning of August 25, 2018. Young Dep., Ex. 18 Supp., 107:9-108:8, 109:11-14, SA 902-04; Moody Dep., Ex. 17 Supp., 84:19-21, 95:8-22, 99:24-100:3, SA 840, 847, 849-50.

**RESPONSE**: This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

134.    Young acknowledged that he had a responsibility to ensure that Caldwell was observing Mr. Freitag and recording the observations, but he did not fulfill that responsibility and does not have any explanation for why he did not do so. Young Dep., Ex. 18 Supp., 105:22-106:10, SA 900-01.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

135.    Officers Young and Moody claimed that they had done everything they were supposed to do in implementing the Level 3 watch for Mr. Freitag. With respect to their responsibility to perform officer checks every 30 minutes, they saw no problem in the absence of an observation for 34 minutes after 10:21 am, even though the observation that occurred at 10:55 am was only because another incarcerated person—not the assigned inmate monitor—yelled that Mr. Freitag was covered in blood. Young Dep., Ex. 18 Supp., 79:14-18, 84:21-85:9, SA 889, 892-93; Moody Dep., Ex. 17 Supp., 28:15-12, SA 821.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

136. Young believed that it would have been permissible to wait until after the people assigned to the B Module came in from their yard time at 10:45 am and to conduct the next tour at 11:00 am. According to Young, no supervisor ever told him that he had to schedule the morning so that he could be sure to conduct watches within 30 minutes notwithstanding the yard schedule. Young Dep., Ex. 18 Supp., 84:21-85:2, 91:2-18, 92:18-23, SA 892-95.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

137. With respect to the supervision of the inmate monitor, Hugh Caldwell, Young believes that he performed satisfactorily. Young Dep., Ex. 18 Supp., 106:11-17, 107:3-8, SA 901-02.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

138. Young does not recall ever looking at inmate monitor forms to ensure that inmate monitors perform their observations, and he claimed he was not aware of any requirement that officers review the forms. Young Dep., Ex. 18 Supp., 50:4-13, SA 876.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

139. Young has seen in the past inmate monitors not doing the jobs they are assigned to perform. According to Young: "So they are paid $3 a day to stand in front of somebody's door

and mark down whether they are sleeping, eating, pooping. Imagine what $3 a day gets you." Young Dep., Ex. 18 Supp., 44:24-45:15, SA 870-71.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

140.    As to the failure to observe Mr. Freitag's cell by the inmate monitor assigned on August 25, Hugh Caldwell, Young stated: "That was $3 a day not well spent." Young Dep., Ex. 18 Supp., 106:11-17, SA 901.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

141.    Despite conducting a watch in violation of Bucks County's policy requirements, Young maintained that there was no way he or any other officer could have done something to prevent Mr. Freitag's suicide and that the only way Mr. Freitag's death could have been prevented would have been him "not going to jail." Young Dep., Ex. 18 Supp., 14:14-21, 16:10-20, 19:12-15, 20:8-20, 21:1-18, 111:16-112:14, SA 855-59, 906-07; Moody Dep., Ex. 17, 15:2-9, SA 820.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

## XII.    Bucks County's Failure to Ensure Officers' Compliance with Watch Protocols

### A.    The 2016 Findings by the National Commission on Correctional Health Care

142.    Bucks County was aware of problems regarding officers' supervision of inmate monitors in watch procedures as of 2016. On March 31 and April 1, 2016, a site visit was conducted at BCCF by inspectors from the National Commission on Correctional Health Care

(NCCHC), a leading national accreditation agency. During that visit, when reviewing BCCF's suicide prevention policies, they observed that inmate monitors prepared inconsistent documentation of their watches. With respect to the officers assigned to supervise the inmate monitors, they noted that "correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches." NCCHC Records, Ex. 11, JA 67-68; Nottingham Dep. 2, Ex. 63 Supp., 52:21-53:20, SA 1112-13.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

143.    NCCHC alerted Bucks County to these issues on June 30, 2016. NCCHC Records, Ex. 11, JA 67.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

144.    Thereafter, Bucks County informed NCCHC that it would take corrective action. NCCHC Records, Ex. 11, JA 67.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

145.    According to Bucks County's designee regarding the NCCHC findings, Captain James Nottingham, Bucks County decided to take corrective actions regarding the supervision of inmate monitors in order to make the prison population safer. Nottingham Dep. 2, Ex. 63 Supp., 36:7-18, SA 1109.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

146.    As part of those corrective actions, Nottingham explained that Bucks County prepared a new form and adopted in-service training for officers regarding their responsibilities to supervise inmate monitors. Nottingham Dep. 2, Ex. 63 Supp., 36:19-24, 38:7-39:19, SA 1109-11.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

