**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

CHARLES JOSEPH FREITAG, JR.,   :
AS ADMINISTRATOR OF ESTATE OF  :
CHARLES JOSEPH FREITAG, SR.   :
     Plaintiff,      :
             :
    v.         :  Civil No. 2:19-cv-05750-JMG
             :
BUCKS COUNTY, *et al.*,     :
     Defendant.    :

---

**MEMORANDUM OPINION**

**GALLAGHER, J.**              **July 12, 2022**

**I. OVERVIEW**

   Mr. Freitag committed suicide in Bucks County Correctional Facility ("BCCF") the morning after he was sentenced to a term of imprisonment that substantially exceeded his worst expectation. Mr. Freitag had a recent and severe history of attempting suicide, and he had made that history known to BCCF's mental healthcare providers.

   Mr. Freitag's son, on behalf of Mr. Freitag's estate, has brought this suit against BCCF, its mental healthcare provider, two of the provider's mental healthcare staff, and two of the prison's correctional officers.[1] Mr. Freitag's son claims that these defendants violated Mr. Freitag's Eighth Amendment right to be free from cruel and unusual punishments. Mr. Freitag's son further claims that the mental healthcare providers committed malpractice in their treatment of Mr. Freitag.

---

[1] The First Amended Complaint identifies other defendants, but those defendants have since been dismissed from this suit.

All these defendants have moved for summary judgment. For the reasons that follow, the Court must enter summary judgment on Plaintiff's § 1983 claims in favor of the individuals who are defendants in this case: correctional officers Moody and Young and mental healthcare providers Penge and Mahoney. But the Court must deny summary judgment on Plaintiff's § 1983 claims against PrimeCare and Bucks County. The Court also declines to relinquish supplemental jurisdiction over Plaintiff's malpractice claims against the mental healthcare providers.

## II.     FACTUAL BACKGROUND

### a.     Allegations

In the year preceding his incarceration, Mr. Freitag had experienced significant mental health challenges. He had attempted suicide on three separate occasions. In the third of those three suicide attempts, Mr. Freitag cut his arms and drove his truck into his ex-wife's house.

Mr. Freitag's third suicide attempt led to his being arrested. He was charged with aggravated assault and convicted. Following his conviction, and for the first time in his life, Mr. Freitag was incarcerated. Mr. Freitag would remain incarcerated at BCCF until he committed suicide three months later, less than a day after he was sentenced.

When an inmate enters BCCF, the inmate undergoes a screening to determine the inmate's suicide risk. Depending on the results of that screening, an inmate can be placed on one of four watch statuses. The two watch statuses that are relevant to this suit are referred to as "Level 2" and "Level 3."

Level 2 watch is intended for inmates who are not actively suicidal but present a risk of suicide. An inmate on Level 2 watch is placed in a stripped cell with a prison uniform, a suicide-safe mattress, a suicide blanket, and shoes without shoelaces. Another inmate, referred to as an

"inmate monitor," is placed outside the at-risk inmate's cell to maintain constant observation over the at-risk inmate. The inmate monitor is supposed to record the at-risk inmate's activities every five minutes, and a correctional officer is supposed to observe the at-risk inmate at random intervals not to exceed fifteen minutes. An inmate on Level 2 watch receives only finger foods and has his cell searched every day.

Level 3 watch is a step below Level 2 watch. On Level 3 watch, an inmate is placed in an ordinary cell and has all the same privileges as any other inmate. An inmate monitor must observe the at-risk inmate every fifteen minutes, and a corrections officer must observe the at-risk inmate in staggered intervals not to exceed thirty minutes. Level 3 watch is not, strictly speaking, appropriate for "suicide prevention." Bucks County Department of Corrections Standard Operating Procedures and Guidelines, Joint Appendix ("JA") 25, 39. Instead, it is used as a stepdown procedure from suicide watch and, generally, when an inmate's behavior "warrants closer observation." *Id.*

When Mr. Freitag first entered BCCF, he was screened and placed on Level 2 watch. Over the next three months, Mr. Freitag was evaluated nineteen times by the employees of Defendant PrimeCare. Defendant PrimeCare is a private company that provides mental healthcare services at BCCF.

In each of Mr. Freitag's nineteen interactions with PrimeCare's mental healthcare providers, Mr. Freitag denied having suicidal thoughts. He often, however, indicated that he was anxious about his case and about the consequences it would have on his career and life. Mr. Freitag indicated that he believed he would receive a sentence of only probation and would soon be released from prison. PrimeCare's employees often noted that Mr. Freitag lacked insight and judgment in their evaluations.

Prior to his incarceration, Mr. Freitag had been prescribed Lexapro for his depression. Defendants also prescribed Mr. Freitag Buspirone soon after he came to BCCF. Mr. Freitag continued to receive Lexapro and Buspirone throughout his incarceration.