147.    Bucks County was not able to locate any documentation from the training given to officers about their duties to supervise inmate monitors. Nottingham Dep. 2, Ex. 63 Supp., 68:17-24, SA 1114.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

148.    Captain Nottingham had also testified earlier in the case as the County's designee regarding training of correctional staff. He was designated for that deposition because of his position starting in late 2018 as the "training lieutenant." Nottingham's first designee deposition testimony occurred before Bucks County disclosed the NCCHC documents to other parties in this case. In Nottingham's deposition prior to the disclosure, he testified that he had never heard reports of problems with the way officers conducted their watches. Nottingham Dep. 1, Ex. 19 Supp., 16:16-17:13, 21:17-22:14, 50:10-51:21, 65:6-66:1, SA 911-14, 926-27, 932-33.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

149.    Nor, Nottingham testified in that earlier deposition, did anyone ever report to him that there were problems with the way officers were supervising inmate monitors. Nottingham

Dep. 1, Ex. 19 Supp., 68:21-69:3, SA 935-36; Nottingham Dep. 2, Ex. 63 Supp., 14:8-17, SA 1100.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

150.    In his second deposition, after disclosure of the NCCHC materials, Nottingham explained that had never been made aware of the NCCHC findings. He confirmed that if he had been aware of those materials he would have testified differently in his earlier deposition. Nottingham Dep. 2, Ex. 63 Supp., 27:11-28:6, SA 1107-08.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

   **B.    Insufficient Supervision of Officers' Compliance with Watch Protocols Persists through 2019**

151.    According to another Bucks County designee, correctional officers' failures to comply with watch responsibilities were well known. Deputy Superintendent of Programs Kelly Reed, designated to testify about BCCF's mental health practices, testified that throughout her career officers have repeatedly complained that they were expected to complete too many watches. Officers believe that they are not able to complete all of the responsibilities required by policy. She has heard such complaints hundreds of times. Reed Dep., Ex. 65, 12:21-13:20, 32:3-33:25, SA 1133-34, 1139-40; *see also* Budd Dep., Ex. 67, 36:14-21, 42:8-14, SA 1176-77; Nottingham Dep. 1, Ex. 19 Supp., 65:25-66:1, 67:16-22, SA 932-34; Bochenek Dep., Ex. 66, 56:12-57:5, SA 1167-68.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

152. In 2018, no one in the administration was checking to ensure that officers were doing their jobs regarding watches. Based on Reed's experience, there was no basis to conclude that officers carried out watches as ordered. Reed Dep., Ex. 65, 37:14-38:22, SA 1143-44.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

153. With respect to officers' compliance with watch protocols, Reed explained: "I don't believe there was any follow through from the Administration to confirm that everybody is following rules and regulations of the facility." Reed Dep., Ex. 65, 38:11-14, SA 1144.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

154. This comports with the perspective of Officer Young, who did not recall any supervisor telling him that inmate monitors were not doing their job or that the inmate monitor forms were fabricated. Young Dep., Ex. 18 Supp., 49:14-50:3, SA 875-76.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

155. Reed started her position as Deputy Superintendent of Programs in 2019. She is not aware of any changes made to address the watches that were implemented before she took that position. Reed Dep., Ex. 65, 34:1-35:18, SA 1141-42.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

156. For that reason, when watches were ordered for Mr. Freitag on August 24, 2018, there was no basis to conclude that the officers would actually check on him. Reed Dep., Ex. 65, 38:15-22, SA 1144.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

157. Hugh Caldwell, the inmate monitor who was assigned to observe Mr. Freitag on August 25, 2018, confirmed that "[n]one of the Correctional Officers followed me to ensure that I was doing my work or even stood watch to make sure that I was checking in on the inmates on my list." Caldwell was never advised that the information he put on an inmate monitor form was inaccurate or inconsistent with what was shown on surveillance video. Caldwell acknowledged that "there were times that I did miss checking on the inmates assigned to me." Hugh Caldwell Statement, Ex. 47, JA 713-14.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

### C. Bucks County's Failure to Investigate Young and Moody's Conduct

158. Following Mr. Freitag's death, no one came and asked defendants Young and Moody whether they had properly conducted their watches. Young Dep., Ex. 18 Supp., 73:15-74:14, SA 886-87; Moody Dep., Ex. 17 Supp., 69:19-70:2, 82:4-6, SA 837-39.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

159. Nor did anyone from Bucks County ask Nottingham as the training lieutenant to look into whether Young and Moody did their watches and whether more training was required. Nottingham Dep. 1, Ex. 19 Supp., at 97:12-99:14, SA 939-41.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