About two weeks after Mr. Freitag came to BCCF, Mr. Freitag met with Defendant Mahoney for an evaluation. Defendant Mahoney works for PrimeCare and has a Doctor of Psychology. During this evaluation, Mr. Freitag indicated that he was "feeling badly" about being incarcerated and that he was struggling with self-blame. Mahoney Dep. 175:11–20, Suppl. App. ("SA") 1069. He specifically asked if he could schedule an appointment to see a mental healthcare provider after his sentencing because he "figured he would need somebody to talk to afterwards." *Id.*

Mr. Freitag was scheduled to be sentenced two-and-a-half months later on Friday, August 24, 2018. The bus carrying prisoners back from their court appearances typically did not return to BCCF until 4:00 p.m. PrimeCare Resp. ¶ 64. Defendant PrimeCare did not maintain mental healthcare professionals on-site after 4:00 p.m. on weekdays or at all on weekends, so Defendant Mahoney scheduled Mr. Freitag for a follow up appointment on Monday, August 27. PrimeCare Resp. PSOF ¶¶ 26, 63. Defendant PrimeCare represents that this was the soonest available appointment under PrimeCare's scheduling practices. PrimeCare Resp. ¶ 26.

As Mr. Freitag's sentencing approached, his depression and anxiety increased. About a month before his sentencing, Mr. Freitag called his brother and told him that he was "so depressed" that he "didn't want to get out of bed anymore." Paul Lang R. Freitag Dep. 29:15–30:6, SA 1094–95. Concerned for Mr. Freitag's wellbeing, Mr. Freitag's brother reached out to Mr. Freitag's criminal defense lawyer, who in turn emailed the deputy warden at BCCF. Mr. Freitag's lawyer informed the deputy warden that Mr. Freitag had a history of suicide attempts

and was not doing well incarcerated. The deputy warden asked the mental health supervisor PrimeCare had assigned to BCCF to look into the matter and follow up with Mr. Freitag.

Following Mr. Freitag's next evaluation, the mental health supervisor sent an email to all of BCCF's mental healthcare staff informing them that Mr. Freitag would have to stay on Level 3 watch for "at least a few weeks" and that staff "need to keep a close eye on him as his sentencing date . . . approaches since he strikes several of the increased risk factors for suicide." Cassidy Email, JA 44. PrimeCare's mental healthcare providers continued to evaluate Mr. Freitag regularly and multiple times per week until his sentencing.

About one week before his sentencing, Mr. Freitag met with Defendant Penge, who works for PrimeCare as a licensed professional counselor. Defendant Penge noted that Mr. Freitag was feeling anxious about his sentencing. But Defendant Penge also noted that Mr. Freitag continued to deny having suicidal thoughts and that Mr. Freitag was forming plans for his future. Following this interaction, Defendant Penge removed Mr. Freitag from Level 3 watch.

Defendant Mahoney and Defendant Penge met with Mr. Freitag again two days and one day before his sentencing respectively. During Defendant Mahoney's evaluation, Mr. Freitag confidently declared that he expected to be released from prison following his sentencing. Neither Defendant Mahoney nor Defendant Penge put Mr. Freitag back on Level 3 watch.

At his sentencing, Mr. Freitag was sentenced to 6-12 years' imprisonment—a sentence that far exceeded his expectation. BCCF's deputy warden became aware of Mr. Freitag's sentence around the same time PrimeCare's mental healthcare staff were leaving the facility for the weekend. The deputy warden asked a subordinate who is not a medical professional to place Mr. Freitag on watch, and the subordinate placed Mr. Freitag on Level 3 watch.

Defendants Young and Moody were the correctional officers assigned to Mr. Freitag's section of the prison the morning after Mr. Freitag's sentencing. Defendant Young had been assigned to Mr. Freitag's unit for the two preceding months as well. Because Mr. Freitag had been placed on Level 3 watch, Defendants Young and Moody and an inmate monitor were responsible for periodically observing Mr. Freitag.

Video evidence reveals that Mr. Freitag left his cell at 9:12 a.m. to receive medication. He returned to his cell at 9:16 a.m. A corrections officer observed Mr. Freitag in his cell at 10:04 a.m. and 10:21 a.m. The inmate monitor on duty then observed Mr. Freitag in his cell at 10:32 a.m. Over the next thirty-three minutes, nobody observed Mr. Freitag.

At 10:55 a.m., another inmate—one who was not responsible for keeping watch over Mr. Freitag—walked past Mr. Freitag's cell and noticed that he was lying in a pool of blood. The inmate alerted Defendants Young and Moody, who immediately called a medical emergency.

Mr. Freitag could not be saved and was pronounced dead at 11:19 a.m. He had killed himself by digging pieces of a broken plastic cup into his arms. Plaintiff's forensic pathology expert has opined that Mr. Freitag likely spent at least ten to fourteen minutes cutting into himself. Plaintiff's expert has also opined that the cutting would have immediately produced blood flow easily observable by anyone looking into Mr. Freitag's cell and that, had Mr. Freitag been observed every fifteen minutes, he likely could have been discovered in time to be resuscitated.

Under BCCF policy, an inmate monitor was supposed to observe Mr. Freitag once every fifteen minutes. But video evidence reveals that the inmate monitor on duty observed Mr. Freitag only twice between 6:15 a.m. and 10:45 a.m. A corrections officer should also have observed

Mr. Freitag no later than 10:51 a.m.—four minutes before Mr. Freitag was found by a fellow inmate.