160. Investigation of these issues was the responsibility of BCCF's investigations unit, led by Frank Bochenek. Nottingham Dep. 1, Ex. 19 Supp., 100:6-19, 120:5-12, SA 942, 949.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

161. Bochenek and his staff did conduct an investigation, but the investigation was focused only on whether a crime occurred. Once Bochenek and his staff determined that the death was a suicide, Bochenek believed that there was nothing left to investigate. Bochenek Dep., Ex. 66, 35:14-36:7, SA 1156-57.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

162. Daniel Onisick, who led the investigation under Bochenek's supervision, did not know anything about whether there was an inmate monitor observing Freitag. Onisick Dep., Ex. 64, 70:9-12, 71:18-72:20, SA 1124-26.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

163. Bochenek has no explanation for why Young and Moody were not asked about whether they complied with their watch obligations in the immediate wake of the suicide. Bochenek Dep., Ex. 66, 31:19-32:23, SA 1154-55.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

164. Bochenek was aware that inmate monitors serve an important purpose under Bucks County policies, as their job is to observe a person who may be at risk of hurting themself and then alert correctional staff. Bochenek Dep., Ex. 66, 52:22-53:6, SA 1163-64.

**RESPONSE**: This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

165. If an inmate monitor is making false reports regarding observations, that is something that would be of great concern to Bucks County. Bochenek Dep., Ex. 66, 53:7-12, SA 1171.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

166. Bochenek did not look into watch levels until October 2019, fourteen months after Mr. Freitag's death, when a national expert on suicide prevention came to BCCF and asked mental health staff about the circumstances of that death. Bochenek Dep., Ex. 66, 40:13-44:17, SA 1158-62; Metellus Dep., Ex. 21 Supp., 16:25-18:20, SA 1011-13.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

167.    In a memorandum written October 23, 2019, Bochenek wrote that in a meeting on that date he was asked, "did the investigator look into the watch issue and check with the module officers to see if the watch was put into place." Bochenek wrote, further, that "[i]nvestigators did not look into the issue." Bochenek Report, Ex. 33, JA 349.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

168.    Prompted by the October 2019 meeting, Bochenek reviewed the surveillance video footage from the day of Mr. Freitag's death and confirmed "there was no inmate monitor observed checking on [Mr. Freitag]." Bochenek Report, Ex. 33, JA 349.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

169.    After Bochenek realized that there was no inmate monitor observing the cell on the morning of August 25, he did not make any effort to obtain interviews of Moody and Young, and he has no explanation for why he did not do that. Bochenek Dep., Ex. 66, 66:16-23, SA 1171; Young Dep., Ex. 18 Supp., 110:17-111:2, SA 905-06; Moody Dep., Ex. 17 Supp., 100:13-101:22, SA 850-51.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

D.    **Acknowledgment of Bucks County Officials Regarding Young and Moody's Failures**

170.    When presented during the course of this litigation with evidence of Young and Moody's conduct, supervising officers confirmed that the officers violated Bucks County policy. According to Deputy Warden Mitchell, Young's lack of knowledge as to whether the inmate

monitor, Caldwell, was looking into Mr. Freitag's cell was not consistent with the Level 3 directive that Mitchell had issued. This constituted a serious violation of the directive and was the type of policy violation that places people at risk of harm. Mitchell Dep., Ex. 20 Supp., 50:12-21, 103:14-104:8, 110:13-111:10, SA 968, 1003-04, 1006-07.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

171.    Deputy Warden Mitchell did not learn about these facts until his deposition in this litigation. If he had learned earlier about what happened on the day of Mr. Freitag's death, he would have undertaken an intensive effort to retrain the officers and he would have directed the training lieutenants to follow up on that effort. Mitchell Dep., Ex. 20 Supp., 108:10-22, SA 1005.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

172.    Captain Nottingham, who was a training lieutenant in the time following Mr. Freitag's death, confirmed that Correctional Officer Young's explanations of his actions were incorrect and in violation of Bucks County's policies. Young was wrong in claiming that he did not need to review the inmate monitor forms, and he was wrong that he did not have a responsibility to ensure that inmate monitors were doing their job. Nottingham Dep. 1, Ex. 19 Supp., 72:6-73:12, 114:21-116:4, SA 937-38, 943-45; Nottingham Dep. 2, Ex. 63 Supp., 82:623, SA 1115.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

173.    To fulfill their responsibility to ensure that inmate monitors have done their assigned jobs, officers and supervisors must review every single monitor form during the shift and at the conclusion of the shift. Nottingham Dep. 1, Ex. 19 Supp., 48:3-22, 69:16-25, SA 924, 936.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