BCCF had previously been made aware that its corrections officers and inmate monitors were not strictly complying with the facility's suicide watch protocols. In 2016, the National Commission on Correctional Health Care ("NCCHC") reviewed BCCF's suicide prevention practices and found them inadequate because inmate monitors prepared inconsistent documentation of their watches and because "correctional officers were not participating in the watches, nor were they consistently observing the inmates while they were performing the watches." NCCHC Records, JA 68; Nottingham Dep. 2, 52:21–53:20, SA 1112–13. BCCF promised NCCHC it would adopt further training for officers regarding their responsibilities to supervise inmate monitors, but it is unclear whether these trainings were ever implemented. Further, multiple officers at BCCF, including the Deputy Superintendent of Programs, have testified that corrections officers recurrently complain that they are unable to keep up with all of their watch-related responsibilities. Reed Dep. 32:3-33:25, SA 1139-40; *see also* Budd Dep. 36:14-21, 42:8-14, SA 1176-77; Nottingham Dep. 1, 65:25-66:1, 67:16-22, SA 932-34; Bochenek Dep. 56:12-57:5, SA 1167-68.

It is also unclear whether BCCF has taken supervisory or disciplinary actions to ensure compliance with its suicide watch protocols. Defendant Young testified that he does not remember ever being confronted by a supervisor about inmate monitors neglecting their duties. Young Dep. 49:14–50:3, SA 875–76. And Defendants Young and Moody do not remember ever having been questioned about their compliance with the suicide watch protocols in connection to the investigation of Mr. Freitag's death. Young Dep. 73:15–74:14, SA 886–87; Moody Dep. 69:19–70:2, 82:4–6, SA 837–39.

      **b.**      **Procedural History**

Plaintiff filed this suit on December 6, 2019. *See* ECF No. 1. Defendants filed motions to dismiss arguing Plaintiff had failed to adequately plead his claims and that Bucks County's employees were entitled to qualified immunity. *See* ECF Nos. 24, 30. The Court denied these motions, *see* ECF Nos. 45–46, and the parties proceeded to discovery. During the course of discovery, Plaintiff stipulated to the dismissal of Defendants Brautigam and James. *See* ECF No. 66. After the close of discovery, all the remaining Defendants filed motions for summary judgment. In Plaintiff's consolidated response, Plaintiff further consented to the dismissal from this suit of Defendant Murphy and all claims under the Americans with Disabilities Act. *See* ECF No. 90 at 3 n.1&2. Accordingly, the motions for summary judgment filed by Defendants PrimeCare, Mahoney, Penge, Bucks County, Moody and Young related to Plaintiff's § 1983 and medical malpractice claims are presently before the Court.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In

response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV.   ANALYSIS

The Court will address Plaintiff's claims under § 1983 first and then address Plaintiff's medical malpractice claims.

### a.   Plaintiff's claims under § 1983

Under the Eighth Amendment to the United States Constitution, an incarcerated individual that has been convicted of a crime has the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII. This constitutional provision prohibits carceral custodians from exhibiting "deliberate indifference" to an inmate's "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

An inmate's vulnerability to suicide can represent a serious medical need. *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Specifically, a defendant violates an inmate's Eighth Amendment right when three conditions are satisfied: (1) the inmate was "particularly vulnerable to suicide," (2) the defendant "knew or should have known" of the

inmate's vulnerability, and (3) the defendant acted with "reckless or deliberate indifference" toward that vulnerability. *Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017).[2]

Here, Plaintiff has come forward with ample evidence that Mr. Freitag was particularly vulnerable to suicide. An inmate is particularly vulnerable to suicide when there is a "strong likelihood, rather than a mere possibility," that he will harm himself. *Palakovic*, 854 F.3d at 222 (internal quotation marks omitted). An inmate's "strong likelihood" of suicide must be "so obvious" that "a lay person would easily recognize the necessity for preventative action." *Id.* (internal quotation marks omitted). An inmate's particular vulnerability to suicide must be evaluated on the "totality of the facts presented." *Id.* at 230.

Mr. Freitag had attempted suicide three times in the year preceding his incarceration. He also had a history of depression and anxiety. He had never been incarcerated before, was anxious about his sentencing, and ultimately received a sentence that was far more severe than he had anticipated. Indeed, when Mr. Freitag first entered BCCF, he was placed on Level 2 watch specifically because he presented a significant risk of attempting suicide, and Defendant PrimeCare's mental health supervisor subsequently instructed all mental health staff to "keep a close eye on" Mr. Freitag as his sentencing approached because of his risk of attempting suicide. Cassidy Email, JA 44. And crediting Plaintiff's evidence, as the Court must at this stage of the litigation, it appears that multiple lay people *did* recognize the Mr. Freitag's suicide risk and the

---

[2] Inmate suicides that occur in state prisons before an individual is sentenced are evaluated under the Fourteenth Amendment's Due Process Clause, whereas inmate suicides that occur after an individual has been sentenced are evaluated under the Eighth Amendment. *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 319 n.5 (3d Cir. 2005). But the Third Circuit has not yet identified any difference between the substantive standards that apply under either provision and has instead generally treated prison suicide claims under the Eighth and Fourteenth Amendment as "essentially equivalent." *Palakovic v. Wetzel*, 854 F.3d 209, 223–24 (3d Cir. 2017). Accordingly, the Court will draw from Eighth and Fourteenth Amendment precedents interchangeably.

need for preventive measures. R. Freitag Dep. 42:10–24, SA 1096; Hyers Dep. 26:16-28:3, SA 1292-1294; Miller Dep. 21:2–15, SA 1298. This is ample evidence for a reasonable jury to conclude that Plaintiff was, in fact, particularly vulnerable to suicide.