174.    When officers fail to supervise inmate monitors, that presents an obvious risk of harm. Nottingham Dep. 1, Ex. 19 Supp., 122:22-123:9, SA 951-52.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

175.    If Nottingham had learned about Young's practices in 2018, he would have "called him on the carpet about it," he would have recommended discipline, and he would have made it part of his daily report. Nottingham Dep. 1, Ex. 19 Supp., 117:7-118:22, 119:11-120:4, SA 946-49; Nottingham Dep. 2, Ex. 63 Supp., 88:7-11, SA 1117.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

176.    Because Young's perception of his responsibilities for supervising inmate monitors was wrong, he definitely required additional training and supervision. Nottingham Dep. 1, Ex. 19 Supp., 127:12-128:2, SA 953-54.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

177.     In his first deposition in May 2021, Nottingham said that because Young and Moody were still employed at BCCF, he would talk to them about their understanding of their responsibilities to supervise inmate monitors. In his second deposition in April 2022, he acknowledged that he had never followed through with that intended action. Nottingham Dep. 1, Ex. 19 Supp., 121:9-20, SA 950; Nottingham Dep. 2, Ex. 63 Supp., 88:21-89:8, SA 1117-18.

**RESPONSE:** This Statement of Fact is asserted against non-PrimeCare Defendants; therefore, no response by the PrimeCare Defendants is required.

## XIII.   PrimeCare's Policy Changes Following Mr. Freitag's Death

178.     Following Mr. Freitag's death, as part of its mortality review process, PrimeCare developed a new practice that any person returning to BCCF who had received a sentence requiring confinement in a state prison would automatically be placed on Level 2 status. Cassidy Dep., Ex. 68, 168:6-23, SA 1243; Penge Dep., Ex. 69, 32:9-33:17, SA 1250-51; Mitchell Dep., Ex. 20 Supp., 74:1-9, SA 979; Scordellis Dep., Ex. 61 Supp., 16:16-24, SA 1069.

**RESPONSE:** Denied.  Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment.  Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct.  Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be

admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted).   Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

179.   If Mr. Freitag had been placed on Level 2 status, his cell would have been stripped. As part of that process, cups like the one that was shattered and used by Mr. Freitag to inflict his fatal wounds would have been removed. Cassidy Dep., Ex. 68, 171:14-173:8, SA 1244-46.

**RESPONSE:** Denied.  Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment.  Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct.  Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted).   Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

180.    Since Mr. Freitag's death in 2018, PrimeCare has expanded the hours in which it has clinicians available at BCCF so that someone is available until 5:00 or 5:30 pm each day. Cassidy Dep., Ex. 68, 40:19-41:10, SA 1184-85.

**RESPONSE:** Denied.  Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment.  Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct.  Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted).  Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

181.    PrimeCare expanded its hours, at least in part, because they found they were not able to see people returning from court. Cassidy Dep., Ex. 68, 41:23-42:13, 93:19-23, SA 1185-86, 1192; Scordellis Dep., Ex. 61 Supp., 60:4-21, SA 1090.

**RESPONSE:** Denied.  Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment.  Federal Rule of Evidence  407 precludes evidence of subsequent remedial

measures to prove negligence or culpable conduct. Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted). Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

182. By expanding the hours in this fashion, mental health staff have been able to see people when they come back from court. Cassidy Dep., Ex. 68, 42:16-19, 93:7-17, SA 1186, 1192.

**RESPONSE:** Denied. Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment. Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct. Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be

admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted). Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

183. If these revised procedures were in place in August 2018, when Mr. Freitag came back from court after receiving a six-to-twelve year sentence, PrimeCare staff would have tried to see him that day. Cassidy Dep., Ex. 68, 101:20-102:25, 103:25-104:6, SA 1199-1202.

**RESPONSE:** Denied. Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment. Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct. Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted). Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

184.    If Mr. Freitag had been seen after court, a formal suicide risk assessment would have been conducted by a mental health clinician. Cassidy Dep., Ex. 68, 115:23-116:6, 117:1-118:2, 130:4-12, SA 1206-09, 1218.

**RESPONSE:** Denied.  Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment.  Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct.  Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted).  Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

185.    If Mr. Freitag had been placed on a more intensive watch status after a formal suicide risk assessment, including Constant Watch, Level 1, or Level 2, it would have been more difficult for him to kill himself. Cassidy Dep., Ex. 68, 130:13-131:21, 133:17-20, SA 1218-19, 1221.