Defendants resist this conclusion by arguing that Mr. Freitag could not have been particularly vulnerable to suicide because he consistently denied having suicidal thoughts. But Mr. Freitag's denials of suicidality do not establish as a matter of law that he was not particularly vulnerable to suicide. To the contrary, Plaintiff has produced testimony from PrimeCare's mental health supervisor that people who are suicidal often do not announce their suicidality or disclose their suicidal thoughts during mental health inquiries. Cassidy Dep. 90:13–91:16, SA 1190–91.

Mr. Freitag's objective vulnerability to suicide is not a difficult issue in this case. The more difficult issue is whether the defendants had the subjective state of mind required to violate the Eighth Amendment—specifically, whether each defendant *knew* of Mr. Freitag's vulnerability and was *deliberately indifferent* toward it.

### i. The Corrections Officers: Defendants Young and Moody

The Court finds that Plaintiff has not produced sufficient evidence for a reasonable jury to conclude that Defendants Young and Moody were subjectively aware of Mr. Freitag's particular vulnerability to suicide. Accordingly, the Court must grant Defendant Young's and Defendant Moody's motions for summary judgment.

A defendant violates an inmate's Eighth Amendment right only if the defendant "knew or should have known" of the inmate's particular vulnerability to suicide. *Palakovic*, 854 F.3d at 231. This requirement focuses entirely on the defendant's subjective knowledge. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (finding a subjective approach "comports best with the text of the [Eighth] Amendment"). To satisfy this requirement, the defendant must both "be aware of

11

facts from which the inference could be drawn" and "draw the inference" that "a *substantial risk* of serious harm exists." *Farmer*, 511 U.S. at 837 (emphasis added).

The facts of *Colburn* shed light on how much knowledge a custodial defendant must have of an inmate's suicide risk before his subjective knowledge reaches the standard required to violate the Eighth Amendment.[3] In *Colburn*, the plaintiff had produced evidence suggesting the defendant knew that the inmate was intoxicated, that she had recently had an argument with her boyfriend, that she had tried to ingest three pills during her time in custody that day, and that a bullet had also been found and removed from the inmate's pocket while she was in custody that same day. 946 F.2d at 1026. There was also evidence that the inmate had observable scarring on her lower forearm indicating a previous suicide attempt. *Id.* But there was no evidence indicating the defendant knew that the inmate had previously been diagnosed with a "mental illness characterized by a high risk of self-inflicted harm" or that the defendant was aware of anything else in the inmate's past "suggesting that she had a particular vulnerability to suicide." *Id.*

In *Colburn*, the inmate ultimately used a gun that she had secreted into custody to commit suicide. 946 F.2d at 1021. But the Third Circuit concluded that, on the summary judgment record described in the preceding paragraph, there was not enough evidence for a reasonable jury to conclude that the defendant subjectively knew of the inmate's particular vulnerability to suicide. *Id.* at 1027.

Here, Plaintiff has produced only circumstantial evidence suggesting that Defendants Young and Moody knew about Mr. Freitag's particular vulnerability to suicide. Plaintiff's primary evidence is that Defendants Young and Moody knew Mr. Freitag was on Level 3 watch.

---

[3] *Colburn* is a Fourteenth Amendment Due Process case rather than an Eighth Amendment case. But, as discussed in footnote 2 above, the Third Circuit generally treats the standards applied to prison suicides under the Fourteenth and Eighth Amendments as equivalent.

Plaintiff also notes that Defendant Young was assigned to Mr. Freitag's prison unit for at least two months preceding Mr. Freitag's suicide, a time during which Mr. Freitag had been placed on Level 3 watch, had been sent to meet with mental health providers numerous times, and had observable scars on his arms. Plaintiff also points to evidence that Defendants Young and Moody knew Mr. Freitag had just returned from court and that risk of self-harm is higher after critical events like court appearances and sentencings.

But this evidence is insufficient to support a reasonable conclusion that Defendants Young or Moody were subjectively aware of Mr. Freitag's particular vulnerability to self-harm.

First, Defendants Young and Moody's awareness that Mr. Freitag was on Level 3 watch does little to support an inference that they knew he was particularly vulnerable to self-harm. Level 3 watch is the least protective form of watch under BCCF's policies and is specifically described in those policies as inappropriate for inmates presenting a risk of suicide. Bucks County Department of Corrections Standard Operating Procedures and Guidelines, JA 39 ("[Level 3 watch] does not meet criteria for suicide precaution."); *see also* Mahoney Dep. 123:6–124:17, SA 1053–54. Level 3 watch specifically permits an inmate to be placed in a general population unit rather than a mental health unit, does not require constant observation, and does not restrict the items an inmate may keep in his cell. And there is no evidence that Defendants Young or Moody's previous experiences with suicide prevention protocols would cause them to believe inmates on Level 3 watch in their general population unit were at risk of committing suicide. Young Dep. 41:7–24 ("Majority of the time on Bravo we never had anyone on a suicide watch. Suicide watch in this jail is normally the restricted housing unit, the mental health unit, and other designated units.").