**RESPONSE:** Denied.  This Statement of Fact is speculative and argumentative.  Further, Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material

issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment. Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct. Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp. 2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted). Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment. Moreover, this Statement of Fact is speculative and argumentative.

186. Additionally, since Mr. Freitag's death, when people who have been treated by the mental health staff go to court, Dr. Cassidy reaches out to custody staff to tell them what watch level to place people on when they return. Reed Dep., Ex. 65, 50:20-51:22, SA 1148-49.

**RESPONSE:** Denied. Plaintiff is offering evidence of subsequent remedial measures in an effort to create a material issue of fact in opposing the PrimeCare Defendants' Motion for Summary Judgment. Federal Rule of Evidence 407 precludes evidence of subsequent remedial measures to prove negligence or culpable conduct. Although summary judgment evidence may be presented in a form which is inadmissible at trial, the party offering the evidence "must demonstrate that it could satisfy the applicable admissibility requirements at trial before the evidence may be used on summary judgment." *Robinson v. Hartzell Propeller, Inc.*, 326 F. Supp.

2d 631, 645 (E.D. Pa. 2004), *appeal dismissed*, 454 F.3d 163 (3d Cir. 2006). This rule requires the proponent to demonstrate that there is more than a "mere possibility that the evidence will be admissible at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 600 (M.D. Pa. 2014) (quotations omitted). Thus, it is submitted that this Statement of Fact does not contain admissible evidence and should not be considered by this Court in deciding the PrimeCare Defendants' Motion for Summary Judgment.

187. Plaintiff's forensic psychology expert, Dr. Mary Perrien, identified multiple systemic issues regarding PrimeCare's treatment of Mr. Freitag, including the absence of treatment planning. In particular, Dr. Perrien wrote: "in any setting, the failure to provide a patient experiencing a serious mental illness and elevated risk of suicide with an individualized adequate treatment plan would be profoundly alarming. The lack of an actual treatment plan [for Mr. Freitag] was a significant departure from treatment standards of the community and in correctional settings." Perrien Report, Ex. 26, JA 247.

**RESPONSE:** Admitted as to Dr. Perrien's opinion. It is denied that such an opinion creates a disputed issue of material fact. At most, this opinion shows a difference of opinion as to the extensive care provided to Mr. Freitag. A difference of opinion does not establish deliberate or reckless indifference to Mr. Freitag.

188. Additionally, Perrien confirmed that the absence of post-sentencing mental health encounters was an obvious deficiency for which "no one seemed to take responsibility" despite

the fact that "operations...could be easily modified to reduce risk of suicide at the facility." Perrien Report, Ex. 26, JA 249.

**RESPONSE:** Admitted as to Dr. Perrien's opinion. It is denied that such an opinion creates a disputed issue of material fact. At most, this opinion shows a difference of opinion as to the extensive care provided to Mr. Freitag. A difference of opinion does not establish deliberate or reckless indifference to Mr. Freitag.

Respectfully submitted,

MARSHALL DENNEHEY WARNER COLEMAN
& GOGGIN

By:  *s/ John R. Ninosky*
JOHN R. NINOSKY, ESQUIRE
PA Attorney ID No. 78000
100 Corporate Center Drive, Suite 201
Camp Hill, PA 17011
T: (717) 651-3709 ~ F: (717) 651-3707
jrninosky@mdwcg.com
Attorney for PrimeCare Defendants

Date:    June 21, 2022

LEGAL/146797609.v1

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on the 21st day of June, 2022, the foregoing *Response of PrimeCare Defendants to Plaintiff's Statement of Facts* was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel of record, which service satisfies the requirements of the Federal Rules of Civil Procedure.

Jonathan H. Feinberg, Esquire
Grace Harris, Esquire
Kairys, Rudovsky, Epstein & Messing, LLP
Cast Iron Building, Suite 501 South
718 Arch Street
Philadelphia, PA 19106
jfeinberg@krlawphila.com
gharris@krlawphila.com
*Attorneys for Plaintiff*

Jeffrey M. Scott, Esquire
Jeffrey M. Kolansky, Esquire
Kerri E. Chewning, Esquire
Archer & Greiner, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA 19103-7393
jscott@archerlaw.com
jkolansky@archerlaw.com
kchewning@archerlaw.com
*Attorneys for Bucks County Defendants*

Keith J. Bidlingmaier, Esquire
Assistant Solicitor
Bucks County Law Department
55 East Court Street
Doylestown, PA 18901
kjbidlingmaier@buckscounty.org
*Attorney for Bucks County and Corrections Officers Moody, Murphy, and Young*

MARSHALL, DENNEHEY, WARNER
COLEMAN & GOGGIN

By: *John R. Ninosky*
     John R. Ninosky