Second, there is no evidence that Defendants Young and Moody knew about Mr. Freitag's history of suicide attempts or mental health diagnoses. Plaintiff argues a reasonable jury could infer that Defendants Young and Moody became aware of Mr. Freitag's mental health and suicide history from the fact that they had supervised Mr. Freitag at other points during his incarceration. But Plaintiff has not produced any evidence clarifying how often Defendant Moody had supervised Mr. Freitag prior to the day of Mr. Freitag's suicide, and the evidence the Court has found suggests Defendant Moody was not often assigned to Mr. Freitag's unit. Moody Dep. 82:19–24, SA 839 ("I was hardly ever down there.").

And while Defendant Young was assigned to Mr. Freitag's unit for the two months preceding Mr. Freitag's suicide, Mr. Freitag was only one of the ninety-two inmates under Defendant Young's supervision. Young Dep. 20:8–15, SA 858. Plaintiff has not produced any evidence that Defendant Young had any interactions with Mr. Freitag prior to Mr. Freitag's suicide. And while Defendant Young may have been aware that Mr. Freitag had been placed on Level 3 watch previously and was frequently meeting with mental health staff, there is no evidence that Defendant Young knew *why* Mr. Freitag was placed on Level 3 watch or frequently meeting with mental health staff. Further, Mr. Freitag was never placed on Level 2 watch during the months he spent under Defendant Young's supervision, so Defendant Young never would have seen Mr. Freitag being classified as presenting an acute suicide risk. While it is theoretically possible that Defendants Young and Moody learned of Mr. Freitag's mental health and suicide history during their time supervising him prior to his suicide, a jury would have to venture beyond inference and into the realm of speculation to reach such a conclusion based on the record before this Court.

The remainder of Plaintiff's evidence provides little additional support for an inference that Defendants Young and Moody knew of Mr. Freitag's vulnerability to suicide. Defendants Young and Moody may have been aware that Mr. Freitag had just returned from a court proceeding, but there is no evidence they were aware of the sentence Mr. Freitag received or that the sentence greatly exceeded Mr. Freitag's expectation. And even assuming Defendants Young and Moody observed the scarring on Mr. Freitag's arms, this scarring would be insufficient to put them on notice of Mr. Freitag's present suicidality, just as observable scarring was inadequate to put the defendant on notice in *Colburn*.

In sum, construing all Plaintiff's evidence in the light most favorable to Plaintiff yields the following picture. On the morning following Mr. Freitag's sentencing, Defendants Young and Moody knew that Mr. Freitag had been identified as an inmate who needed further observation. They knew he had just returned from court and that inmates generally have a higher risk of self-harm when they return from court. They knew, from the scars on Mr. Freitag's arms, that Mr. Freitag may have attempted suicide at some previous point. And Defendant Young additionally knew that Mr. Freitag had been identified for further observation before and had frequently met with mental health providers but had otherwise caused no issues requiring Defendant Young's attention.

Like the defendant in *Colburn*, Defendants Young and Moody did not know of Mr. Freitag's mental health diagnoses or have information about his previous suicide attempts beyond the information they could infer from the scars on his arms. And unlike the defendant in *Colburn*, who had found two means of committing suicide on the inmate, Defendants Young and Moody did not observe anything in Mr. Freitag's cell or on his person indicating that he had the intent and ability to commit self-harm.

15

Quite simply, Defendants Young and Moody had less reason to know of Mr. Freitag's vulnerability to suicide than the defendant in *Colburn* had to know about his inmate's vulnerability to suicide. Just as in *Colburn*, then, no reasonable jury could conclude that Defendants Young and Moody knew of Mr. Freitag's vulnerability to suicide.

> ii. **The Individual Healthcare Providers: Defendants Mahoney and Penge**

The Court also finds that no reasonable jury could conclude that Defendants Mahoney or Penge exhibited deliberate indifference towards Mr. Freitag's particular vulnerability to suicide.

The deliberate indifference standard requires a more culpable state of mind than negligence. *Farmer*, 511 U.S. at 835; *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). A plaintiff must come forward with evidence supporting more than a "mere disagreement" about an inmate's "proper medical treatment" to prove deliberate indifference. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987) (internal citations omitted).

Plaintiff's evidence might suggest, at most, that Defendants Mahoney or Penge were negligent in their treatment of Mr. Freitag, but such evidence cannot meet the deliberate indifference standard. The record before this Court indicates that Defendants Mahoney and Penge met with Mr. Freitag regularly throughout his incarceration—along with their fellow staff members, Defendants Mahoney and Penge met with Mr. Freitag a total of nineteen times over just three months. At no point during this time did Defendant Mahoney or Penge decline or cut short a meeting with Mr. Freitag. Plaintiff is correct that extensive medical encounters do not preclude a finding of deliberate indifference. *Cf. Carlos v. York Cnty.*, 2019 WL 6699710, at *20–*21 (M.D. Pa. Dec. 9, 2019). But such extensive medical counters certainly make it more

difficult for a reasonable jury to infer deliberate indifference. *Cf. Glazewski v. Corzine*, 385 F. App'x 83, 87 (3d Cir. 2010).

Further, Defendant Mahoney's and Defendant Penge's responses to Mr. Freitag's evaluations were not so discordant with the information they received so as to support an inference of deliberate indifference. In each of Mr. Freitag's interactions with Defendants Mahoney and Penge, Mr. Freitag denied having suicidal thoughts. And while Mr. Freitag expressed anxiety about his sentencing, Defendants Mahoney and Penge did in fact respond to that anxiety. Defendant Mahoney scheduled Mr. Freitag for the soonest follow-up evaluation available under PrimeCare's scheduling policies, and Defendant Penge informed Mr. Freitag about how he could access medical services between his sentencing and that appointment. Penge Dep. 230:3–11, SA 1285.

Plaintiff insists that Defendants Mahoney and Penge exhibited deliberate indifference to the fact that Mr. Freitag had deluded himself into believing he would be released from prison on probation. The critical problem with this argument, however, is that there is no evidence that Defendants Mahoney and Penge knew Mr. Freitag's sentencing expectations were unreasonable. There is no evidence that Defendants Mahoney or Penge have legal training. And the evidence that does exist suggests the only information to which these defendants were privy indicated Mr. Freitag would indeed be released on probation. Mahoney Dep. 196:9–17, SA 1073 ("[E]verything that I had been told . . . it was as set in stone as it can be when you go to court that he was going to have probation and be released"); Penge Dep. 230:19–232:10, SA 1285–87 ("[Mr. Freitag] reported talking to his lawyer and that he was going to get on probation, and . . . I didn't have any inkling to the contrary.").

Mr. Freitag's sentencing expectation may indeed have been unrealistic, and this unrealistic expectation may indeed have increased Mr. Freitag's risk of suicide. But absent evidence that Defendants Mahoney and Penge had reason to know Mr. Freitag's sentencing expectation was unrealistic, no reasonable jury could infer that Defendants Mahoney and Penge were aware of Mr. Freitag's elevated risk, much less that they were deliberately indifferent to it.

Plaintiff also argues that Defendant Mahoney exhibited deliberate indifference toward Mr. Freitag's vulnerability to suicide by scheduling his post-sentencing follow up evaluation three days after his sentencing despite knowing that Mr. Freitag was anxious about his sentencing and that sentencings are critical events for vulnerable inmates. The problem with this argument is that PrimeCare has conceded that Defendant Mahoney scheduled Mr. Freitag's post-sentencing evaluation three days after Mr. Freitag's sentencing because she was left no other choice by PrimeCare's scheduling policy. While this scheduling policy might have itself exhibited a deliberate indifference to the mental health needs of vulnerable inmates, as discussed below, no reasonable jury could impute this this indifference to an employee who was simply following company protocol.

Plaintiff also argues that Defendant Penge exhibited deliberate indifference to Mr. Freitag's vulnerability to suicide by removing him from Level 3 watch shortly before his sentencing. To support this argument, Plaintiff points to evidence that some clinical indicators—such as Mr. Freitag's insight, judgment, and sentencing-related anxiety—would have militated toward keeping Mr. Freitag on watch and that the mental health supervisor for BCCF would have taken a different approach. At best, however, this evidence indicates a disagreement among medical professionals about the appropriate course of care. While such evidence could support a

18

claim for malpractice, it cannot support a claim under the Eighth Amendment for deliberate indifference. *Lanzaro*, 834 F.2d at 346.

No reasonable jury could conclude that Defendants Mahoney and Penge exhibited a deliberate indifference to Mr. Freitag's particular vulnerability to suicide, so the Court must grant these defendants' motions for summary judgment on Plaintiff's § 1983 claims.

### iii.   The Entities: Defendants PrimeCare and Bucks County

Although the individual defendants in this case lacked the subjective state of mind necessary to be held liable under § 1983, a reasonable jury could still find that Defendants PrimeCare and Bucks County themselves, through their policies and customs, violated Mr. Freitag's Eighth Amendment right.[4]

A § 1983 claim may proceed against a municipal entity or its contractor in two distinct ways.

First, an entity will be held liable if it adopted a "policy or custom" that caused the constitutional violation at issue. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). The plaintiff must either identify a facially unconstitutional policy or custom or show that the facially lawful policy or custom was adopted with "deliberate indifference" to its "known or obvious consequences" for individuals' constitutional rights. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 407 (1997). A "policy" is a "final proclamation" announced by a "decisionmaker possessing final authority." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). A "custom" is "an act that has not been formally

---

[4] A § 1983 claim may proceed against a municipal entity or contractor even when all claims against the entities' employees have been dismissed. *See Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) ("The County, in this case, appears to push for a rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell*. This is an unreasonable extension of *Heller*.").

approved by an appropriate decisionmaker" but is "so widespread as to have the force of law." *Id.*

Alternatively, an entity will be held liable if it failed to supervise or discipline its employees in circumstances where such a failure exhibits a deliberate indifference to the likely violation of constitutional rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989); *Forrest v. Parry*, 930 F.3d 93, 105–06 (3d Cir. 2019). A plaintiff may prevail on a failure to supervise claim by showing that (1) an entity's policymakers knew its employees would confront a particular situation, that (2) employees have historically mishandled the situation, and that (3) an employee's mishandling of the situation will frequently cause deprivation of constitutional rights. *Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019).

Here, a reasonable jury could conclude that PrimeCare adopted a policy that exhibited a deliberate indifference to inmates' serious medical needs and that this policy caused a violation of Mr. Freitag's rights. PrimeCare concedes that it did not maintain mental health providers on-site after 4:00 p.m. on weekdays or at any time on weekends. PrimeCare Resp. PSOF ¶¶ 26, 63. And there is evidence that PrimeCare knew inmates usually would not return from their court appearances until 4:00 p.m. There is also evidence that mental health providers, including PrimeCare's employees, generally understand that an inmate's risk of self-harm increases around critical events like court appearances.

A reasonable jury could rely on this concession as well as these pieces of evidence to conclude that PrimeCare had a policy or custom of not scheduling in-person mental health evaluations after 4:00 p.m. on weekdays or at all on weekends; that an obvious consequence of this policy or custom was that vulnerable inmates would be denied access to mental healthcare for up to seventy-two hours when their need was most acute following a court appearance; and

that PrimeCare adopted this policy with deliberate indifference to its obvious consequence. *See Natale*, 318 F.3d at 585 (finding municipality's maintenance of a policy allowing even inmates with acute medical needs to go seventy-two hours without seeing a doctor—and, therefore, without receiving prescription medications—could exhibit a deliberate indifference to inmates' serious medical needs).

A reasonable jury could also conclude that PrimeCare's scheduling policy caused the violation of Mr. Freitag's Eighth Amendment right to receive adequate care for his serious medical needs. As discussed above, a reasonable jury could conclude that Mr. Freitag presented a particular vulnerability to suicide and, therefore, had a serious medical need. There is also evidence that Mr. Freitag was anxious about his sentencing, communicated that anxiety to PrimeCare's employees, and specifically asked to see a mental health provider following his sentencing because "he figured he would need somebody to talk to afterwards." Mahoney Dep. 175:11–20, SA 1069. But Mr. Freitag's appointment was not scheduled until almost seventy-two hours after his sentencing seemingly only because of PrimeCare's scheduling policy. And there is evidence that, had Mr. Freitag seen a mental health professional following his sentencing, he would have been placed on a higher level of suicide watch, which would have significantly reduced his ability to commit suicide. Cassidy Dep. 160:7-20, 162:11-23, SA 1241-42; Perrien Expert Report, JA 248. Based on this evidence, a reasonable jury could conclude that PrimeCare's scheduling policy caused the violation of Mr. Freitag's Eighth Amendment right.

Were a jury to make these findings, Plaintiff would be entitled to judgment in his favor on his § 1983 claim against PrimeCare. Accordingly, the Court cannot grant PrimeCare's motion for summary judgment.

PrimeCare resists this conclusion by arguing that its mental healthcare providers were available by phone at all times even when they were not on site. To be sure, a jury might credit this evidence and agree with PrimeCare that the on-call availability of mental health providers made up for their absence on-site and prevents a finding of deliberate indifference. But there is also evidence in the record that a reasonable jury could rely on to disagree with PrimeCare. Indeed, there is evidence that the decision to call a mental health provider after hours was left to correctional staff who had little to no training in identifying suicide risk factors. Cassidy Dep. 89:24-90:7, 97:3-8 SA 1189-91, 1193; Scordellis Dep. 54:7-15, 56:4-14, SA 1088-89. There is also evidence that identifying suicide risk is difficult for non-mental health professionals. A reasonable jury could rely on this evidence to conclude that PrimeCare's staff were available after hours in theory only rather than in practice. Only a jury can resolve this dispute of fact, so the Court cannot enter summary judgment.[5]

A reasonable jury could also conclude that Bucks County either adopted a custom of relying on inmate monitors who were not fulfilling their duties or failed to supervise those inmate monitors. There is evidence that inmate monitors regularly failed to fulfil their monitoring duties and that corrections officers were too overburdened to properly supervise them. NCCHC Records, JA 68; Reed Dep. 12:21–13:20, 32:3–33:25, SA 1133–34, 1139–40; Budd Dep. 36:14–21, 42:8–14, SA 1176–77; Nottingham Dep. 1, 65:25–66:1, 67:16–22, SA 932–34; Bochenek Dep. 56:12–57:5, SA 1167–68; *see also* Reed Dep. 37:14–38:14, SA 1143–44 ("I don't believe there was any follow through from Administration to confirm that everybody

---

[5] PrimeCare suggests that a denial of its motion for summary judgment amounts to a holding that the Eighth Amendment requires prisons to maintain mental healthcare providers on-site 24/7. But the Court disagrees. The Court holds only that a prison or its contractor could violate the Eighth Amendment by delaying mental health evaluations for inmates acutely vulnerable to self-harm by almost seventy-two hours for purely non-medical reasons. Whether PrimeCare's policy in fact had that effect will be a question for the jury to decide.

is following rules and regulations of the facility."). There is also evidence that Bucks County was aware of this problem. NCCHC Records, JA 68. Indeed, Defendant Young has suggested that inmate monitors' unreliability was entirely predictable given how little they were paid and the nature of their assignment. Young Dep. 44:15–45:15, SA 870–71.

A jury could use this evidence to conclude that that BCCF had a custom of relying on inmate monitors to conduct observations of inmates with particular vulnerability to suicide even though those inmate monitors were known not to be completing those observations. Such a custom—if a jury found it to exist—could be held to exhibit a deliberate indifference to its obvious consequences for inmates' rights. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 329 (3d Cir. 2014) (holding that incarcerated persons have the "right to the proper implementation of adequate suicide prevention protocols"), *cert. granted, judgment rev'd sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015) (reversing only on the ground that this right was not clearly established at the time of the underlying incident).

Alternatively, a jury could rely on the same facts to conclude that Bucks County unconstitutionally failed to supervise inmate monitors in their duties. By paying inmate monitors to keep watch over inmates who presented a risk of self-harm, Bucks County made inmate monitors directly responsible for safeguarding their fellow inmates' constitutional rights. There is evidence, however, that Bucks County was aware since at least 2016 that inmate monitors often failed to fulfil their monitoring duties. NCCHC Records, JA 68. And an obvious, if not inevitable, consequence of inmate monitors failing to conduct their observations is that inmates particularly vulnerable to self-harm will have their Eighth Amendment right violated. There is also evidence that BCCF still fails to supervise its inmate monitors—indeed, Defendant Young has testified that he has never been confronted by a supervisor about inmate monitors failing to

23

fulfil their duties on Defendant Young's shift. Young Dep. 49:14–50:3, SA 875–76. A reasonable jury could rely on this evidence and these inferences to conclude that Bucks County failed to supervise inmate monitors in a manner that exhibited a deliberate indifference to inmates' Eighth Amendment right.

If a jury concludes Bucks County had a custom of using unreliable inmate monitors or failed to supervise those inmate monitors, it could also reasonably conclude that Bucks County's inadequate inmate monitor program caused the violation of Mr. Freitag's Eighth Amendment right. Under BCCF's policies, Mr. Freitag should have been observed by an inmate monitor at least every fifteen minutes. But the inmate monitor assigned to Mr. Freitag did not observe him every fifteen minutes on the day of his suicide—in fact, the inmate monitor observed Mr. Freitag only twice over a nearly five-hour period. Specifically, at least thirty-three minutes elapsed between the last time Mr. Freitag was viewed and when he was discovered in a pool of blood. Had the inmate monitor on duty strictly complied with his watch duties, he would have discovered Mr. Freitag about half-way into this period. According to Plaintiff's expert, Mr. Freitag likely would have still been in the act of committing suicide at that point and still could have been resuscitated.

A reasonable jury could rely on this evidence to conclude that Bucks County's inadequate inmate monitoring program caused the violation of Mr. Freitag's Eighth Amendment right to be protected from his particular vulnerability to suicide by the proper implementation of adequate suicide prevention protocols. Accordingly, the Court cannot grant Bucks County's motion for summary judgment.

### b. Medical Malpractice Claims

PrimeCare and its employees do not attack Plaintiff's medical malpractice claims on the merits. Instead, they ask the Court to decline supplemental jurisdiction over those claims. However, since a § 1983 claim will proceed against PrimeCare, and since the trial of this § 1983 claim will cover very similar if not identical testimony and evidence as a trial of the medical malpractice claims would, the Court will retain supplemental jurisdiction over the medical malpractice claims. *See* 28 U.S.C. § 1367(a) (providing district courts with supplemental jurisdiction over all "claims that are so related to claims within" the court's "original jurisdiction that they form part of the same case or controversy" including "claims that involve . . . additional parties."); *Rosado v. Wyman*, 397 U.S. 397, 405 (1970) ("We are not willing to defeat the commonsense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.").

## V.     CONCLUSION

Plaintiff has failed to produce sufficient evidence to support a genuine dispute of fact as to whether Defendants Young and Moody knew of Mr. Freitag's particular vulnerability to suicide, so the Court must grant those defendants' motions for summary judgment on Plaintiff's § 1983 claims. Plaintiff has also failed to produce sufficient evidence to support a genuine dispute of fact as to whether Defendants Mahoney and Penge acted with deliberate indifference to Mr. Freitag's particular vulnerability to suicide, so the Court must grant those defendants' motions for summary judgment on Plaintiff's § 1983 claims.

Plaintiff has, however, produced evidence from which a reasonable jury could conclude PrimeCare adopted a scheduling policy that delayed suicidal inmates' access to mental health

professionals by almost seventy-two hours for non-medical reasons and that this policy caused a violation of Mr. Freitag's Eighth Amendment right. Plaintiff has also produced evidence from which a reasonable jury could conclude Bucks County either had a custom of employing inmate monitors to conduct suicide watches despite knowing that these inmate monitors often shirked their duties or that Bucks County failed to properly supervise these inmate monitors. A reasonable jury could also conclude that Bucks County's custom of relying upon or failure to supervise these inmate monitors caused the violation of Mr. Freitag's Eighth Amendment right. Accordingly, the Court cannot grant Defendant PrimeCare or Defendant Bucks County's motion for summary judgment.

Since a § 1983 claim will proceed against Defendant PrimeCare that will involve substantially overlapping evidence and testimony as malpractice claims against Defendants Mahoney and Penge would involve, the Court will retain supplemental jurisdiction over Plaintiff's malpractice claims against Defendants Mahoney and Penge.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge